# Exhibit F



2 of 3 DOCUMENTS

**JOHN JOVANOVICH and JOVANOVICH SUPPLY CO., INC., a Washington corporation, Plaintiffs, v. REDDEN MARINE SUPPLY, INC., Defendant.**

**CASE NO. C10-924-RSM**

**UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF WASHINGTON**

*2011 U.S. Dist. LEXIS 103117*

**September 13, 2011, Decided
September 13, 2011, Filed**

**SUBSEQUENT HISTORY:** Motion granted by, in part, Motion denied by, in part *Jovanovich v. Redden Marine Supply, Inc., 2011 U.S. Dist. LEXIS 110020 (W.D. Wash., Sept. 26, 2011)*

**PRIOR HISTORY:** *Jovanovich v. Redden Marine Supply, Inc., 2011 U.S. Dist. LEXIS 139234 (W.D. Wash., June 6, 2011)*

**COUNSEL:** [*1] For John Jovanovich, an individual, Jovanovich Supply Co., Inc., a Washington corporation, Plaintiffs, Counter Defendants: Brian G Bodine, Paul Douglas Swanson, LEAD ATTORNEYS, Tiffany Hallen Scott, LANE POWELL PC (SEA), SEATTLE, WA.

For Redden Marine Supply, Inc., a Washington corporation, Defendant: Benjamin J Byer, Maya Yamazaki, Stuart R. Dunwoody, DAVIS WRIGHT TREMAINE (SEA), SEATTLE, WA.

For Redden Marine Supply, Inc., a Washington corporation, Counter Claimant: Benjamin J Byer, LAW OFFICES OF ALAN S. MIDDLETON, SHORELINE, WA; Maya Yamazaki, Stuart R. Dunwoody, DAVIS WRIGHT TREMAINE (SEA), SEATTLE, WA.

**JUDGES:** RICARDO S. MARTINEZ, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** RICARDO S. MARTINEZ

**OPINION**

ORDER GRANTING PLAINTIFF'S MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 41(a)(2)

**I. INTRODUCTION**

This matter comes before the Court upon Plaintiffs' Motion for Voluntary Dismissal Pursuant to *Fed. R. Civ. P. 41(a)(2)* and For an Order Terminating Remaining Discovery Proceedings (Dkt. # 55). For the reasons set forth below, Plaintiffs' motion is GRANTED in part and DENIED in part.

**II. DISCUSSION**

**A. Background**

The patent at issue is *U.S. Patent No. 5,819,464* (the "*'464 patent*"), entitled "Condition-adaptable colored fishing [*2] net." The patent describes a fishing net comprised of a single, large net panel of a color capable of blending in water in certain lighting and water conditions and, created on that net panel, different size

2011 U.S. Dist. LEXIS 103117, *2

and shape areas of different colors, also capable of blending in water in certain lighting and water conditions. *'464 Patent*, 1:58-68. On June 4, 2010, plaintiffs filed a complaint alleging that defendant was importing, offering to sell, and selling condition-adaptable, colored fishing nets manufactured and distributed by Osada Fishing Net Co., Ltd. and by Nagaura Net Co., Inc. that infringed one or more claims of the *'464 patent*. Dkt. # 1. Defendant counterclaimed seeking declaratory judgments of invalidity and noninfringement and asserting a claim for false marking under *35 U.S.C. § 292*. Dkt. # 10.

On April 28, 2011, defendant moved to amend its answer to withdraw the counterclaim alleging false marking and to assert a new claim of inequitable conduct. To support its allegation of inequitable conduct, defendant alleged that "material prior art was withheld that contradicted statements that plaintiff John Jovanovich and his attorney made to the Patent Office". Dkt. # 28. The Court [*3] granted defendant's leave to amend. Dkt. # 42. Defendant filed its amended answer, asserting counterclaims for declaratory judgments of invalidity, noninfringement, and inequitable conduct shortly thereafter. Dkt. # 43. On May 27, 2011, the Court held a Markman Hearing on disputed claim terms. The Court issued its order on claim construction on June 7, 2011. Dkt. # 47.

Now before the Court is plaintiffs' motion to dismiss all claims and counterclaims in the present action. Plaintiffs assert that, "[b]ased on the Court's Order on Claim Construction... plaintiffs hereby irrevocably and unconditionally covenant not to sue defendant for infringement of any claim of the *'464 patent* based upon any colored fishing net products currently or previously manufactured, used, sold, offered for sale, or imported into the United States by defendant." Dkt. # 55, p. 1. Plaintiffs seek dismissal of all of its claims with prejudice; dismissal of defendant's counterclaims without prejudice; and an order terminating all discovery proceedings. Plaintiffs argue that the covenant not to sue together with the dismissal of its claims divest the Court of subject matter jurisdiction over defendant's declaratory [*4] judgment counterclaims.

Defendant does not oppose dismissal of plaintiffs' claims and agrees that the Court no longer has jurisdiction over its declaratory judgment counterclaims for noninfringement and invalidity. However, defendant argues that it may still pursue a claim for attorneys fees

pursuant to *35 U.S.C. § 285* and, because that claim is predicated on an argument of inequitable conduct, the Court retains jurisdiction over its declaratory judgment claim of unenforceability.

**B. Analysis**

A federal district court may exercise subject matter jurisdiction over a declaratory judgment action only where there is "a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Preiser v. Newkirk, 422 U.S. 395, 401, 95 S. Ct. 2330, 45 L. Ed. 2d 272 (1975)*. "Without an underlying legal cause of action, any adverse economic interest that the declaratory plaintiff may have against the declaratory defendant is not a legally cognizable interest sufficient to confer declaratory judgment jurisdiction." *Benitec Australia, Ltd. v. Nucleonics, Inc., 495 F.3d 1340, 1344 (Fed. Cir. 2007)* (quoting *Microchip Tech. Inc. v. Chamberlain Group, Inc., 441 F.3d 936, 943 (Fed.Cir.2006))*. [*5] Accordingly, as the parties here concede, plaintiffs' dismissal of all claims against defendant and covenant not to sue on the *'464 patent* with respect to any of defendant's current or previously manufactured products deprives this court of jurisdiction over defendant's counterclaims for declaratory relief as to invalidity and noninfringement. Nonetheless, at issue here is whether defendant's counterclaim for attorney's fees under *35 U.S.C. § 285*, as it is predicated on an allegation of inequitable conduct, vests the Court with jurisdiction to consider defendant's counterclaim for a declaratory judgment of unenforceability.

Addressing this very issue, the Federal Circuit has held that, even where a district court no longer retains jurisdiction with respect to "patent-related counterclaims," *35 U.S.C. § 285* serves as an independent basis for the exercise of jurisdiction over a claim for attorneys fees:

> While the covenant [not to sue for infringement] may have eliminated the case or controversy pled in the patent-related counterclaims and deprived the district court of Article III jurisdiction with respect to those counterclaims, the covenant does not deprive the district court of jurisdiction [*6] to determine the disposition of ... the request for attorney

fees under *35 U.S.C. § 285*.

*Monsanto Co. v. Bayer Bioscience N.V., 514 F.3d 1229, 1242 (9th Cir. 2008)* (quoting *Highway Equip. Co. v. FECO, Ltd., 469 F.3d 1027, 1033 n. 1 (Fed.Cir.2006)).* Furthermore, "jurisdiction to decide whether a patent was obtained through inequitable conduct necessarily includes the jurisdiction to declare a patent unenforceable as a result of that inequitable conduct." *Id. at 1243*. The precedent leaves the Court with little doubt that it has jurisdiction under *§ 285* to consider defendant's allegations of inequitable conduct as to the withdrawn patents.

Plaintiff attempts to distinguish *Monsanto* from the present controversy on the basis that this matter has yet to proceed to trial or even summary judgment. However, this argument misses the mark. A line of cases beginning with *Super Sack Mfg. Corp. v. Chase Packaging Corp.* established a general rule that subject matter jurisdiction in a district court ends for declaratory judgment counterclaims when a plaintiff enters a dismissal based on a covenant not to sue. *See Super Sack Mfg. Corp. v. Chase Packaging Corp., 57 F.3d 1054, 1060 (Fed. Cir. 1995); see* **[*7]** *also Intellectual Prop. Dev., Inc. v. TCI Cablevision of Cal., Inc., 248 F.3d 1333, 1342 (Fed. Cir. 2001).* A series of cases then established exceptions to this rule. For example, an exception may exist where the covenant not to sue is not broad enough to cover all of defendant's products that exist at the time of the covenant and therefore will not eliminate the "actual controversy" between the parties. *See e.g., Amana Refrigeration, Inc. v. Quadlux, Inc., 172 F.3d 852, 855 (Fed.Cir.1999); Revolution Eyewear, Inc. v. Aspex Eyewear, Inc., 556 F.3d 1294, 1298 (Fed. Cir. 2009).* Another exception, relevant to plaintiffs' argument in the instant matter, is the exception for a covenant not to sue that is entered after the court has entered a judgment of noninfringement. *See Fort James Corp. v. Solo Cup Co., 412 F.3d 1340 (Fed. Cir. 2005).* In *Fort James*, the Federal Circuit held that, where a covenant not to sue was entered-post verdict, the covenant "had no effect on Fort James's claim for infringement, because that controversy had already been resolved by the jury's verdict." *Id. at 1348*.

The exception articulated in *Fort James* is inapposite to the dispute before the Court. *Fort James* articulates **[*8]** an exception to the rule that a court cannot retain jurisdiction over declaratory judgment counterclaims once the patent-holder has entered a sufficiently broad

covenant not to sue. *Fort James* does not address whether a court has an *independent basis* for exercising jurisdiction when a claim is brought under *35 U.S.C. § 285*. This very different question is addressed by *Monsanto*, in which the Federal Circuit unequivocally states that such an independent basis for jurisdiction in fact exists. *See Monsanto, 514 F.3d at 1242*.

While the Court retains jurisdiction to consider defendant's request for attorney's fees under *§ 285*, the question remains whether the Court should retain jurisdiction over defendant's counterclaim for a declaratory judgment of unenforceability or whether the Court should dismiss this counterclaim and consider defendant's allegations of inequitable conduct in the context of a motion for attorneys fees. District courts seem to be split on this issue. In *Gordon-Darby Systems, Inc. v. Applus Technologies, Inc.*, the district court saw "no basis for retaining jurisdiction over a declaratory judgment claim for unenforceability after a covenant not to sue has been filed and **[*9]** agreed upon by the parties." *2010 U.S. Dist. LEXIS 135863, 2010 WL 5419068, at *2 (N.D. Ill. Dec. 23, 2010).* However, in light of *Monsanto*, it granted the defendant leave to move for fees and costs under *35 U.S.C. § 285* and stated that "we may progress to a theory of inequitable conduct (and therefore ultimately unenforceability) as required in that context, if that remains the Defendant's intention." *2010 U.S. Dist. LEXIS 135863, [WL] at *4.* On the other end of the spectrum, the Central District of California, also analyzing *Monsanto*, held that the "Defendant would be sorely mistaken" if it "[w]ere ...to assume that its covenants not to sue divested the Court of jurisdiction over plaintiff's claim for declaratory judgment of unenforceability." *U.S. Rubber Recycling, Inc. v. Encore International, Inc., 2011 U.S. Dist. LEXIS 11678, 2011 WL 311014, at *6 (C.D. Cal. Jan. 7, 2011).*

Indeed, the language in *Monsanto* is not clear as to the precise point of whether a district court retains jurisdiction over a counterclaim seeking a declaratory judgment of unenforceability when a defendant seeks attorneys fees under *§ 285* on the basis of inequitable conduct, or whether the court may determine whether inequitable conduct has occurred merely in the context of a *§ 285* motion. On the **[*10]** one hand, *Monsanto* suggests that the covenant divests the district court over *any* counterclaims seeking declaratory relief:

Even if filing such a covenant may

divest the court of jurisdiction over a declaratory judgment action regarding these patents ... under our precedent the district court retained independent jurisdiction over Monsanto's request for attorneys fees under *35 U.S.C. §285*.

*Monsanto, 514 F.3d at 1242* (emphasis added). *See also Gordon-Darby, 2010 U.S. Dist. LEXIS 135863, 2010 WL 5419068 at *2* ("The point here is that the *Monsanto* court was considering jurisdictional issues related to declaratory judgment claims of unenforceability, and plainly lumped them in with non-infringement and invalidity claims. The court understood unenforceability declarations as failing for jurisdiction right along with those other claims."). On the other hand, once a district count enters a finding of inequitable conduct, the patent is automatically rendered unenforceable. *See Kingsdown Medical Consultants, Ltd. v. Hollister Inc., 863 F.2d 867, 877 (Fed. Cir. 1988)* (en banc in pertinent part). To this end, *Monsanto* explicitly provides that a district court that retains jurisdiction only by way of a *§ 285* claim for attorneys **[*11]** fees retains jurisdiction to *declare* a patent unenforceable:

> [J]urisdiction to decide whether a patent was obtained through inequitable conduct necessarily includes the jurisdiction to declare a patent unenforceable as a result of that inequitable conduct.

*Monsanto, 514 F.3d at 1243* (emphasis added).

Ultimately, the Court finds the language of *Monsanto* best supports defendant's position as *Monsanto* explicitly provides that a district court has jurisdiction to "*declare* a patent unenforceable." Since any request for attorney's fees under *§ 285* that is predicated on allegations of inequitable conduct implicates the enforceability of plaintiff's patent, the Court retains jurisdiction over defendant's counterclaim for a declaratory judgment of unenforceability as to the *'464 patent*.

## III. CONCLUSION

Having considered the briefing, all exhibits and declarations attached thereto, and the remainder of the record, the Court hereby finds and ORDERS:

(1) Plaintiff's Motion for Voluntary Dismissal and for an Order Terminating Discovery (Dkt. # 55) is hereby GRANTED in part and DENIED in part.

(2) Plaintiff's claims are hereby DISMISSED WITH PREJUDICE.

(3) Defendant's counterclaims for a declaratory judgment **[*12]** that the *'464 patent* is invalid and for a declaratory judgment of noninfringement are hereby DISMISSED WITHOUT PREJUDICE. The Court does not dismiss defendant's counterclaim for a declaratory judgment that the patent in suit is unenforceable. The court does not dismiss defendant's claim for attorneys' fees under *35 U.S.C. § 285*.

(4) All discovery is terminated except as it relates to defendant's remaining claims.

(5) The Clerk is directed to forward a copy of this Order to all counsel of record.

Dated this 13 day of September 2011.

/s/ Ricardo S. Martinez

RICARDO S. MARTINEZ

UNITED STATES DISTRICT JUDGE

LEXSEE

**FREDERICK GOLDMAN, INC., Plaintiff. -v- TRENT WEST, TRENT WEST, INC., and TRENT WEST DESIGN, Defendants.**

**No. 06 Civ. 3413 (LTS) (RLE)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

**2007 U.S. Dist. LEXIS 50259**

**July 6, 2007, Decided**
**July 6, 2007, Filed**

**CORE TERMS:** patent, summons, matter jurisdiction, notice, patent infringement, good cause, declaration, tungsten, declaratory judgment action, infringement, deem, customers, retailer, jewelry, carbide, declaratory judgment, negotiations, captioned, supplier, proffer, intend, band, rings, substantial controversy, apprehension, prejudiced, encompass, lawsuit, modified, selling

**COUNSEL:** [*1] For Frederick Goldman, Inc., Plaintiff: Joel Nathan Bock, LEAD ATTORNEY, Martin P. Michael, Sonnenschein Nath & Rosenthal LLP (NY), New York, NY; Alexander J. Hadjis, Mark E. Wadrzyk, Sonnenschein Nath & Rosenthal LLP, Washington, DC.

For Trent West, Inc., Defendant: Edward Vincent King, Jr., LEAD ATTORNEY, King & Kelleher LLP, San Francisco, CA; Kevin N. Ainsworth, LEAD ATTORNEY, Mintz Levin Cohn Ferris Glovsky & Popeo, P.C. (NYC), New York, NY.

**JUDGES:** LAURA TAYLOR SWAIN, United States District Judge.

**OPINION BY:** LAURA TAYLOR SWAIN

**OPINION**

**MEMORANDUM ORDER**

Defendant Trent West, Inc. ("TWI") moves to dismiss for lack of subject matter jurisdiction the Amended Complaint in this declaratory judgment action

concerning the alleged invalidity, non-infringement, and unenforceability of certain patents. TWI argues principally that there is no case or controversy between Plaintiff Frederick Goldman, Inc. ("Goldman" or "Plaintiff") and TWI because the parties were in licensing negotiations before this action was filed and because TWI does not own the patents-in-suit. TWI also moves the Court to strike portions of the October 5, 2006, Declaration of Jonathan Goldman, and of Plaintiff's Opposition to TWI's motion to dismiss. [*2] Plaintiff moves the court to deem proper its August 31, 2006, service of the summons and complaint on Trent West ("Mr. West") and Trent West Design ("TWD"), or in the alternative, to extend its time under Federal Rule of Civil Procedure 4(m) to effect service on Mr. West and TWD.

The Court has carefully considered all of the parties' submissions and, for the following reasons, denies TWI's motion to dismiss the Amended Complaint and denies TWI's motion to strike. The Court denies Goldman's motion to deem the August 31, 2006, service on Mr. West and TWD proper, but extends the Rule 4(m) period to encompass the September 21, 2006, date on which the Amended Complaint and summons were served on those defendants.

BACKGROUND

In deciding these motions, the Court takes as true the following facts as alleged in the Amended Complaint, as well as certain uncontradicted evidentiary proffers.

Negotiations and Infringement Claims

Plaintiff is a corporation engaged in the production and sale of jewelry, including the sale of wedding bands and rings made primarily from tungsten carbide. (Am. Compl. P 9.) Defendant holds patents concerning tungsten carbide-based rings. (Id. P 10.) In or around October 2005, [*3] Defendant, through its officer and inventor, Mr. West, commenced negotiations with Goldman for the possible sale or merger of TWI. (Id. P 12.)

In or around April 2006, after several months of contentious negotiations failed to result in the formation of an agreement, Plaintiff began receiving inquires from many of its customers regarding the status of a lawsuit between Plaintiff and Mr. West. (Id. P 21.) Specifically, a letter received by one of Plaintiff's customers and signed "Trent West/CEO Trent West Inc.," is captioned "Notice of Potential Patent Infringement," and asserts that the writer "cannot tolerate infringements of my Intellectual Property (IP) by any retailer, manufacturer or end user" and that certain band rings "made out of a predominately tungsten carbide material" are "generally considered to be Patent infringed jewelry products." The letter further asserts that "[w]e intend to inform the public that certain jewelry retailers are selling bands that infringe these patents" and that various media outlets will be utilized in such a public information campaign. The letter bears an address line reading "Trent West Design, 41 Hangar Way, Watsonville, CA." (Jonathan Goldman [*4] Decl., Nov. 6, 2006, Ex. J.) Plaintiff is a major supplier of tungsten carbide rings, and received calls from several of its customers indicating that they had received the letter and inquiring about litigation and indemnification. (Id. PP 15-17.) On April 25, 2006, Goldman had received an email captioned "By Trent West Inc." that included that following statement: "I intend on aggressively enforcing my IP starting with a major supplier and then with low end internet retailers and then to retailers buying from unlicensed suppliers, etc." (Id. Ex. H) Like the letter to Goldman's customers, the emailed communication also included a "Trent West Design" address line. (Id.) In its papers in support of the instant motion, TWI asserts that Trent West Design is a "fictitious name" for TWI. (Trent West Decl. P 10.)

Believing that Defendant might bring a lawsuit against it for patent infringement, Plaintiff filed this declaratory judgment action on May 3, 2006. (Pl. Opp. to Def.'s Mot. to Dismiss 6.)

## Service of Complaint

Plaintiff's original request for a summons in this action inadvertently included only TWI, and omitted any references to Mr. West and TWD, although all three parties were named [*5] as defendants in the complaint. Plaintiff thereafter attempted to obtain a corrected summons that properly named Mr. West, TWI, and TWD, but proffers that it was unable to because the Clerk of Court would not issue corrected summonses until proof of service of the original summons was returned. (Joel N. Bock Decl., Nov. 5, 2006, P3.) According to Plaintiff's undisputed proffer, all three entities share the same California address, and Mr. West is an officer and principal of TWI. Plaintiff proffers that its process server made three attempts to serve the original complaint within the 120-day window, but that no party was willing to accept service on behalf of Mr. West, TWI, and TWD. (Id. P5); (John Fraser Decl. PP 2-3.) During the last attempt to serve Defendants on August 31, 2006, and after being told by Mr. West's receptionist that Mr. West was in the building but that he was unwilling to accept service, Plaintiff's process server left copies of the original complaint and summons on the door of Mr. West's office, and thereafter mailed copies to all three defendants. (John Fraser Decl. PP 2-3.)

On September 20, 2006, Plaintiff filed the Amended Complaint, which includes all of the [*6] material contents of the original complaint, and on September 21, 2006, served it on Mr. West, TWI, and TWD. The summonses for the Amended Complaint named Mr. West, TWD, and TWI as parties to the suit. (Joel N. Bock Decl., Nov. 5, 2006, PP 6-7.)

## DISCUSSION

### Defendant's Motion to Dismiss the Amended Complaint

#### Subject Matter Jurisdiction (Fed. R. Civ. P 12(b)(1))

A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it. Makarova v. U.S., 201 F.3d 110, 113 (2d Cir. 2000). "When considering a motion to dismiss pursuant to Rule 12(b)(1), the court must take all facts alleged in the complaint as true." Raila v. United States, 355 F.3d 118, 119 (2d Cir. 2004). Where the defendant challenges the factual basis for subject matter jurisdiction, a district court may refer to evidence outside

the pleadings. See Goodman v. Children's Television Workshop, No. 98 Civ. 8348, 1999 U.S. Dist. LEXIS 5518 at *8, 1999 WL 228396, at *2 (S.D.N.Y. Apr. 19, 1999). A plaintiff asserting subject matter jurisdiction, once challenged, has the burden of proving by a preponderance of the evidence that jurisdiction exists. Makarova, 201 F.3d at 113. [*7] Unlike a motion to dismiss under Rule 12(b)(6), a motion to dismiss for lack of subject matter jurisdiction is not directed to the claim's merits. See Nowak v. Ironworkers Local 6 Pension Fund, 81 F.3d 1182, 1188 (2d Cir. 1996); Vink v. Hendrikus Johannes Schijf Rolkan N.V., 839 F.2d 676, 677 (Fed. Cir. 1988).

Historically, to determine whether there was an actual controversy in declaratory judgment actions involving allegations of patent infringement, invalidity or unenforceability, the Federal Circuit applied a two-prong inquiry. The Federal Circuit's test required:

(1) an explicit threat or other action by the patentee, which creates a reasonable apprehension on the part of the declaratory plaintiff that it will face an infringement suit; and (2) present activity which could constitute infringement or concrete steps taken with the intent to conduct such activity.

Fina Research, S.A. v. Baroid Ltd., 141 F.3d 1479, 1481 (Fed. Cir. 1998).

Recent decisions of the Supreme Court and Federal Circuit have, however, changed the law with respect to the "reasonable apprehension" test, in effect lowering the bar for a plaintiff to bring a declaratory judgment action in a patent dispute. Finding [*8] a conflict between the "reasonable apprehension" test and its longstanding declaratory judgment standard, the Supreme Court held that, in determining whether a declaratory judgment is appropriate, "the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between the parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." MedImmune, Inc. v. Genentech, Inc., 127 S. Ct. 764, 771, 166 L. Ed. 2d 604 (2007), quoting Maryland Casualty Co. v. Pacific Coal & Oil Co., 312 U.S. 270, 273, 61 S. Ct. 510, 85 L. Ed. 826 (1941). In a March 2007 decision, the Federal Circuit acknowledged the

impact of MedImmune, and ruled that a company can bring a declaratory judgment action before facing an explicit threat of patent infringement litigation:

Where a patentee asserts rights under a patent based on certain identified ongoing or planned activity of another party, and where that party contends that it has the right to engage in the accused activity without license, an Article III case or controversy will arise and the party need not risk a suit for infringement by engaging in the identified activity before [*9] seeking a declaration of its legal rights.

SanDisk Corp. v. STMicroelectronics, Inc., 480 F.3d 1372, 2007 WL 881008, at *7 (Fed. Cir. Mar. 26, 2007); see also MedImmune, 127 S. Ct. at 777.

Here, based upon a review of the record, there can be no dispute that there is a substantial controversy between parties having adverse legal interests, that is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment. The April 26, 2006, letter received by one of Plaintiff's customers from TWI was captioned "Notice of Potential Patent Infringement" asserted that TWI "intend[s] to inform the public that certain jewelry retailers are selling bands that infringe [its] patents," and the April 25, 2006, email Goldman received from TWI, which was captioned "By Trent West Inc.," included the following statement: "I intend on aggressively enforcing my IP starting with a major supplier . . .." These communications are sufficient to frame the existence of an Article III case or controversy between TWI and Goldman. An objective reader of the email and the letters to Goldman's clients could readily conclude that there was substantial controversy between the parties since TWI was asserting [*10] that its patent rights were being infringed and Goldman, in selling the tungsten carbide products, was taking the position that it had the right to engage in the accused activity of production and sale of tungsten carbide jewelry without a license.

TWI further argues that the Court lacks subject matter jurisdiction and TWI is not a properly named defendant because TWI "does not own the patents." (Def. Mem. in Supp. of Mot. to Dismiss the Am. Compl. 6.) TWI also submits that TWD is not a properly named defendant because TWD is a fictitious name for TWI. (Id.

7.) Patent ownership is, of course, a key element of a cause of action putting in controversy the validity of a patent. Where the basis on which subject matter jurisdiction is challenged is also an element of the federal cause of action, however, courts properly "assume or find a sufficient basis for jurisdiction and reserve further scrutiny for an inquiry on the merits." Nowak, 81 F.3d at 1189. Dismissal pursuant to Rule 12(b)(1) generally is not appropriate except where the alleged federal question "clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or where such claim is wholly insubstantial [*11] and frivolous." Bell v. Hood, 327 U.S. 678, 682-83, 66 S. Ct. 773, 90 L. Ed. 939 (1946). Here, in light of the use of TWI's name in communications regarding the alleged patent infringement of the patent, the Court finds that the alleged federal question is far from insubstantial. Accordingly, the motion to dismiss the Amended Complaint for lack of subject matter jurisdiction is denied.

Compliance with Procedural Order

TWI also asserts that the action should be dismissed in light of Plaintiff's alleged failure to comply with various aspects of the Court's May 10, 2006, Initial Conference Order. The requisite joint preliminary pretrial statement has been prepared and the parties are properly engaged in discussions and trial preparation. The application to dismiss the Amended Complaint on this ground is denied.

Accordingly, TWI's motion to dismiss the Amended Complaint is denied in its entirety.

Defendant's Motion to Strike

TWI moves the Court to strike portions of the October 5, 2006, Declaration of Jonathan Goldman, and of Plaintiff's Opposition to TWI's motion to dismiss. [1] The Court has carefully considered all the parties' submissions, including the contents of the modified Declaration of Jonathan Goldman signed on [*12] November 6, 2006. TWI's motion to strike is denied. The modified Goldman Declaration alleviates any evidentiary concerns, and was substituted for the original Declaration of Jonathan Goldman, signed October 5, 2006, in connection with the Court's consideration of the dismissal and service extension application. Additionally, the modified recitation of facts from pages 7 through 9 of Goldman's Opposition to the Motion to Dismiss the

Amended Complaint was deemed substituted for the original recitation.

1   TWI violated Rule 2(B) of this Court's Individual Practices by filing this motion without first using its best efforts to resolve informally the matters in controversy. Specifically, TWI's notice of motion does not include the requisite certification of prior efforts to resolve informally or narrow the issues to be brought before the Court. Plaintiff represents in its papers that the first time it learned about TWI's motion to strike was at the October 23, 2006, Initial Pre-Trial Conference, which was one day prior to the filing of the motion, and that at no time prior to the filing of the motion did TWI's counsel attempt to resolve these issues with Plaintiff. TWI is hereby directed to [*13] comply with the Court's Individual Practices in connection with any future motion practice or requests for judicial intervention.

Plaintiff's Fed. R. Civ. P. 4(m) Motion

Plaintiff moves the Court to deem proper the August 31, 2006, service on Mr. West and TWD, or in the alternative, to extend its time to serve these defendants pursuant to Federal Rule of Civil Procedure 4(m). Mr. West and TWD oppose the motion and urge the Court to dismiss the complaint without prejudice, for failure to make timely service. See Fed. R. Civ. P. 4(m).

Rule 4(m) provides, in relevant part:

If service of the summons and complaint is not made upon a defendant within 120 days after the filing of the complaint, the court, upon motion or on its own initiative after notice to the plaintiff, shall dismiss the action without prejudice as to that defendant or direct that service be effected within a specified time; provided that if the plaintiff shows good cause for the failure, the court shall extend the time for service for an appropriate period.

Fed. R. Civ. P. 4(m). In determining whether good cause exists, courts have considered: (1) whether the party making service exhibited reasonable diligence or made a reasonable [*14] effort to effect service; and (2) whether the parties to be served are prejudiced as a result of the

delay of service. Feingold v. Hankin, 269 F.Supp.2d 268, 276 (S.D.N.Y. 2003).

While it is true that Plaintiff's failure to name all three defendants on the original request for summons is the sort of inadvertence that counsels against extending service time for good cause, Plaintiff's efforts to serve Mr. West and TWD in a timely fashion demonstrate reasonable diligence, and the Court finds that TWI was not prejudiced by the three-week delay in effecting service. Additionally, and importantly, all three named defendants are likely under the direct control of Mr. West. Thus, it is reasonable to conclude that, since TWI had notice of this litigation based upon Plaintiff's August 31, 2006, service, which included a complaint naming Mr. West and TWD, that Mr. West and TWD also had timely notice of this litigation. See Grammenos v. Lemos, 457 F.2d 1067, 1070 (2d Cir. 1972).

Since the original summons was issued only in the name of TWI, Plaintiff's motion to deem service proper is denied insofar as it seeks to have the August 31, 2006, service of the original complaint deemed proper as to all [*15] of the named defendants. However, the Court finds that the August 2006 service did give Mr. West and TWD timely notice of the existence of the lawsuit and that good cause exists for extension of the Rule 4(m) period to encompass the September 21, 2006, service of the Amended Complaint on all three defendants. [2] Accordingly, the period is so extended and the September 21, 2006, service is deemed timely.

> [2]   Even if good cause did not exist in this case, the Court is free to exercise its discretion to extend time for service taking into consideration: (1) whether the statute of limitations would bar a re-filed action; (2) whether Plaintiff has attempted to conceal the defect in service; (3) whether the Defendants would be prejudiced; and (4) whether Defendants have actual notice of the claims

asserted in the complaint. Feingold, 269 F. Supp. 2d 268, 277. For substantially the reasons detailed in the Court's Rule 4(m) analysis, the Court finds that the balance of factors weighs strongly in favor of extending time for service regardless of a finding of good cause.

Mr. West and TWD shall respond to the Amended Complaint within twenty-one days from the date of this Memorandum Order.

CONCLUSION

For [*16] the foregoing reasons, TWI's Motion to Dismiss the Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(1) is denied. Additionally, TWI's Motion to Strike is denied in its entirety. Finally, the Court denies Goldman's motion to deem the August 31, 2006, service on Mr. West and TWD proper, but extends the Rule 4(m) period to encompass the September 21, 2006, date on which the Amended Complaint and summons were served on those defendants.

Mr. West and TWD shall respond to the Amended Complaint within twenty-one days from the date of this Memorandum Order.

The parties are directed to comply with the Court's October 24, 2006, Pre-trial Scheduling Order *and* to meet with Judge Ellis for settlement purposes promptly.

SO ORDERED.

Dated: New York, New York

July 6, 2007

LAURA TAYLOR SWAIN

United States District Judge



FOCUS - 1 of 1 DOCUMENT

**CITY OF AURORA, COLORADO, a municipal corporation, acting by and through its Utility Enterprise, Aurora Water, Plaintiff, v. PS SYSTEMS, INC., a Colorado corporation; and RAR GROUP, LLC, a Colorado limited liability company, Defendants.**

**Civil Action No. 07-cv-02371-WYD-BNB**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLORADO**

*2008 U.S. Dist. LEXIS 82053*

**September 19, 2008, Decided
September 19, 2008, Filed**

**SUBSEQUENT HISTORY:** Patent interpreted by *City of Aurora v. PS Sys., 2010 U.S. Dist. LEXIS 61935 (D. Colo., June 2, 2010)*

**PRIOR HISTORY:** *City of Aurora v. PS Sys., 2008 U.S. Dist. LEXIS 69396 (D. Colo., July 18, 2008)*

**COUNSEL:** **[\*1]** For Aurora, Colorado, City of, a municipal corporation, acting by and through its Utility Enterprise other Aurora Water, Plaintiff: Martha Fitzgerald Bauer, LEAD ATTORNEY, Ashley Krause, Ericka Houck Englert, Ronald C. Gorsche , Jr., Brownstein Hyatt Farber Schreck, LLP, Denver, CO; Charles H. Richardson, Aurora City Attorney's Office, Aurora, CO.

For PS Systems, Inc., a Colorado corporation, RAR Group, LLC, a Colorado limited liability company, Defendants: Peter Attila Gergely, Merchant & Gould, PC-Denver, Denver, CO.

For PS Systems, Inc., a Colorado corporation, Counter Claimant: Peter Attila Gergely, Merchant & Gould, PC-Denver, Denver, CO.

For Aurora, Colorado, City of, a municipal corporation,

acting by and through its Utility Enterprise, Counter Defendant: Martha Fitzgerald Bauer, LEAD ATTORNEY, Ashley Krause, Ericka Houck Englert, Ronald C. Gorsche , Jr., Brownstein Hyatt Farber Schreck, LLP, Denver, CO; Charles H. Richardson, Aurora City Attorney's Office, Aurora, CO.

**JUDGES:** Wiley Y. Daniel, U. S. District Judge.

**OPINION BY:** Wiley Y. Daniel

**OPINION**

**ORDER**

I. INTRODUCTION

    THIS MATTER comes before the Court on Defendants' Motion to Dismiss filed January 11, 2008. Defendants moves to dismiss Plaintiff's request **[\*2]** for a declaratory judgment pursuant to *FED. R. CIV. P. 12(b)(1)* based on a lack of subject matter jurisdiction. For the reasons stated below, Defendants' Motion to Dismiss is denied.

II. FACTUAL BACKGROUND

This is a declaratory judgment action by Plaintiff, City of Aurora, Colorado ["Aurora" or "the City"] in response to allegations that Aurora is infringing or will infringe two patents owned by Defendants PS Systems, Inc. ["PS Systems"] and RAR Group, LLC ["RAR"] [collectively "PS"] through use of the Aquifer Recharge and Recovery ["ARR"] component of Aurora's Prairie Waters Project ["the Project" or "Prairie Waters"]. Aurora seeks a declaratory judgment that the ARR component of the Project is not infringing the two patents owned by PS, or a ruling that PS' patents are invalid and/or unenforceable.

By way of background, as a response to the statewide drought of 2002-2003 which caused Aurora's reservoir supply to drop below 30% capacity, Aurora began long-range planning for water supply and treatment. In 2004, Aurora began formal design and engineering studies for what would become the Prairie Waters Project. Aurora contends in its Complaint that when the Project is implemented in 2010, [*3] it will have the potential to increase the water supply available to the City's water supply by 10,000 acre-feet annually. (Compl. For Decl. Jud. Of Non-Infringement, Invalidity and/or Unenforceability, P 8 [hereinafter "Compl."]) The Project essentially takes unpotable water from the South Platte River, stores the water underground and cleanses it, and then further treats the water for use by Aurora residents.

According to the Complaint, the Prairie Waters Project will allow Aurora to recover its fully reusable water rights diverted through alluvial well fields where water will be piped to three shallow infiltration ponds and will percolate by gravity into 40-60 foot deep native sands and gravel in an ARR facility. (*Id.,* P 9). "The ARR will be surrounded by a low-permeability barrier: a discontinuous two-part slurry wall connected by grout walls which in combination will restrict groundwater movement into and out of the ARR facility." (*Id.*) Extraction walls located inside the low-permeability barrier will remove water that has migrated from the infiltration ponds through the sand and gravels, removing most of the organic, nutrient, phosphorous, and sedimentary elements from the water [*4] before it will be piped for additional treatment via a 35-mile pipeline to an advanced purification facility near the Aurora Reservoir. (*Id.,* P 10.)

Stanley R. Peters ["Peters"], Randall R. Beeson, and

Donald O. Summers ["Summers"] invented the subject matter of *United States Patent No. 6,840,710* ["*the 710 Patent*"] titled "Underground Alluvial Water Storage Reservoir and Method". The patent application for the *710 Patent* was filed May 15, 2002, and the *710 Patent* issued on May 11, 2005. Peters and Summers invented the subject matter of United *Patent No. 7,192,218* [the "*218 Patent*"] titled "Direct Recharge Injection of Underground Water Reservoirs." The patent application for the *218 Patent* was filed February 23, 2005, and the *218 Patent* issued on March 20, 2007. The *710 Patent* is assigned to Defendant RAR. PS Systems is the assignee of the *218 patent*.

On November 2, 2005, counsel for PS Systems sent a letter to Aurora stating that the ARR system it was using as part of its Project may utilize certain technology covered by the *710 Patent*. The letter stated:

> PS Systems would be pleased to work with the City to construct an underground reservoir as described in the '*710 patent* as part of [*5] the South Platte Project. Please contact representatives of PS Systems. . . to discuss potential collaboration or licensing possibilities. Alternatively, if you are of the opinion that you do not need a license from PS Systems, it would be helpful if you would contact the undersigned to provide some insight into your reasons.

(Defs.' Mot. to Dismiss, Ex. A).

By letter dated December 22, 2005, counsel for the City responded. (*Id.,* Ex. C. ) It stated in the letter that it was conducting an analysis and assessment of the ARR system and the relevance of the claims of the *710 Patent*. Counsel anticipated that the review would be concluded by the end of January 2006 and that a substantive response would be provided at that time. (*Id.*) PS Systems asserts that it did not receive this letter until January 27, 2006.

On January 23, 2006, counsel for PS Systems sent the City a certified follow-up letter stating that input had been asked for on potential collaboration licensing possibilities with respect to the *710 Patent*, that no response had been received to date, and that PS Systems would appreciate the City's response as soon as possible.

(Defs.' Mot. to Dismiss, Ex. B.)

On September 22, 2006, another **[*6]** letter was sent to the City by counsel for PS Systems. (*Id.,* Ex. E.) It stated that since no response had yet been received concerning the *710 patent*, it would be assumed that the City has no substantive response concerning the relevance of the claims of the *710 patent*. That letter noted that in June 2006, the City filed for underground alluvial water storage and that in September 2006, the City began a bond offering process to fund the project. The letter concluded, "Given that the city is moving forward with this project, has furnished no substantive response concerning the relevance of the *'710 patent*, and is commencing the bond offering process, we again invite the City of Aurora to contact us to discuss project collaboration or a licensing agreement concerning the *'710 patent*." (*Id.*)

By letter of September 26, 2006, counsel for the City responded that it had not been able to provide a response in the timetable originally anticipated because the City's design of the Prairie Waters Project was not sufficiently developed. (Defs.' Mot. to Dismiss, Ex. E.) It further stated that the City was "now confident in the specific design of the System" and that it was anticipated a substantive **[*7]** response could be provided by October 13, 2006. (*Id.*)

By letter of October 13, 2006, counsel for the City stated that in response to PS Systems' letter of November 2, 2005, legal counsel had engaged in a review of the City's ARR system which is to be developed as part of the Prairie Waters Project. (*Id.,* Ex. F.) The letter stated that the review had concluded that the system as currently designed did not infringe the *710 patent* and that PS Systems' offer of a license thus did not appear necessary. It concluded, "If you believe that, notwithstanding the noninfringement opinion, you have information or argument that the City of Aurora should consider, then please contact me so that we can arrange a time to sit down and talk." (*Id.*) Aurora did not share its counsel's non-infringement opinion referenced in the letter with Defendants. PS Systems did not respond to this letter.

In January 2007, Defendants assert that Aurora's attorney left PS Systems' attorneys an unsolicited phone message stating that no response had been received to the October letter and asking if PS Systems wanted to sit down and talk. The message stated, "[t]he City of Aurora is open to hear what it is that they're interested **[*8]** in

doing on a license basis" and that "[a]s I noted in the letter, the non-infringement opinion appears to make a license unnecessary, but with a project of this size the City of Aurora is open to sitting it down and trying to resolve the matter amicably." (Defs.' Mot. to Dismiss, Ex. G.) The message concluded that if PS Systems was interested in educating the City about what was wanted in a license, it should advise as to what the key terms of that license would be.

In February 2007, a meeting was held between the parties to discuss a license and, according to the City, a settlement of the infringement and licensing issues. Summers stated in his Declaration that he informed Aurora at that time of what PS Systems believed were fair licensing terms. (Summers Decl., P 16.) He further stated that during the meeting, Aurora mentioned the possibility of litigation between the parties, that this was the first mention of litigation, and that Aurora initiated it, not PS Systems. (*Id.*)

When the *218 Patent* issued, counsel for PS Systems sent a letter to the City dated March 20, 2007. (Defs.' Mot. to Dismiss, Ex. G.) The letter reminded the City of PS Systems' November 2, 2005 letter notifying **[*9]** the City that its Project may utilize technology of the *710 Patent* and advised the City that it also may be utilizing certain beneficial technology of the *218 Patent* through its ARR system. The letter concluded, "PS Systems would be happy to work with the City to construct an underground reservoir as described in the *'218 patent* as part of the Prairie Water Project. Please contact us to discuss potential collaboration or licensing possibilities." (*Id.*)

Counsel for the City responded by letter dated March 23, 2007. (Defs.' Mot. to Dismiss, Ex. I.) The letter stated that the City was reviewing the *218 Patent*'s applicability to the Prairie Waters Project and would respond in due course "if the subject matter of this letter does not render that effort moot." (*Id.*) It further referenced the February meeting and stated that the letter was being provided in an effort to achieve resolution of the dispute between the clients pursuant to *Rule 408 of the Federal Rules of Evidence*. It stated that after reviewing the variety of settlement structures put forth by PS Systems, the City determined that a straight license with an upfront fee of $ 50,000 was the best way to proceed in the matter. The **[*10]** letter set forth specific terms for the license. It concluded that the license would enable PS Systems "to

receive compensation for a technology that, at least in the case of the *'710 patent*, the City does not plan to use and without the risk of a finding of invalidity in any subsequent litigation with the City." (*Id.*)

By letter dated March 28, 2007, PS Systems stated that the "proposal of $ 50,000 for a license is unreasonable and therefore rejected". (Defs.'s Mot. to Dismiss, Ex. J.) The letter stated that the City's "offer presumes that it does not plan to use the technology recited in the claims of the *'710 patent*, but it has furnished PS Systems absolutely no factual, legal, or economic analysis of its position either under the patent or the *'218 patent*. Accordingly, PS Systems' position remains that the City is planning to use the technology recited in both the *'710 patent* and the *'218 patent*. If the City is interested in licensing the referenced patents on reasonable terms, please contact me." (*Id.*)

On June 4, 2007, Summers attended and spoke at an Aurora City Council meeting. (Summers Decl., P 22.) While Summers states that he praised the Prairie Waters Project and stated that [*11] the Project enjoyed a cost savings advantage of over $ 375 million over other systems, he also stated at the meeting that some of the technology Aurora proposes to use is covered by the two patents issued to PS Systems. (*Id.*) He further stated at the meeting that he was not satisfied with the way Aurora's staff had handled its issues with PS Systems. (*Id.*) Aurora contends that by doing this PS Systems escalated the dispute between the parties by airing its allegations of Aurora's supposed infringement to the public.

By letter dated June 11, 2007, counsel for Aurora wrote that Summers' statements at the Aurora City Council session wherein Summers claimed that the City was "stealing" his company's technology as part of the Prairie Waters Project and that his company had not been treated fairly were "ironic and inflammatory in light of our notification to you that the City had obtained a written non-infringement opinion. . . and your client's outright rejection of the City's offer to settle any dispute, notwithstanding, without making any kind of counteroffer whatsoever." (Defs.' Mot. to Dismiss, Ex. K.) The letter stated that "[i]t is impossible to explore the possibility of negotiating [*12] a resolution to our clients' differences if your client refuses to give any statement of what it demands from the City." (*Id.*) It further stated that "[t]he City remains willing to explore a resolution here and avoid any prospect of litigation down

the road" even though the City assumes it is not using Defendants' technology. (*Id.*) It advised that as the City was moving forward on the Project, a response was needed by no later than June 29, 2007. The letter also indicated that while the *218 patent* was still being evaluated, the City had a written non-infringement letter as to the *710 patent* and had identified a number of invalidity arguments based upon the City's "prior art." (*Id.*) It also noted recent litigation where a patent was held to have been obtained by inequitable conduct of an attorney from PS Systems' counsel's firm, and stated that because of this, there was a likelihood of the firm being conflicted out of representing PS Systems in any litigation that occurs in the case. (*Id.*) Finally, the letter stated that PS Systems' failure to timely respond would confirm to the City that PS was not interested in a negotiated resolution of differences. (*Id.*)

On June 21, 2007, PS Systems [*13] sent a response to Aurora indicating that the City Council meeting had been videotaped and that Aurora had mischaracterized Summers' comments which were "measured and accurate" instead of ironic and inflammatory. (Defs.' Mot. to Dismiss, Ex. L; *see also* Summers Decl., P 23.) The letter stated that Aurora had failed to furnish any evidence of non-infringement in the nearly two years since PS Systems had notified Aurora of the *710 patent* and Aurora's proposed use of PS Systems' patented technology and had instead "delayed and obfuscated every step of the way." (*Id.*) It stated that Aurora should share the non-infringement opinion and/or evidence of invalidity or cease licensing negotiations, and that Aurora is doing neither. Further, it stated that PS Systems had already provided reasonable licensing terms and that it was not going to bid against itself by making a counteroffer. Nevertheless, it stated that while $ 125.7 million is a reasonable royalty, PS Systems was willing to license the *710 patent* for $ 1800 per acre-foot of water storage, subject to negotiation and to entering into a final, mutually acceptable, licensing agreement. It concluded that PS Systems is willing to engage [*14] in licensing agreements concerning the *218 patent* "and the continuation application from the *'710 patent* once Aurora follows through on its promise to respond 'in due course, whatever that may be." (*Id.*)

Also on June 21, 2007, Aurora published its Preliminary Official Statement ["POS"] regarding the proposed issuance of over $ 420 million in water improvement revenue bonds for the Prairie Waters

Project. (Defs.' Mot. to Dismiss, Ex. M.) The POS stated:

> A person claiming to hold a patent relating to an underground reservoir for storing water in alluvial deposits has alleged through his attorney that his patent is infringed by the proposed configuration of the ARR site and related structures at the North Campus, although no legal proceedings have been initiated to pursue such a claim. Based upon the advice of patent counsel, the City believes that it is unlikely that such a claim would be successful if asserted in a legal proceedings. In the event of an adverse resolution of this claim, it is possible that costs may be incurred in excess of those assumed in the current budget for the construction of the North Campus facilities. It is not currently anticipated that any resolution of the **[*15]** alleged patent claim will materially affect the timely completion or cost of the Prairie Waters Project.

(*Id.*)

On June 25, 2007, counsel for PS Systems sent a letter addressed both to bond counsel for Aurora and to underwriters' counsel for the bond issuance objecting to the City's disclosures regarding the PS patents in the POS, and setting out its position that a reasonable royalty would be $ 125.7 million for Aurora's alleged use of its technology. The letter stated that the POS was inaccurate with respect to the City's Disclosure of PS Systems' patents (as it failed to disclose the *218 patents*) and as to Aurora's disclaimer of materiality. (Defs.' Mot. to Dismiss, Ex. N; *see also* Summers Decl., P 26.) The City claims that this communication caused considerable turmoil in the context of the pending debt transaction.

Notwithstanding PS Systems' letters, the bonds issued without any change to the Statements in the POS. Further, the City contends that it broke ground on the Project in July 2007. (Peter D. Binney ["Binney"] Decl., P 6, Ex. 1 to Pl.'s Resp. to Mot. to Dismiss.)

In early July 2007, Aurora provided PS Systems with design drawings for the ARR in order to allegedly demonstrate **[*16]** that the City would not infringe PS'

patents. The drawings were marked "Preliminary Not for Construction." (Defs.' Mot. to Dismiss, Ex. Q.) Aurora asserts that those drawings have been supplemented by final design drawings. (Binney Decl., P 3.)

By letter dated July 6, 2007, counsel for PS Systems wrote to Aurora indicating the letter was "written pursuant to F.R.E. and C.R.E. 408". (Defs.' Mot. to Dismiss, Ex. O.) It explained why PS Systems had written to Aurora's bond and underwriters' counsel, reiterated that $ 125.7 million was a reasonable royalty, and stated that did not replace the $ 1,800/acre-foot offer. (*Id.*) It further stated:

> In his June 11, 2007 letter, Bruce Plotkin referred to the possibility of litigation. PS Systems has never threatened the City with litigation. Nevertheless, the City should be aware that, in the event of litigation, its potential exposure for use of the *'218 patent* is $ 125.7 million.

(*Id.*) It also stated that the City's exposure for both the *710* and *218 patent* was approximately $ 150 million to $ 160 million, and that PS Systems' offer of $ 1,800 per acre-foot "is a good bargain for a license to the *'710 patent.*" (*Id.*) It concluded that PS Systems was **[*17]** available for a meeting to discuss licensing of the *710 patent*, and that it eagerly awaited the City's response concerning the *218 patent*. (*Id.*)

A meeting between the parties was held in late July, 2007. Summers states in his Declaration that he furnished Aurora with a reasonable royalty for the two patents, and that Aurora again mentioned the possibility of litigation. (Summers Decl., P 30.) He further asserts that since Aurora had mentioned the possibility of litigation for the fourth time, PS Systems said at that meeting that if litigation occurred, then it would pursue the case to verdict. (*Id.*) PS asserts that it did not threaten litigation but was responding to the City's mentions of litigation. The City contends, on the other hand, that PS Systems demanded a minimum payment of $ 17 - $ 27 million in licensing fees, stated that the offer would not be left open indefinitely, and that if the City did not accept it, PS Systems "would be forced to litigate." (Binney Decl., PP 4-5.) The parties did not reach an agreement at that meeting.

Aurora then left a phone message for counsel for PS

Systems that it was interested in mediation. A mediation was held on August 31, 2007. No resolution **[\*18]** was reached, and Summers stated that Aurora left the mediation after several hours with no explanation of why the City was leaving.

The Complaint for Declaratory Judgment of Non-Infringement, Invalidity, and Unenforceability was filed on November 9, 2007. Preliminary construction plans for the Prairie Waters Project were given to pre-qualified bidders in July 2007. (Binney Decl., P 7.) Construction plans for the ARR portion of the Project were finalized in October 2007 and ready-to-bid documents were transmitted to pre-qualified bidders in November of 2007. (*Id.*). As of January 31, 2008, the City indicated it had awarded contracts for the Project in the amount of $ 371,968,553. (*Id.,* P 8.) In February 2008, the City expected to award another $ 68 million in contracts for the ARR. (*Id.,* P 9.) The City plans to complete the Prairie Waters Project and begin its start-up process in the last quarter of 2010. (*Id.,* P 10.)

### III. ANALYSIS

#### A. Parties' Positions

Defendants contend that there is no case or controversy between the parties that merits declaratory judgment jurisdiction. That is because PS has been discussing its patents with Aurora for years -- usually at Aurora's request. PS has never **[\*19]** filed or threatened any litigation against Aurora because, to the best of PS' knowledge, Aurora has not built any system or practiced any method that has infringed its patents. Indeed, PS argues that Aurora's complaint admits that it will not build its Prairie Waters Project until 2010. Further, PS asserts that the plans for the Project are labeled "preliminary" and "not for construction." Accordingly, PS asserts that Aurora is simply asking for an advisory opinion and that the case should be dismissed under *Rule 12(b)(1)* for lack of subject matter jurisdiction. Alternatively, it is argued that the Court should exercise its discretion to decline declaratory judgment jurisdiction because 1) a declaratory judgment concerning Aurora's preliminary plans will not settle any controversy between the parties; and 2) Aurora's litigation is interfering with PS Systems' licensing negotiations with third parties.

Aurora contends, on the other hand, that there is a case or controversy of sufficient immediacy and reality to warrant declaratory judgment jurisdiction. It argues that

Defendants' motion seeks to have the Court endorse their attempt to prolong the uncertainty they have cast over construction **[\*20]** of Aurora's much-needed municipal water supply project. Further, the City argues that for over two years, Defendants have held a sword over its head, demanding that Aurora pay a licensing fee under patents which do not apply here. That attempt is unjustified under the facts and the law, and Aurora should be allowed to proceed with this action in order to resolve the underlying dispute.

Specifically, it is argued by the City that Defendants have identified the patents allegedly infringed, have made calculated licensing and royalty demands of up to $ 160 million for Aurora, continue to assert infringement, have actually threatened litigation and have rejected Aurora's continual denial of infringement. Aurora is faced with a choice of paying license fees PS does not deserve or abandoning the ARR part of its Project. Accordingly, the City argues that this Court should exercise its discretion and permit declaratory judgment jurisdiction in order to remedy Aurora's uncertainty of its rights with regard to the Project and PS' patents.

#### B. Standard of Review

A motion to dismiss under *Rule 12(b)(1)* can be either a facial attack on the sufficiency of the allegations of the complaint as to subject **[\*21]** matter jurisdiction or a challenge to the actual facts upon which subject matter jurisdiction is based. *Ruiz v. McDonnell, 299 F.3d 1173, 1180 (10th Cir. 2002)*. In a factual attack, as here, the court may consider matters outside the pleadings and a motion to dismiss is not converted to a motion for summary judgment. *Stuart v. Colorado Interstate Gas Co., 271 F.3d 1221, 1225 (10th Cir. 2001)*. The court may not presume the truthfulness of the complaint's factual allegations. *Holt v. United States, 46 F.3d 1000, 1003 (10th Cir. 1995)*. Further, where the court's jurisdiction is contested, as in this case, the plaintiff has the burden of proving that jurisdiction exists. *AST Sports Science, Inc. v. CLF Distrib. Ltd., 514 F.3d 1054, 1056 (10th Cir. 2008)*; *see also Benitec Australia, Ltd. v. Nucleonics, Inc., 495 F.3d 1340, 1343 (Fed. Cir. 2007)*.

#### C. Whether A Sufficient Case or Controversy Exists

The Declaratory Judgment Act provides that "[i]n a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other

legal relations of an interested party seeking such declaration, whether or not **[*22]** further relief could be sought." *28 U.S.C. § 2201(a)*. The phrase "case or controversy" in the Act refers to the type of "cases" or "controversies" that are justiciable under the Act. *Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 240, 57 S. Ct. 461, 81 L. Ed. 617 (1937)*.

According to the Supreme Court, "*Aetna* and the cases following it do not draw the brightest of lines between those declaratory-judgment actions that satisfy the case-or-controversy requirement and those that do not." *MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 127 S. Ct. 764, 771, 166 L. Ed. 2d 604 (2007)*. However, the dispute must "be 'definite and concrete, touching the legal relations of parties having adverse legal interests'; and that it is 'real and substantial' and 'admi[t] of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.'" *Id.* (quoting *Aetna, 300 U.S. 240-241*). "'Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" *Id.* **[*23]** (quotation omitted). The Supreme Court rejected the dissent's assertion that the declaratory judgment procedure cannot be used to obtain advanced rulings on matters that would be addressed in a future case of actual controversy. *Id. at 771 n. 7.*

According to the Federal Circuit, "[p]rior to MedImmune, our case law required that there be 'both (1) an explicit threat or other action by the patentee, which creates a reasonable apprehension on the part of the declaratory plaintiff that it will face an infringement suit, and (2) present activity which could constitute infringement or concrete steps taken with the intent to conduct such activity.'" *Benitec Australia, 495 F.3d at 1343-44.* "However, "[t]he Supreme Court's opinion in *MedImmune* represents a rejection of our reasonable apprehension of suit test.'" *Id. at 1344* (quoting *SanDisk Corp. v. STMicroelectronics, NV, 480 F.3d 1372, 1380 (Fed. Cir. 2007)*).

The Federal Circuit has also indicated that *MedImmune* "articulated a more lenient legal standard' for the availability of declaratory judgment relief in patent cases'". *Cat Tech LLC. v. TubeMaster, Inc., 528 F.3d 871, 880 (Fed. Cir. 2008)* (quoting *Micron Tech, Inc. v. Mosaid Techs., Inc., 518 F.3d 897, 902-03 (Fed. Cir. 2008)*). **[*24]** The issue of whether there has been meaningful preparation to conduct potentially infringing activity is an important element in determining whether a declaratory judgment is appropriate. *Id.* "If a declaratory judgment plaintiff has not taken significant, concrete steps to conduct infringing activity, the dispute is neither "immediate" nor "real" and the requirements for justiciability have not been met." *Id.*

The Federal Circuit further explained:

> A party may not "obtain a declaratory judgment merely because it would like an advisory opinion on whether it would be liable for patent infringement if it were to initiate some merely contemplated activity." . . . Thus, although a party need not have engaged in the actual manufacture or sale of a potentially infringing product to obtain a declaratory judgment of non-infringement, there must be a showing of "meaningful preparation" for making or using that product . . . .

*Id. at 881* (quoting *Arrowhead Indus. Water, Inc. v. Ecolochem, Inc., 846 F.2d 731, 735 (Fed. Cir. 1988)* and other cases). Jurisdiction may be met "where the patentee takes a position that puts the declaratory judgment plaintiff in the position of either pursuing arguably illegal **[*25]** behavior or abandoning that which he claims a right to do." *SanDisk Corp., 480 F.3d at 1381.*

"A plaintiff need not 'bet the farm, or . . . risk treble damages . . . before seeking a declaration of its actively contested legal rights.'" *Cat Tech, 528 F.3d at 883* (quoting *MedImmune, 127 S. Ct. at 775*). "The dilemma posed by that coercion-putting the challenger to the choice between abandoning his rights or risking prosecution-is 'a dilemma that it was the very purpose of the Declaratory Judgment Act to ameliorate.'" *MedImmune, 127 S. Ct. at 775* (quoting *Abbott Laboratories v. Gardner, 387 U.S. 136, 152, 87 S. Ct. 1507, 18 L. Ed. 2d 681 (1967)*).

In the case at hand, I find that Aurora has engaged in meaningful preparation for using the ARR system in the Prairie Waters Project and that it has taken concrete steps to begin conducting the alleged infringing activity

involving the ARR system. That is because, construing the evidence in the light most favorable to Aurora as I must for purposes of this motion, I find that Aurora has finalized its plans for the Project, issued over $ 420 million in water improvement revenue bonds for the Project, and broken ground on the construction of the Project in July 2007. Construction plans [*26] for the ARR portion of the Project were finalized in October 2007 and ready-to-bid documents were transmitted to qualified bidders in November 2007. Further, Aurora has awarded contracts on the Project in the amount of $ 371,968,553 and expected to award another $ 68 million in contracts for the ARR in February 2008. The Project is expected to be completed and begin its start-up process in 2010.

Also, Defendants took steps to inform the City of its patent and the alleged infringing activity, and engaged in negotiations for a licensing agreement. Finally, whether or not Defendants were the first to mention litigation, PS Systems advised Aurora that if its offer of a minimum payment of $ 17 to $ 27 million in licensing fees was not accepted, it would be "forced to litigate". Further, counsel for PS Systems sent Aurora a letter advising Aurora that "in the event of litigation", Aurora's exposure would be $ 150 to $ 160 million. I find that the foregoing conduct rises to the level of an Article III case or controversy. *See SanDisk Corp., 480 F.3d at 1381* ("[W]here a patentee asserts rights under a patent based on certain identified ongoing or planned activity of another party, and where [*27] that party contends that it has the right to engage in the accused activity without license, an Article III case or controversy will arise and the party need not risk a suit for infringement by engaging in the identified activity before seeking a declaration of its legal rights").

Defendants rely, however, on cases from the Federal Circuit which have held that there is not a sufficient case or controversy where the declaratory judgment plaintiff relied on infringing activity which was to occur in the future and where the dispute lacked sufficient immediacy. For example, in *Benitec Australia,* the court affirmed the dismissal of a counterclaim where the party who sought declaratory relief had professed plans to engage in human gene-therapy treatment, but such activities could not be considered infringing until a new drug application ("NDA") was filed with FDA and the plaintiff, who sought relief in 2005, did not anticipate filing an NDA until "at least 2010-2012, if ever". *Id., 495 F.3d at 1346-50.* Further, the plaintiff's activities consisted of

developing and submitting only preliminary information to the FDA. *Id.*

Similarly, in *Telectronics Pacing Sys., Inc. v. Ventritex, Inc., 982 F.2d 1520, 1527 (Fed. Cir. 1992),* [*28] the court affirmed a dismissal of a defibrillator component manufacturer's claim for future patent infringement where clinical trials of the accused product had just begun and it was "years away" from potential FDA approval. Finally, in *Sierra Applied Sciences, Inc. v. Advanced Energy Indust., Inc., 363 F.3d 1361, 1379 (Fed. Cir. 2004),* the court found that the immediacy requirement was not satisfied where the project at issue (the Billings 150 kw power supply) was at an early stage of development and the design may not be the one which was ultimately designed and produced. *See also Lang v. Pac. Marine & Supply Co., 895 F.2d 761, 764 (Fed. Cir. 1990)* (the accused infringing ship hull would not be ready for at least nine months and the accused infringer had not distributed sales literature or engaged in any activity indicating that the ship would soon be ready).

I find those cases to be distinguishable. First, I find that in those cases the declaratory judgment plaintiffs had not engaged in the type of concrete steps to develop the alleged infringing product that the City has in this case. Further, it was uncertain in those cases when the declaratory plaintiff would engage in potentially [*29] infringing activity and whether the preliminary plans at issue would be the final design for the infringing activity. In this case, however, Aurora asserts that the plans have been finalized, the construction has begun on the Project and there is a definite timetable for the Project to be operational. As the Federal Circuit explained in a recent case, "the technology involved in *Telectronics, Sierra* and *Benitec* . . . was fluid and in an early stage of development." *Cat Tech, 528 F.3d at 882.* Here, like in *Cat Tech,* the technology appears to be "'substantially fixed'". *Id.* Finally, I note that those cases were decided under the "reasonable apprehension" test which appears to be no longer valid in light of the more lenient standard articulated in *MedImmune.*

I conclude that Aurora has shown, under all the circumstances, "that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment. *MedImmune, 127 S. Ct. at 771.* I further find that Aurora has shown that its activity in pursuing the ARR component of the Prairie Waters

2008 U.S. Dist. LEXIS 82053, *29

Project puts the City in the untenable position of either [*30] pursuing arguably illegal behavior or abandoning the ARR component of the Project altogether, despite the millions of dollars it has invested already. This is the classic dilemma that the Declaratory Judgment Act is meant to ameliorate.

Finally, I deny Defendants' alternative argument in their Motion to Dismiss that the Court should exercise its discretion to decline declaratory judgment jurisdiction. I find that jurisdiction should be exercised in order to remedy Aurora's uncertainty of its rights with regard to the Project and PS' patents, and in light of the millions of dollars that have already been expended by the City in connection with the Project.

IV. CONCLUSION

Based upon the foregoing, it is

ORDERED that Defendants' Motion to Dismiss (Doc. # 7 filed January 11, 2008) is **DENIED.**

Dated: September 19, 2008

BY THE COURT:

/s/ Wiley Y. Daniel

Wiley Y. Daniel

U. S. District Judge

LEXSEE

**HR TECHNOLOGY, INC., f/k/a THERMAL SOLUTIONS, INC., Plaintiff, v.
IMURA INTERNATIONAL U.S.A., INC., VITA CRAFT CORPORATION, and
MAMORU IMURA, an individual, Defendants.**

**Case No. 08-2220-JWL**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF KANSAS**

**2011 U.S. Dist. LEXIS 59331**

**June 3, 2011, Decided
June 3, 2011, Filed**

**SUBSEQUENT HISTORY:** Summary judgment
granted, in part, summary judgment denied, in part by HR
Tech., Inc. v. Imura Int'l U.S.A., Inc., 2012 U.S. Dist.
LEXIS 31492 (D. Kan., Mar. 9, 2012)

**PRIOR HISTORY:** HR Tech., Inc. v. Imura Int'l
U.S.A., Inc., 2011 U.S. Dist. LEXIS 43160 (D. Kan.,
Apr. 20, 2011)

**CORE TERMS:** covenant, patent, infringement,
declaratory judgment, affirmative defenses, counterclaim,
inequitable conduct, fee claim, technology, cookware,
unenforceable, divest, subject matter jurisdiction, reply
brief, license, patent infringement, claim relating,
summary judgment, attorney fees, exceptional cases,
prevailing party, manufacture, invalidity, infringing,
pretrial, invalid, concede, e-mail, confers, license
agreements

**COUNSEL:** [*1] For HR Technology, Inc., also known
as Thermal Solutions, Inc., Plaintiff, Counter Defendant:
Alicia E. Bodecker, James M. Armstrong, Michael J.
Norton, Todd N. Tedesco, LEAD ATTORNEYS,
Foulston Siefkin LLP - Wichita, Wichita, KS.

For Imura International U.S.A., Inc., Vita Craft
Corporation, Mamoru Imura, an individual, Defendants,
Counters Claimants: Brian W. Fields, J. Bradley Leitch,
Jason C. Parks, Robert O. Lesley, LEAD ATTORNEYS,
Lathrop & Gage LLP - KC, Kansas City, MO.

**JUDGES:** John W. Lungstrum, United States District
Judge.

**OPINION BY:** John W. Lungstrum

**OPINION**

**MEMORANDUM AND ORDER**

This case, which includes a patent infringement
claim by plaintiff, presently comes before the Court on
plaintiff's motions to dismiss for lack of subject matter
jurisdiction certain declaratory judgment counterclaims
and affirmative defenses asserted by defendants relating
to three patents (Doc. ## 303, 305, 307). Specifically,
plaintiff argues that those counterclaims and defenses no
longer satisfy the "case or controversy" requirement of
Article III of the United States Constitution and the
Declaratory Judgment Act in light of plaintiff's execution
of certain covenants not to sue defendants for
infringement. For the reasons  [*2] set forth below, the
Court **denies** the motions to dismiss.

In the form of declaratory judgment counterclaims
and affirmative defenses, defendants seek declarations of
invalidity, non-infringement, and non-enforceability with
respect to three patents held by plaintiff (the '169 Patent,
the '585 Patent, and the '919 Patent). At various times, in
this case and in other litigation between the parties,
plaintiff has alleged that defendants infringed those three
patents. In the pretrial order in this case, plaintiff has
preserved a claim only for infringement of Claims 19, 22,
26, and 36 of the '169 Patent.

Plaintiff previously moved for summary judgment on
defendants' declaratory judgment counterclaims, on the

basis that the Court lacked jurisdiction over those claims because no justiciable controversy existed. [1] Specifically, plaintiff argued that in this case it alleges only *past* infringement by defendants and that defendants did not plan to engage in the allegedly infringing activity--the manufacture or sale of certain cookware using RFID technology--in the future. By Memorandum and Order of April 13, 2010 (Doc. #217), the Court denied plaintiff's motion, ruling that when viewed in defendants' [*3] favor, the evidence was sufficient to create an issue of fact regarding whether defendants did still intend to sell the cookware in the future.

> 1   "Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127, 127 S. Ct. 764, 166 L. Ed. 2d 604 (2007) (quoting *Maryland Cas. Co. v. Pacific Coal& Oil Co.*, 312 U.S. 270, 273, 61 S. Ct. 510, 85 L. Ed. 826 (1941)). The Supreme Court has made clear that a party need not engage in the allegedly infringing activity (and risk treble damages for infringement) simply to create a case or controversy under Article III to support a declaratory judgment claim relating to a patent. *See id.* at 138-37.

Plaintiff now moves to dismiss all counterclaims and affirmative defenses asserted by defendants relating to the '585 Patent (Doc. # 305) or the '919 Patent (Doc. # 303), as well as all counterclaims and affirmative defenses other than defendants' inequitable conduct counterclaim relating to all claims in the '169 Patent except Claims 18-22, 25, 26, and 36 [*4] (Doc. # 307). Once again, plaintiff argues that the Court lacks jurisdiction because there is no longer any present case or controversy concerning defendants' infringement of those patents and patent claims. Plaintiff rests that argument solely on a January 18, 2011, e-mail from plaintiff's counsel to defendants' counsel, which states that plaintiff "decided to offer the covenants below in order to moot the issue and divest the Court of subject matter jurisdiction over most of [defendants'] patent claims and defenses." The actual covenants that follow in the e-mail state that plaintiff "unconditionally covenants not to sue" defendants for infringement as to any claim of the '585 Patent and the '919 Patent and as to Claims 1-17, 23, 24,

27-35, and 37-56 of the '169 Patent "based upon the Defendants' manufacture, importation, use, sale, or offer for sale of Defendants' products as they exist today or have existed in the past." Plaintiff thus argues that, by virtue of these covenants not to sue, it may no longer claim infringement of those patents and patent claims by defendants, and that therefore no controversy remains to support defendants' declaratory judgment claims and affirmative [*5] defenses relating to those patents and patent claims. *See Dow Jones & Co., Inc. v. Ablaise Ltd.*, 606 F.3d 1338, 1345-48 (Fed. Cir. 2010) ("a covenant not to sue for patent infringement divests the trial court of jurisdiction over claims that the patent is invalid, because the covenant eliminates any case or controversy between the parties") (citing cases).

1. The Court first addresses the parties' arguments not relating to the actual language of the covenants. Defendants argue that because plaintiff never filed a motion to dismiss its claim of infringement of the '585 Patent under Fed. R. Civ. P. 41, that claim remains in the case, which gives rise to a controversy concerning that patent. The Court rejects that argument. Rule 41 applies only to the dismissal of an entire action and not merely the dismissal of a claim. *See Gobbo Farms & Orchards v. Poole Chemical Co., Inc.*, 81 F.3d 122, 123 (10th Cir. 1996). This claim has clearly been abandoned by virtue of its omission from the pretrial order, *see Cortez v. Wal-Mart Stores, Inc.*, 460 F.3d 1268, 1276-77 (10th Cir. 2006), and defendants have provided no authority for its position that the claim somehow remains in the case. Moreover, [*6] plaintiff's motion with respect to the '585 Patent is based on the covenant not to sue, which, if effective, would serve as an absolute defense to the claim even if it were still technically alive.

2. Defendants also argue that because they have alleged that plaintiff breached license agreements by licensing invalid patents, the issue of invalidity cannot be wholly removed from the case. That fact is irrelevant to the present motions, which do not relate to defendants' affirmative contract claims. Accordingly, in considering whether defendants' declaratory judgment claims and affirmative defenses should be dismissed, the Court does not address any issues that may or may not be involved in other claims not at issue in these motions. [2]

> 2   For that reason, the Court does not address plaintiff's argument that multiple defendants cannot have standing to pursue the contract

claims.

3. Defendants also point to their claim for attorney fees under 35 U.S.C. § 285, which provides that in a patent case, "[t]he Court in exceptional cases may award reasonable attorney fees to the prevailing party." Defendants argue that the fee claim confers jurisdiction on the Court to rule the patents to be unenforceable [*7] based on inequitable conduct by plaintiff in prosecuting the patents.

In support of this argument defendants rely solely on the case of *Monsanto Co. v. Bayer Bioscience N.V.*, 514 F.3d 1229 (Fed. Cir. 2008). In that case, even though Bayer had dismissed its patent claims and given Monsanto a covenant not to sue, the court rejected Bayer's argument that the district court did not have jurisdiction to find that the patents were unenforceable in ruling on a fee claim under Section 285. *See id.* at 1242-43. The court noted that the district court's jurisdiction to rule on the fee claim encompassed the jurisdiction to make findings of inequitable conduct, based on prior law allowing a prevailing party to establish an "exceptional case" under the statute by showing inequitable conduct. *See id.* at 1242 (citing *Brasseler, U.S.A. I, L.P. v. Stryker Sales Corp.*, 267 F.3d 1370, 1380 (Fed. Cir. 2001)). Thus, the court held that the district court was required to find the patents unenforceable once it found inequitable conduct. *See id.* at 1243.

Under *Monsanto*, defendants are correct that, even if plaintiff's covenants could divest the Court of jurisdiction over defendants' declaratory judgment claims, [*8] the Court could still possibly declare the three patents unenforceable in ruling on defendants' fee claim. *Monsanto* does not suggest, however, that the fee claim confers or creates jurisdiction over the declaratory judgment claims. To the contrary, in *Monsanto* the court ruled that the district court retained jurisdiction over the fee claim even if the covenant divested that court of jurisdiction over the declaratory judgment claims. *See id.* at 1242. Thus, the fee claim has no effect on the viability of the declaratory judgment claims and affirmative defenses that are the subject of these motions, including defendants' claims seeking declaratory judgments that the '585 Patent and the '919 Patent are unenforceable based on inequitable conduct. Nor would the dismissal of the inequitable conduct claims affect defendants' ability to pursue their fee claim, which is not at issue in these

motions. [3]

[3]   Plaintiff argues that, even without the covenants not to sue, the Court lacks jurisdiction over defendants' inequitable conduct declaratory judgment claims relating to the '585 Patent and the '919 Patent because plaintiff was no longer alleging infringement of those patents in this case at the [*9] time defendants added those claims by amendment. As noted above, however, the absence of an infringement claim does not mean that a case or controversy may not exist. *See supra* note 1. The Court also notes that plaintiff did not properly raise this argument, which was made for the first time in plaintiff's reply brief. *See, e.g.*, *U.S. Fire Ins. Co. v. Bunge N. Am., Inc.*, 2008 U.S. Dist. LEXIS 59737, 2008 WL 3077074, at *9 n.7 (D. Kan. Aug. 4, 2008) (court will not consider issues raised for first time in reply brief) (citing *Minshall v. McGraw Hill Broadcasting Co.*, 323 F.3d 1273, 1288 (10th Cir. 2003)).

4. Finally, the Court considers defendants' opposition based on the actual language of the covenants at issue. "Whether a covenant not to sue will divest the trial court of jurisdiction depends on what is covered by the covenant." *Revolution Eyewear, Inc. v. Aspex Eyewear, Inc.*, 556 F.3d 1294, 1297 (Fed. Cir. 2009). For instance, in *Revolution Eyewear*, the court held that because the covenant at issue did not extend to future sales of the product, it did not divest the district court of jurisdiction, and that because the declaratory judgment plaintiff retained stores of the product to sell, the district court would [*10] not merely be rendering an advisory opinion. *See id.* at 1298-1300.

Defendants argue that the covenants here are not broad enough to eliminate any possible future claim by plaintiff of infringement by defendants because they cover only defendants' products "as they exist today or have existed in the past." Thus, defendants argue that the covenants cover the RFIQ products that they had already produced when plaintiff terminated the licenses, but they do not preclude a future infringement claim by plaintiff if defendants develop different products using the patents' RFID technology. [4]

[4]   The Court rejects defendants' other arguments relating to the scope of the covenants. The fact that the covenants do not explicitly refer to

methods is immaterial, as the covenants apply to all claims of two patents and specific claims of the third, and infringement claims would be barred as to those patents and claims. Moreover, the fact that plaintiff's surviving infringement claims under the '169 Patent could preclude defendants' development of their products even with the covenants is irrelevant, as the covenants could still eliminate any possible claim of infringement (and thus any controversy) relating [*11] to the other two patents and the other claims of the '169 Patent. Finally, because the covenants track the language of the infringement statute, 35 U.S.C. § 271(a), the Court rejects defendants' argument that the covenants are too narrow because they don't refer to the exporting of parts.

In response, plaintiff argues that the covenants were not intended to be so narrow as to apply only to the RFIQ system as it existed in 2006. Plaintiff interprets the covenants in its reply brief as follows: "The covenant was not limited to any particular pan or pot size, so if Vita Craft wanted to add, for example, a stockpot or a different size sauce pan, the covenant covers the new size." Plaintiff also concedes that the covenant was not intended to be unlimited in scope, as it was not intended to cover future unknown products that fall outside the "clarification" quoted above. [5] That "clarification" that the covenant covers application of defendants' previously-produced RFIQ system to new pot sizes is not sufficient, however, to include all possible applications of the patents' technology to defendants' cookware, which applications would therefore remain subject to a possible claim by plaintiff [*12] of infringement. As recognized by the Federal Circuit in *Revolution Eyewear*, the mere fact that plaintiff has granted covenants not to sue is not enough; rather, the scope of the covenants must be considered.

     [5]  Plaintiff argues that it may effectively broaden the scope of its covenants by its statements in its brief, which would also bind plaintiff.

The Court agrees with plaintiff that the covenants need not cover every possible act of infringement that defendants could possible commit in the future; for instance, on the present record, they need not cover defendants' future application of the patents' technology to some heretofore-unmentioned product other than

cookware. As defendants concede, they must have made "meaningful preparation" for the development of the product before a case or controversy arises. *See Cat Tech LLC v. TubeMaster, Inc.*, 528 F.3d 871, 880-81 (Fed. Cir. 2008). Plaintiff, however, has not disputed defendants' evidence (the same evidence on which they relied in opposing plaintiff's previous summary judgment motion) that they invested a great deal of money and time in developing applications of the patents' RFID technology, as permitted by the licenses, to their [*13] cookware. [6] The Court previously held that that evidence was sufficient to demonstrate a controversy and support subject matter jurisdiction at this stage of the litigation. Plaintiff's covenants--even as "clarified" in its brief--do not extend to all future applications of the patents' technology to defendants' cookware; therefore, the covenants do not eliminate any case or controversy concerning the patents and patent claims referenced in those covenants, and the Court retains subject matter jurisdiction over defendants' declaratory judgment counterclaims and affirmative defenses relating to those patents and patent claims. For that reason, the Court denies plaintiff's motions to dismiss.

     [6]  Plaintiff argues that the appropriate controversy is limited to the scope of the patents, not the scope of the license agreements. Plaintiff is correct that the controversy must involve a possible claim of infringement of the patents. The license agreements, however, provide context concerning defendants' potentially-infringing future activity.

IT IS THEREFORE ORDERED BY THE COURT THAT plaintiff's motions to dismiss certain counterclaims and affirmative defenses (Doc. ## 303, 305, 307) are **denied**.

IT [*14] IS SO ORDERED.

Dated this 3rd day of June, 2011, in Kansas City, Kansas.

/s/ John W. Lungstrum

John W. Lungstrum

United States District Judge

**<u>Citation #4</u>**
**2011 us dist lexis 139234**

LEXSEE

**U.S. RUBBER RECYCLING, INC., Plaintiff, v. ENCORE INTERNATIONAL, INC., et al., Defendants.**

**NO. CV 09-09516 SJO (OPx)**

**UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA**

**2011 U.S. Dist. LEXIS 11678**

**January 7, 2011, Decided**
**January 7, 2011, Filed**

**SUBSEQUENT HISTORY:** Summary judgment granted by, Claim dismissed by U.S. Rubber Recycling, Inc. v. ECORE Int'l, 2011 U.S. Dist. LEXIS 154151 (C.D. Cal., Dec. 12, 2011)

**PRIOR HISTORY:** Dodge-Regupol, Inc. v. RB Rubber Prods., 585 F. Supp. 2d 645, 2008 U.S. Dist. LEXIS 91620 (M.D. Pa., 2008)

**CORE TERMS:** patent, covenant, declaratory judgment, infringement, matter jurisdiction, declaratory judgment, reconsideration, consolidate, reissue, citation omitted, attorney fees, invalidity, unenforceability, cause of action, inequitable conduct, notice, prevailing party, underlayment, patentee, original patent, declaratory, antitrust, issuance, marking, rubber, divest, Sherman Act, acoustical, surrender, case law

**COUNSEL:** [*1] For U.S. Rubber Recycling, Inc., a California Corporation, Jeffrey J. Zuber, Zuber and Taillieu LLP, Kevin Isaac Shenkman, Zuber and Taillieu LLP, Plaintiffs: Benjamin C Deming, LEAD ATTORNEY, Zuber & Taillieu LLP, Los Angeles, CA. Yuri Mikulka, LEAD ATTORNEY, Stradling Yocca Carlson & Rauth, Newport Beach, CA. Sarah S Brooks, Zuber & Taillieu LLP, Los Angeles, CA.

For ECORE Internatonal Inc., Defendant: Jeffrey D Wexler, LEAD ATTORNEY, Luce Forward Hamilton and Scripps LLP, Los Angeles, CA. Robert C Nissen, William T Enos, PRO HAC VICE, Oblon Spivak McClelland Maier & Neustadt LLP, Alexandria, VA.

**JUDGES:** S. JAMES OTERO, UNITED STATES

DISTRICT JUDGE.

**OPINION BY:** S. JAMES OTERO

**OPINION**

**ORDER GRANTING DEFENDANT'S MOTION FOR RECONSIDERATION OF ORDER DENYING DEFENDANT'S MOTION TO DISMISS CLAIMS ONE, TWO, AND THREE FOR LACK OF SUBJECT MATTER JURISDICTION; DISMISSING PLAINTIFF'S CLAIM FOR DECLARATORY JUDGMENT OF INVALIDITY; DENYING PLAINTIFF'S MOTION TO CONSOLIDATE**

[Docket Nos. 29, 50]

This matter is before the Court on Defendant Encore International, Inc.'s ("Defendant") Motion for Reconsideration of the Court's Order Denying Defendant's Motion to Dismiss Claims One, Two, and Three ("Motion for Reconsideration"), filed [*2] on August 16, 2010. (Docket No. 29.) Plaintiff U.S. Rubber Recycling, Inc. ("Plaintiff") filed an Opposition on August 23, 1010, to which Defendant submitted a Reply. (Docket Nos. 30, 33.) On November 8, 2010, Plaintiff filed a Motion to Consolidate Cases, praying the Court to consolidate the instant action with *Kinetics Noise Control, Inc. v. Encore International, Inc.*, Case No. CV 10-7902 (C.D. Cal., filed Oct. 20, 2010). (Docket No. 50.) Defendant submitted an Opposition to the Motion to Consolidate on November 15, 2010 and Plaintiff filed a

Reply. (Docket Nos. 51, 52.) The Court found the matters suitable for disposition without oral argument and vacated the hearings set for September 13, 2010 and December 6, 2010. *See* Fed. R. Civ. P. 78(b). For the following reasons, Defendant's Motion for Reconsideration is **GRANTED**. Plaintiff's Motion to Consolidate is **DENIED**.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff and Defendant are manufacturers and sellers of flooring products, including rubber acoustical underlayment products. (Compl. ¶¶ 27, 28.) Acoustical underlayment products are flat, resilient substrates used under floors to dampen sound. (*Id.* ¶ 14.) Rubber acoustical underlayment [*3] is made from recycled automobile tires and provides greater sound dampening characteristics than underlayment made from other materials. (*Id.* ¶¶ 15, 16.) Rubber acoustical underlayment also provides points for Leadership in Energy and Environmental Design ("LEED") certification, which has become the recognized standard for measuring environmentally sustainable construction in the United States. (*Id.* ¶¶ 16, 18.) Obtaining LEED certification allows participants to take advantage of government initiatives available for green projects and to compete in the rapidly growing "green build market." (*Id.* ¶ 19.) The demand for sustainable construction has created a corresponding demand for acoustical flooring underlayment made of recycled materials. (*Id.* ¶ 22.)

On December 29, 2009, Plaintiff filed its Complaint against Defendant, alleging that Defendant fraudulently procured and wrongfully enforced U.S. Patent Number 6,920,723 (the "'723 Patent") to monopolize the rubber acoustical underlayment market. (Compl. ¶¶ 3, 30, 35.) The '723 Patent purportedly provides a substrate that minimizes bulk while still providing insulating material with the requisite acoustic properties and strength characteristics [*4] needed in a flooring system. (*See id.* ¶ 36.) Plaintiff asserted that, during the prosecution of the '723 Patent, Defendant intentionally failed to disclose to the United States Patent and Trademark Office ("PTO") material prior art that showed the claimed invention had been sold in the United States and described in printed publications more than one year prior to the '723 Patent application. (*Id.* ¶¶ 35, 52.) Plaintiff also alleged that Defendant threatened litigation to competitors, distributors, architects, and end-users from at least 2006 to 2009 and communicated to them that they may not sell

or purchase rubber acoustic underlayment from anyone but Defendant due to the '723 Patent. (*Id.* ¶ 65.) Plaintiff posited that these threats were baseless, made in bad faith, and for anti-competitive purposes. (*Id.* ¶¶ 66, 67.)

In its Complaint, Plaintiff asserted eight claims for relief: (1) violation of § 2 of the Sherman Antitrust Act; (2) declaratory judgment of invalidity of the '723 Patent; (3) declaratory judgment of unenforceability of the '723 Patent; (4) false patent marking; (5) violation of § 43(a) of the Lanham Act; (6) intentional interference with prospective economic advantage [*5] under California common law; (7) negligent interference with prospective economic advantage under California common law; and (8) unfair competition in violation of California Business and Professions Code §§ 17200, *et seq.* (Unfair Competition Law ("UCL")). (*See generally* Compl.) In response to the Complaint, Defendant sent Plaintiff two written covenants that "disclaimed *all rights* to sue [Plaintiff] or any of its customers for any past, present or future infringement of the '723 [P]atent for any current or past product." (Pl.'s Mot. for Recons. ("MFR") 2:13-15 (emphasis in original).) On March 8, 2010, Defendant filed a Motion to Dismiss and a Motion to Strike Claim Eight. (Docket No. 15.) The Court issued an Order Granting in Part and Denying in Part Defendant's Motion (the "July 28 Order"), granting dismissal of Claim Eight, but denying dismissal of Claims One through Seven. (Order 13:10-14.)

Defendant subsequently filed its Motion for Reconsideration on August 16, 2010. (Docket No. 29.) Plaintiff filed an Opposition on August 23, 1010 and Defendant submitted a Reply on August 26, 2010. (Docket Nos. 30, 33.) Plaintiff then moved the Court to transfer *Kinetics Noise Control*, Case [*6] No. CV 10-7902. On October 26, 2010, the Court issued an Order Declining Transfer. In response, Plaintiff lodged a Motion to Consolidate the instant action with *Kinetics Noise Control* on November 8, 2010. (Docket No. 50.) Plaintiff also provided Notice of Reissue Patent 41,945 (the "'945 Reissue Patent") Issuance in Support of Its Opposition to the Motion for Reconsideration ("Notice of Reissue Patent"), to which Defendant submitted a Response to Notice of Reissue Patent Issuance ("Response to Notice of Reissue"). (Docket Nos. 54, 55.)

## II. DISCUSSION

A. The Court Grants Defendant's Motion for Reconsideration.

Defendant moves the Court for reconsideration of its July 28 Order. Defendant argues that *King Pharms., Inc. v. Eon Labs, Inc. (King Pharm. I), 616 F.3d 1267, 1282 (Fed. Cir. 2010)*, constitutes a material difference in law. (Def.'s MFR 1:22-26.) Plaintiff contends that Defendant has failed to meet its burden for a motion for reconsideration because *King Pharm. I* does not constitute a change in the controlling law and Defendant improperly repeats arguments. (Pl.'s Opp'n to MFR 2:18-5:12.)

1. Legal Standard for Motion for Reconsideration

A party may move for reconsideration pursuant to [*7] Federal Rule of Civil Procedure ("Rule") 60 and Local Rule 7-18. The "motion for reconsideration should not be granted, absent highly unusual circumstances, unless the district court is presented with newly discovered evidence, committed clear error, or if there is an intervening change in the controlling law." *389 Orange St. Partners v. Arnold, 179 F.3d 656, 665 (9th Cir. 1999)* (citation omitted); *see also* Fed. R. Civ. P. 60(b) (permitting reconsideration due to mistake or any justifiable reason). The motion may also be granted if there is an "emergence of new material facts or a change of law . . . [or] a manifest showing of a failure to consider material facts presented to the Court . . . ." *See* L.R. 7-18.

2. Defendant's Covenants Not to Sue Divested the Court of Subject Matter Jurisdiction over Plaintiff's Claim for a Declaratory Judgment of Invalidity

"It is a fundamental precept that federal courts are courts of limited jurisdiction. The limits upon federal jurisdiction, whether imposed by the Constitution or by Congress, must be neither disregarded nor evaded." *Owen Equip. & Erection Co. v. Kroger, 437 U.S. 365, 374, 98 S. Ct. 2396, 57 L. Ed. 2d 274 (1978)*. "A federal court is presumed to lack jurisdiction in [*8] a particular case unless the contrary affirmatively appears." *A-Z Int'l v. Phillips, 323 F.3d 1141, 1145 (9th Cir. 2003)* (quotes and citation omitted). Thus, a party claiming jurisdiction based on the Declaratory Judgment Act carries the burden to establish that such jurisdiction "existed at the time the claim for declaratory relief was filed and that it has continued since." *Benitec Australia, Ltd. v. Nucleonics, Inc., 495 F.3d 1340, 1344 (Fed. Cir. 2007)*; *see also Steffel v. Thompson, 415 U.S. 452, 459 n.10, 94 S. Ct. 1209, 39 L. Ed. 2d 505 (1974)* ("The rule in federal cases is that an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed.")

(citations omitted).

The Declaratory Judgment Act provides jurisdiction "[i]n a case of actual controversy . . . [to] any court of the United States . . . [so that it] may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). To satisfy the "actual controversy" requirement of the Declaratory Judgment Act, the Supreme Court has held that "the facts alleged, under all the circumstances, [must] show that there is a [*9] substantial controversy, between the parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *MedImmune, Inc. v. Genentech, Inc. (MedImmune I), 549 U.S. 118, 127, 127 S. Ct. 764, 166 L. Ed. 2d 604 (2007)* (citation omitted). Under Federal Circuit case law, the parties have adverse legal interests when there is "an underlying legal cause of action that the declaratory defendant could have brought or threatened to bring, if not for the fact that the declaratory plaintiff has preempted it." *Microchip Tech., Inc. v. Chamberlain Grp., Inc., 441 F.3d 936, 943 (Fed. Cir. 2006)*. "Without an underlying legal cause of action, any adverse economic interest that the declaratory plaintiff may have against the declaratory defendant is not a legally cognizable interest sufficient to confer declaratory judgment jurisdiction." *Id.* In determining jurisdiction pursuant to the Declaratory Judgment Act, a district court has "unique and substantial discretion in deciding whether to declare the rights of litigants." *Wilton v. Seven Falls Co., 515 U.S. 277, 286, 115 S. Ct. 2137, 132 L. Ed. 2d 214 (1995)*.

The Federal Circuit has long held that "a patentee defending against an action for a declaratory judgment [*10] of invalidity [and unenforceability] can divest the trial court of jurisdiction over the case by filing a covenant not to assert the patent at issue against the putative infringer with respect to any of its past, present or future acts . . . ." *Super Sack Mfg. Corp. v. Chase Packaging Corp., 57 F.3d 1054, 1058 (Fed. Cir. 1995)* (citing *Spectronics Corp. v. H.B. Fuller Co., 940 F.2d 631, 636-38 (Fed. Cir. 1991)*). The vitality of this precedent was thrown into doubt when the Supreme Court in *MedImmune I, 549 U.S. at 132 n.11*, rejected the Federal Circuit's "reasonable apprehension of suit" test, which the appellate court had previously used to determine subject matter jurisdiction for declaratory judgment patent actions. [1] In *Benitec Australia, Ltd. v.*

*Nucleonics, Inc.*, 495 F.3d at 1347-48, however, "[t]he Federal Circuit[] . . . clarifie[d] that a covenant not to sue is still sufficient to divest a trial court of subject matter jurisdiction, even under the new legal standard." *Crossbow Tech., Inc. v. YH Tech.*, 531 F. Supp. 2d 1117, 1120 (N.D. Cal. 2007). In *King Pharms. I*, 616 F.3d at 1282 (citations omitted), the Federal Circuit reaffirmed its long standing precedent that broad and unrestricted [*11] covenants not to sue remove any case and controversy between the parties. Therefore, *King Pharm. I* does not represent a change in the controlling law and cannot be the basis for Defendant's Motion for Reconsideration.

> 1   Prior to *MedImmune I*, 549 U.S. at 132 n.11, the Federal Circuit applied a two-part test to determine the existence of declaratory judgment jurisdiction; the test required both: (1) an explicit threat or other action by the patentee, which creates a reasonable apprehension on the part of the declaratory plaintiff that it will face an infringement suit; and (2) present activity which could constitute infringement or concrete steps taken with the intent to conduct such activity. *Super Sack*, 57 F.3d at 1058 (citation omitted). The Federal Circuit has now recognized that the "Supreme Court's opinion in *MedImmune* [*I*] represents a rejection of [its] reasonable apprehension of suit test." *SanDisk Corp. v. STMicroelectronics, Inc.*, 480 F.3d 1372, 1380 (Fed. Cir. 2007). The "all the circumstances" test applied in *MedImmune I* represents a "more lenient legal standard [that] facilitates or enhances the availability of declaratory judgment jurisdiction in patent cases." *Micron Tech., Inc. v. Mosaid Techs., Inc.*, 518 F.3d 897, 902 (Fed. Cir. 2008) [*12] (citations omitted).

The Court, however, grants Defendant's Motion for Reconsideration because, in denying Defendant's Motion to Dismiss as to Plaintiff's Claims One, Two, and Three, it mistakenly relied on *SanDisk Corp. v. STMicroelectronics, Inc.*, 480 F.3d 1372, 1382-83 (Fed. Cir. 2007). [2] In *SanDisk*, the Federal Circuit declined to hold that a statement, made by the defendant's vice president of intellectual property and licensing, eliminated the justiciable controversy created by that defendant's actions. *Id.* The defendant's officer stated in a meeting that the defendant had "absolutely no plan whatsoever to sue." *Id.* at 1376. The defendant, however,

had approached the declaratory judgment plaintiff, made studied and considered determination of infringement, and communicated to the plaintiff its preparedness and willingness to enforce its patent rights. *Id.* at 1383. Applying *SanDisk* in its July 28 Order, the Court held that Defendant's covenant not to sue did not eliminate the controversy in the instant litigation because the Defendant engaged in extra-judicial patent enforcement similar to the defendant in *SanDisk*. (Order 5:17-6:10.)

> 2   "An error doesn't become a mistake until you [*13] refuse to correct it." Paul H. King & Richard C. Fries, Design of Biomedical Devices and Systems 441 (2003) (quoting Orlando A. Battista).

Though *SanDisk* is still good law, the Federal Circuit has since limited its holding in that case regarding covenants not to sue. In *Benitec*, the Federal Circuit differentiated *SanDisk* by finding that the defendant in *SanDisk* "only stated that it did not *intend* to sue [the plaintiff]; it did not say it *would not* sue [the plaintiff] in the future for its alleged infringement." 495 F.3d at 1347 (emphases in the original). The Court of Appeals then proceeded to hold that a covenant not to sue by the defendant in *Benitec* extinguished any controversy between the parties. *See id.* at 1347-48. Several district courts have recognized the distinct factual circumstances of *SanDisk. See, e.g., Crossbow Tech.*, 531 F. Supp. 2d at 1123 ("[A]n oral promise made at a business meeting . . . [that reflected] a statement of intent not to sue during negotiations is not the same as a covenant not to sue in the future for infringement.") (citation omitted); *Dodge-Regupol, Inc. v. RB Rubber Prods., Inc.*, 585 F. Supp. 2d 645, 654 (M.D. Pa. 2008) (distinguishing *SanDisk* by [*14] stating that the *SanDisk* defendant: (1) took a course of conduct that vitiated the effect of its officer's oral covenant; (2) persisted in threatening enforcement after stating that it would not do so; and (3) conveyed only its intention, rather than a promise not to sue). Indeed, since *Benitec*, the Federal Circuit has consistently upheld that "broad and unrestricted covenants not to sue . . . for infringement . . . [will] remove any case or controversy that may have existed between the parties . . . ." *King Pharms. I*, 616 F.3d at 1282 (citation omitted); *see also Dow Jones & Co. v. Ablaise, Ltd. (Ablaise II)*, 606 F.3d 1338, 1347-49 (Fed. Cir. 2010) (reversing a district court's denial of a motion to dismiss because a covenant not to sue extinguished any case or controversy between the parties, even though the

district court found "sound prudential reasons" to exercise jurisdiction, like efficiency and the public interest in minimizing gamesmanship).

The case at hand is readily distinguishable from *SanDisk*. Whereas the defendant in *SanDisk* merely made an oral promise showing intent not to sue, here, Defendant provided two broadly written and unrestricted covenants to not sue Plaintiff [*15] or anyone using Plaintiff's products. 3 *Compare SanDisk, 480 F.3d at 1382-83 with* (Def.'s MFR 2:20-25.) Even assuming that Defendant's multiple unconditional covenants not to sue did not extinguish declaratory judgment jurisdiction, the Court must hold that Defendant's representation at the September 27 Scheduling Conference does so. Counsel for Defendant stated unequivocally, "We are not going to sue them on the [']723 [Platent], period, ever. That's it." (Hr'g Tr. 13:5-6, Sept. 27, 2010.)

> 3  The first covenant provides that Defendant will not sue Plaintiff for infringement "now or in the future (including for any possible past damages, if any) for any products that [Plaintiff] currently makes, uses, sells, offers for sale, or imports into the United States." (Def.'s MFR 2:20-23.) The second covenant states that Defendant will not sue any of Plaintiff's customers for infringement "now or in the future (including for any possible past damages, if any) for any products that [Plaintiff] currently makes (or made in the past), and which were purchased, used, offered for sale, imported, or resold by any customers of [Plaintiff] to any other person." (*Id.* at 2:22-25.)

Moreover, none of the exceptions [*16] that the Federal Circuit has carved out from the jurisprudence engendered by *Super Sack, 57 F.3d at 1058*, are applicable to the case at hand. The Federal Circuit has held that a covenant not to sue has to be filed prior to consideration or resolution of the underlying infringement claim for the covenant to divest the district court of its declaratory judgment jurisdiction. *Fort James Corp. v. Solo Cup Co., 412 F.3d 1340, 1348 (Fed. Cir. 2005).* The Court of Appeals has also held that, for a covenant to effectively divest jurisdiction, it must cover "current products whether they were produced and sold before or after the covenant . . . ." *Revolution Eyewear, Inc. v. Aspex Eyewear, Inc., 556 F.3d 1294, 1300 (Fed. Cir. 2009).* Here, Defendant provided its covenants not to sue when "no trial of the infringement issue has taken

place." *Benitec, 495 F.3d at 1347.* The covenants at issue also cover infringement "now or in the future . . . for any products that [Plaintiff] currently makes, uses, sells, offers for sale, or imports into the United States." (Def.'s MFR 2:20-25.)

Lastly, the argument that Defendant's covenants do not divest jurisdiction because they do not cover future potential [*17] products of Plaintiff is unavailing. At the September 27 Scheduling Conference, Plaintiff attempted to differentiate *Dow Jones & Co. v. Ablaise, Ltd. (Ablaise II), 606 F.3d at 1348,* by characterizing Defendant's covenants as "fairly narrow" for only covering "current products." (Hr'g Tr. 12:15-25.) Plaintiff's argument runs counter to established Federal Circuit case law. The Federal Circuit has made abundantly clear that "an actual controversy cannot be based on a fear of litigation over future products." *Amana Refrigeration, Inc. v. Quadlux, Inc., 172 F.3d 852, 855 (Fed. Cir. 1999)* (citation omitted); *see also Super Sack, 57 F.3d at 1059-60* ("The residual possibility of a future infringement suit based on [a declaratory judgment plaintiff's] future acts is simply too speculative a basis for jurisdiction . . . for declaratory judgments of invalidity."); *Benitec, 495 F.3d at 1345-48* (holding the fact that a declaratory judgment plaintiff may file a new drug application for a potentially infringing product in a few years "does not provide the immediacy and reality required for a declaratory judgment"); *MedImmune, Inc. v. Genentech, Inc. (MedImmune II), 535 F. Supp. 2d 1000, 1005 (C.D. Cal. 2008)* [*18] ( "[A] covenant need not cover potentially infringing activities in the future as long as it covers the past and present activities that constitute the 'actual controversy' between the parties.") (citation omitted).

Accordingly, the Court GRANTS Defendant's Motion for Reconsideration and DISMISSES WITH PREJUDICE Plaintiff's Claim Two for declaratory judgment of invalidity. 4

> 4  The Court fully acknowledges the potential unfairness of the Federal Circuit precedent, which binds this Court. If the facts alleged by Plaintiff are true, Defendant attempted "extra-judicial patent enforcement with scare-the-consumer [and competitor]-and-run tactics that infect[ed] the competitive environment of the business community with uncertainty and insecurity." *Arrowhead Indus. Water, Inc. v. Ecolochem, Inc., 846 F.2d 731, 735 (Fed. Cir. 1988)* (citation

omitted), *overruled on other grounds by* MedImmune I, 549 U.S. at 118. An important purpose behind the Declaratory Judgment Act is to prevent patent holders from threatening enforcement while avoiding litigation that might render the patent invalid or unenforceable. *See id.*; *see also* Cardinal Chem. Co. v. Morton Int'l, Inc., 508 U.S. 83, 100, 113 S. Ct. 1967, 124 L. Ed. 2d 1 (1993) (The Supreme [*19] Court "emphasized the importance to the public at large of resolving questions of patent validity . . . ."); Dow Jones & Co. v. Ablaise, Ltd. (Ablaise I), 583 F. Supp. 2d 41, 44 (D.D.C. 2008) ("There is an important public interest in protecting the legal system against manipulation by parties, especially those prone to involvement in repeat litigation, who might contrive to moot cases that otherwise would be likely to produce unfavorable precedents.") (citing Hart & Weschler, The Federal Courts and the Federal System 204 (5th ed. 2003)), *rev'd in part*, Ablaise II, 606 F.3d at 1348-49. Thus, Defendant's covenants not to sue are likely "manipulative efforts to defeat declaratory jurisdiction . . . " and thwart that very important goal. *See* Benitec, 495 F.3d at 1351 (Dyk, J., dissenting). Perhaps a different test for determining whether there is a case or controversy should apply when the allegation of infringement is withdrawn during the course of litigation, like the case at hand. *See* id. at 1350. Such policy questions, however, are better left for the Federal Circuit and Congress. The Court, as a district court, is duty bound to apply Federal Circuit precedent with fidelity. *See* Ablaise II, 606 F.3d at 1348 [*20] ("Subject matter jurisdiction is a threshold requirement for a court's power to exercise jurisdiction over a case, and no amount of 'prudential reasons' or perceived increases in efficiency, however sound, can empower a federal court to hear a case where there is no extant case or controversy.").

3. The Court, However, Retains Jurisdiction to Declare the '723 Patent Unenforceable Because It Retains Independent Jurisdiction over Plaintiff's Request for Attorney Fees.

Were Defendant to assume that its covenants not to sue divested the Court of jurisdiction over Plaintiff's claim for declaratory judgment of unenforceability (*see*

Def.'s MFR 4:4-8), however, Defendant would be sorely mistaken.

In Monsanto Co. v. Bayer Bioscience N.V., 514 F.3d 1229, 1242 (Fed. Cir. 2008), the Federal Circuit held that a covenant not to sue did not strip a district court of jurisdiction over a claim for declaratory judgment of unenforceability because, "[e]ven if filing such a covenant may divest the [district] court of jurisdiction over a declaratory judgment action regarding [the] patents [at issue] . . . under [Federal Circuit] precedent the district court retain[s] independent jurisdiction over . . . [a] [*21] request for attorney fees under 35 U.S.C. § 285." Pursuant to § 285, "[a] district court may award reasonable attorney fees to the prevailing party in a patent infringement case where the conduct of a party is deemed to be 'exceptional' . . . The prevailing party may prove the existence of an exceptional case by showing: inequitable conduct before the PTO . . . ." Brasseler, U.S.A. I, L.P. v. Stryker Sales Corp., 267 F.3d 1370, 1380 (Fed. Cir. 2001) (citations omitted). Thus, a "district court's jurisdiction to rule on attorney fees encompass[es] the jurisdiction to make findings of inequitable conduct regarding [the withdrawn] claim." Monsanto, 514 F.3d at 1242 (citation omitted). Once a patent is found to have been obtained by inequitable conduct, the Federal Circuit "has long held that the unenforceability of a patent follows automatically . . . ." Id. at 1243. Having "jurisdiction to decide whether a patent was obtained through inequitable conduct necessarily includes the jurisdiction to declare a patent unenforceable as a result of that inequitable conduct." Id.

Defendant's attempt to differentiate Monsanto, 514 F.3d at 1243, is unpersuasive and nonsensical. Defendant argues [*22] that "*Monsanto* did not involve a declaratory judgment for unenforceability." (Def.'s Reply in Supp. of Mot. to Dismiss ("MTD") 2:3-5.) Yet, the Federal Circuit expressly stated, "The question facing this court is . . . whether a district court's jurisdiction under § 285 to determine whether there was inequitable conduct in the prosecution of patents that are otherwise no longer in suit confers on that court the jurisdiction to hold such patents unenforceable for inequitable conduct. We hold that it does." Monsanto, 514 F.3d at 1232, 1243 (also stating that plaintiff had "filed a declaratory judgment action . . . seeking a declaration that . . . [the] patents were invalid and unenforceable"). In light of the clear holding of *Monsanto*, Defendant's misrepresentation is overreaching at best and dishonest at worst.

Having established that § 285 grants district courts independent jurisdiction to review inequitable conduct, the Court must turn to whether Defendant is eligible to assert an attorneys' fee claim under § 285. Pursuant to § 285, "[o]nly a 'prevailing' party is eligible to recover attorney fees . . . ." *King Pharms., Inc. v. Eon Labs, Inc. (King Pharm. II),* No. 04-CV-5540, 2010 U.S. Dist. LEXIS 102740, 2010 WL 3924685, at *4 (E.D.N.Y. Sept. 28, 2010) [*23] (citing *Manildra Milling Corp. v. Ogilvie Mills, Inc.,* 76 F.3d 1178, 1183 (Fed. Cir. 1996)); *see also Jacobsen v. Katzer,* 609 F. Supp. 2d 925, 931 (N.D. Cal. 2009) ("To be eligible for an award of attorneys' fees under section 285, [plaintiff] must first demonstrate that [it] is the prevailing party on the patent claims."). Federal Circuit case law controls in determining whether a party is a "prevailing party" for purposes of § 285. *See Highway Equip. Co. v. FECO, Ltd.,* 469 F.3d 1027, 1032 (Fed. Cir. 2006). Under Federal Circuit precedent, a party is a "prevailing" party when it obtains a result in its favor that "has the necessary judicial imprimatur to constitute a judicially sanctioned change in the legal relationship of the parties . . . ." *Id.* at 1035 (citations omitted).

Defendant argued that Plaintiff "cannot properly claim that it is entitled to its attorney's fees . . . because . . . [Defendant had] voluntarily dismissed its [patent infringement] claim." (Def.'s Reply in Supp. of MTD 2:27-28.) Were Plaintiff's claim for attorney fees based only on its claims for declaratory judgment of invalidity and unenforceability, Defendant would likely be correct. 5 Defendant, however, [*24] fails to understand that Plaintiff's Fourth Claim of false patent marking is still viable. In the July 28 Order, the Court denied Defendant's Motion to Dismiss Plaintiff's false patent marking claim. (Order 10:1-18.) Under its Fourth Claim, Plaintiff requested attorney fees provided by 35 U.S.C. § 285, after alleging that Defendant "falsely marked, and continues to falsely mark, non-patented products with the '723 Patent . . . ." (Compl. ¶¶ 97, 104.) Defendant has neither alleged nor provided statutory or case law support for the proposition that attorney fees pursuant to § 285 is inapplicable to a claim of false patent marking. "It is well established that to recover attorney's fees under 35 U.S.C. § 285, the cause of action must arise under patent law." *Calypso Bay, L.L.C. v. State Farm Fire & Cas. Co.,* No. 06-4367, 2008 U.S. Dist. LEXIS 70264, 2008 WL 4286492, at *3 (E.D. La. Sept. 18, 2008) (citing *Wilson v. Cont'l Dev. Co.,* 112 F. Supp. 2d 648, 666 (W.D. Mich. 1999)). A false patent marking cause of action arises

under patent law. *See* 35 U.S.C. § 292(b); *see also Forest Grp., Inc. v. Bon Tool Co.,* 590 F.3d 1295, 1304 (Fed. Cir. 2009) (where the Federal Circuit reviewed a request for attorney fees based on [*25] alleged litigation misconduct over a false patent marking claim). Thus, it would be premature and inappropriate for the Court to hold that Plaintiff, as a matter of law, cannot be a "prevailing" party for its claim of false patent marking, especially when that claim survived a motion to dismiss.

5    Defendant's voluntary covenants not to sue do not have the necessary judicial sanctioned imprimatur for Plaintiff to be a "prevailing" party for the infringement claim. In *Highway Equipment Co. v. FECO, Ltd.,* 469 F.3d at 1032, the Federal Circuit held that a voluntary motion to dismiss by a defendant based on a covenant not to sue and a district court's subsequent dismissal of claims with prejudice permit a "district court [to] properly entertain . . . [a] fee claim under 35 U.S.C. § 285." That, however, is not the case before the Court. Defendant never asserted an infringement claim or counterclaim. It also did not file a motion to dismiss upon which the Court could grant. Indeed, the Federal Circuit has yet to determine whether a declaratory judgment defendant's grant of a covenant not to sue qualifies as a "judicially sanctioned change in the legal relationships" if no infringement claims [*26] or counterclaims were ever first made against the declaratory judgment plaintiff. Several district courts have held that, in such a scenario, a court does not have the authority to hear an attorney fees claim. *Jacobsen,* 609 F. Supp. 2d at 931 ("Because, as the patent at issue was voluntarily disclaimed, the Court cannot find that [plaintiff] is the prevailing party in this matter. Therefore, attorneys' fees under section 285 could not become available to [plaintiff] and does not, in any case, form an independent basis for jurisdiction over the now-disclaimed patent."); *see also King Pharms. II,* 2010 U.S. Dist. LEXIS 102740, 2010 WL 3924685, at *5 (same).

Accordingly, the Court, after properly reconsidering Defendant's Motion to Dismiss, DENIES Defendant's prayer to dismiss Claim Three because the Court retains independent jurisdiction to review for inequitable conduct in the prosecution of the '723 Patent under 35 U.S.C. § 285. 6

6     Defendant could divest the Court of
jurisdiction over attorney fees if it offered to pay
the entire amount of attorney fees in dispute,
thereby mooting the § 285 issue. *Samsung Elecs.
Co. v. Rambus, Inc., 523 F.3d 1374, 1379-80
(Fed. Cir. 2008)*.

4. After Reconsideration, the Court Reaffirms [*27] Its
Denial of Defendant's Motion to Dismiss Plaintiff's
Antitrust Claim Under the Sherman Act.

Defendant argues that the Court "lacks subject matter
jurisdiction over claim 1 because it does not have subject
matter jurisdiction over claims 2 and 3." (Def.'s MFR
5:3-9.) In its Complaint, Plaintiff asserted an antitrust
claim against Defendant, alleging that Defendant
"intentionally and fraudulently failed to disclose and
concealed prior art from the Patent Office that was
material to the '723 Patent application" and that
Defendant "has been, and is currently engaged in,
enforcing the fraudulently procured '723 Patent against . .
. competitors, distributors, and others in the Relevant
Market." (Compl. ¶¶ 70, 71.)

a. The Court Has Subject Matter Jurisdiction over
Plaintiff's *Walker Process* Claim.

In *Walker Process Equipment, Inc. v. Food Machine
& Chemical Corp., 382 U.S. 172, 174, 86 S. Ct. 347, 15
L. Ed. 2d 247 (1965)*, the Supreme Court held "that the
enforcement of a patent procured by fraud on the Patent
Office may be violative of § 2 of the Sherman Act
provided the other elements necessary to a § 2 case are
present." Because of that holding, a monopolization claim
against a patentee for the enforcement of a fraudulently
[*28] obtained patent is commonly referred to as a
*Walker Process* claim. *See, e.g., Dippin' Dots, Inc. v.
Mosey, 476 F.3d 1337, 1347 (Fed. Cir. 2007)*. A
meritorious *Walker Process* claim strips the patentee of
its exemption from antitrust laws and subjects the
patentee to treble damages. *See Walker, 382 U.S. at
176-77*.

Firstly, the Court must reject Defendant's request for
a dismissal of Claim One because, as previously
determined, independent subject matter jurisdiction exists
for the Court to decide Claim Two. *See* Part II.A.3.
Plaintiff may be entitled to attorney fees pursuant to 35
U.S.C. § 285. Section 285 provides the Court with
jurisdiction to determine whether Defendant committed
inequitable conduct before the PTO, irrespective of

whether Defendant's covenants to not sue divested the
Court of jurisdiction over Plaintiff's declaratory judgment
claims. *See id.* By Defendant's logic, the Court thus has
subject matter jurisdiction over Plaintiff's *Walker Process*
claim.

Secondly, and perhaps more importantly, Defendant
is confusing subject matter jurisdiction under the
Declaratory Judgment Act with subject matter
jurisdiction under the Sherman Act. They are not one and
the same. As previously [*29] stated, a court has subject
matter jurisdiction to issue a declaratory judgment if
"substantial controversy, between the parties having
adverse legal interests, of sufficient immediacy and
reality . . ." exists. *MedImmune I, 549 U.S. at 127*. In
contrast, a court has subject matter jurisdiction over a
Sherman Act claim because the claim arises under the
laws of the United States. *See Litecubes, LLC v. N. Light
Prods., Inc., 523 F.3d 1353, 1364 (Fed. Cir. 2008)*
("Respondents asserted nonfrivolous claims under the
Sherman Act, and 28 U.S.C. § 1331 vests district courts
with subject-matter jurisdiction over cases 'arising under'
federal statutes . . . .") (quoting *Hartford Fire Ins. Co. v.
California, 509 U.S. 764, 812, 113 S. Ct. 2891, 125 L.
Ed. 2d 612 (1993)* (Scalia, J., dissenting)).

Thus, Defendant mistakenly characterized its attack
on Plaintiff's *Walker Process* claim as a Motion to
Dismiss for lack of subject matter jurisdiction, when in
reality, Defendant is alleging that Plaintiff has failed to
sufficiently plead an antitrust claim upon which relief is
plausible. This confusion may be due to the Federal
Circuit's holding that a patent cannot serve as the
foundation of a monopolization case without some efforts
by [*30] the patentee to enforce the patent. *See Cygnus
Therapeutic Sys. v. ALZA Corp., 92 F.3d 1153, 1161
(Fed. Cir. 1996), overruled on other grounds by
Nobelpharma AB v. Implant Innovations, Inc., 141 F.3d
1059 (Fed. Cir. 1998)*. Under Federal Circuit case law,
"the standards . . . for determining jurisdiction in a
Declaratory Judgment Action of patent invalidity also
define the minimum level of 'enforcement' necessary to
expose the patentee to a *Walker Process* claim for
attempted monopolization." *Unitherm Food Sys., Inc. v.
Swift-Eckrich, Inc., 375 F.3d 1341, 1358 (Fed. Cir.
2004), rev'd on other grounds, 546 U.S. 394, 126 S. Ct.
980, 163 L. Ed. 2d 974 (2006)*. Though the standards are
similar, neither the Supreme Court nor the Federal Circuit
has held that the "enforcement" element of a *Walker
Process* claim is a hurdle to asserting subject matter

jurisdiction. *See, e.g., Vendo Co. v. Lektro-Vend Corp., 433 U.S. 623, 644, 97 S. Ct. 2881, 53 L. Ed. 2d 1009 n.* (1977)* (Blackmun, J., concurring) (The Supreme Court "held only that the enforcement of a patent procured by fraud on the Patent Office could **state a claim** under *§ 2* of the Sherman Act . . . .") (emphasis added); *Hydril Co. v. Grant Prideco LP, 474 F.3d 1344, 1350 (Fed. Cir. 2007)* ("The [*31] district court dismissed the antitrust claim because [plaintiff] ***failed to allege*** the minimum level of enforcement necessary ***to state a Walker Process claim*** . . . .") (internal quotes omitted and emphasis added).

To properly resolve this issue, the Court need not look any further than the wisdom contained in *Walker, 382 U.S. at 174*. In *Walker*, the patentee "moved to dismiss its [infringement] complaint with prejudice because the patent had expired. [The defendant] then amended its [declaratory judgment of invalidity] counterclaim to charge that [the patentee] had illegally monopolized interstate and foreign commerce by fraudulently and in bad faith obtaining and maintaining its patent . . . ." *Id.* (internal quotes omitted). Thus, in *Walker*, once the patent had expired, the claim for a declaratory judgment of invalidity became moot, which is likely why the counterclaim was amended. Rather than dismiss the *Walker Process* claim for lack of subject matter jurisdiction, as the Defendant suggests, the Supreme Court held that the alleged infringer should "have the opportunity to make its *§ 2* claims . . . and to establish the necessary elements of the asserted § 2 violation." *Id. at 178*. In [*32] doing so, the Supreme Court stated that a *Walker Process* claim arises under antitrust law, not under patent law or the Declaratory Judgment Act. *See id. at 176*.

Defendant cited *Cygnus Therapeutic Systems v. ALZA Corp., 92 F.3d at 1162*, for support, but that case is inapposite. (Def.'s MTD 8:12-18.) [7] In *Cygnus*, the Federal Circuit affirmed a district court's dismissal of the plaintiff's claim for declaratory judgment of invalidity and unenforceability and the district court's grant of summary judgment for the defendant on the plaintiff's *Walker Process* claim. *92 F.3d at 1160-62*. Rather than dismissing the claim based on lack of subject matter jurisdiction, the *Cygnus* district court had granted summary judgment on the *Walker Process* claim. *See id. at 1161*. It goes without saying that a court cannot decide a case on the merits if it lacks subject matter jurisdiction. *See Sinochem Int'l Co. v. Malay. Int'l Shipping Corp.,*

*549 U.S. 422, 430-31, 127 S. Ct. 1184, 167 L. Ed. 2d 15 (2007)* ("[A] federal court generally may not rule on the merits of a case without first determining that it has jurisdiction over the category of claim in suit (subject-matter jurisdiction) and the parties (personal jurisdiction).") (citation omitted). [*33] Ergo, the fact that the district court ruled and the Federal Circuit affirmed on the *Walker Process* claim, even after the declaratory judgment claim was dismissed for lack of subject matter jurisdiction, shows that the Court's jurisdiction over the *Walker Process* claim is not dependent on the viability of Plaintiff's declaratory judgment claims.

> 7   In its Motion to Dismiss, Defendant took a quote from *Cygnus* out of context; the quote reads, "[i]t is enough to simply point out that the same facts that compel the conclusion that [the plaintiff] failed to establish declaratory judgment jurisdiction for the district court also compel the conclusion that no reasonable fact finder could find that [the defendant] has acted to enforce [its] patents." (Def.'s MTD 8:14-18); *Cygnus, 92 F.3d at 1162*. Contrary to Defendant's assertion, this quote does not mean that "once the Court dismisses the declaratory judgment claims, it [must] also dismiss [the] antitrust claim." (Def.'s MTD 8:12-13.) Rather, the Federal Circuit was merely restating its prior holding that the standard to determine declaratory judgment jurisdiction is the same as the standard to determine whether a plaintiff has properly pled [*34] the enforcement element of a *Walker Process* claim. *See Unitherm Food, 375 F.3d at 1358*.

Accordingly, the Court DENIES Defendant's Motion to Dismiss Plaintiff's Claim One because the Court has subject matter jurisdiction over Plaintiff's *Walker Process* claim.

b. Plaintiff Sufficiently Pled a *Walker Process* Claim.

Because Defendant is actually arguing that Plaintiff failed to sufficiently plead Claim One, the Court takes time to address that assertion. Plaintiff argued in its Opposition to Plaintiff's Motion to Dismiss that, under Federal Circuit precedent, Plaintiff has sufficiently pled its *Walker Process* claim. The Court agrees.

In *Hydril Co. v. Grant Prideco LP, 474 F.3d at 1345*, the plaintiff alleged that the defendant had monopolized

two product markets by enforcing a patent that had been obtained by fraud from the PTO. The district court dismissed the *Walker Process* claim "for failure to state a valid claim for relief" because the plaintiff "ha[d] failed to allege the minimum level of enforcement necessary . . . ." [8] *Id.* at 1348. The Federal Circuit reversed the district court's decision and held that "a valid *Walker Process* claim may be based upon enforcement activity directed against [*35] the plaintiff's customers." *Id.* at 1350. The Court of Appeals found plaintiff's allegation, that the defendants "wrongfully threaten[ed] to enforce the [patent] against other market participants, including connections manufacturers, drill pipe distributors and end-users," *id.* at 1346, sufficient to state a claim. For the case at hand, Plaintiff made the same allegation as the plaintiff in *Hydril* did. Plaintiff alleged that "from at least 2006 through 2009, communications were made to competitors, distributors, architects and end-users that they may not sell or purchase rubber acoustic underlayment products from anyone but [Defendant] due to the '723 Patent." (Compl. ¶ 65.)

    [8] Not to belabor the point, the Court notes that the *Hydril* district court asserted subject matter jurisdiction over the *Walker Process* claim even though the plaintiff had not asserted a declaratory judgment claim. *See Hydril*, 474 F.3d at 1345. By Defendant's logic, a *Walker Process* claim could not have stood alone in *Hydril* because the court's jurisdiction should have depended on a pendent declaratory judgment claim. That was not the case in *Hydril* and that cannot be the case here. Both the district court and the [*36] Federal Circuit in *Hydril* reviewed the necessary "enforcement" element of a *Walker Process* claim as a Rule 12(b)(6) issue, not a subject matter jurisdiction issue. *See id.*

    Therefore, not only does the Court have subject matter jurisdiction over Claim One, Plaintiff has sufficiently pled the claim. The Court cannot dismiss Plaintiff's *Walker Process* claim at this juncture. This action is not at the summary adjudication stage and Plaintiff deserves an opportunity to prove its *Walker Process* claim after discovery is completed.

5. The Issuance of the '945 Reissue Patent Does Not Alter the Court's Holding.

    Plaintiff provides notice to the Court that the '723 Patent has been reissued by the PTO as the '945 Reissue

Patent. (Notice of Reissue Patent 1:1-25.) Plaintiff asserts that Defendant's refusal to provide a covenant to not sue on the reissue patent shows that Defendant's original covenants not to sue on the '723 Patent are "meaningless." (*Id.* at 2:11-18.)

    When the PTO issues a reissue patent, the original patent is surrendered and cannot be infringed. *Seattle Box Co. v. Indus. Crating & Packing, Inc.*, 731 F.2d 818, 827 (Fed. Cir. 1984). Previously, the "surrender precluded any action for [*37] infringement for acts done prior to the surrender . . . Courts . . . would dismiss for a failure to state a cause of action any action *filed* before the patent was surrendered since the patent sued on no longer existed." *Id.* (emphasis in original). Congress, however, sought to "ameliorate the harsh effect of a patent's surrender . . . [and] legislated that under certain circumstances claims of the original patent have a form of continuity if carried over to the reissue patent." *Id.* Under 35 U.S.C. § 252, Congress legislated that:

> The surrender of the original patent shall take effect upon the issue of the reissued patent, and every reissued patent shall have the same effect and operation in law, on the trial of actions for causes thereafter arising . . . but in so far as the claims of the original and reissued patents are substantially identical, such surrender shall not affect any action then pending nor abate any cause of action then existing, and the reissued patent, to the extent that its claims are substantially identical with the original patent, shall constitute a continuation thereof and have effect continuously from the date of the original patent.

35 U.S.C. § 252. Thus, a cause [*38] of action for infringement before the date of the issuance of the reissue patent survives if the claims of the original and reissue patents are substantially identical. *See Seattle Box Co.*, 731 F.2d at 827. "With respect to new or amended claims, an infringer's liability commences only from the date the reissue patent is issued." [9] *Id.* The Federal Circuit has determined that the term "identical" as used in § 252, "means, at most, without substantive change." *Id. at 927-28* (internal quotes omitted). "[I]t is the scope of the claim that must be identical, not that the identical words must be used." *Slimfold Mfg. Co. v. Kinkead*

*Indus., Inc.*, 810 F.2d 1113, 1115 (Fed. Cir. 1987).

9   In a PTO reissue proceeding, "new claims that broaden, narrow, or otherwise alter the scope of the original patent" are permissible, if conducted within two years of the issuance of the original patent. *Rolls-Royce PLC v. United Techs. Corp.*, 730 F. Supp. 2d 489, 2009 WL 6750627, at *1 n.2 (E.D. Va. 2009) (citing 35 U.S.C. § 251).

The issuance of the '945 Reissue Patent does not alter the Court's analysis with regards to Defendant's Motion to Dismiss Claims One, Two, and Three. Contrary to Plaintiff's assertion, [*39] Defendant's covenants are not meaningless. Pursuant to § 252, when the PTO issued the '945 Reissue Patent, Defendant surrendered the '723 Patent. *See* 35 U.S.C. § 252. In surrendering the Patent-in-Suit, however, Defendant did not surrender any cause of action regarding substantially identical claims contained in both the original and reissue patents. *See Seattle Box Co.*, 731 F.2d at 827. Both Plaintiff and Defendant agree that Claims 1 through 16 of the '945 Reissue Patent are identical to the claims of the '723 Patent. (Resp. to Notice of Reissue 1:9-14.) 10 Therefore, Defendant had a cause of action for infringement of Claims 1 through 16 of the '945 Reissue Patent (the '723 Patent) before and after the date the reissue patent was issued by the PTO. Defendant's covenants not to sue forever extinguished that cause of action. (*See id.* at 1:12-14.)

10   The Court construes Plaintiff's renewed request to deny Defendant's Motion to Dismiss Claims One, Two, and Three as consent that the claims of the '723 Patent are identical to Claims 1 through 16 of the '945 Reissue Patent. (*See* Notice of Reissue Patent 2:16-18.) Were the claims of the '723 Patent to be substantively different, Plaintiff's [*40] claims for declaratory judgment of invalidity and unenforceability would be moot because Plaintiff could not be liable for any infringement prior to the date of the reissue patent. *See Seattle Box Co.*, 731 F.2d at 827.

Nonetheless, the Court notes that Defendant's refusal to covenant not to sue on the '945 Reissue Patent seems inequitable. Defendant is seemingly trying to have it both ways. On one hand, Defendant wants to deprive the Court of jurisdiction over Plaintiff's claims for declaratory judgment of invalidity and unenforceability, thereby protecting the '723 Patent (and Claims 1 through 16 of

the '945 Reissue Patent) from scrutiny. On the other hand, Defendant wants to retain the right to essentially file another lawsuit for infringement of the new claims in the '945 Reissue Patent against the Defendant. The Court acknowledges that Plaintiff has not alleged that Defendant has asserted against Plaintiff the new claims contained in the '945 Reissue Patent. (*See generally* Notice of Reissue Patent.) Moreover, as Defendant highlights, the new claims in the '945 Reissue Patent are not at issue in this litigation. (Resp. to Notice of Reissue 1:15-18.)

B.   The Court Denies Plaintiff's [*41] Motion to Consolidate.

1. Plaintiff's Motion to Consolidate Is Actually a Motion for Reconsideration of the Court's Decision to Deny Transfer.

The Court deems Plaintiff's Motion to Consolidate as a motion for reconsideration of the Court's Order Denying Transfer. On October 27, 2010, the Court declined to transfer *Kinetics Noise Control*, Case No. CV 10-7902, because the Court determined that the "cases are not related pursuant to G.O. 08-05 . . . [and] [t]hey concern different plaintiffs, acts of anticompetitive conduct, damages, and counts." (Order Declining Transfer). Through its Motion, Plaintiff seeks to transfer the *Kinetics Noise Control* case and consolidate it with the action at hand. Thus, Plaintiff's prior motion to transfer and its current Motion to Consolidate are the same. Plaintiff has not met its burden for a motion for reconsideration under Rule 60 and Local Rule 7-18. *See* Fed. R. Civ. P. 60; L.R. 7-18. Plaintiff failed to show the existence of newly discovered evidence, that the Court committed clear error, or an intervening change in the controlling law. *See* 389 Orange St. Partners, 179 F.3d at 665. Accordingly, the Court DENIES Plaintiff's Motion to Consolidate.

2. Were [*42] Plaintiff's Motion to Consolidate Proper, the Court Would Still Deny the Request to Consolidate.

Were the Court to entertain Plaintiff's Motion as a Motion to Consolidate, the Court would deny the request. Rule 42 provides that, "[i]f actions before the court involve a common question of law or fact, the court may . . . consolidate the actions." Fed. R. Civ. P. 42(a)(2). A district court has "broad discretion to order consolidation of actions presenting a common issue of law or fact," and should "weigh[] the saving of time and effort

consolidation would produce against any inconvenience, delay, or expense that it would cause." *Huene v. United States*, 743 F.2d 703, 704 (9th Cir.1984).

Here, the Court exercises its broad discretion and declines to consolidate the two actions as requested by Plaintiff. Defendant has identified significant differences between the action at hand versus *Kinetic Noise Control*, Case No. CV 10-7902. In this case, Plaintiff asserted four claims that do not exist in the *Kinetic Noise Control* case. (Def.'s Opp'n to Mot. to Consolidate 3:4- 5.) Moreover, the plaintiff in *Kinetic Noise Control* is a distributor, which may involve different questions of law as to the [*43] claims that are similar between the two actions. (*See id.* at 3:15-4:2, 4:22-5:7.) Lastly, consolidating the two cases would unduly delay the case at hand. This action is set for trial in July of 2011 and fact discovery is set to close on March 11, 2011. (*Id.* at 5:21-22.) The Court intends to hold both parties to the set schedule, which might be unnecessarily compromised if the two cases are consolidated. *See e.g., Glass v. Intel Corp.,* No. CV06-671, 2007 U.S. Dist. LEXIS 57666, 2007 WL 2265663, at *5 (D. Ariz. Aug. 6, 2007) ("[A] motion under Rule 42(a) may be denied . . . if consolidation will cause delay in the processing of one or more of the individual cases" or "when one of the actions has proceeded further in the discovery process than the other.") (quoting 9 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2383 (2006)). Thus, were Plaintiff's

Motion to Consolidate proper, the Court would still deny the request to consolidate.

III. RULING

For the foregoing reasons, the Court **GRANTS** Defendant's Motion for Reconsideration of the Order Denying Defendant's Motion to Dismiss Claims One, Two, and Three. Having properly reconsidered the July 28 Order, the Court **DISMISSES WITH PREJUDICE** Plaintiff's [*44] claim for declaratory judgment of invalidity as to the '723 Patent. The Court, however, **DENIES** Defendant's Motion to Dismiss Claims One and Three because the Court finds that it has subject matter jurisdiction over Plaintiff's *Walker Process* claim and declaratory judgment claim for unenforceability. Furthermore, the Court **DENIES** Plaintiff's Motion to Consolidate. The parties should take heed that the **trial set for July of 2011** and the **end of fact discovery on March 11, 2011** remain unchanged.

IT IS SO ORDERED.

Dated: January 7, 2011.

/s/ S. James Otero

S. JAMES OTERO

UNITED STATES DISTRICT JUDGE

**<u>Citation #6</u>**
**2011 us dist lexis 34903**

LEXSEE

**THOMAS A. LUBRANO, Plaintiff, -against- THE STATE OF NEW YORK, ET AL., Defendants.**

**10-CV-2598 (JS)(AKT)**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK**

**2011 U.S. Dist. LEXIS 34903**

**March 30, 2011, Decided**
**March 30, 2011, Filed**

**SUBSEQUENT HISTORY:** Motion granted by Lubrano v. New York, 2011 U.S. Dist. LEXIS 137070 (E.D.N.Y., Nov. 22, 2011)

**PRIOR HISTORY:** Lubrano v. New York, 2011 U.S. Dist. LEXIS 745 (E.D.N.Y., Jan. 4, 2011)

**CORE TERMS:** limitations period, pro se, cause of action, statute of limitations, accrue, quotations, answered, suffice, tolling

**COUNSEL:** [*1] For Plaintiff: Thomas A. Lubrano, Pro se, Shirley, NY.

For Suffolk County Defs: Rudolph Max Baptiste, Esq., Suffolk County, Department of Law, Hauppauge, NY.

For Brookhaven Defs: David T. Fowler, Esq., Teresa Campano, Esq., McCabe, Collins McGeough & Fowler, LLP, Carle Place, NY.

For N.Y.S. Defs: Susan M. Connolly, Esq., N.Y.S. Office of the Attorney General, Hauppauge, NY.

**JUDGES:** Joanna Seybert, United States District Judge.

**OPINION BY:** Joanna Seybert

**OPINION**

MEMORANDUM & ORDER

SEYBERT, District Judge

Pending before the Court are two motions to dismiss, one filed by Defendants Suffolk County and Steve Levy ("Suffolk County Defendants"), and the other filed by New York State and then-Governor David Paterson ("New York State Defendants"). For the following reasons, these motions are GRANTED. [1]

1    Plaintiff has also sued the Town of Brookhaven and Supervisor Mark Lesko ("Brookhaven Defendants"). The Brookhaven Defendants answered Plaintiff's Complaint and then, four months later, curiously sought to move to dismiss under FED. R. CIV. P. 12(b)(6). The Court denied this request, noting that the filing of an answer waives the right to file a Rule 12(b)(6) motion. See Docket No 23; Electronic Order dated January 11, 2011. However, [*2] with the filing of this Order, the Brookhaven Defendants are the only Defendants left in this case. And, as they have already answered, the pleadings have closed. Thus, the Brookhaven Defendants can now move for judgment on the pleadings under Fed. R. Civ. P. 12(c). Given this opinion, and the law of the case doctrine, extensive briefing will not be required. A short letter motion will suffice.

BACKGROUND

Plaintiff Thomas A. Lubrano, pro se, is a citizen and resident of the United States. (Compl. ¶ A.) Plaintiff alleges that, on September 24, 2004, the State of New York, Suffolk County, and the Town of Brookhaven conspired to seize his 1987 Ford Thunderbird, under "Section 1224" of the "Abandoned Vehicles Law."

(Compl. ¶¶ 2, 3.) This theft, Plaintiff claims, violated 42 U.S.C. § 1983, entitling him to $3 million in compensatory damages. (Compl. ¶ 4 & "Legal Demands.")

DISCUSSION

I. Standard of Review

In deciding FED. R. CIV. P. 12(b)(6) motions to dismiss, the Court applies a "plausibility standard," which is guided by "[t]wo working principles," Ashcroft v. Iqbal, U.S. , 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009); Harris v. Mills, 572 F.3d 66, 72 (2d Cir. 2009). First, although [*3] the Court accepts all factual allegations as true, and draws all reasonable inferences in the plaintiff's favor, this "tenet" is "inapplicable to legal conclusions"; thus, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Harris, 572 F.3d at 72 (quoting Ashcroft); Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Management LLC, 595 F.3d 86, 91 (2d Cir. 2010). Second, only complaints that state a "plausible claim for relief" can survive Rule 12(b)(6). Id. Determining whether a complaint does so is "a context specific task that requires the reviewing court to draw on its judicial experience and common sense." Id.

Pro se plaintiffs enjoy a somewhat more liberal pleading standard. See Erickson v. Pardus, 551 U.S. 89, 94, 127 S. Ct. 2197, 167 L. Ed. 2d 1081 (2007) ("[A] pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.") (internal quotations and citations omitted). However, pro se plaintiffs must still "comport with the procedural and substantive rules of law." Javino v. Town of Brookhaven, 06-CV-1245, 2008 U.S. Dist. LEXIS 17323, at *3 (E.D.N.Y. Mar. 4, 2008).

II. [*4] Application to the Pending Motions

The pending motions to dismiss identify several persuasive reasons why Plaintiff's Complaint must be dismissed. This Court need reach only one: the statute of limitations. See generally Perez v. Hoblock, 368 F.3d 166, 172 (2d Cir. 2004) (it is "unnecessary to reach" a "complicated issue" if "there is a more straightforward and well-settled basis" for dismissing a claim).

In 42 U.S.C. § 1983 actions, the applicable limitations period is found in the "general or residual

[state] statute [of limitations] for personal injury actions." Owens v. Okure, 488 U.S. 235, 249-50, 109 S. Ct. 573, 102 L. Ed. 2d 594 (1989); Pearl v. City of Long Beach, 296 F.3d 76, 79 (2d Cir. 2002). Thus, § 1983 actions predicated on New York-based conduct have a three-year limitations period. Pearl, 296 F.3d at 79; N.Y. C.P.L.R. § 214(5). Federal law determines when such claims accrue, but New York law then determines "whether the limitations period has been tolled, unless state tolling rules would defeat the goals of section 1983." Abbas v. Dixon, 480 F.3d 636, 641 (2d Cir. 2007).

Here, Plaintiff's claim accrued on or near September 24, 2004, when Defendants allegedly stole his [*5] car. It was around then that Plaintiff knew, or should have known, that his car was missing. See Shomo v. City of New York, 579 F.3d 176, 181 (2d Cir. 2009) ("A Section 1983 claim ordinarily accrues when the plaintiff knows or has reason to know of the harm.") (internal citations and quotations omitted). Thus, absent tolling, his claim expired sometime in late-September or early-October 2007. [2]

> 2   Depending on the circumstances, it is not unreasonable to suggest that Plaintiff's cause of action did not accrue until a few days or weeks after Defendants allegedly seized his car. If, for example, Plaintiff was travelling, he might not have had reason to learn of the harm until he returned home. No such facts are, however, pled in the Complaint.

Plaintiff provides no basis to toll the statute of limitations, and the Court can find none. Instead, Plaintiff argues, incorrectly, that "there [is] no statute of limitations when the fault lies with the Government" or when the cause of action stems from "the Constitution, Bill of Rights, 42 USC 1983, Title 18 U.S.C. § 241, 242 of the Federal Code." Docket No. 35 at 12, Docket No. 36 at 10-11.

Consequently, the Court finds that Plaintiff's limitations period [*6] ended no later than early-October 2007. Plaintiff did not, however, commence this action until June 8, 2010, more than two and a half years later. It follows then that this action is time-barred, and must be DISMISSED.

CONCLUSION

The two pending motions to dismiss (Docket Nos.

2011 U.S. Dist. LEXIS 34903, *6

25, 30) are GRANTED. The Clerk of the Court is directed to terminate the Suffolk County and New York State Defendants from this case.

SO ORDERED.

Dated: March 30, 2011

Central Islip, New York

/s/ JOANNA SEYBERT

Joanna Seybert, U.S.D.J.

**<u>Citation #7</u>**
**2011 us dist lexis 20679**

LEXSEE

**ROLLS-ROYCE PLC, Plaintiff, v. UNITED TECHNOLOGIES CORPORATION (d/b/a PRATT & WHITNEY), Defendant.**

**1:10cv457 (LMB/JFA)**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF VIRGINIA, ALEXANDRIA DIVISION**

**2011 U.S. Dist. LEXIS 20679**

**March 2, 2011, Decided**
**March 2, 2011, Filed**

**SUBSEQUENT HISTORY:** Motion granted by Rolls-Royce PLC v. United Techs. Corp., 2011 U.S. Dist. LEXIS 48984 (E.D. Va., May 4, 2011)

**PRIOR HISTORY:** Rolls-Royce v. United Techs., 2010 U.S. App. LEXIS 15901 (Fed. Cir., June 29, 2010)

**CORE TERMS:** inequitable conduct, prior art, patent, casing, declaration, convergent, examiner, misrepresentation, intent to deceive, counterclaim, tip, affirmative defense, blade, deposition, profile, engine, swept, fan, fan blade, technology, disclose, inventor, shock, original application, filing date, anticipated, cumulative, invention, falsely, gas turbine engine

**COUNSEL:** [*1] For Rolls-Royce plc, Plaintiff, Counter Defendant: Scott Guthrie Lindvall, LEAD ATTORNEY, Kaye Scholer LLP (NY), New York, NY; Aaron Levi Webb, Richard Earle Rice, William Paul Berridge, Oliff & Berridge PLC, Alexandria, VA; Roy William Sigler, Kaye Scholer LLP, Washington, DC.

For United Technologies Corporation, doing business as Pratt & Whitney, Defendant: Antigone Gabriella Peyton, LEAD ATTORNEY, Cloudigy Law PLLC, Arlington, VA; Charles Brandon Rash, Finnegan Henderson Farabow Garrett & Dunner LLP (DC), Washington, DC; Robert Leo Burns, II, Finnegan Henderson Farabow Garrett & Dunner LLP (VA), Reston, VA.

For United Technologies Corporation, Counter Claimant: Antigone Gabriella Peyton, LEAD ATTORNEY, Cloudigy Law PLLC, Arlington, VA; Charles Brandon Rash, Finnegan Henderson Farabow Garrett & Dunner

LLP (DC), Washington, DC; Robert Leo Burns, II, Finnegan Henderson Farabow Garrett & Dunner LLP (VA), Reston, VA.

**JUDGES:** Leonie M. Brinkema, United States District Judge.

**OPINION BY:** Leonie M. Brinkema

**OPINION**

MEMORANDUM OPINION

Before the Court is plaintiff Rolls-Royce plc's Motion to Dismiss and Strike United Technologies Corporation's Affirmative Defenses and Counterclaims of Inequitable Conduct, Estoppel, Laches, [*2] and Unclean Hands [Dkt. No. 195]. Specifically, Rolls-Royce moves to dismiss defendant United Technologies Corporation's ("UTC") third counterclaim and to strike the third affirmative defense, each of which alleges inequitable conduct. For the reasons discussed below, the motion will be denied. [1]

> 1   On January 14, 2011, the motion was granted in part as to UTC's affirmative defenses of laches, estoppel, and unclean hands.

I. Background

Rolls-Royce and UTC manufacture jet engines. On November 17, 1995, UTC filed U.S. patent application no. 08/559,965 ("'965 application") for a jet engine swept

fan blade. The '965 application issued as Patent No. 5,642,985 ("'985 Patent") on July 1, 1997. On April 9, 1996, Rolls-Royce filed a patent application for a jet engine fan blade in Great Britain, and on March 18, 1997, filed a similar application in the United States, Application No. 08/819,269 ("'269 application"). First Am. Answer ¶ 69-71. On November 17, 1997, the PTO rejected the '269 application as being anticipated by UTC's '985 Patent. Id. ¶ 73-74. On March 18, 1998, Rolls-Royce responded to the examiner by canceling all of its claims, and proposed five new claims. Id. ¶ 75. On April 9, 1998, [*3] the examiner rejected these claims as being anticipated by the '985 Patent. Id. ¶ 77. Rolls Royce abandoned the '269 application. Id. ¶ 78. On October 9, 1998, Rolls-Royce filed continuation-in-part application no. 09/168,968 ("'968 application"). Id. ¶ 79. On August 18, 1999, the examiner rejected all of Rolls-Royce's claims as either obvious or anticipated by UTC's '985 Patent. Rolls-Royce responded to the rejection by arguing that its application contained two features not disclosed in UTC's '985 Patent: a "fan casing having an inner duct wall which in the region of a fan rotor is convergent in the downstream direction," and "swept fan blades having a tip profile which in revolution conforms to the convergent duct wall." First Am. Answer ¶ 100. In response to that representation, the PTO approved the application and issued U.S. Patent No. 6,071,077 ("'077 Patent") on June 6, 2000. The '077 Patent covers:

> A swept fan blade design for the low pressure compressor rotor or fan rotor stage of a ducted fan gas turbine engine has a leading edge swept forward near the hub up to a first radial height, then rearward up to second radial height and finally is swept again up to the blade tip. [*4] The aerodynamic effect is to produce a mid-height bias to the airflow enabling the tip region to be given increased twist and to possess increased resistance to foreign object damage. The design also provides a rear radial blade stacking axis to help reduce internal stresses due to centrifugal forces.

'077 Patent, Ex. A to First Am. Compl.

On June 5, 2001, UTC filed a second reissue application, no. 09/874,931 ("'931 Reissue Application") based on the '985 Patent. In 2003, UTC convinced the Patent and Trademark Office's Board of Patent Appeals and Interferences to declare an interference between the '077 Patent and UTC's '931 Reissue Application. The purpose of an interference is to determine which of multiple parties, each asserting patent rights to the same claimed invention, was the first to actually invent it. Rolls-Royce appealed the interference to this Court in 2005, and the Court reversed the PTO's decision. Rolls-Royce PLC v. United Techs. Corp., 730 F. Supp. 2d 489 (E.D. Va. 2009). The Federal Circuit affirmed this Court on May 5, 2010. Rolls-Royce PLC v. United Techs. Corp., 603 F.3d 1325 (Fed. Cir. 2010).

On May 5, 2010, Rolls-Royce filed this civil action for patent infringement, [*5] alleging that UTC's Geared Turbofan engines and other products infringe the '077 Patent. First Am. Compl. ¶¶ 20-24. Rolls Royce asks the Court to declare that UTC has infringed the '077 Patent, enjoin UTC's infringement, and award damages pursuant to 35 U.S.C. § 284.

On December 6, 2010, UTC filed its First Amended Answer, asserting six affirmative defenses, the third of which alleges that the '077 patent is unenforceable due to inequitable conduct. UTC also filed eight counterclaims, of which the third seeks a declaratory judgment that the '077 is unenforceable due to inequitable conduct. Rolls-Royce moves to dismiss the third counterclaim and to strike the third affirmative defense.

## II. Discussion

To establish inequitable conduct, a party must demonstrate by clear and convincing evidence that the applicant "(1) made an affirmative misrepresentation of material fact, failed to disclose material information, or submitted false material information, and (2) did so with intent to deceive the PTO." Cancer Research Tech. Ltd. v. Barr Labs., Inc., 625 F.3d 724, 2010 U.S. App. LEXIS 23214, at *21 (Fed. Cir. Nov. 9, 2010). The Federal Circuit has repeatedly indicated that inequitable conduct defenses are [*6] disfavored. See, e.g., Burlington Indus. Inc. v. Dayco Corp., 849 F.2d 1418, 1422 (Fed. Cir. 1998) (declaring that "the habit of charging inequitable conduct in almost every major patent case has become an absolute plague.").

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), an inequitable conduct counterclaim or affirmative defense must satisfy Fed. R. Civ. P. 9(b)'s particularity standard and identify "the specific who,

what, when, where, and how of the material misrepresentation or omission committed before the PTO." Exergen Corp. v. Wal-Mart Stores, Inc., 575 F.3d 1312, 1326 (Fed. Cir. 2009). As to intent, Rule 9(b) requires that the defendant "allege sufficient underlying facts from which a court may reasonably infer that a party acted with the requisite state of mind," which in this case is the intent to deceive the PTO. Id. at 1327. An inference of deceptive intent "must be reasonable and drawn from a pleading's allegations of the underlying facts to satisfy Rule 9(b) . . ." Id. at 1329, n.5. The Court must accept all of a complaint's well-pleaded allegations and view them in a light most favorable to the plaintiff. Battlefield Builders, Inc. v. Swango, 743 F.2d 1060, 1062 (4th Cir. 1984).

UTC's [*7] four theories of inequitable conduct allege that: 1) the Rolls-Royce employee-inventor of the '077 Patent, Anthony Rowlands ("Rowlands"), filed a false inventor declaration; 2) Rolls-Royce misled the PTO about the patent application's priority date; 3) Rolls-Royce failed to inform the PTO about material prior art; and 4) Rolls-Royce mischaracterized UTC's '985 Patent during prosecution of the '077 Patent.

A. Inventor declaration

UTC alleges that Rolls-Royce engaged in inequitable conduct by submitting a declaration in which Rowlands falsely stated that he had reviewed and understood the '968 application. First Am. Answer ¶¶ 85-91. In a declaration filed with the '968 application, Rowlands attested:

I hereby state that I have reviewed and understand the contents of this application, including the claims as amended by any amendment referred to above; and that I acknowledge my duty to disclose to the Office all information known to me to be material to patentability as defined in Title 37, Code of Federal Regulations, § 1.56.

Id. ¶ 89.

UTC supports its argument that this declaration was false by citing to Rowlands's September 15, 2005 deposition testimony in which he stated that he had not [*8] seen Figure 4 in the '077 Patent:

Q: But you didn't have an involvement

in Figure 4? I notice you left it out.

A: It was brought to my attention this week that that was added, and I wasn't involved in it, no. If you asked me last week, I wouldn't have known.

First Am. Answer ¶ 87. UTC also claims that Rowlands was not aware of material changes to the '968 application, citing the following testimony from Rowlands's deposition:

Q: In the first part of the writing, the description that's in Column 1 to the very top of Column 8, is that something that you did the initial draft of?

A: Yes.

Q: And then reviewed that draft description with the patent lawyer and made changes as appropriate; correct?

A: Yes, but I'd like to add that this has been - that would have been my original application. This is, as I understand it, has been changed subsequently to that.

Q: Do you know why it was changed?

A: I wasn't involved in the details of that, no.

Q: Well, when the change was made in the application, the later application for a patent where you were the inventor, were you involved in that?

A: In making the changes, I wasn't involved, no, from my recollection.

First Am. Answer ¶ 86.

Rolls-Royce responds that [*9] UTC's counterclaim omits the portion of the same deposition in which Rowlands stated that he reviewed the application before signing the declaration:

Question: But even after the changes were made, you did review the description and the claims to see if they were - if they accurately reflected your invention; correct?

Mr. Rowlands: Yes.

Question: And in terms of the initial application, before it was filed, you reviewed the description and the claims to make sure they accurately reflected your invention; correct?

Mr. Rowlands: Yes.

Mot. to Dismiss at 11.

The first element of an inequitable conduct claim is misrepresentation of a material fact. The deposition testimony cited by UTC suggests that Rowlands did not fully review and understand the revised '968 application, but the testimony cited by Rolls-Royce suggests that Rowlands had reviewed and did understand the application. On this record, the Court cannot determine, as a matter of law, whether Rowlands misrepresented a material fact. Such a determination requires fact-finding, including weighing witness credibility. At the motion to dismiss stage, UTC merely must allege a plausible and specific claim that Rowlands falsely declared that [*10] he had fully reviewed and understood the revised application. UTC has done so, by referring to specific deposition statements that present a plausible claim that Rowlands falsely declared that he reviewed and understood the revised application, thereby satisfying the Rule 9(b) pleading requirement of alleging the "who, what, when, where, and how" of the alleged misrepresentation.

As to intent, UTC has also alleged sufficient facts that would lead to a reasonable inference that Rolls-Royce intended to deceive the PTO by filing the declaration. In its Opposition brief, UTC argues that "a reasonable examiner would have wanted to know that the sole inventor had not reviewed and/or understood his own application when it was submitted." Opp. at 19. It is reasonable to infer that the false declaration was made with the intent to deceive the PTO. Accordingly, UTC has satisfied all of the requirements of Rule 9(b), and its inequitable conduct claim will not be dismissed as a matter of law.

B. Priority date

In its second inequitable conduct claim, UTC alleges that Rolls-Royce incorrectly claimed that the '968 application should receive the filing date of the earlier

'269 patent application and [*11] the British patent application. First Am. Answer ¶¶ 94-97. "As a general rule, the filing date of an application will determine the scope of the prior art that an examiner will consider in evaluating whether an application should be rejected on grounds of anticipation or obviousness." Arrow Int'l, Inc. v. Spire Biomedical, Inc., 635 F. Supp. 2d 46, 61 (D. Mass. 2009). UTC argues that "the '968 application included critical additions and other changes that were not from the original inventor and were not disclosed in the earlier applications," and that by falsely claiming the priority date of the earlier application, Rolls-Royce avoided disclosure of material prior art that was created between the April 9, 1996 Great Britain priority date and the October 9, 1998 filing of the '968 application. Id. ¶¶ 94-96.

The '968 application is a "continuation-in-part." Such applications receive the filing date of the prior application, as long as the claims were either disclosed or supported by the original application. If a claim in the continuation-in-part application discloses new matter, it does not get the benefit of the original application's filing date. Rolls-Royce argues that although the [*12] '968 application contains information that was not in the earlier '269 application, the general subject matter is the same.

The strength of UTC's inequitable conduct argument depends on whether the '968 application added subject matter that was not in the '269 application. As with UTC's allegation about the Rowlands declaration, this is a question of fact that cannot be determined at the motion to dismiss stage.

UTC has satisfied the Rule 9(b) pleading requirements. It has specifically alleged why the priority date was incorrectly reported and what prior art was excluded because of the earlier priority date. Because exclusion of material prior art could provide a patent applicant with the significant benefit of having the application granted, UTC has also pled sufficient facts upon which a reasonable inference of intent to deceive could be based. Therefore, this inequitable conduct allegation will not be stricken.

C. Failure to inform the PTO about prior art

UTC claims that Rolls-Royce failed to disclose prior art in the '968 application process. First Am. Answer ¶¶ 98-127. On August 18, 1999, the examiner rejected the

'968 application as obvious or anticipated by UTC's '985 patent. Id. [*13] ¶ 98. Rolls-Royce successfully responded to that rejection by arguing that its '968 application differed from UTC's '985 Patent because the '968 application disclosed convergent fan casings combined with convergent blade tip profiles. Id. ¶ 100. UTC argues that Rolls-Royce did not present the patent examiner with any prior art related to that claim. Citing depositions from the interference action, UTC contends that Rolls-Royce's employees and agents were aware of prior art containing convergent casings with corresponding blade tip profiles, much of which was in dozens of existing Rolls-Royce engines, and that Rolls-Royce's failure to report its own technology as prior art constitutes inequitable conduct. Id. ¶¶ 102, 104.

Moreover, UTC alleges that James Oliff, the lawyer who prosecuted the '968 application for Rolls-Royce, had prosecuted two other patents for Rolls-Royce: U.S. Patent No. 4,845,939 ("'939 Patent"), a gas turbine engine with bypass diverter means, and U.S. Patent No. 5,737,921 ("'921 Patent"), a gas turbine engine fuel injector. UTC argues that Oliff was aware that the '939 and '921 patents contained technology that should have been disclosed in the '968 application. Id. [*14] ¶¶ 106-07. Lastly, UTC claims that Rolls-Royce never disclosed to the PTO that its own Trent 700 engine had a swept fan blade with convergent casing and convergent blade tip profiles. Id. ¶¶ 119-26.

Rolls-Royce responds that the technology cited by UTC is cumulative to prior art that Rolls-Royce did cite to the examiner For example, Rolls-Royce points to the '077 Patent specification, which discloses:

> An angled casing of this kind has long been used by us to avoid complicated aerodynamic interference effects which might otherwise be brought about by reflection of the passage shock waves from the casing wall as has been described in U.S. Pat. No. 5,642,985.

Mot. to Dismiss at 17; Ex. H. In this specification, Rolls-Royce points to prior art for convergent casings from both Rolls-Royce and UTC. UTC counters that the '968 application's statement of "[a]n angled casing of this kind" is not sufficiently specific and that Rolls-Royce distinguished its '968 application from UTC's '985 patent by stating that it had convergent casings combined with

corresponding blade tip profiles. Opp. at 9-10, First Am. Answer ¶ 108.

The strength of this inequitable conduct argument hinges on whether the prior [*15] art cited by UTC is cumulative. See Alloc, Inc. v. Pergo, Inc., 366 Fed. Appx. 173, 175 (Fed. Cir. 2010) ("information is not material if it is cumulative of other information already disclosed."). To determine whether prior art was intentionally omitted will require a fuller record. In considering a 12(b)(6) motion, the only inquiry is whether UTC has satisfied Rule 9(b) by pleading the "who, what, when, where, and how" of the material misrepresentation and intent to deceive. It has. UTC has cited specific examples of prior art that Rolls-Royce did not cite, proffered reasons why the prior art is material and not cumulative, and explained how the prior art might have impacted the examiner's review of the '968 application. Therefore, because UTC has met the pleading requirements for both material misrepresentation and intent to deceive, this inequitable conduct claim will not be dismissed or stricken.

D. Misrepresentation of UTC's '985 patent

Lastly, UTC alleges that Rolls-Royce engaged in inequitable conduct by materially misrepresenting UTC's '985 patent during prosecution of the '968 application by stating that "[a]n angled casing of this kind has long been used by us to avoid complicated [*16] aerodynamic interference effects which might otherwise be brought about by reflection of the passage shock waves from the casing wall as has been described in [UTC's '985 Patent]." Opp. at 24; First Am. Answer at ¶¶ 92-93. In a November 17, 2005 brief in the interference trial, Rolls-Royce admitted that:

> While the '077 Patent inaccurately characterizes the endwall shock described in the 985 Patent, it specifically notes that endwall shock is not an issue with a convergent inner duct wall/fan blade tip profile as disclosed and claimed in the '077 Patent, as discussed above with respect to the Breugelmas Declaration.

Mot. to Dismiss at 13; Ex. E at 59.

Rolls-Royce has conceded that it mischaracterized UTC's '985 Patent, but contends that the mischaracterization is immaterial and not grounds for an inequitable conduct counterclaim or defense. In response,

UTC argues that the mischaracterization is material because the statement was not in Rolls-Royce's original application, which was rejected on the basis of UTC's '985 Patent. After adding that its invention solved the '985 Patent's problem with reflection of passage shock waves coming from the casing wall, the examiner granted the application. [*17] To determine whether this error was material and made with intent to deceive will require actual evidence, not just argument. UTC has satisfied the Rule 9(b) pleading standards by identifying the alleged misrepresentation and why the misrepresentation was material, and has pled sufficient facts to support a reasonable inference of intent to deceive by alleging that the statement distinguished Rolls-Royce's application from UTC's '985 patent, which had been grounds for an earlier rejection. Therefore, this inequitable conduct claim will neither be dismissed nor stricken at this stage.

IV. Conclusion

For the reasons discussed above, Rolls-Royce's Motion to Strike UTC's Third Affirmative Defense and Dismiss UTC's Third Counterclaim will be denied in an Order to be issued separately.

Entered this 2nd day of March, 2011.

Alexandria, Virginia

/s/ LMB

Leonie M. Brinkema

United States District Judge



1 of 1 DOCUMENT

**KIMBERLY-CLARK WORLDWIDE, INC., Plaintiff vs. FIRST QUALITY BABY PRODUCTS, LLC, FIRST QUALITY PRODUCTS, INC., FIRST QUALITY RETAIL SERVICES, LLC, FIRST QUALITY HYGIENIC, INC., Defendants and Counterclaim Plaintiffs vs. KIMBERLY-CLARK CORPORATION, KIMBERLY-CLARK WORLDWIDE, INC., KIMBERLY-CLARK GLOBAL SALES, LLC, Counterclaim Defendants**

**CIVIL NO. 1:CV-09-1685**

**UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

*2011 U.S. Dist. LEXIS 52416; 2011-1 Trade Cas. (CCH) P77,452*

**May 17, 2011, Decided**
**May 17, 2011, Filed**

**PRIOR HISTORY:** *Kimberly-Clark Worldwide, Inc. v. First Quality Baby Prods., LLC, 2011 U.S. Dist. LEXIS 46147 (M.D. Pa., Apr. 29, 2011)*

**COUNSEL:**  [*1] For Kimberly-Clark Worldwide Inc, Plaintiff: Andrew G. Klevorn, Chad J. Doellinger, LEAD ATTORNEYS, PRO HAC VICE, Eimer Stahl Klevorn & Solberg LLP, Chicago, IL; Bridget E. Montgomery, LEAD ATTORNEY, Eckert Seamans Cherin & Mellott, LLC, Harrisburg, PA; David J. Schertz, LEAD ATTORNEY, Harrisburg, PA; Janice V Mitrius, Jeffrey M Cox, Katherine L Fink, Marc S. Cooperman, LEAD ATTORNEYS, PRO HAC VICE, Banner & Witcoff, Ltd, Chicago, IL; Jason S. Shull, Michael L. Krashin, Thomas J. Lerdal, LEAD ATTORNEYS, Banner & Witcoff, Ltd., Chicago, IL; Vicki Margolis, LEAD ATTORNEY, PRO HAC VICE, Kimberly-Clark Corporation, Neenah, WI; Adam M. Shienvold, Eckert, Seamans, Cherin & Mellott, Harrisburg, PA; Bradley F. Rademaker, Jeffrey M. Cox, Banner & Witcoff, Chicago, IL.

For First Quality Products Inc, First Quality Baby Products, LLC, First Quality Retail Services, LLC,

Defendants: Aden A. Allen, Jose C. Villarreal, Michele K. Connors, LEAD ATTORNEYS, Wilson Sonsini Goodrich & Rosati, PC, Austin, TX; Brian A. Comack, LEAD ATTORNEY, Amster Rothstein & Ebenstein LLP, New York, NY; Brian P. Downey, Frederick Alcaro, Thomas B. Schmidt, III, LEAD ATTORNEYS, Pepper Hamilton, LLP, Harrisburg, PA; D.  [*2] Michael Underhill, Evan A. Parke, Michael A. Brille, LEAD ATTORNEYS, Boies, Schiller & Flexner LLP, Washington, DC; David A. Barrett, LEAD ATTORNEY, Boies, Schiller & Flexner LLP, New York, NY; Ira E. Silfin, Kenneth P. George, LEAD ATTORNEYS, PRO HAC VICE, Amster, Rothstein & Ebenstein LLP, New York, NY; Julie M. Holloway, LEAD ATTORNEY, Wilson, Sonsini, Goodrich & Rosati, San Francisco, CA; Kalina V. Laleva, Michael A. Ladra, Ron E. Shulman, Thomas T. Carmack, LEAD ATTORNEYS, Wilson Sonsini Goodrich & Rosati, Palo Alto, CA.

For First Quality Hygienic, Inc., Defendant: Adam M. Shienvold, LEAD ATTORNEY, Eckert, Seamans, Cherin & Mellott, Harrisburg, PA; Aden A. Allen, LEAD ATTORNEY, Wilson Sonsini Goodrich & Rosati PC, Austin, TX; Bridget E. Montgomery, LEAD

2011 U.S. Dist. LEXIS 52416, *2; 2011-1 Trade Cas. (CCH) P77,452

ATTORNEY, Eckert Seamans Cherin & Mellott, LLC, Harrisburg, PA; Frederick Alcaro, Thomas B. Schmidt, III, LEAD ATTORNEYS, Pepper Hamilton, LLP, Harrisburg, PA; Ira E. Silfin, LEAD ATTORNEY, PRO HAC VICE, Amster, Rothstein & Ebenstein LLP, New York, NY; Janice V Mitrius, Katherine L Fink, Marc S. Cooperman, LEAD ATTORNEYS, PRO HAC VICE, Banner & Witcoff, Ltd, Chicago, IL; Jeffrey M. Cox, LEAD ATTORNEY, Banner & Witcoff, Chicago, [*3] IL; Michele K. Connors, LEAD ATTORNEY, Wilson Sonsini Goodrich & Rosati, PC, Austin, TX; Thomas T. Carmack, LEAD ATTORNEY, Wilson Sonsini Goodrich & Rosati, Palo Alto, CA.

For First Quality Retail Services, LLC, Counter Plaintiff: Frederick Alcaro, LEAD ATTORNEY, Pepper Hamilton LLP, Harrisburg, PA; Ira E. Silfin, LEAD ATTORNEY, PRO HAC VICE, Amster, Rothstein & Ebenstein LLP, New York, NY; Brian A. Comack, Amster Rothstein & Ebenstein LLP, New York, NY.

For First Quality Baby Products, LLC, First Quality Retail Services, LLC, First Quality Products Inc, Counterclaim Plaintiffs: Aden A. Allen, Jose C. Villarreal, Michele K. Connors, LEAD ATTORNEY, Wilson Sonsini Goodrich & Rosati PC, Austin, TX; Brian A. Comack, LEAD ATTORNEY, Amster Rothstein & Ebenstein LLP, New York, NY; Brian P. Downey, Frederick Alcaro, Thomas B. Schmidt, III, LEAD ATTORNEYS, Pepper Hamilton, LLP, Harrisburg, PA; D. Michael Underhill, Evan A. Parke, Michael A. Brille, LEAD ATTORNEY, Boies, Schiller & Flexner LLP, Washington, DC; David A. Barrett, LEAD ATTORNEY, Boies, Schiller & Flexner LLP, New York, NY; Ira E. Silfin, Kenneth P. George, LEAD ATTORNEYS, PRO HAC VICE, Amster, Rothstein & Ebenstein LLP, New York, [*4] NY; Julie M. Holloway, LEAD ATTORNEY, Wilson, Sonsini, Goodrich & Rosati, San Francisco, CA; Michael A. Ladra, Ron E. Shulman, Thomas T. Carmack, LEAD ATTORNEYS, Wilson Sonsini Goodrich & Rosati, Palo Alto, CA.

For First Quality Baby Products, LLC, First Quality Products, Inc., First Quality Hygienic, Inc., Counterclaim Plaintiffs: Frederick Alcaro, LEAD ATTORNEY, Pepper Hamilton LLP, Harrisburg, PA; Ira E. Silfin, LEAD ATTORNEY, PRO HAC VICE, Amster, Rothstein & Ebenstein LLP, New York, NY; Brian A. Comack, Amster Rothstein & Ebenstein LLP, New York, NY.

For Kimberly-Clark Worldwide, Inc., Counterclaim

Defendant: Andrew G. Klevorn, Chad J. Doellinger, LEAD ATTORNEYS, PRO HAC VICE, Eimer Stahl Klevorn & Solberg LLP, Chicago, IL; Bridget E. Montgomery, LEAD ATTORNEY, Eckert Seamans Cherin & Mellott, LLC, Harrisburg, PA; Jason S. Shull, Thomas J. Lerdal, LEAD ATTORNEYS, Banner & Witcoff, Ltd., Chicago, IL.

For Kimberly-Clark Corporation, Kimberly-Clark Global Sales, LLC, also known as Kimberly-Clark Global Services, LLC, Counterclaim Defendants: Bridget E. Montgomery, LEAD ATTORNEY, Eckert Seamans Cherin & Mellott, LLC, Harrisburg, PA.

For Kimberly-Clark Worldwide Inc, Counterclaim Defendant: [*5] Andrew G. Klevorn, Chad J. Doellinger, LEAD ATTORNEYS, PRO HAC VICE, Eimer Stahl Klevorn & Solberg LLP, Chicago, IL; Bridget E. Montgomery, LEAD ATTORNEY, Eckert Seamans Cherin & Mellott, LLC, Harrisburg, PA; David J. Schertz, LEAD ATTORNEY, Harrisburg, PA; Jason S. Shull, Thomas J. Lerdal, LEAD ATTORNEY, Banner & Witcoff, Ltd., Chicago, IL; Adam M. Shienvold, Eckert, Seamans, Cherin & Mellott, Harrisburg, PA.

For First Quality Baby Products, LLC, Counterclaim Plaintiff: Aden A. Allen, Jose C. Villarreal, Michele K. Connors, LEAD ATTORNEYS, Wilson Sonsini Goodrich & Rosati, PC, Austin, TX; Brian A. Comack, Ira E. Silfin, LEAD ATTORNEYS, Amster, Rothstein & Ebenstein LLP, New York, NY; Brian P. Downey, Frederick Alcaro, Thomas B. Schmidt, III, LEAD ATTORNEY, Pepper Hamilton, LLP, Harrisburg, PA; D. Michael Underhill, Evan A. Parke, Michael A. Brille, LEAD ATTORNEYS, Boies, Schiller & Flexner LLP, Washington, DC; David A. Barrett, LEAD ATTORNEY, Boies, Schiller & Flexner LLP, New York, NY; Ira E. Silfin, Kenneth P. George, LEAD ATTORNEYS, PRO HAC VICE, Amster, Rothstein & Ebenstein LLP, New York, NY; Julie M. Holloway, LEAD ATTORNEY, Wilson, Sonsini, Goodrich & Rosati, San Francisco, [*6] CA; Michael A. Ladra, Ron E. Shulman, Thomas T. Carmack, LEAD ATTORNEYS, Wilson Sonsini Goodrich & Rosati, Palo Alto, CA.

For First Quality Products Inc, First Quality Retail Services, LLC, Counterclaim Plaintiffs: Aden A. Allen, Jose C. Villarreal, Michele K. Connors, LEAD ATTORNEYS, Wilson Sonsini Goodrich & Rosati, PC, Austin, TX; Brian A. Comack, Ira E. Silfin, LEAD ATTORNEYS, Amster, Rothstein & Ebenstein LLP,

Case 3:10-cv-01435-AWT   Document 46-6   Filed 06/08/12   Page 50 of 177

Page 3

2011 U.S. Dist. LEXIS 52416, *6; 2011-1 Trade Cas. (CCH) P77,452

New York, NY; Brian P. Downey, Frederick Alcaro, Thomas B. Schmidt, III, LEAD ATTORNEYS, Pepper Hamilton, LLP, Harrisburg, PA; D. Michael Underhill, Evan A. Parke, Michael A. Brille, LEAD ATTORNEY, Boies, Schiller & Flexner LLP, Washington, DC; David A. Barrett, LEAD ATTORNEY, Boies, Schiller & Flexner LLP, New York, NY; Ira E. Silfin, Kenneth P. George, LEAD ATTORNEYS, PRO HAC VICE, Amster, Rothstein & Ebenstein LLP, New York, NY; Julie M. Holloway, LEAD ATTORNEY, Wilson, Sonsini, Goodrich & Rosati, San Francisco, CA; Michael A. Ladra, Ron E. Shulman, Thomas T. Carmack, LEAD ATTORNEYS, Wilson Sonsini Goodrich & Rosati, Palo Alto, CA.

For Kimberly-Clark Worldwide Inc, Counterclaim Defendant: Andrew G. Klevorn, Chad J. Doellinger, LEAD ATTORNEYS, PRO HAC VICE, Eimer Stahl Klevorn [*7] & Solberg LLP, Chicago, IL; Bridget E. Montgomery, LEAD ATTORNEY, Eckert Seamans Cherin & Mellott, LLC, Harrisburg, PA; David J. Schertz, LEAD ATTORNEY, Harrisburg, PA; Janice V Mitrius, Jason S. Shull, Jeffrey M Cox, Katherine L Fink, Marc S. Cooperman, Thomas J. Lerdal, LEAD ATTORNEYS, Banner & Witcoff, Ltd, Chicago, IL; Vicki Margolis, LEAD ATTORNEY, Kimberly-Clark Corporation, Neenah, WI; Adam M. Shienvold, Eckert, Seamans, Cherin & Mellott, Harrisburg, PA.

**JUDGES:** William W. Caldwell, United States District Judge.

**OPINION BY:** William W. Caldwell

**OPINION**

*MEMORANDUM*

*I. Introduction*

Presently before the court is plaintiff Kimberly-Clark Worldwide, Inc.'s ("KC") motion to dismiss defendants First Quality Baby Products, LLC, First Quality Products, Inc., First Quality Retail Services, LLC, and First Quality Hygienic, Inc.'s (collectively "First Quality") counterclaims I-VII. For the following reasons, we will deny the motion.

*II. Background*

First Quality avers the following. First Quality and KC each manufacture a line of absorbent hygiene products, such as infant diapers, training pants, and adult incontinence products. (Countercl. ¶¶ 16-18, 22-25.) KC is the maker of the Huggies brand of products, while First Quality [*8] manufacturers and sells "private label", or store brands, to retailers. (Countercl. ¶¶ 16, 22-25.) KC currently maintains a thirty-five percent market share for disposable baby diapers and a seventy-five percent share in the training pants markets. (Countercl. ¶ 17-18.)

As a result of these market shares and the amassing of over 300 patents, First Quality alleges that KC uses its patents to disrupt competitors and to maintain a monopoly in the disposable baby diaper and training pants market. (Countercl. ¶¶ 13, 93.) KC first threatens a patent lawsuit and then engages in sham litigation to drain the resources of private label manufacturers, thereby reducing the ability of private labelers to compete with KC's larger market shares. (Countercl. ¶¶ 84-87, 112-13.) It accomplishes this goal by enforcing patents that, according to First Quality, KC knows to be invalid, procured through fraud on the Patent and Trademark Office ("PTO"), or not infringed. (Countercl. ¶¶ 51-52, 84-86.) KC then misrepresents the nature of the litigation in order to threaten retail outlets, such as Walmart, with "empty shelves" of diapers if it does not make KC the exclusive supplier of training pants store brand, [*9] or forces private label manufacturers to enter into secret settlement agreements that involved the purchasing of unnecessary licences. (*See* Countercl. ¶¶ 18, 112.) As a result, consumers are forced to pay more for disposable baby diapers and training pants, and competitors efforts to enter and compete in the market are hindered. (Countercl. ¶¶ 113-114.)

On February 12, 2010, KC submitted a motion seeking leave to file a second amended complaint. KC's proposed amendment included the same allegations against all the defendants, but also sought to add a new defendant, First Quality Hygienic, Inc., add allegations of inducement and/or contributory infringement in Count I, add allegations of willful infringement to Counts III and IV, and finally include additional allegedly infringing products under Counts VI, VII, VIII, and X--Confidence Underwear and Extra Absorbency. We granted leave and the second amended complaint was deemed filed on May 5, 2010.

On July 26, 2010, First Quality filed an answer

Case 3:10-cv-01435-AWT   Document 46-6   Filed 06/08/12   Page 51 of 177

Page 4

2011 U.S. Dist. LEXIS 52416, *9; 2011-1 Trade Cas. (CCH) P77,452

wherein in alleged numerous additional facts that were not present in its original answer or its answer to the amended complaint. In addition, First Quality alleged, for the first time, seven new **[\*10]** counterclaims. In response, KC filed motions to strike, dismiss, sever and transfer, or in the alternative sever and stay defendants counterclaims I-VII. We granted KC's motion to strike the counterclaims, concluding that First Quality did not seek leave of court before filing asserting its new claims. *See Kimberly-Clark Worldwide, Inc. v. First Quality Baby Prods., LLC, 757 F.Supp.2d 520, 2010 U.S. Dist. LEXIS 134969, 2010 WL 5365650 (M.D. Pa. 2010).* However, on reconsideration, we vacated our order and denied KC's motion to strike. *See Kimberly-Clark Worldwide, Inc. v. First Quality Baby Prods., LLC, No. CV-09-1685, 2011 U.S. Dist. LEXIS 18003, 2011 WL 743468 (M.D. Pa. Feb. 24, 2011).* On April 29, 2011, we granted KC's motion to bifurcate the patent claims and counterclaims I-VII for purposes of trial, concluding judicial efficiency and jury comprehension necessitated claim separation. *Kimberly-Clark Worldwide, Inc. v. First Quality Baby Prods., LLC, No. CV-09-1685, 2011 U.S. Dist. LEXIS 46147, 2011 WL 1627052, at \*2 (M.D. Pa. April 29, 2011).* We also stayed discovery related to counterclaims I-VII until such time as we resolved the instant motion to dismiss. *2011 U.S. Dist. LEXIS 46147, [WL] at \*3.*

### III. Discussion

#### A. Standard of Review

Federal Rule of Civil Procedure 12(b)(6) authorizes dismissal **[\*11]** of a complaint for "failure to state a claim upon which relief can be granted." Under *Rule 12(b)(6)*, we must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009)* (quoting *Phillips v. County of Allegheny, 515 F.3d 224, 231 (3d Cir. 2008)).* While a complaint need only contain "a short and plain statement of the claim," *Fed. R. Civ. P. 8(a)(2)*, and detailed factual allegations are not required, *Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555, 127 S.Ct. 1955, 1964, 167 L.Ed.2d. 929 (2007)*, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Id. at 570, 127 S.Ct. 1955 at 1974.* "The plausibility standard is not akin to a 'probability requirement,' but it

asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal, 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009)*(quoting *Twombly, 550 U.S. at 556, 127 S.Ct. at 1965.*) Instead, this requirement "calls for enough facts to raise a reasonable expectation **[\*12]** that discovery will reveal evidence of the necessary element." *West Penn Allegheny Health Sys., Inc. v. UPMC, 627 F.3d 85, 98 (3d Cir. 2010)*(citing *Phillips, 515 F.3d at 234*). "[L]abels and conclusions" are not enough, *Twombly, 550 U.S. at 555, 127 S.Ct. at 1964-65*, and a court "'is not bound to accept as true a legal conclusion couched as a factual allegation.'" *Id., 127 S.Ct. at 1965* (quoted case omitted).

In resolving the motion to dismiss, we thus "conduct a two-part analysis." *Fowler, supra, 578 F.3d at 210.* First, we separate the factual elements from the legal elements and disregard the legal conclusions. *Id. at 210-11.* Second, we "determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a "'plausible claim for relief.'" *Id. at 211* (quoted case omitted). When evaluating monopolization claims under the Sherman Act, we must "look to the [alleged] monopolist's conduct taken as a whole rather than considering each aspect in isolation." *LePage's Inc. v. 3M, 324 F.3d 141, 162 (3d Cir. 2003).*

#### B. Counts I and VI - Monopolization

First Quality asserts a monopolization claim against KC under *section 2* of the Sherman Act, *15 U.S.C. § 2*, and violation **[\*13]** of New York's Donnelly Act, *N.Y. General Business Law § 340.*[1] KC seeks dismissal of both claims for failure to state a claim, arguing that: (1) First Quality failed to sufficiently allege anticompetitive conduct in the relevant monopolized market; (2) First Quality inadequately alleges fraud or sham litigation, thus rendering KC immune from antitrust liability; (3) First Quality's allegations of secret settlements and arbitrations do not show plausible monopolization; and (4) First Quality failed to sufficiently plead that KC's patent enforcement actions were objectively baseless. (*see* doc. 271.)

> 1  New York's Donnelly Act is a parallel antitrust statute to the Sherman Act. Thus, the monopolization claims will be addressed together because the requirements under the Donnelly Act are identical to a monopolization claim under the Sherman Act. *See Benjamin of Forest Hills Realty, Inc. v. Austin Sheppard Realty, Inc., 34*

2011 U.S. Dist. LEXIS 52416, *13; 2011-1 Trade Cas. (CCH) P77,452

*A.D.3d 91, 823 N.Y.S.2d 79, 81 (N.Y. App. Div. 2006)*("The Sherman Act (*15 U.S.C. § 1*) and the Donnelly Act require identical basic elements of proof for claims of monopolization...and, in fact, the Donnelly Act was modeled on the Sherman Act.).

The Sherman Act provides, in relevant part **[*14]** that "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony." *15 U.S.C. § 2.* To that end, a monopolization claim has two elements: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp., 384 U.S. 563, 570-71, 86 S.Ct. 1698, 16 L. Ed. 2d 778 (1966).* However, the "mere possession of monopoly power" alone is not unlawful; "it is an important element of the free-market system." *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP., 540 U.S. 398, 407, 124 S.Ct. 872, 157 L. Ed. 2d 823 (2004).* Nevertheless, the possession of monopoly power will be found unlawful if "it is accompanied by an element of anticompetitive *conduct*." *See Id.* (emphasis in original). Anticompetitive conduct takes many forms, "but it is generally defined as conduct to obtain or maintain monopoly power as a result of competition **[*15]** on some basis other than the merits." *Broadcom Corp. v. Qualcomm, Inc., 501 F.3d 297, 308 (3d Cir. 2007); see Conwood Co., L.P. v. U.S. Tobacco Co., 290 F.3d 768, 783 (6th Cir. 2002)*("If a firm has been attempting to exclude rivals on some basis other than efficiency, it is fair to characterize its behavior as [anticompetitive]").[2]

> 2  Monopoly power is defined as the "ability to control prices or exclude competition." *United States v. Dentsply Int'l., Inc., 399 F.3d 181, 187 (3d Cir. 2005).*

This requirement of anticompetitive behavior is important in the context of patents, because a patent by its nature grants a patentee the right to exclude others. Thus, "a patent is an exception to the general rule against monopolies and to the right of access to a free and open market." *In re Ciprofloxacin Hydrochloride Antitrust Litig., 544 F.3d 1323, 1333 (Fed. Cir. 2008)*(quoting *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co., 324 U.S. 806, 816, 65 S.Ct. 993, 89 L. Ed. 1381, 1945 Dec. Comm'r Pat. 582 (1945)).*[3]

> 3  In determining whether conduct in procuring or enforcing a patent is sufficient to strip a patentee of its immunity from federal antitrust laws, we apply the law of the Federal Circuit. *Honeywell Int'l Inc. v. Universal Avionics Sys. Corp., 488 F.3d 982, 1000-01 (Fed. Cir. 2007).* **[*16]** However, we apply Third Circuit law when approaching other antitrust issues. *Id.*

### 1. Anticompetitive Conduct

As mentioned previously, KC argues that First Quality failed to sufficiently plead anticompetitive conduct tied to the relevant monopolized markets.[4] While neither conceding nor denying that it holds monopoly power in this market, KC claims that First Quality does not explain how KC's enforcement of its patents with respect to disposable diapers or incontinence products can somehow enhance or protect KC's position in the training pants market. (doc. 271, pg. 16.) First Quality responds that KC intended to harm First Quality by attacking it across a range of products in order to raise First Quality's costs thereby preventing it from challenging KC in the relevant market. (doc. 314, pg. 19.)

> 4  First Quality avers that the relevant markets are disposable baby diaper and training pants markets, (Countercl. ¶¶ 13, 111, & 113), and the relevant geographic location for said markets is the United States, (Countercl. ¶ 14). As mentioned previously, KC allegedly maintains a 35% and 75% market share in the disposable baby diaper and training pants market, respectively. KC does not admit or **[*17]** deny that it holds monopoly power in the training pants market. Furthermore, KC is correct in its assertion that a 35% market share alone is insufficient to establish monopoly power. *See Fineman v. Armstrong World Indust., Inc., 980 F.2d 171, 201 (3d Cir. 1992).* However, this determination does not apply if "other relevant factors" are present, such as the size and strength of competing companies, freedom of entry into the market, pricing trends and practices in the industry, ability of consumers to substitute to comparable goods, and consumer demand. *Id. at 201-02* (citing *Weiss v. York Hosp. 745 F.2d 786, 827 n.72 (3d Cir. 1984).* For

2011 U.S. Dist. LEXIS 52416, *17; 2011-1 Trade Cas. (CCH) P77,452

purposes of this motion, we conclude that First Quality alleged sufficient facts showing these additional factors. Thus, we will assume that KC maintains monopoly power in the above mentioned markets.

After review, First Quality's sufficiently alleges that KC engaged in anticompetitive conduct. KC excluded and suppressed competition. (Countercl. ¶¶ 112-13). The alleged anticompetitive conduct included intentionally obtaining patents through fraud on the patent office (Countercl. ¶¶ 35-83), product disparagement through false claims (Countercl. ¶¶ 18, 33), [*18] secretly arbitrating patent disputes and coercively acquiring licensing agreements through settlement. (Countercl. ¶¶ 13, 92-99, 112.) Each of these acts in isolation may itself not rise to the level of anticompetitive conduct, but in the aggregate it represents anticompetitive activity tied to the relevant markets that raise a plausible claim for relief. *See Abbott Labs. v. Teva Pharms. USA, Inc., 432 F. Supp. 2d 408, 428 (D. Del. 2006)*("[A plaintiff is] entitled to claim that individual acts are antitrust violations, as well as claiming that those acts as a group have anticompetitive effect even if the acts taken separately do not.").

2. *Noerr-Pennington Immunity*

KC next asserts it is shielded from antitrust liability by *Noerr-Pennington* immunity. This doctrine, first expressed in *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 81 S.Ct. 523, 5 L. Ed. 2d 464 (1961)* and later examined in *Mine Workers v. Pennington, 381 U.S. 657, 85 S.Ct. 1585, 14 L. Ed. 2d 626 (1965)*, immunizes from antitrust liability those who petition the government. Prosecuting a patent infringement action is the type of activity protected by *Noerr-Pennington*.

Exceptions exist to this rule, generally referred to as the [*19] "sham" and "*Walker Process* fraud" exceptions, which deny immunity to petitioning activities that are mere "sham" and conduct before the PTO that is fraudulent, respectively. *In re Relafen Antitrust Litig., 346 F.Supp.2d 349, 358-59 (D. Mass. 2004)*; *Nobelpharma AB v. Implant Innovations, Inc., 141 F.3d 1059, 1068 (Fed. Cir. 1998)*. "[S]ham litigation is present where the lawsuit is objectively baseless and subjectively motivated by a desire to impose anticompetitive harm from the judicial process rather than obtain judicial relief." *Erbe Elektromedizin GmbH v. Canady Tech. LLC, 629 F.3d 1278, 1291 (Fed. Cir. 2010)*(citing *Professional

Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc. ("PRE"), 508 U.S. 49, 60-61, 113 S.Ct. 1920, 123 L. Ed. 2d 611 (1993))*. In *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp., 382 U.S. 172, 86 S.Ct. 347, 15 L. Ed. 2d 247 (1965)*, the Supreme Court held that "the enforcement of a patent procured by fraud on the PTO may be violative of § 2 of the Sherman Act." *Id. at 174*. For *Walker Process* to apply, a plaintiff must establish (1) a misrepresentation or omission, (2) intentionally done to deceive the PTO, (3) which the patent office justifiably relied on, and (4) but for the acts [*20] the patent would not have issued. *In Re Relafen, 346 F.Supp.2d at 365* (citing *C.R. Bard, Inc. v. M3 Sys., Inc., 157 F.3d 1340, 1364 (Fed. Cir. 1998)*); *Nobelpharma, 141 F.3d at 1070-71*. *Walker Process* fraud demands more than showing inequitable conduct. *Id. at 1070*. It requires a higher threshold showing of both intent and materiality, and the patentee must have been aware of the fraud when bringing the suit. *Id. at 1070, 1069-70*. As explained by the Federal Circuit:

> *PRE* and *Walker* Process provide alternative legal grounds on which a patentee may be stripped of its immunity from the antitrust laws; both legal theories may be applied to the same conduct. Moreover, we need not find a way to merge these decisions. Each provides its own basis for depriving a patent owner of immunity from the antitrust laws; either or both may be applicable to a particular party's conduct in obtaining and enforcing a patent.

*Id. at 1071*. It therefore follows that if the elements of *Walker Process* can be met antitrust liability "can be imposed without the additional sham inquiry required" for sham litigation under *PRE*.

Here, First Quality's allegations sufficiently allege a *Walker Process* claim: KC deliberately [*21] and intentionally withheld material prior art in connection with the prosecution of a patent-in-suit. (Countcl. ¶¶ 35-48.) The complaint specifically describes the individuals who knew of the prior art's existence, (Countercl. ¶¶ 41-46, 147, 154, 159-162, 168-170, 188), that the prior art was withheld during the patent prosecution process (Countercl. ¶¶ 38, 41-48, 154, 163, 186, 188) from the PTO (Countercl. ¶¶ 38, 41-48, 154, 163, 186, 188), and that the objective of failing to cite

Case 3:10-cv-01435-AWT   Document 46-6   Filed 06/08/12   Page 54 of 177

Page 7

2011 U.S. Dist. LEXIS 52416, *21; 2011-1 Trade Cas. (CCH) P77,452

this prior art was to deceive the PTO into issuing a patent. (Countercl. ¶¶ 35-41 186, 188.) Thus, as a result of KC's conduct, the PTO issued a patent that is clearly invalid. (Countercl. ¶ 35, 36, 40; doc. 314 at pg. 31.) The above allegations demonstrate that First Quality has alleged enough facts showing a plausible *Walker Process* claim. Therefore, this claim may be used to support First Quality's antitrust allegations.

Based on the preceding, we conclude that First Quality has sufficiently alleged a monopolization claim under the Sherman and Donnelly Acts. Thus, we will deny KC's motion to dismiss these claims.[5]

> 5   At this time, the allegations also show a plausible sham litigation claim. However, nothing **[*22]** in our analysis precludes KC from reasserting its immunity claim at the close of discovery in a motion for summary judgment.

### C. *Counts II, III, and V-VII*

Instead of challenging the allegations of each the additional counterclaims, KC simply raises two arguments in support of its claim that the remaining counterclaims should be dismissed: (1) First Quality failed to sufficiently plead bad faith and (2) false statements. (*See* doc. 271 at pgs. 33 & 35, respectively.) These arguments are based on KC's contention that First Quality insufficiently pled claims for sham litigation and *Walker Process*. As discussed in the preceding, we concluded that First Quality has sufficiently alleged said claims. Thus, KC's arguments are mooted by this finding because we concluded that First Quality sufficiently pled numerous acts of potential bad faith related to the antitrust claims. In addition, First Quality has alleged that

KC claimed that certain products were covered by patents that it knew to be invalid, unenforceable and fraudulently obtained (Countercl. ¶¶ 32-34, 88-91), that its products were covered by certain patents when they were not (Countercl. ¶¶ 118-124), that First Quality was incapable **[*23]** of supplying non-infringing products (Countercl. ¶¶ 129-131), and that KC knowingly and intentionally interfered with First Quality's contractual relationships (Countercl. ¶¶ 123-136.) These allegations, in conjunction with the aforementioned averments under the antitrust claims, sufficiently plead that KC intentionally made false statements or misrepresentations to disparage and harm the business interests of First Quality. Thus, we will deny KC's motion to dismiss the counterclaims.

We will issue an appropriate order.

/s/ William W. Caldwell

William W. Caldwell

United States District Judge

Date: May 17, 2011

### ORDER

AND NOW, this 17th day of May, 2011, upon consideration of plaintiff's motion to dismiss, and pursuant to the accompanying Memorandum, it is ordered that plaintiff's motion to dismiss (doc. 270) is denied.

/s/ William W. Caldwell

William W. Caldwell

United States District Judge

LEXSEE

**ELAN CORPORATION, PLC and ELAN PHARMA INTERNATIONAL LTD.,
Plaintiffs, v. TEVA PHARMACEUTICALS USA, INC., Defendants.**

**Civ. No. 07-552-SLR**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

**2008 U.S. Dist. LEXIS 17807**

**March 7, 2008, Decided
March 7, 2008, Filed**

**COUNSEL:** [*1] For Elan Corporation PLC, Elan Pharma International Ltd., Plaintiffs: Jack B. Blumenfeld, LEAD ATTORNEY, Morris, Nichols, Arsht & Tunnell LLP, Wilmington, DE; Maryellen Noreika, Richard John Bauer, Morris, Nichols, Arsht & Tunnell, Wilmington, DE.

For Teva Pharmaceuticals USA Inc., Defendant: Thomas Gerard Whalen, Jr., LEAD ATTORNEY, Joseph Grey, Stevens & Lee, Wilmington, DE.

For Intellipharmaceutics Corporation, Intellipharmaceutics Ltd., Par Pharmaceutical Inc., Defendants: Frederick L. Cottrell, III, LEAD ATTORNEY, Steven J. Fineman, Richards, Layton & Finger, Wilmington, DE.

For Actavis South Atlantic LLC, Defendant: David J. Margules, LEAD ATTORNEY, Bouchard, Margules & Friedlander, P.A., Wilmington, DE; Francis H. Morrison, PRO HAC VICE, Pro Hac Vice; James Mahanna, PRO HAC VICE, Pro Hac Vice; Jeremony C. Lowe, PRO HAC VICE, Pro Hac Vice; Jonathan A. Harris, PRO HAC VICE, Pro Hac Vice; Matthew J. Becker, PRO HAC VICE, Pro Hac Vice.

For Barr Laboratories, Inc., Defendant: John C. Phillips, Jr., LEAD ATTORNEY, Phillips, Goldman & Spence, P.A., Wilmington, DE.

For Teva Pharmaceuticals USA Inc., Counter Claimant: Thomas Gerard Whalen, Jr., LEAD ATTORNEY, Stevens & [*2] Lee, Wilmington, DE.

For Elan Corporation PLC, Elan Pharma International Ltd., Counter Defendants: Jack B. Blumenfeld, LEAD ATTORNEY, Morris, Nichols, Arsht & Tunnell LLP, Wilmington, DE.

**JUDGES:** Sue L. Robinson, United States District Judge.

**OPINION BY:** Sue L. Robinson

**OPINION**

**MEMORANDUM ORDER**

At Wilmington this 7th day of March 2008, having heard oral argument on plaintiffs' motion to dismiss counts III and VI of defendant's counterclaims and to strike its third and sixth affirmative defenses; and having reviewed the papers submitted in connection with said motion;

IT IS ORDERED that said motion (D.I. 12) is denied without prejudice to renew. Although the court agrees with the basic proposition underlying the motion, that is, that attorneys are permitted to advocate for their own interpretation of the prior art before an examiner, nonetheless, arguments made to the PTO can form the basis for inequitable conduct defenses under certain circumstances. *See, e.g., Young v. Lumenis, Inc., 492 F.3d 1336, 1349 (Fed. Cir. 2007)* ("[G]ross mischaracterizations or unreasonable interpretations of the [prior art] reference" can support an inequitable conduct determination.). At this stage of the proceedings, the court is required [*3] to take defendant's factual representations as true, that is, that the arguments made to the examiner involve intentional falsehoods about a

material reference.

    IT IS FURTHER ORDERED, however, that no discovery shall be taken regarding the intent prong of the inequitable conduct defense. Specifically, the deposition(s) of the prosecuting attorney(s) shall not be taken, nor shall interrogatories or document production

requests be propounded that are related to such, absent further order of the court.

    /s/ Sue L. Robinson

    United States District Judge

**Citation #10**
**2012 us dist lexis 26912**

LEXSEE

**WYETH HOLDINGS CORPORATION, WYETH-AYERST LEDERLE LLC, and
WYETH LLC, Plaintiffs and Counterclaim-Defendants, v. SANDOZ, INC.,
Defendant and Counterclaim-Plaintiff.**

**Civ. Action No. 09-955-LPS-CJB**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

**2012 U.S. Dist. LEXIS 26912**

**February 3, 2012, Decided**

**SUBSEQUENT HISTORY:** Adopted by, Motion
denied by Wyeth Holdings Corp. v. Sandoz, Inc., 2012
U.S. Dist. LEXIS 27332 (D. Del., Mar. 1, 2012)

**CASE SUMMARY:**

**OVERVIEW:** In a patent infringement suit regarding the
filing of an abbreviated new drug application, a
magistrate issued a report recommending denial of
plaintiff patent holder's motion to dismiss a counterclaim
alleging inequitable conduct because the defendant
pleaded sufficient facts, with sufficient particularity, to
give rise to a reasonable inference that the holder's
representatives deliberately acted to deceive the PTO
during the prosecution of the patent-in-suit.

**OUTCOME:** Recommended denying motion.

**CORE TERMS:** inequitable conduct, examiner,
misrepresentation, reasonable inference, tigecycline,
patent, prior art, materiality, intent to deceive, deceptive,
prong, affirmative defense, counterclaim, lactose, pled,
pleading stage, material information, declaration,
convincing, deceive, but-for, unexpected, disclose,
withheld, infer, stabilization, misrepresented,
presentation, experimental, obviousness

**LexisNexis(R) Headnotes**

*Civil Procedure > Judicial Officers > Magistrates >
Duties & Powers*
[HN1]Absent unanimous consent of the parties to the
jurisdiction of a United States Magistrate Judge, a
Magistrate Judge's authority as to the resolution of a
motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) is
limited to making a report and recommendation to the
district court. 28 U.S.C.S. § 636(b)(1)(B); D. Del. R.
72.1(a)(3).

*Civil Procedure > Pleading & Practice > Defenses,
Demurrers & Objections > Failures to State Claims*
[HN2]Where a court is resolving a motion to dismiss, not
a summary judgment motion, the court may consider not
only the allegations in the amended answer, but also any
exhibits attached to the pleading and matters of public
record.

*Patent Law > Nonobviousness > Elements & Tests >
Ordinary Skill Standard*
*Patent Law > Nonobviousness > Elements & Tests >
Prior Art*
*Patent Law > Nonobviousness > Elements & Tests >
Secondary Considerations*
[HN3]Unexpected results are a secondary consideration
of non-obviousness that can be used to overcome a
rejection by the Patent and Trademark Office. Four
factors should be used in assessing obviousness: (1) the
scope and content of the prior art, (2) the differences
between the prior art and the claims, (3) the level of
ordinary skill in the art, and (4) secondary considerations
such as commercial success, unexpected results, and
long-felt need. Secondary considerations, when present,
must be considered in determining obviousness.

***Civil Procedure > Pleading & Practice > Pleadings > Complaints > Requirements***

[HN4]A plaintiff is required to plead sufficient factual matter, taken as true, to suggest liability for the alleged misconduct. Such a complaint must include more than labels and conclusions or the formulaic recitation of the elements of a cause of action, but need only provide enough facts to state a claim to relief that is plausible on its face.

***Civil Procedure > Pleading & Practice > Pleadings > Complaints > Requirements***

[HN5]A claim is facially plausible when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant acted unlawfully.

***Civil Procedure > Pleading & Practice > Defenses, Demurrers & Objections > Failures to State Claims***
***Civil Procedure > Pleading & Practice > Pleadings > Complaints > Requirements***

[HN6]After Twombly and Iqbal, district courts faced with a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) should perform a two-part analysis. First, the district court should separate the factual and legal elements of a claim, accepting any well-pleaded facts as true, but disregarding any legal conclusions. Second, the district court must determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a plausible claim for relief. Determining whether a claim is plausible is a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.

***Civil Procedure > Pleading & Practice > Defenses, Demurrers & Objections > Failures to State Claims***
***Civil Procedure > Pleading & Practice > Pleadings > Complaints > Requirements***

[HN7]A court must construe a complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief. When ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint. As such, a well-pleaded complaint may not be dismissed simply because it strikes a savvy judge that actual proof of the

alleged facts is improbable, and that a recovery is very remote and unlikely.

***Civil Procedure > Pleading & Practice > Defenses, Demurrers & Objections > Failures to State Claims***
***Civil Procedure > Pleading & Practice > Defenses, Demurrers & Objections > Motions to Strike > General Overview***

[HN8]Fed. R. Civ. P. 12(b)(6) does not offer a mechanism for dismissing an affirmative defense, and instead refers only to claims. Fed. R. Civ. P. 12(b)(6). However, pursuant to Fed. R. Civ. P. 12(f), a court may strike from a pleading any insufficient defense. Fed. R. Civ. P. 12(f). This rule has been used in this jurisdiction to strike affirmative defenses where a party has failed to state a corresponding claim upon which relief can be granted.

***Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements > Fraud Claims***
***Patent Law > Inequitable Conduct > General Overview***

[HN9]An individual associated with the filing and prosecution of a patent application commits inequitable conduct when he or she (1) makes an affirmative misrepresentation of a material fact, fails to disclose material information, or submits false material information to the U.S. Patent and Trademark Office (PTO); (2) with the specific intent to deceive the PTO. If both of these elements--materiality and intent--are proven by clear and convincing evidence, this equitable defense bars enforcement of a patent. Although inequitable conduct is conceptually broader than fraud, any such allegations must be pleaded in accordance with Fed. R. Civ. P. Rule 9(b), which requires that the circumstances constituting fraud or mistake shall be stated with particularity. Fed. R. Civ. P. 9(b).

***Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements > Fraud Claims***
***Patent Law > Inequitable Conduct > Effect, Materiality & Scienter > Elements***

[HN10]To plead the circumstances of inequitable conduct with the requisite particularity under Fed. R. Civ. P. 9(b), the pleading must identify the specific who, what, when, where and how of the material misrepresentation or omission committed before the U.S. Patent and Trademark Office (PTO). Moreover, although knowledge and intent may be averred generally, a pleading of

inequitable conduct under Rule 9(b) must include sufficient allegations of underlying facts from which a court may reasonably infer that a specific individual (1) knew of the withheld material information or of the falsity of the material misrepresentation, and (2) withheld or misrepresented this information with a specific intent to deceive the PTO.

***Patent Law > Inequitable Conduct > Effect, Materiality & Scienter > Elements***
[HN11]In Therasense, the U.S. court of Appeals for the Federal Circuit retained the two-pronged construct for inequitable conduce requiring a showing of both materiality and intent to deceive. However, in various ways, it elected to tighten the standards for finding both intent and materiality in order to redirect a doctrine that has been overused to the detriment of the public.

***Patent Law > Inequitable Conduct > Burdens of Proof***
***Patent Law > Inequitable Conduct > Effect, Materiality & Scienter > Effect of Inequitable Conduct***
***Patent Law > Inequitable Conduct > Effect, Materiality & Scienter > Elements***
[HN12]A party making an inequitable conduct claim must show that but for an omission or misrepresentation by the patent applicant, the Patent and Trademark Office would not have allowed a patent claim to issue.

***Patent Law > Inequitable Conduct > Effect, Materiality & Scienter > Elements***
[HN13]As for the intent prong, Therasense expressly overruled a series of decisions holding that if a misrepresentation or omission at issue amounted to gross negligence or mere negligence, this would be sufficient to satisfy the intent prong; instead, a deliberate decision to make the misrepresentation or omission would be required. Lastly, the U.S. Court of Appeals for the Federal Circuit reemphasized its holding that although a district court may infer intent from indirect and circumstantial evidence, to meet the clear and convincing evidence standard, the specific intent to deceive must be the single most reasonable inference able to be drawn from the evidence.

***Civil Procedure > Pleading & Practice > Defenses, Demurrers & Objections > Failures to State Claims***
***Civil Procedure > Pleading & Practice > Pleadings >***

***Complaints > Requirements***
***Patent Law > Inequitable Conduct > Effect, Materiality & Scienter > Elements***
[HN14]In light of Therasense, a party pleading inequitable conduct in a patent case must allege facts allowing for the reasonable inference of but-for materiality.

***Civil Procedure > Pleading & Practice > Defenses, Demurrers & Objections > Failures to State Claims***
***Civil Procedure > Pleading & Practice > Pleadings > Complaints > Requirements***
***Patent Law > Inequitable Conduct > Effect, Materiality & Scienter > Elements***
[HN15]Several district courts have confronted the question of how the "single most reasonable inference" language from Therasense should be reconciled with the "reasonable inference" directives from Exergen and have reached different conclusions. On one end of the spectrum, courts deny a motion for leave to file an amended answer alleging inequitable conduct because there are multiple reasonable inferences that may be drawn from the facts alleged in the proposed inequitable conduct pleading. Other courts hold that the "single most reasonable inference" standard applies to at least some extent in the pleading context. The U.S. District Court for the District of Delaware believes that in order to adequately plead the intent prong of an inequitable conduct defense, a claimant need only allege facts from which the court could reasonably infer that the patent applicant made a deliberate decision to deceive the Patent and Trademark Office.

***Civil Procedure > Pleading & Practice > Defenses, Demurrers & Objections > Failures to State Claims***
***Civil Procedure > Pleading & Practice > Pleadings > Complaints > Requirements***
***Patent Law > Inequitable Conduct > Effect, Materiality & Scienter > Elements***
[HN16]Courts do not inquire whether a plaintiff will ultimately prevail when considering a motion to dismiss, only whether the plaintiff is entitled to offer evidence to support his or her claims. At the pleading stage, a court does not, and cannot, review all of the circumstances at play in a case, as the Therasense single most reasonable inference inquiry requires. Instead, a court assessing the sufficiency of a pleading looks only to a narrow category of materials--the pleading and any attached exhibits--provided only by one side--the party or parties

asserting the inequitable conduct claim.

**Patent Law > Inequitable Conduct > Effect, Materiality & Scienter > Duties**

[HN17]Inequitable conduct allegations typically center on the failure of a patent applicant to disclose relevant prior art.

**Patent Law > Inequitable Conduct > Effect, Materiality & Scienter > Elements**

[HN18]To the extent that a patent applicant's alleged misrepresentations consist solely of arguments to the examiner that are not unreasonable interpretations or demonstrably false, such statements do not amount to misrepresentations that give rise to an inequitable conduct claim.

**Patent Law > Inequitable Conduct > Effect, Materiality & Scienter > Elements**

[HN19]Although an attorney may vigorously argue in favor of patentability without being subject to allegations of inequitable conduct, the law prohibits genuine misrepresentations of material fact; not all arguments by attorneys are shielded from liability for inequitable conduct.

**Patent Law > Inequitable Conduct > Effect, Materiality & Scienter > Elements**

[HN20]with respect to a claim of inequitable conduct, a patent applicant is not relieved of responsibility for any alleged misstatements simply because a patent reference and certain data were before the U.S. Patent and Trademark Office (PTO). It is not possible for a patent applicant to misrepresent the teachings of the prior art unless that material is before the PTO in the first place.

**Patent Law > Inequitable Conduct > Effect, Materiality & Scienter > General Overview**

[HN21]Attorney arguments can give rise to an actionable patent suit claim of inequitable conduct.

**Patent Law > Inequitable Conduct > General Overview**

[HN22]In patent cases, inequitable conduct claims remain viable as a general matter, even when they are not based solely on affirmative acts of egregious misconduct.

**COUNSEL:**  [*1] For Wyeth Holdings Corporation, Wyeth-Ayerst Lederle LLC, Wyeth LLC, Plaintiffs: Jack B. Blumenfeld, LEAD ATTORNEY, Morris, Nichols, Arsht & Tunnell, Wilmington, DE; Maryellen Noreika, Morris, Nichols, Arsht & Tunnell LLP, Wilmington, DE.

For Sandoz Inc., Defendant: John W. Shaw, LEAD ATTORNEY, Karen Elizabeth Keller, Shaw Keller LLP, Wilmington, DE; David C. Doyle, PRO HAC VICE; Elizabeth C. Miller, PRO HAC VICE; James J. Cekola, PRO HAC VICE; M. Andrew Woodmansee, PRO HAC VICE; Marc D. Sharp, PRO HAC VICE.

For Sandoz Inc., Counter Claimant: John W. Shaw, LEAD ATTORNEY, Shaw Keller LLP, Wilmington, DE; David C. Doyle; Elizabeth C. Miller; M. Andrew Woodmansee.

For Wyeth Holdings Corporation, Wyeth-Ayerst Lederle LLC, Wyeth LLC, Counter Defendants: Jack B. Blumenfeld, LEAD ATTORNEY, Morris, Nichols, Arsht & Tunnell, Wilmington, DE.

For Sandoz Inc., Counter Claimant: John W. Shaw, LEAD ATTORNEY, Shaw Keller LLP, Wilmington, DE; David C. Doyle; Elizabeth C. Miller; M. Andrew Woodmansee; Marc D. Sharp.

**JUDGES:** Christopher J. Burke, UNITED STATES MAGISTRATE JUDGE.

**OPINION BY:** Christopher J. Burke

**OPINION**

**REPORT     AND     RECOMMENDATION REGARDING PLAINTIFFS' MOTION TO DISMISS SANDOZ'S FOURTH COUNTERCLAIM AND TO STRIKE SANDOZ'S**  [*2]  **FOURTH AFFIRMATIVE DEFENSE DIRECTED TO INEQUITABLE CONDUCT**[1]

>    1  [HN1]Absent unanimous consent of the parties to the jurisdiction of a United States Magistrate Judge, a Magistrate Judge's authority as to the resolution of a motion to dismiss pursuant to Rule 12(b)(6) is limited to making a Report and Recommendation to the District Court. 28 U.S.C. § 636(b)(1)(B); D. Del. LR 72.1(a)(3).

Pending before the Court in this patent case is a motion filed pursuant to Fed. R. Civ. P. 12(b)(6) and 12(f) by Wyeth Holdings Corporation, Wyeth-Ayerst Lederle LLC, and Wyeth LLC (collectively, "Wyeth" or "Plaintiffs") seeking dismissal of the Fourth Counterclaim and Fourth Affirmative Defense of Sandoz, Inc. ("motion to dismiss"). (D.I. 64) Sandoz opposes Wyeth's motion to dismiss.

For the reasons that follow, I recommend that the Court DENY Wyeth's motion.

## I. BACKGROUND

### A. Procedural History

This is a patent case arising from Sandoz's filing of Abbreviated New Drug Application ("ANDA") No. 91-620 with the United States Food and Drug Administration ("FDA"). Sandoz's ANDA seeks to market an injectable form of tigecycline, an antibiotic that Wyeth currently markets under the brand name Tygacil®. (D.I. 1 at ¶ 10) Wyeth [*3] first filed suit against Sandoz on December 11, 2009. (D.I. 1) On September 7, 2011, Wyeth filed an Amended and Supplemental Complaint ("Amended Complaint") that reflects its current allegations against Sandoz. (D.I. 48) Wyeth's Amended Complaint alleges that Sandoz's generic tigecycline product infringes at least one valid claim of U.S. Reissue Patent No. 40,183 and U.S. Patent No. 7,879,828 ("the '828 patent") (collectively, "the patents-in-suit") and seeks a permanent injunction barring Sandoz from manufacturing, using, selling, or offering to sell in the United States, or importing into the United States, any drug product that infringes a valid claim of the patents-in-suit. (See D.I. 48)

Sandoz has stipulated that by submitting ANDA No. 91-620, it has committed an act of infringement under 35 U.S.C. § 271(e)(2), and has further stipulated that the commercial manufacture, use, and/or sale of its generic tigecycline antibacterial products would infringe the asserted claims of the patents-in-suit, if any of those claims are found valid and enforceable. (D.I. 62 at 5, ¶ 16; 6, ¶ 24) While conceding infringement, Sandoz challenges the validity of both of the patents-in-suit (id. at 7), [*4] and asserts that the '828 patent is unenforceable based upon several acts of inequitable conduct (id. at 11-17).

Sandoz first asserted that inequitable conduct should

bar enforcement of the '828 patent on October 21, 2011, two days after the close of fact discovery. (D.I. 62; D.I. 68 at 3) In lieu of answering Sandoz's counterclaim for inequitable conduct, Wyeth moved to dismiss (and to strike the accompanying affirmative defense of unenforceability based on inequitable conduct). (D.I. 64) Sandoz timely opposed (D.I. 68), and Wyeth's motion to dismiss was fully briefed on December 8, 2011 (D.I. 70). The Court heard oral argument on Wyeth's motion to dismiss on January 31, 2012. (D.I. 85)

### B. Sandoz's Inequitable Conduct Defense

The '828 patent was issued to Plaintiff Wyeth LLC on February 1, 2011, and is based on Application No. 11/374,330 ("the '330 application"). It is entitled "Tigecycline Compositions and Methods of Preparation," and lists three individuals (Mahdi B. Fawzi, Tianmin Zhu, and Syed M. Shah) as inventors. ('828 patent at 1) Although the title of the '828 patent refers to "Methods of Prepar[ing]" tigecycline, all of the '828 patent claims are directed to compositions that [*5] include tigecycline, lactose, and an acid. (D.I. 65 at 1, 3)

Tigecycline is a well-known antibiotic in the tetracycline family. ('828 patent at col. 1:23-25; col. 2:55-65) It is a particularly effective intravenous treatment against certain strains of drug-resistant bacteria. (Id. at col. 1:24-29, 45-47) Tigecycline is typically dissolved in water and then freeze-dried or "lyophilized" into a powder form before being shipped to end users, such as hospital pharmacies. (Id. at col. 1:55-63) Prior to being administered to patients, the powder is mixed with saline or another form of diluent and placed into intravenous bags for delivery. (Id. at col. 1:66-2:7)

During this process, tigecycline is subject to two countervailing degradative pathways. First, tigecycline is susceptible to rapid oxidation in solution form, which typically occurs at a slightly basic pH (about 7.8). (Id. at col. 2:26-35) To avoid this oxidative degradation, the pH of the solution can be lowered by adding an acid or buffer. (Id. at col. 2:44-48) However, lowering the pH triggers a second degradative process, known as epimerization. (Id. at col. 2:48-50) Under acidic conditions, the standard "cis" form of tigecycline [*6] is converted into the "trans" isomer. This epimerized product is non-toxic, but also exhibits low antibacterial efficacy. (Id. at col. 3:16-21) Thus, according to the '828 patent, there was a need to develop a composition that minimizes both the propensity of tigecycline to oxidize

and its tendency to epimerize. (*Id.* at col. 3:62-65) It is through the addition of a carbohydrate (such as lactose) that a stable balance against the countervailing degradation pathways is achieved. (*Id.* at col. 4:49-59)

The addition of lactose and the accompanying acidic pH conditions claimed in the '828 patent are at the heart of Sandoz's inequitable conduct defense. [2] This defense spans more than nine pages, and refers to several exhibits, including a PowerPoint presentation given by Wyeth to the U.S. Patent & Trademark Office ("PTO"); redacted tigecycline stabilization data; patents and prior art references; prosecution history excerpts; and a declaration from Mr. Christian Ofslager, a Section Head at Wyeth. [3] (*See* D.I. 62 & exs. 1-6) The claims of the '330 application were rejected during prosecution by the PTO Examiner in light of a U.S. patent publication. (*Id.* at 8, ¶ 6) The Examiner argued that this [*7] publication (hereinafter referred to as the "Testa" reference) disclosed the combination of tigecycline and excipients, including lactose. (*Id.* at 8, ¶ 7) Moreover, in the Examiner's view, it would have been obvious to a person of ordinary skill in the relevant art to use the teachings of Testa to introduce lactose into an acidic, lyophilized solution of tigecycline to stabilize the solution against degradation. (*Id.*) The Examiner further rejected the applicants' argument that the claims were nonobvious because the claimed combination unexpectedly stabilized tigecycline; instead, he found that any improvement in stability was "minimal" at best, and "that the claimed compositions demonstrated no unexpected results." [4] (*Id.* at 8, ¶ 8)

2    Sandoz asserts inequitable conduct (and explains the basis for its allegations) in the Fourth Affirmative Defense in its Amended Answer. (D.I. 62 at 8-17) Sandoz asserts an identical counterclaim based upon the same facts and law. (*Id.* at 22) For ease of reference, Sandoz's Fourth Affirmative Defense and Fourth Counterclaim are collectively referred to as Sandoz's "inequitable conduct defense."

3    [HN2]Although the Court is resolving a motion to dismiss, not a [*8] summary judgment motion, the Court may consider not only the allegations in Sandoz's Amended Answer, but also any "'exhibits attached to the [pleading] and matters of public record.'" *Collins & Aikman Corp. v. Stockman*, Civ. No. 07-265-SLR-LPS, 2010 U.S. Dist. LEXIS 3818, 2010 WL 184074, at *3 (D. Del. Jan. 19, 2010) (quoting *Pension*

*Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993)).

4    [HN3]"Unexpected results" are a secondary consideration of non-obviousness that can be used to overcome a rejection by the PTO. *See, e.g., Siemens Med. Solutions USA, Inc. v. Saint-Gobain Ceramics & Plastics, Inc.*, 637 F.3d 1269, 1291-92 (Fed. Cir. 2011) (Prost, C.J., dissenting) ("The Supreme Court has instructed us that four factors should be used in assessing obviousness: (1) the scope and content of the prior art, (2) the differences between the prior art and the claims, (3) the level of ordinary skill in the art, and (4) *secondary considerations* such as commercial success, *unexpected results*, and long-felt need.") (emphasis added). "[S]econdary considerations, when present, must be considered in determining obviousness." *Ruiz v. A.B. Chance Co.*, 234 F.3d 654, 667 (Fed. Cir. 2000).

In response, the [*9] applicants filed a request for continued examination, and thereafter made presentations to the Examiner aimed at overcoming his rejection. Sandoz contends that as part of this process, Wyeth made certain claims to the Examiner that amounted to "affirmative misrepresentations of material fact." (*Id.* at 8, ¶ 4) Sandoz cites three means through which the PTO allegedly received false and misleading information from Wyeth, as part of its response to the Examiner's final rejection: (1) during the Examiner's post-rejection interview of certain Wyeth representatives on September 16, 2010; (2) through data disclosed in the '828 patent and internal Wyeth data submitted to the PTO; and (3) in the October 5, 2010 declaration submitted to the PTO by Mr. Ofslager, who also participated in the September 16, 2010 interview. (*See* D.I. 62 at 9-17, ¶¶ 9-32)

In these presentations, Wyeth allegedly made two primary arguments: (1) the prior art, as exemplified by a European patent ("the '277 reference") "taught away" from the use of lactose to stabilize tigecycline in light of other information; and (2) the addition of lactose to an acidic solution of tigecycline led to significant and unexpectedly stable [*10] results, citing experimental data that was included in the text of the '330 application or submitted to the FDA. (*See id.*) Sandoz contends that in making these statements, Wyeth's representatives misrepresented the teachings of the prior art, overstated the stabilizing effects of lactose, and omitted key information regarding experimental error rate and

discrepancies in data. (*Id.*) According to Sandoz, these actions deceived the Examiner, who issued the '828 patent due to Wyeth's claims of "unexpected results" and other representations made by Wyeth during prosecution. (*Id.* at 16, ¶ 30)

## II. STANDARD OF REVIEW

### A. Motion to Dismiss Under Rule 12(b)(6)

Prior to 2007, district courts were permitted to dismiss a complaint for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6) only if "it appear[ed] beyond doubt that the plaintiff [could] prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957). The Supreme Court, concerned that this "no set of facts" language could be read to suggest that "a wholly conclusory statement of claim would survive a motion to dismiss whenever the pleadings left open the possibility that [*11] a plaintiff might later establish some set of [undisclosed] facts to support recovery," rejected that test in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). *Id.* at 561 (internal quotations and citations omitted). [HN4]A plaintiff is now required to plead sufficient "factual matter (taken as true) to suggest" liability for the alleged misconduct. *Id.* at 556. Such a complaint must include "more than labels and conclusions" or the "formulaic recitation of the elements of a cause of action," but need only provide "enough facts to state a claim to relief that is plausible on its face." *Id.* at 555, 570.

In *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 173 L. Ed. 2d 868 (2009), the Supreme Court extended these standards to all civil complaints. *Id.* at 1953. Notably, the *Iqbal* Court held that[HN5] a claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 1949. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant acted unlawfully." *Id.* (internal quotation marks omitted).

[HN6]After *Twombly* and *Iqbal*, district [*12] courts in the Third Circuit faced with a motion to dismiss pursuant to Rule 12(b)(6) should perform a two-part analysis. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009). First, the district court should

separate the factual and legal elements of a claim, accepting any well-pleaded facts as true, but disregarding any legal conclusions. *Id.* Second, the district court must "determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Id.* at 211 (quoting *Iqbal*, 129 S.Ct. at 1950). Determining whether a claim is plausible is "'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Id.* (quoting *Iqbal*, 129 S.Ct. at 1949).

In so doing, [HN7]the court must "construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Fowler*, 578 F.3d at 210 (citing *Phillips v. County of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (internal quotations omitted)); *see also Erickson v. Pardus*, 551 U.S. 89, 94, 127 S. Ct. 2197, 167 L. Ed. 2d 1081 (2007) ("[W]hen ruling on a defendant's motion to [*13] dismiss, a judge must accept as true all of the factual allegations contained in the complaint.") As such, a well-pleaded complaint may not be dismissed simply because "it strikes a savvy judge that actual proof of [the alleged] facts is improbable, and that a recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (internal quotations omitted).

### B. Motion to Strike Under Rule 12(f)

As noted above, Sandoz has asserted inequitable conduct in two substantively identical but procedurally distinct forms--as both a counterclaim and an affirmative defense. [HN8]Rule 12(b)(6) does not offer a mechanism for dismissing an affirmative defense, and instead refers only to "claim[s]." Fed. R. Civ. P. 12(b)(6). However, pursuant to Rule 12(f), the Court "may strike from a pleading any insufficient defense." Fed. R. Civ. P. 12(f). This rule has been used in this jurisdiction to strike affirmative defenses where a party has failed to state a corresponding claim upon which relief can be granted. *See, e.g., Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, Civ. No. 08-309-JJF-LPS, 2009 U.S. Dist. LEXIS 118383, 2009 WL 4928024, at *8-10 (Dec. 18, 2009). There is no dispute that Sandoz's inequitable conduct counterclaim [*14] and affirmative defense "rise[] or fall[]" together. (D.I. 68 at 4)

### C. Pleading Inequitable Conduct Under Rule 9(b)

[HN9]An individual associated with the filing and

prosecution of a patent application commits inequitable conduct when he or she (1) makes an affirmative misrepresentation of a material fact, fails to disclose material information, or submits false material information to the PTO; (2) with the specific intent to deceive the PTO. *Star Scientific, Inc. v. R.J. Reynolds Tobacco Co., 537 F.3d 1357, 1365 (Fed. Cir. 2008).* If both of these elements--materiality and intent--are proven by clear and convincing evidence, this equitable defense bars enforcement of a patent. *Therasense, Inc. v. Becton, Dickinson & Co., 649 F.3d 1276, 1287 (Fed. Cir. 2011).* Although inequitable conduct is conceptually broader than fraud, any such allegations must be pled in accordance with Rule 9(b), which requires that "'the circumstances constituting fraud or mistake shall be stated with particularity.'" *Ferguson Beauregard/Logic Controls, Div. of Dover Res., Inc. v. Mega Sys., LLC, 350 F.3d 1327, 1342, 1344 (Fed. Cir. 2003)* (quoting Fed. R. Civ. P. 9(b)).

In *Exergen Corp. v. Wal-Mart Stores, Inc., 575 F.3d 1312, 1328 (Fed. Cir. 2009),* [*15] the Federal Circuit established the standard for evaluating the sufficiency of inequitable conduct allegations. [5] *Exergen* held that:

> [HN10][T]o plead the 'circumstances' of inequitable conduct with the requisite 'particularity' under Rule 9(b), the pleading must identify the specific who, what, when, where and how of the material misrepresentation or omission committed before the PTO. Moreover, although 'knowledge' and 'intent' may be averred generally, a pleading of inequitable conduct under Rule 9(b) must include sufficient allegations of underlying facts from which a court may reasonably infer that a specific individual (1) knew of the withheld material information or of the falsity of the material misrepresentation, and (2) withheld or misrepresented this information with a specific intent to deceive the PTO.

575 F.3d at 1328-29.

5    Although *Exergen* concerned a motion for leave to amend a pleading to assert an inequitable conduct defense, its standards are also used to assess the sufficiency of a pleading that is

challenged in a motion to dismiss. *See In re BP Lubricants USA, Inc., 637 F.3d 1307, 1311 (Fed. Cir. 2011).*

However, roughly eighteen months after the Federal Circuit's decision in [*16] *Exergen,* an en banc Federal Circuit altered and clarified the elements for proving inequitable conduct in *Therasense, Inc. v. Becton, Dickinson & Co., 649 F.3d 1276 (Fed. Cir. 2011).* Unlike *Exergen,* which specifically outlined the requirements for *pleading* inequitable conduct, *Therasense* involved the review of a district court decision as to inequitable conduct made after a bench trial. *Id. at 1285.* [HN11]In *Therasense,* the Federal Circuit retained the two-pronged construct requiring a showing of both materiality and intent to deceive. However, in various ways, it elected to "tighten[] the standards for finding both intent and materiality in order to redirect a doctrine that has been overused to the detriment of the public." *Therasense, 649 F.3d at 1290.*

For example, the *Therasense* Court overruled a separate series of decisions that placed the materiality and intent prongs on a "sliding scale," in which a weak showing of intent could be found sufficient based on a strong showing of materiality, or vice versa. *Id. at 1288.* In addition, as to the first prong regarding materiality, *Therasense* held that absent evidence of "affirmative egregious misconduct," this prong requires a "but-for" showing. [*17] *Id. at 1291-92.* In other words,[HN12] the party making an inequitable conduct claim must show that but for an omission or misrepresentation by the patent applicant, the PTO would not have allowed a patent claim to issue. Id.

[HN13]As for the intent prong, *Therasense* expressly overruled a series of decisions holding that if a misrepresentation or omission at issue amounted to gross negligence or mere negligence, this would be sufficient to satisfy the intent prong; instead, a deliberate decision to make the misrepresentation or omission would be required. 649 F.3d at 1287-90. Lastly, the Federal Circuit re-emphasized its prior holding that although "a district court may infer intent from indirect and circumstantial evidence . . . ., to meet the clear and convincing evidence standard, the specific intent to deceive must be 'the single most reasonable inference able to be drawn from the evidence.'" *Id. at 1290* (quoting *Star Scientific, 537 F.3d at 1366*).

## III. DISCUSSION

**A. Applicable Standard Governing Inequitable Conduct Pleadings**

In its opening brief, Wyeth claims that, under the tightened materiality standards announced in *Therasense*, "a pleading of inequitable conduct requires factual allegations [*18] that make it plausible that but for the alleged omission, the Examiner would not have issued the patent." (D.I. 65 at 8) Wyeth argues Sandoz has not met this burden. Moreover, as to the intent prong, Wyeth repeatedly asserted that Sandoz's inequitable conduct defense should be dismissed because "Sandoz did not plead any facts that would allow the Court to conclude that *the single most reasonable inference* from the applicants' alleged conduct is that the applicants had the specific intent to deceive the PTO." (D.I. 65 at 2 (emphasis added)) *see also id.* at 8, 10) Citing *Therasense*, Wyeth argued that unless the Court finds that intent to deceive is the "single most reasonable inference" that can be drawn from the facts alleged in Sandoz's pleading, *Therasense* compels dismissal of Sandoz's inequitable conduct defense. (*Id.* at 9-11)

In response, Sandoz concedes that at the pleading stage, [HN14]in light of *Therasense*, it must allege facts allowing for the reasonable inference of "but-for" materiality. [6] (D.I. 68 at 10-12) The Court agrees that *Therasense* impacted the pleading standards for inequitable conduct claims in this way. *See Pfizer Inc. v. Teva Pharms. USA, Inc.*, 803 F. Supp. 2d 409, 432 (E.D. Va. 2011).

> 6 Prior [*19] to *Therasense*, the Federal Circuit had adhered to less rigid standards for demonstrating materiality, often rooted in the PTO's Rule 56. *Therasense*, 649 F.3d at 1294; *see also* 37 C.F.R. § 1.56 (1977) (a reference is material "if there is a substantial likelihood that a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent"). The *Therasense* Court concluded that the current version of Rule 56 sets too "low [a] bar" because "anything bearing any relation to obviousness could be found material." *Id.* at 1294-95.

However, Sandoz argues that Wyeth has "attempt[ed] to conflate the holdings of *Therasense* and *Exergen* to impose an insurmountable pleading bar for allegations of inequitable conduct" as to the intent prong. (D.I. 68 at 9) According to Sandoz, the *Therasense* Court

did not disturb the applicable pleading standard in this way. It urges the Court to reject Wyeth's formulation of the intent prong, and instead use the standard articulated in *Exergen*: whether deceptive intent could be "reasonably infer[red]" from the facts as pled. (*Id.*)

At oral argument, despite the argument made in its opening brief, Wyeth withdrew its assertion [*20] that *Therasense's* "single most reasonable inference" standard has any bearing on the Court's analysis at the pleading stage. (D.I. 85 at 9-10) However, because Wyeth has otherwise argued that Sandoz has not met the threshold showing of intent required by *Twombly*, *Iqbal* and *Exergen*, I am required to determine what the contours of that standard are. For this reason, and in light of the parties' previously divergent positions, the Court will briefly analyze how the *"single most* reasonable inference" language from *Therasense* should be reconciled with the "reasonable inference" directives from *Exergen*.

[HN15]Several district courts have recently confronted this question and have reached different conclusions. On one end of the spectrum, the District of South Dakota denied a motion for leave to file an amended answer alleging inequitable conduct because "there [were] multiple reasonable inferences that may be drawn" from the facts alleged in the proposed inequitable conduct pleading. *Hansen Mfg. Corp. v. Enduro Sys., Inc.*, No. CIV. 11-4030, 2011 U.S. Dist. LEXIS 131410, 2011 WL 5526627, at *4 (D.S.D. Nov. 14, 2011). This conclusion derives from the *Hansen* Court's determination that *"Therasense* tightened the *standard for pleading* [*21] so that specific intent to deceive must be the single most reasonable inference able to be drawn from the evidence." *Id.* (emphasis added) (internal quotation marks and citation omitted); *see also Quest Software, Inc. v. Centrify Corp.*, No. 2:10-CV-859 TS, 2011 U.S. Dist. LEXIS 129629, 2011 WL 5508820, at *2-3 (D. Utah Nov. 9, 2011) (denying defendant's motion for leave to file amended answer including inequitable conduct claim in part because "the allegations do not reveal that the intent to deceive is the most reasonable inference to be drawn from the evidence").

Other courts have held that the "single most reasonable inference" standard applies to at least some extent in the pleading context. For instance, the Eastern District of Virginia determined that *"Exergen* still states the correct elements required for pleading inequitable

conduct after *Therasense*," and that a party is not required at the pleading stage "to meet the clear and convincing evidence standard that applies on the merits." *Pfizer Inc., 803 F. Supp. 2d at 432.* However, the *Pfizer* Court concluded that in light of *Therasense*, "a party must make an initial showing from which it may be plausibly inferred that... the intent to deceive is the single [*22] most likely explanation for the non-disclosure [of but-for material information]." *Id; accord VDF FutureCeuticals, Inc. v. Sandwich Isles Trading Co.,* Civ. No. 11-00288 ACK-RLP, 2011 U.S. Dist. LEXIS 148527, 2011 WL 6820122, at *6 (D. Haw. Dec. 27, 2011)* (dismissing an inequitable conduct counterclaim where the allegations pled did not "give rise to a plausible inference that the intent to deceive was the single most likely explanation" for the alleged conduct). While the *Pfizer* and *VDF* Courts did not take as rigid a view as did *Hansen*, they nonetheless held that the "single most reasonable" rubric has been engrafted onto the inequitable conduct pleading standard from *Exergen.*

I disagree with the conclusions reached by these courts. Instead, for the three reasons set forth below, I believe that in order to adequately plead the intent prong of an inequitable conduct defense, the claimant need only allege facts from which the Court could *reasonably infer* that the patent applicant made a deliberate decision to deceive the PTO.

First, the Federal Circuit explains in *Therasense* that the "single most reasonable inference" requirement is an *evidentiary* standard that must be satisfied at the proof stage, not a pleading standard. [*23] The Federal Circuit notes that "to meet the clear and convincing *evidence* standard, the specific intent to deceive must be the single most reasonable inference able to be drawn from the *evidence* . . . .Indeed, the *evidence* must be sufficient to require a finding of deceitful intent in light of all the circumstances." *Therasense, 649 F.3d at 1290* (emphasis added) (internal quotation marks omitted). This statement is couched strictly in terms of the ultimate evidentiary analysis, in which a district court determines whether under a heightened standard of proof (the clear and convincing evidence standard), deceptive intent is the single most reasonable inference to be drawn. This form of analysis clearly contrasts with the pleading stage analysis required by *Iqbal*, which asks whether, taking all of the alleged facts as true, the Court can draw the "reasonable inference" that a party is liable for the claimed misconduct, such that the claim is "plausible."

*Iqbal, 129 S.Ct. at 1949.* After all, [HN16]courts "do not inquire whether a plaintiff will ultimately prevail when considering a motion to dismiss, only whether the plaintiff is *entitled to offer evidence to support his or her claims." Grier v. Klem, 591 F.3d 672, 676 (3d Cir. 2010)* [*24] (emphasis added). Moreover, at the pleading stage, a court does not (and cannot) review "all of the circumstances" at play in a case, as the *Therasense* "single most reasonable inference" inquiry requires. *649 F.3d at 1290.* Instead, a court assessing the sufficiency of a pleading looks only to a narrow category of materials (the pleading and any attached exhibits) provided only by one side (the party or parties asserting the inequitable conduct claim).

Second, in *Exergen*, the Federal Circuit appeared to specifically indicate that the "single most reasonable inference" analysis was a separate inquiry from that used to examine whether inequitable conduct is well-pled. After holding that a party must plead facts from which a court can "reasonably infer" that material information was misrepresented or withheld with the specific intent to deceive the PTO, the *Exergen* Court noted how this pleading standard differs from the applicable standard of proof first articulated in *Star Scientific, Inc. v. R.J. Reynolds Tobacco Co., 537 F.3d 1357, 1365-66 (Fed. Cir. 2008):*

> In contrast to the pleading stage, to prevail on the merits, the accused infringer must prove both materiality and intent by clear [*25] and convincing evidence. *See Star Scientific, 537 F.3d at 1365. Whereas an inference of deceptive intent must be reasonable and drawn from a pleading's allegations of underlying fact to satisfy Rule 9(b), this inference must be the 'single most reasonable inference able to be drawn from the evidence to meet the clear and convincing standard.' Id. at 1366.*

*Exergen, 575 F.3d at 1329 n.5* (emphasis added). To read *Therasense* as disturbing this well-established dichotomy would be to collapse inequitable conduct into a mini-trial on the pleadings, and to ignore the clear holdings from both *Star Scientific* and *Exergen.* The Court finds no language in *Therasense* to support such an outcome, particularly given that "*Therasense* did not address inequitable conduct at the motion to dismiss stage and did

not discuss leave to amend." *Oracle Corp. v. DrugLogic, Inc.*, 807 F. Supp. 2d 885, 2011 WL 3443889, at *13 (N.D. Cal. 2011).

Third, this reading is corroborated by the Federal Circuit's own post-*Therasense* case law. In *Delano Farms Co. v. Cal. Table Grape Comm'n*, 655 F.3d 1337 (Fed. Cir. 2011), the Federal Circuit stated that "[a] charge of inequitable conduct based on a failure to disclose [*26] will survive a motion to dismiss only if the plaintiff's complaint recites facts from which the court may *reasonably infer* that a specific individual both knew of invalidating information that was withheld from the PTO and withheld that information with a specific intent to deceive the PTO." *Id.* at 1350 (citing *Exergen* and *Therasense*) (emphasis added). Although this statement does not definitively resolve the issue (in part because it refers only to non-disclosure of information, as opposed to misrepresentation of material information, as alleged by Sandoz here), it strongly suggests that Sandoz need only set forth facts from which deceptive intent can be reasonably inferred. [7] *Accord Human Genome Sciences, Inc. v. Genentech, Inc.*, Case No. 2:11-cv-6519-MRP (JEMx), slip op. at 6 (C.D. Cal. Dec. 9, 2011) (considering *Therasense* and *Exergen* and concluding that "[i]n order to survive dismissal [of an inequitable conduct claim], the accused infringer must allege facts from which it is plausible that the applicant had an intent to deceive," and need not demonstrate that deceptive intent is "the most reasonable inference").

[7]   In this District, only a single written opinion resolving a motion [*27] to dismiss an inequitable conduct claim has issued since *Therasense. See Softview LLC v. Apple Inc.*, Civil Action No. 10-389-LPS, 2011 U.S. Dist. LEXIS 112476, 2011 WL 4571793 (D. Del. Sept. 30, 2011). In *Softview*, this Court granted a motion to dismiss and strike an inequitable conduct claim and defense where the defendants' "theory [of inequitable conduct] [was] based on a mere disagreement with . . . prosecution counsel as to whether certain amendments impermissibly added 'new matter.'" 2011 U.S. Dist. LEXIS 112476, [WL] at *1. In granting the motion to dismiss and strike, the Court found that any such "disagreement does not give rise to a *reasonable inference* that prosecution counsel" knew that he was adding new matter and intended to deceive the PTO by so doing. *Id.* (emphasis added). This

language suggests that a "reasonable inference" of specific intent is sufficient to state a claim for inequitable conduct at the pleading stage. However, the parties in *Softview* did not raise the question as to what impact (if any) *Therasense* had on this question, as *Therasense* was not yet issued at the time that the parties submitted their briefs.

In light of these considerations, and hewing closely to the guidance of the Federal Circuit, the Court will [*28] assess whether the facts as pled give rise to a reasonable inference that material information was misrepresented with the specific intent (i.e., as the result of a deliberate decision) to deceive the PTO.

**B. Inequitable Conduct Has Been Pled With Sufficient Particularity Under the Applicable Standard**

**1. Materiality Prong--Misrepresentation of Material Fact**

[HN17]Inequitable conduct allegations typically center on the failure of a patent applicant to disclose relevant prior art. *See, e.g., Genentech, Inc. v. Trustees of the Univ. of Pa.*, No. 10-CV-02037-LHK, 2011 U.S. Dist. LEXIS 54784, 2011 WL 1936136, at *7 (N.D. Cal. May 20, 2011). In this case, however, there is no allegation of a failure to disclose a prior art reference. Instead, Sandoz alleges that Wyeth's representatives misrepresented the teachings of the prior art in a manner that would be recognized as false by a person of ordinary skill in the art, and also submitted incomplete, misleading, and internally inconsistent empirical data relating to epimer formation in experimental solutions of tigecycline. (D.I. 62)

As an initial matter, the Court finds that Sandoz has properly and specifically identified the "who, what, where, when, and how" of the alleged material [*29] misrepresentations. *See generally Aerocrine AB v. Apieron, Inc.*, Civ No. 08-787-LPS, 2010 U.S. Dist. LEXIS 31176, 2010 WL 1225090, at *9 (D. Del. Mar. 30, 2010). The "who" refers to three individuals who played a role in the prosecution of the '330 application: Mr. Ofslager, a Wyeth employee involved in the development of Tygacil® who submitted a declaration to the PTO and attended the interview with the Examiner; and Ian Liu and David Joran, two Wyeth attorneys who prosecuted the '330 application and also attended the Examiner interview. (D.I. 62 at 9, ¶ 9) The "what" in this case refers to the alleged misrepresentations regarding the

state of prior art (including the '277 reference, which Wyeth allegedly used as a "straw man"), (*id.* at 10, ¶ 13), and the tigecycline stabilization data that was submitted to and discussed with the PTO. The "when" implicates at least two separate dates on which misrepresentations were allegedly made: (1) at the examiner interview on September 16, 2010; and (2) the submission of the Ofslager declaration on October 5, 2010. (*Id.* at 9, ¶ 9; 12, ¶ 19) The "where"--meaning where in the prior art and other documents submitted the allegedly material information is found--is detailed in [*30] the Amended Answer, which lists each piece of information that was (or was not, but allegedly should have been) part of the asserted misrepresentations. (*See id.* at 9-16) As for the "how" element--how a reasonable examiner would have used the information allegedly concealed or falsified by Wyeth's representatives--Sandoz describes two such ways. First, by falsely asserting that a person of ordinary skill in the art would understand that the possible stabilization mechanisms discussed in the cited references "could not work for tigecycline," Wyeth was able to improperly overcome the obviousness rejection. (*Id.* at 10, ¶ 12) Second, by arguing that the Wyeth stability data established "unexpected results," Wyeth convinced the Examiner that secondary considerations of non-obviousness should overcome his rejection of the '330 application. (*Id.* at 10, ¶ 15) According to Sandoz, these data were flawed. (*Id.* at 10-15)

In its briefs, Wyeth alleges that Sandoz's allegations fall short of the requirements of the materiality prong in two primary respects. First, Wyeth asserts that Sandoz has not made the requisite showing of but-for materiality, because it "never alleged that 'the PTO would not have [*31] allowed a claim had [the Examiner] been aware' of the alleged 'critical information [that Wyeth's representatives did not share with the Examiner].'" (D.I. 65 at 12) However, Sandoz *did* explicitly allege but-for materiality. After listing the various types of alleged misrepresentations made to the Examiner by Wyeth representatives, Sandoz asserted: "Thus, the '828 patent would not have been issued *but for* [Wyeth's] deceptive and erroneous representations to the [PTO]." (D.I. 62 at 16, ¶ 30 (emphasis added)) Moreover, Sandoz alleged that because the Examiner specifically acknowledged and cited many of the statements made by Wyeth's representatives when listing the Reasons for Allowance of the '828 patent, but-for materiality is a reasonable inference. (*Id.*) Therefore, contrary to Wyeth's assertion, the allegation of but-for materiality was squarely made.

Moreover, that allegation is legally sufficient because the underlying facts allow the Court to draw the reasonable inference that the '828 patent would not have issued but for the alleged misrepresentations. Those alleged misrepresentations were made during the September 16, 2010 Examiner interview (in which Wyeth's representatives [*32] were attempting to overcome the Examiner's earlier rejection of the '330 application) and in the October 5, 2010 Ofslager declaration (a document submitted for the specific purpose of convincing the Examiner that the invention at issue was non-obvious). Moreover, the Examiner repeatedly cited the data provided in the declaration as the primary reason for his allowance of the patent. (D.I. 62, ex. 6 at 3 ("Applicant has overcome this prima facie case of obviousness by providing secondary considerations, in the form of unexpected results, as highlighted by the Ofslager Declaration below.")) The clear nexus between the alleged misrepresentations, the circumstances in which they were made, and the resulting impact they had on the Examiner's decision, leads to a reasonable inference of but-for materiality. [8]

> [8] *Cf. Pollin Patent Licensing, LLC v. Capital One Auto Fin., Inc.*, No. 1:10-CV-07420, 2011 U.S. Dist. LEXIS 124805, 2011 WL 5118891, at *4 (N.D. Ill. Oct. 25, 2011) (finding allegations of materiality in inequitable conduct claim sufficient to permit leave to amend to add claim, as counterclaimant had alleged that the patent application would not have been granted if the information withheld by the applicant had been [*33] disclosed); *Nycomed U.S. Inc. v. Glenmark Generics, Ltd.*, No. 08-CV-5023 (CBA)(RLM), 2010 U.S. Dist. LEXIS 29267, 2010 WL 1257803, at *14 (E.D.N.Y. Mar. 26, 2010) (granting defendant's motion to amend regarding inequitable conduct defense and counterclaim and finding, pre-*Therasense*, that defendant's allegations of false representations to PTO were "*highly* material" because they were submitted to overcome the Examiner's rejection of application on obviousness grounds, and because in issuing a Notice of Allowance, the Examiner "expressly cited [plaintiff's] arguments" concerning the representations at issue).

Second, Wyeth asserts that regardless of the representations it made to the PTO regarding the '277 reference and observational data from tigecycline

solutions, "[t]he Examiner admittedly had all the relevant data and was free to disregard [Wyeth's] interpretation of it and draw his own conclusions." (D.I. 65 at 12) Although Wyeth describes this as indicating a failure to sufficiently allege but-for materiality, (*id.*), its claim is more accurately framed as an assertion that the alleged misrepresentations are not actually misrepresentations at all. This argument hinges on Wyeth's contention that "[t]he Federal [*34] Circuit has long held that merely presenting arguments and interpretations concerning a reference that was in front of the Examiner does not constitute an actionable misrepresentation." (D.I. 70 at 6 (citing cases)) That line of case law generally stands for the proposition that,[HN18] to the extent that an applicant's alleged misrepresentations consist solely of arguments to the Examiner that are not unreasonable interpretations or demonstrably false, such statements do not amount to "misrepresentations" that give rise to an inequitable conduct claim. *See Young v. Lumenis, Inc., 492 F.3d 1336, 1349 (Fed. Cir. 2007)* (cited in D.I. 70 at 6); *Life Techs., Inc. v. Clontech Lab., Inc., 224 F.3d 1320, 1326 (Fed. Cir. 2000)* (cited in D.I. 70 at 6); *Genzyme Corp. v. Transkaryotic Therapies, Inc., No. 00-677, 2004 U.S. Dist. LEXIS 19250, at *7 (D. Del. Sept. 27, 2004)* (cited in D.I. 70 at 5).

Sandoz counters that Wyeth's argument as to the alleged misstatements about the '277 reference "misses the point... [because] [t]he conduct of the applicants' representatives was not just zealous advocacy; it was a misleading characterization of a key reference." (D.I. 68 at 13) Sandoz also highlights its allegation [*35] that "Mr. Ofslager withheld not the data itself but material information relating to the data, e.g., the error rate associated with the data, alternative explanations for the data, and inconsistencies in the data that draw into question its reliability (if one knows what to look for). . . . The Examiner did not have this information and had no way of independently learning it." (*Id.* at 12-13) In support, Sandoz cites an alternative line of case law establishing that although "an attorney is free to argue vigorously in favor of patentability without being subject to accusations of inequitable conduct, the law prohibits genuine misrepresentations of material fact." (*Id.* at 13 (citing *Ring Plus, Inc. v. Cingular Wireless Corp., 614 F.3d 1354, 1360-61 (Fed. Cir. 2010)*)) [9]

[9]   *See also Rothman v. Target Corp., 556 F.3d 1310, 1328 (Fed. Cir. 2009)* (noting that [HN19]although an attorney may vigorously

argue in favor of patentability without being subject to allegations of inequitable conduct, "the law prohibits genuine misrepresentations of material fact"); *VDF FutureCeuticals, Inc., 2011 U.S. Dist. LEXIS 148527, 2011 WL 6820122 at *6* (noting that "not all arguments by attorneys are shielded from liability for inequitable conduct").

Wyeth's [*36] claim thus requires the Court to assess whether, accepting the well-pleaded facts of the inequitable conduct defense as true, and viewing those facts in the light most favorable to Sandoz, the Court can reasonably infer that Wyeth's statements crossed the line from permissible advocacy to impermissible misrepresentation. As an initial matter, the Court agrees with Sandoz that [HN20]Wyeth is not relieved of responsibility for any alleged misstatements simply because the '277 reference and the stabilization data were before the PTO. It is not possible for a patent applicant to misrepresent the teachings of the prior art unless that material is before the PTO in the first place. *Cf. Ring Plus, 614 F.3d at 1360* (upholding district court's finding that a person of skill in the art would have understood two prior art references to disclose software-based algorithms, and that because applicants had identified these two references to the Examiner and claimed that these references did not propose software-based systems, these statements amounted to material misrepresentations). To countenance Wyeth's approach would create a perverse incentive, where applicants would be free to falsely characterize [*37] such documents, but then claim immunity from a later charge of inequitable conduct because the mischaracterized material was before the PTO.

Moreover, this Court recently affirmed the principle that [HN21]attorney arguments can give rise to an actionable claim of inequitable conduct. [10] In *Southco, Inc. v. Penn Eng'g & Mfg. Corp., 768 F. Supp. 2d 715 (D. Del. 2011)*, this Court denied a motion to dismiss an inequitable conduct claim that was based, at least in part, on alleged misrepresentations that the patentee's counsel made during reexamination proceedings. *Id. at 723-24*. In *Southco*, the accused infringer requested reexamination of the asserted patent in light of a prior art fastener that was found in a catalog, referred to as the "Huck reference." *Id. at 721-22*. The patentee argued to the PTO that the claims-at-issue were nonetheless patentable for two reasons: (1) the Huck reference failed to "disclose a 'rigid connection' between the head of the screw and the

knob" of the depicted fastener, as required by the patented claims; and (2) the Huck reference likewise did not show the "protrusions" required by the claimed fastener. *Id.* at 722. In seeking to dismiss and strike the counterclaim [*38] and affirmative defense of inequitable conduct in later litigation, the *Southco* plaintiff asserted (just as Wyeth has here) that the patentee's statements to the Examiner were simply "arguments of counsel and, therefore, they cannot be considered misrepresentations." *Id.* This Court rejected that proposition, and instead found that the alleged misrepresentations, even if categorized as mere "attorney argument," were "sufficient to satisfy the requirements of [Rule 9(b)]." *Id.* at 723. In doing so, it noted that defendant's allegations were, in part, "that Southco's arguments to the Examiner amounted to material misrepresentations because Southco knew its arguments were factually and patently false" given its pre-existing knowledge of the actual fastener. *Id.* [11] Thus, *Southco* demonstrates that a claim based upon allegedly false and misleading statements to the PTO regarding a prior art reference (or other information submitted to the PTO, such as experimental data) can survive the pleading stage (assuming that the other elements of the inequitable conduct defense are sufficiently pled).

> 10   All three of the cases that Wyeth cites in support of its argument that the alleged misrepresentations [*39] do not give rise to even a plausible inequitable conduct claim are of limited utility, as all of them involved a district court decision as to the sufficiency of an inequitable conduct claim at or after the summary judgment stage. (D.I. 70 at 5-6 (citing cases))
>
> 11   *See also* Elan Corp., PLC v. Teva Pharms. USA, Inc., Civ. No. 07-552-SLR, 2008 U.S. Dist. LEXIS 17807, 2008 WL 623506, at *1 (D. Del. Mar. 7, 2008) (denying plaintiff's motion to dismiss inequitable conduct claims and to strike related affirmative defenses in light of allegations that arguments made to patent examiner involved intentional falsehoods about a material reference, and did not simply constitute permissible attorney argument)

In line with the decision in *Southco*, the Court finds that at this stage, Sandoz has alleged sufficient facts to support the reasonable inference that Wyeth made actionable misrepresentations to the Examiner. The alleged misrepresentations here concern not only

knowledge of this particular industry, but also relate to Wyeth's internal testing procedures and protocols. This is precisely the sort of information that Mr. Ofslager was uniquely qualified to characterize and explain, which is what allegedly allowed him to "deceive" [*40] the Examiner by failing to do so accurately. (D.I. 62 at 16, ¶ 30) Moreover, at least with regard to Mr. Ofslager's alleged failure to disclose to the Examiner certain significant error rates, Sandoz appears to assert that this data was never provided by Wyeth to the Examiner in any form, which would have required the Examiner to rely even more significantly on Mr. Ofslager's representations. (D.I. 62 at 11, ¶ 16 ("Mr. Ofslager . . . never explained to the Examiner either the error rate in these figures or its significance to his conclusions.")) Taking these facts as true, as the Court must at this stage, it is at least plausible that the alleged misrepresentations traversed the line from mere argument to actionable falsehoods.

## 2. Intent Prong--Specific Intent to Deceive the PTO

In its opening brief, Wyeth asserts that Sandoz's inequitable conduct defense should also be dismissed for failure to allege a plausible claim of deceptive intent. Wyeth states that Sandoz has failed to meet its burden pursuant to the intent prong for two primary reasons.

First, Wyeth claims that "Sandoz [did] not allege facts from which the Court could conclude that the 'single most reasonable inference' to be [*41] drawn is that Wyeth intended to deceive the PTO" because "a conclusion that the named individuals acted innocently without any intent to deceive the PTO *is at least as plausible*, if not more so, than a conclusion of intent to deceive." (D.I. 65 at 10 (emphasis added)) As noted above, this argument was largely premised on the view that Sandoz could survive a motion to dismiss if and only if it offered evidence that deceptive intent was the single most reasonable inference to be drawn from the facts pled. Yet Wyeth withdrew that assertion at oral argument, (D.I. 85 at 9-10), and the Court has now concluded that the "single most reasonable inference" analysis was not meant to be grafted onto the standard for analysis of the sufficiency of pleadings. Yet it is notable that in its briefing, even Wyeth appeared to concede that a "conclusion of intent to deceive" is "at least" one "plausible" inference based on the facts as pled. (D.I. 65 at 10)

Second, Wyeth asserts that given the alleged

"objective indicators of candor and good faith" inherent in Sandoz's pleading, and the fact that the alleged misrepresentations are "nothing more than the typical exchanges between an applicant and the PTO," [*42] Sandoz has failed to plausibly allege deceptive intent. (*Id.* at 10-11) Wyeth expands on this argument in its Reply Brief, asserting that Sandoz failed to cite any evidence concerning when Mr. Ofslager became aware of any alleged data discrepancies, whether he even considered them when presenting the data at issue to the Examiner, or whether in doing so, Mr. Ofslager "deliberately set out to deceive." (D.I. 70 at 4) Wyeth claims Sandoz's allegations thus amount to "an unsupported theory of intent." (*Id.*)

Sandoz responds to Wyeth's arguments first by cataloguing the alleged inaccuracies and inconsistencies in the tigecycline stabilization data that were submitted to and relied upon by the PTO, noting that "the accuracy of these measurements, and their comparability between experiments, was the entire premise of Mr. Ofslager's assertion of unexpected results." (D.I. 68 at 14) Sandoz alleges that this "premise" is fatally undermined by, *inter alia*, the unreported error rate and data (that was absent from Mr. Ofslager's "incomplete" presentation) showing tigecycline epimerization inexplicably decreasing over time in certain experiments. (D.I. 62 at 11-14) Given that "a person of extraordinary [*43] skill such as Mr. Ofslager would appreciate that these inconsistencies raise serious doubts about the accuracy and reliability of the methods used" by Wyeth to assess tigecycline, Sandoz argues that Mr. Ofslager's representations were meant to deliberately mislead the PTO. (D.I. 68 at 16)

The Court finds that Sandoz has pled sufficient facts, with sufficient particularity, to give rise to a reasonable inference that Wyeth's representatives deliberately acted to deceive the PTO during the prosecution of the '828 patent. Sandoz alleges that Wyeth engaged in a multi-faceted strategy to deceive the PTO by convincing the Examiner that the claimed invention, which exposes tigecycline to acidic conditions in combination with lactose, results in a much more stable solution than the prior formulations of tigecyline. (D.I. 62 at 17, ¶ 32) By way of example, Sandoz asserts that Mr. Ofslager offered numerous test results to the PTO that compared "First Generation Tigecycline" (without hydrochloric acid or lactose) to "Second Generation Tigecyline" (containing both of those elements). (*Id.* at 15, ¶ 28; ex. 1 at ¶¶ 8-9) Mr. Ofslager interpreted this data, which showed that the

purity of tigecycline [*44] was reduced by more than 2% in First Generation Tigecycline as compared to Second Generation Tigecycline, and represented that "Second Generation Tigecycline possesses a *significantly greater stability* [from prior formulations without the elements claimed in the '828 patent] in both lyophilized and reconstituted forms." (*Id.*, ex. 1 at ¶ 36 (emphasis added)) Yet Sandoz contends that Mr. Ofslager did not tell the Examiner that the error rate in these measurements was about 2%, nor that other data in the submitted materials contained results so anomalous as to render them effectively unreliable, thus creating an incomplete and misleading picture. (*Id.* at 15-16, ¶ 29)

Additionally, Sandoz repeatedly states that Mr. Ofslager made these false and misleading representation in a "deceptive" fashion--in essence, Sandoz alleges that Mr. Ofslager knew about the existence of this problematic data but made a calculated, deliberate decision to conceal it in his presentations to the Examiner. (*Id.* at 16, ¶ 30 ("As with his characterization of the data from the '330 application, Mr. Ofslager presented the data from the stability reports in a deceptive way. . . . Thus, the '828 patent would not have [*45] been issued but for Mr. Ofslager's deceptive and erroneous representations to the Patent Office.")) Assuming that Sandoz's allegations are accurate, as I must at this stage, then those allegations give rise to the plausible claim that Mr. Ofslager's presentation was designed to mislead the Examiner into issuing the '828 patent on a faulty premise (of unexpected results). *Accord Pollin Patent Licensing, LLC, 2011 U.S. Dist. LEXIS 124805, 2011 WL 5118891 at *4* (granting motion for leave to amend to assert inequitable conduct claim and finding allegation of deceptive intent was sufficient, where counterclaimant alleged that withheld information would have been material to the PTO's examination and was known to applicant).

Moreover, although Wyeth claims that "Sandoz does not present any evidence concerning when Mr. Ofslager became aware of the[] alleged 'discrepancies'" in tigecycline data or whether he even considered them when presenting data to the Examiner (D.I. 70 at 4), the Court finds that the allegations give rise to that plausible inference. Mr. Ofslager represented that all of the "facts presented in [his] Declaration" were "of [his] own knowledge" and that he had read, was familiar with, and understood Wyeth's [*46] patent application. (D.I. 62, ex. 1 at ¶¶ 9-11 & pg. 10) More significantly, Mr.

Ofslager was the individual who developed the manufacturing process for the current version of Tygacil® made by Wyeth, which "contains lactose monohydrate as a diluent/stabilizer and hydrochloric acid as pH adjustment." (*Id.*, ex. 1 at ¶ 8) He not only oversaw this process, but developed or co-developed several other drugs, and is the inventor of multiple U.S. patents and applications. (*Id.*, ex. 1 at ¶¶ 6-7) Given Mr. Ofslager's experience, his direct oversight of this process, and his statements to the Examiner, it is reasonable to infer, at this stage, that he was familiar with the testing protocols he cited in his declaration (and that were included in the '828 patent specification), as well as the contrary data referenced by Sandoz.

In its briefs, Wyeth cites only a single instance of a case in this Court where an inequitable conduct claim was disallowed in its entirety at the pleading stage due to the failure to adequately allege scienter: *Softview LLC v. Apple Inc., No. 10-389-LPS, 2011 U.S. Dist. LEXIS 112476, 2011 WL 4571793 (D. Del. Sept. 30, 2011).* *Softview* is distinguishable from the present facts, most notably because unlike [*47] the many deliberate misrepresentations regarding stabilization data alleged in the instant case, the *Softview* counterclaim focused only on a "mere disagreement" over what constituted "new matter" in a patent application. *2011 U.S. Dist. LEXIS 112476, [WL] at *1.* Similarly, Wyeth cites *Fred Hutchinson Cancer Research Ctr. v. BioPet Vet Lab, Inc., Civil Action No. 2:10cv616, 2011 U.S. Dist. LEXIS 68800, 2011 WL 2551002 (E.D. Va. June 27, 2011),* another case in which a district court disallowed an inequitable conduct claim at the pleading stage on grounds that insufficient evidence of deliberate deception was pled. However, the claim at issue in *Fred Hutchinson* involved only "curs[o]ry allegations" that the inventors of a patent were aware of undisclosed prior art. *2011 U.S. Dist. LEXIS 68800, [WL] at *3.* Those cursory allegations pale in comparison to the lengthy factual recitation in Sandoz's pleading here, which alleges misrepresentations by Mr. Ofslager and others acting on Wyeth's behalf, regarding data that they repeatedly and affirmatively brought to the PTO's attention.

At oral argument, Wyeth also cited an additional, unpublished district court decision granting a motion to dismiss inequitable conduct allegations--*Human Genome Sciences, Inc. v. Genentech, Inc.*, Case No. 2:11-cv-6519-MRP (JEMx) (C.D. Cal. Dec. 9, 2011) (slip op.) [*48] Wyeth argued that because the facts in

*Genentech* are closely analogous to those at issue here, the Court should similarly dismiss Sandoz's inequitable conduct defense. (D.I. 85 at 11)

Although the *Genentech* inequitable conduct defense included many different elements, two particular allegations are most relevant here: (1) alleged misrepresentation of a prior art reference; and (2) alleged misrepresentation of experimental data. *Genentech*, slip op. at 8-10. In *Genentech*, the defendants alleged that one of Genentech's scientists stated that the patent application-at-issue and a series of prior art references were closely related. *Id.* at 8. Genentech's prosecution counsel later represented to the PTO that one of those same prior art references "was 'irrelevant to the claims of [the patent application].'" *Id.* at 8-9. The *Genentech* court found that these allegations were insufficient to give rise to a reasonable inference of deceptive intent. *Id.* at 9. These allegations bear little resemblance to those at issue in this case. Sandoz's argument is that Wyeth's representatives asserted that the prior art, as exemplified by the [*49] '277 reference, did not disclose a stabilization mechanism that would work for tigecycline. (D.I. 62 at 9, ¶ 10; 10, ¶ 12) Sandoz's arguments are not exclusively directed to the '277 reference itself, but rather concern the real-world applications of the biochemical mechanisms disclosed in that reference. (*Id.*) If anything, this portion of *Genentech* simply stands for the proposition that conflicting statements from party-representatives will not alone be sufficient to assert a plausible claim. That proposition is inapplicable to the facts as pled by Sandoz.

The *Genentech* defendants also pointed to "one of the inventor's statements to the PTO that the experiment in the specification had resulted in reactions 'significantly higher than the background,' whereas that inventor had previously said[,] in a private letter to a colleague, that the data in the application was 'barely measurable above background.'" *Genentech*, slip op. at 10. The *Genentech* court determined that "[a]ny number of reasons could exist for that contradiction--the inventor could have made a mistake in that letter or he could have changed his mind about how to read the data." *Id.* Although there could well be an innocent [*50] explanation for the conduct described in Sandoz's inequitable conduct defense, under *Exergen*, that is by no means the *only* reasonable inference to be drawn here. Moreover, in this case, the alleged contradictions go to the heart of patentability. The Examiner made clear that the '330 application was

Page 16

rejected because the stability of the claimed invention offered only "minimal" advantages over the prior art. (D.I. 62 at 8, ¶ 8) Thus, Wyeth's only recourse to obtain the '828 patent was to assert that something more than a "minimal" increase in stability was observed in the claimed combination, even if the experimental data was inconsistent with that conclusion. There is no evidence that the contradiction at issue in *Genentech* was so central to patentability, or that there was such a motive to overstate the effectiveness of the invention. Thus, the cases cited by Wyeth do not alter the Court's conclusion as to this issue.

## IV. CONCLUSION

The Federal Circuit has expressed an unequivocal desire to reign in the proliferation of inequitable conduct claims, which have "increased adjudication cost and complexity, reduced likelihood of settlement, burdened courts, strained PTO resources, increased [*51] PTO backlog, and impaired patent quality." *Therasense*, 649 F.3d at 1290. However, that effort must be balanced against the fact that "honesty at the PTO is essential," and thus [HN22]inequitable conduct claims remain viable as a general matter, even when they are not based solely on affirmative acts of egregious misconduct. *Id.* at 1290, 1292. While Sandoz faces a more difficult task of proving inequitable conduct in light of the Federal Circuit's recent precedent, it has provided a lengthy recitation of facts that give rise to a reasonable inference that Wyeth misrepresented material information with the intent to deceive the PTO. Thus, I recommend that the Court DENY Plaintiffs' motion.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1. The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b)(2). The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in the district court. *See Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987); *Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006).

The [*52] parties are directed to the Court's Standing Order In Non-Pro Se Matters For Objections Filed Under Fed. R. Civ. P. 72, dated November 16, 2009, a copy of which is available on the Court's website, http://www.ded.uscourts.gov/StandingOrde rsMain.htm.

Because this Report & Recommendation may contain confidential information, it has been released under seal, pending review by the parties to allow them to submit a single jointly proposed redacted version of the Report & Recommendation. Such redacted version shall be submitted no later than **February 10, 2012** for review by the Court. The Court will subsequently issue a publicly-available version of its Report & Recommendation.

Dated: February 3, 2012

/s/ Christopher J. Burke

Christopher J. Burke

UNITED STATES MAGISTRATE JUDGE

**<u>Citation #11</u>**
**2012 us dist lexis 13611**

LEXSEE

**W.L. GORE & ASSOCIATES, INC., and GORE ENTERPRISE HOLDINGS, INC., Plaintiffs, v. MEDTRONIC, INC., MEDTRONIC USA, INC., and MEDTRONIC VASCULAR, INC., Defendants.**

**Civil Action No. 2:10cv441**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF VIRGINIA, NORFOLK DIVISION**

**2012 U.S. Dist. LEXIS 13611**

**February 3, 2012, Decided
February 3, 2012, Filed**

**CORE TERMS:** patent, inequitable conduct, covering, counterclaim, prior art, intent to deceive, inventor, intentionally, withheld, stent, disclose, mischaracterized, thick, medical devices, misrepresentation, thinner, graft, infer, pled, reasonable inference, heightened, cumulative, examiner, material facts, sufficient facts, particularity, patentability, invalidating, materiality, conclusory

**COUNSEL:** [*1] For W.L. Gore & Associates, Inc., Gore Enterprise Holdings, Inc., Plaintiffs: Ahmed Jamal Davis, Fish & Richardson PC (DC), Washington, DC; Juanita Rose Brooks, PRO HAC VICE, Fish & Richardson P. C. (CA-NA), San Diego, CA; Martina Tyreus Hufnal, Robert M. Oakes, Susan Morrison Coletti, Timothy Devlin, PRO HAC VICE, Fish & Richardson (DE NA), Wilmington, DE.

For Medtronic, Inc., Medtronic USA, Inc., Medtronic Cardiovascular, Inc., Defendants: Dabney Jefferson Carr, IV, LEAD ATTORNEY, Robert Armistead Angle, Troutman Sanders LLP, Richmond, VA; Daniel William McDonald, Karen Diane McDaniel, Rachel Clark Hughey, Thomas Joseph Leach, PRO HAC VICE, Merchant & Gould PC, Minneapolils, MN; James Joseph Elacqua, PRO HAC VICE, Skadden Arps Slate Meagher & Flom LLP, Palo Alto, CA; Peter Attila Gergely, Ryan James Fletcher, PRO HAC VICE, Merchant & Gould PC, Denver, CO.

For Medtronic Cardiovascular, Inc., Medtronic USA, Inc., Medtronic, Inc., Counter Claimant: Dabney Jefferson Carr, IV, LEAD ATTORNEY, Robert Armistead Angle, Troutman Sanders LLP, Richmond,

VA; Karen Diane McDaniel, Rachel Clark Hughey, Thomas Joseph Leach, Merchant & Gould PC, Minneapolils, MN; Ryan James Fletcher, Merchant & Gould [*2] PC, Denver, CO.

For Gore Enterprise Holdings, Inc., W.L. Gore & Associates, Inc., Counter Defendants: Ahmed Jamal Davis, Fish & Richardson PC (DC), Washington, DC; Juanita Rose Brooks, Fish & Richardson P. C. (CA-NA), San Diego, CA; Susan Morrison Coletti, Timothy Devlin, Fish & Richardson (DE NA), Wilmington, DE.

For Medtronic USA, Inc., Counter Claimant: Dabney Jefferson Carr, IV, LEAD ATTORNEY, Robert Armistead Angle, Troutman Sanders LLP, Richmond, VA; Karen Diane McDaniel, Rachel Clark Hughey, Thomas Joseph Leach, Merchant & Gould PC, Minneapolils, MN; James Joseph Elacqua, PRO HAC VICE, Skadden Arps Slate Meagher & Flom LLP, Palo Alto, CA; Peter Attila Gergely, Ryan James Fletcher, Merchant & Gould PC, Denver, CO.

For Medtronic, Inc., Medtronic Cardiovascular, Inc., Counter Claimant: Dabney Jefferson Carr, IV, LEAD ATTORNEY, Robert Armistead Angle, Troutman Sanders LLP, Richmond, VA; Karen Diane McDaniel, Rachel Clark Hughey, Thomas Joseph Leach, Merchant & Gould PC, Minneapolils, MN; Ryan James Fletcher, Merchant & Gould PC, Denver, CO.

For Gore Enterprise Holdings, Inc., Counter Defendant: Ahmed Jamal Davis, Fish & Richardson PC (DC), Washington, DC; Juanita Rose Brooks, Fish & [*3]

Richardson P. C. (CA-NA), San Diego, CA; Robert M. Oakes, Susan Morrison Coletti, Timothy Devlin, PRO HAC VICE, Fish & Richardson (DE NA), Wilmington, DE.

For W.L. Gore & Associates, Inc., Counter Defendant: Ahmed Jamal Davis, Fish & Richardson PC (DC), Washington, DC; Juanita Rose Brooks, Fish & Richardson P. C. (CA-NA), San Diego, CA; Susan Morrison Coletti, Timothy Devlin, Fish & Richardson (DE NA), Wilmington, DE.

**JUDGES:** Mark S. Davis, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** Mark S. Davis

**OPINION**

**OPINION AND ORDER**

Plaintiffs W.L. Gore & Associates, Inc. and Gore Enterprise Holdings, Inc. (collectively "Gore") filed this action against Defendants, Medtronic, Inc., Medtronic USA, Inc., and Medtronic Vascular, Inc. (collectively "Medtronic"), alleging that Medtronic infringed upon Gore's U.S. Patent No. 5,810,870 ("the '870 patent"), entitled "Intraluminal Stent Graft." Medtronic, in turn, has asserted various affirmative defenses and counterclaims. Gore's Motion to Dismiss Medtronic's Inequitable Conduct Counterclaim, under Federal Rule of Civil Procedure 12(b)(6), is presently before the Court. For the reasons discussed below, the motion will be **DENIED.**

**I. FACTUAL AND PROCEDURAL BACKGROUND**

On September 3, 2010, [*4] Gore filed a complaint against Medtronic alleging patent infringement. Gore alleges that Medtronic's Talent Thoracic Stent Graft and its Talent Abdominal Stent Grafts infringe claims 12, 16 and 19 of the '870 patent which are directed to methods of making a tubular intraluminal graft disclosed in the patent. On November 19, 2010, Medtronic filed a Motion to Dismiss Plaintiff's Complaint. On April 20, 2011, this Court denied the Defendant's Motion to Dismiss. Gore then filed an Amended Complaint on April 26, 2011, and Medtronic filed an Answer and Counterclaim on May 10, 2011.

Medtronic has asserted three counts in its counterclaim: (1) non-infringement, (2) invalidity, and (3) unenforceability due to inequitable conduct. Gore now moves to dismiss Medtronic's inequitable conduct count under Federal Rule of Civil Procedure 12(b)(6). Medtronic's inequitable conduct count can be broken into three allegations:

(1) House and Myers (the inventors named in the '870 patent) intentionally withheld material prior art (specifically U.S. Patent Nos. 5,358,516 (the '516 patent) and 5,397,628 (the '628 patent)).

(2) House and Myers intentionally mischaracterized references they disclosed to the Patent [*5] Office (specifically, U.S. Patent Nos. 5,123,917 (the '917 patent), 5,107,852 (the '852 patent), 4,768,507 (the '507 patent), and German Patent No. 3,918,736 (the '736 patent)).

(3) House and Myers submitted a false affidavit to the patent office by signing the standard inventor oath (stating they believed they were the "original, first and joint inventors") required to be filed with the patent application.

**II. STANDARD OF REVIEW**

Application of Rule 12(b)(6) in patent cases is a procedural question and is therefore governed by the law of the regional circuits. McZeal v. Sprint Nextel Corp., 501 F.3d 1354, 1355-56 (Fed. Cir. 2007) ("A motion to dismiss for failure to state a claim upon which relief can be granted is a purely procedural question not pertaining to patent law. Thus, on review [this Court must] apply the law of the regional circuit."); Polymer Indus. Prods. Co v. Bridgestone/Firestone, Inc., 347 F.3d 935, 937 (Fed. Cir. 2003) (same). In the Fourth Circuit, "[t]o survive a motion to dismiss pursuant to 12(b)(6), plaintiffs' '[f]actual allegations must be enough to raise a right to relief above the speculative level,' thereby 'nudg[ing] their claims across the line from conceivable [*6] to plausible.'" Aziz v. Alcolac, Inc., 658 F.3d 388, 391 (4th Cir. 2011) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929, (2007)). Although a court must accept the material facts

alleged as true, statements of bare legal conclusions will be insufficient to state a claim. Id.

Although most unenforceability defenses need not be pled with particularity, the defense of inequitable conduct is an exception. Rule 9(b) of the Federal Rules of Civil Procedure states that: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b); see Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 1949-50, 173 L. Ed. 2d 868 (2009) (although intent may be averred generally, "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice"). Whether inequitable conduct has been adequately pleaded is a question of Federal Circuit law, not the law of the regional circuit, because it "pertains to or is unique to patent law." Exergen Corp. v. Wal-Mart Stores, Inc., 575 F.3d 1312, 1326 (Fed. Cir. 2009) (citing [*7] Cent. Admixture Pharm. Servs. v. Advanced Cardiac Solutions, P.C., 482 F.3d 1347, 1356 (Fed. Cir. 2007)). Thus, to survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), an inequitable conduct counterclaim or affirmative defense must satisfy Fed. R. Civ. P. 9(b)'s particularity standard and "identify the specific **who, what, when, where and how** of the material misrepresentation or omission committed before the PTO." Exergen, 575 F.3d at 1328 (emphasis added). Although under Rule 9(b), "knowledge" and "intent" may be alleged generally, a pleading of inequitable conduct must include sufficient facts from which a Court can "reasonably infer that a specific individual both knew of invalidating information that was withheld from the PTO and withheld that information with a specific intent to deceive the PTO." Delano Farms Co. v. Cal. Table Grape Comm'n, 655 F.3d 1337, 1350 (Fed. Cir. 2011).[1] "A reasonable inference is one that is plausible and that flows logically from the facts alleged, including any objective indications of candor and good faith." Exergen, 575 F.3d at 1329. The Court must accept all allegations of material fact and construe them in the light most favorable to the [*8] nonmoving party. See Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 253 (4th Cir. 2009) (noting that in ruling on a motion to dismiss, the district court must assume all well-pleaded facts to be true).

> 1  Charging inequitable conduct has become a common litigation tactic and recent studies have

estimated that eighty percent of patent cases included such an allegation. Therasense, Inc. v. Becton, Dickinson & Co., 649 F.3d 1276, 1289 (Fed. Cir. 2011). In an attempt to control the doctrine, the Federal Circuit has recently tightened the standards for finding intent and materiality. Id. at 1290. Under Therasense, "the accused infringer must prove by clear and convincing evidence that the applicant knew of the reference, knew that it was material, and made a deliberate decision to withhold it." Id. Thus, a party alleging inequitable conduct must now show "but-for materiality" and that the intent to deceive is "the single most reasonable inference able to be drawn from the evidence." Id. at 1290-91 (emphasis added).

Although Therasense has heightened the standards for inequitable conduct on the merits, it does not specifically address the pleading stage. The Court is aware [*9] that at least one district court in the Eastern District of Virginia has concluded that the heightened standards of Therasense must be incorporated and considered at the pleading stage. See Pfizer, Inc. v. Teva Pharms. USA, Inc., 2011 U.S. Dist. LEXIS 90021, *57-58 (E.D. Va. Aug. 12, 2011) (concluding that after Therasense, "a party must make an initial showing from which it may be plausibly inferred that: (1) the individual knew of the information not disclosed; (2) the information not disclosed was but-for material to the prosecution of the patent; and (3) the intent to deceive is the single most likely explanation for the non-disclosure"). However, subsequent to the Pfizer opinion, in a post-Therasense opinion, the Federal Circuit recently stated that to survive a motion to dismiss, an inequitable conduct counterclaim simply must recite "facts from which the court may reasonably infer that a specific individual both knew of invalidating information that was withheld from the PTO and withheld that information with a specific intent to deceive the PTO." Delano Farms, 655 F.3d at 1350 (citing Exergen, 575 F.3d at 1318, 1330; citing generally Therasense). Thus, this Court will follow [*10] the Delano court's recitation of the Exergen standard, without any modification for the heightened Therasense requirements, as it is binding precedent on this Court.

Thus, with the above standards in mind, the Court will now assess Medtronic's three theories of inequitable conduct.

## III. DISCUSSION

### A. Undisclosed Prior Art

Medtronic first alleges that Wayne D. House, a Gore employee and the prosecuting attorney/agent for the '870 patent, intentionally withheld U.S. Patent No. 5,358,516 (the '516 patent) and U.S. Patent No. 5,397,628 (the '628 patent) with specific intent to deceive the PTO. (Def.'s Answer and Counterclaim ¶ 45, Docket No. 69). Medtronic similarly alleges that David J. Myers, a Gore employee and the listed inventor of the '870 patent, intentionally withheld the '516 patent with specific intent to deceive the PTO. (Id. at ¶ 48). Medtronic argues that the '870 patent application represented to the PTO that the "crux" of the invention and the improvement over prior art was an ePTFE covering less than 0.10mm thick. Medtronic alleges that, notwithstanding this representation to the PTO, both Mr. House and Mr. Myers were aware that Gore already had the capability of making ePTFE [*11] coverings that were less than 0.10mm thick and had already been using such coverings in other patented implantable medical devices (specifically, the '516 and '628 patents). (Id. at ¶ 51-62). Thus, Medtronic argues that Mr. House and Mr. Myers falsely represented to the PTO that ePTFE coverings less than 0.10mm did not exist in the prior art.

Gore argues that Medtronic's allegations concerning the '516 and the '628 patent are pled solely on information and belief and contain nothing more than conclusory allegations that these references were "material" to the patentability of the '870 patent. Specifically, Gore argues that the '516 and the '628 patents patents describe vastly different technologies than the '870 patent. The '516 patent discloses a wire carrying an electrical current that is coated with a thin layer of ePTFE for insulation. (Id. at Ex. B, Docket No. 69-2; '516 patent col 1:37-43). The '628 patent discloses a "rubber body protection material" whose purpose is to "increase the wearing comfort of cellular rubber wet suits and orthopedic braces." (Id. at Ex. C, Docket No. 69-3; '628 patent col 1:54-57). Gore also argues that it is clear from the specification of the '870 patent [*12] that the '516 and the '628 patents would not be material to patentability. Specifically, the specification of the '870 patent refers to U.S. Patent No. 3,953,566 (the '566

patent) which discloses an ePTFE film that is less than 0.10mm thick. [2] Thus, Gore argues that Medtronic's basis for alleging the '516 and '628 patents are material is contradicted by the patent itself. Last, Gore argues the reasonableness of Medtronic's allegations are contradicted by the prosecution history of the '870 patent since the patent examiner instructed the applicants to "eliminate irrelevant and marginally pertinent cumulative references." [3]

> [2] The '566 patent was issued in 1976 and discloses a "process for producing porous products." Medtronic argues that it is improper for the Court to consider the '566 patent since it was not attached as an exhibit to Medtronic's counterclaim. The Court need not address this issue because it does not rely on the '566 patent in assessing the sufficiency of the pleading.
>
> [3] Again, Medtronic argues that it is improper for the Court to consider the '870 patent's prosecution history as it was not attached as an exhibit to Medtronic's counterclaim. However, the '214 patent application [*13] is already part of the record and was attached to plaintiff's opening claim construction brief as part of a joint appendix. (Pl. Claim Construction Brief, Ex. 3, Docket No. 66-3). Nevertheless, the Court does not rely on the '214 application in ruling on the motion.

The first element of an inequitable conduct claim is misrepresentation of a material fact. At the motion to dismiss stage, Medtronic must merely allege a plausible and specific claim from which a reasonable jury could infer that Mr. House and Mr. Myers knew of the prior use, appreciated that the prior use was material, and decided not to disclose that information with deceptive intent. Delano, 655 F.3d at 1350. Medtronic has, in a detailed manner, identified the specific "who, what, when, where, and how" of the alleged misrepresentation. Exergen, 575 F.3d at 1328. Medtronic has referred to specific examples of prior art that Gore did not cite, detailed why those omissions are material and not cumulative, and how one could infer Mr. House and Mr. Myers were aware of the undisclosed patents and their potential materiality.

The second element of an inequitable conduct claim is intent to deceive. Because exclusion of material [*14] prior art could provide a patent applicant with the

significant benefit of having the application granted, Medtronic has also pled sufficient facts upon which a reasonable inference of intent to deceive could be based. The strength of these inequitable conduct arguments will ultimately hinge on whether the prior art cited by Medtronic is material and non-cumulative. See Alloc, Inc. v. Pergo, Inc., 366 Fed. Appx. 173, 176 (Fed. Cir. 2010) (noting that information is material when a reasonable examiner would consider it important in issuing a patent; but also noting that "information is not material if it is cumulative of other information already disclosed"). However, the cumulative determination will require a fuller record and is not a proper inquiry at the 12(b)(6) stage. Although the facts alleged in Medtronic's counterclaim may not be enough to satisfy the Therasense elements by clear and convincing evidence, the alleged facts are sufficient to satisfy Exergen's pleading requirements. Therefore, this inequitable conduct claim will not be dismissed.

**B. Mischaracterized Prior Art**

Next, Medtronic alleges that Gore engaged in inequitable conduct by materially misrepresenting that the [*15] problem for solution by the '870 patent was "a stent with a *thinner* covering of ePTFE" when Mr. House knew that the '917 patent, the '852 patent, the '507 patent, and the '736 patent all disclosed the use of thinner ePTFE coverings "with medical devices." (Def. Answer and Counterclaim, ¶ 46, Docket No. 69). Similarly, Medtronic alleges that Mr. Myers also intentionally mischaracterized material information and engaged in a pattern of deception by alleging the '870 patent solved the problem of creating a stent with *thinner* coverings when he knew the '516 and the '852 patent already disclosed the use of a thinner ePTFE covering "with medical devices." (Id. at ¶ 49).

In response, Gore first argues that the '870 patent's "sole improvement" over the prior art is not an ePTFE covering of less than 0.10mm as Medtronic states. Gore notes that the '870 patent describes a stent graft with various features such as a diametrically adjustable stent, a covering less than 0.10mm, a covering on the exterior surface, and a seam extending from the exterior surface through the luminal surface. Gore argues that Medtronic therefore improperly elevates the importance of one attribute over the others. Second, [*16] Gore argues that Medtronic's allegations that Mr. House and Mr. Myers intentionally "mischaracterized" these prior patents are

conclusory and pled on information and belief. Gore points out that Medtronic concedes that each of these patents was submitted to the PTO during the prosecution of the '214 application (the '892 parent patent application) and cites to the actual '214 application to demonstrate the examiner considered and initialed the prior art before issuing the patent. (Pl. Ex. 1, 23680-88). Thus, Gore argues that Medtronic's allegations that they deliberately mischaracterized these references simply do not make sense because Gore disclosed these very references to the Examiner.

The Court finds Medtronic has satisfied the Rule 9(b) pleading standards by identifying the alleged misrepresentation, why the misrepresentation was material, and has pled sufficient facts to support a reasonable inference of intent to deceive. Taking the facts in the light most favorable to the non-moving party, Medtronic has alleged that House and Myers were both involved with these prior art patents (as inventors or prosecuting agents), and thus they were aware that Gore already had the capability [*17] of manufacturing ePTFE coverings less than 0.10mm thick. Yet, Medtronic alleges that with this knowledge, House and Myers still characterized the '870 patent as solving the "thick bulky wall" problem of past stents. To ultimately determine whether this alleged mischaracterization was material and made with intent to deceive will require actual evidence, not just argument. However, taking the facts in the light most favorable to the non-moving party, Medtronic was thorough in its pleading and has satisfied the Rule 9(b) pleading requirements. Therefore this inequitable conduct claim will not be dismissed or stricken at this stage.

**C. False Affidavit**

In Medtronic's last inequitable conduct allegation, they accuse both Mr. House and Mr. Myers of intentionally filing a false affidavit. Medtronic alleges that Mr. House filed a false affidavit as an alleged inventor by stating he believed he was the "original, first and joint inventor of the subject matter" when he knew the '516, '628, '917, '852, '507, and '736 patents all disclosed the use of ePTFE coverings less than 0.10mm with medical devices. (Def. Answer and Counterclaim, ¶ 47, Docket No. 69). Additionally, Medtronic similarly alleges [*18] that Mr. Myers filed a false affidavit as the first and joint inventor of the subject matter since he knew the '516 and the '852 patent already disclosed the use of a thinner ePTFE covering with medical devices.

(Id. at ¶ 50).

Gore has argued that the declaration on which Medtronic is relying is something that *every* inventor is required to sign before submitting a patent application. Thus, Gore posits, if the Court accepts Medtronic's argument, every single allegation of failure to disclose would trigger a false affidavit allegation.

Because the Court has found the previous two inequitable conduct allegations sufficient, the Court finds that this last allegation also satisfies Rule 9(b)'s pleading standards. If Mr. House and Mr. Myers were aware of prior art that disclosed ePTFE coverings less than 0.10mm thick, knew the prior art could be material to the patentability and still intentionally failed to disclose or mischaracterized those patents, then it is reasonable for the Court to also infer that Mr. House and Mr. Myers intentionally filed a false affidavit by signing the inventors oath with that knowledge. As stated above, although the allegations alone may not be sufficient to win [*19] on the merits under Therasense's heightened standards, the facts alleged are sufficient for the Court to find that the individuals "knew of invalidating information that was withheld from the PTO and withheld that information with a specific intent to deceive." Delano, 655 F.3d at 1350. Thus, the false affidavit inequitable conduct allegation will also not be dismissed or stricken at this time.

## IV. CONCLUSION

For the reasons discussed above, Gore's Motion to Dismiss Medtronic's Inequitable Conduct Counterclaim is **DENIED.**

The Clerk is **REQUESTED** to send a copy of this Opinion and Order to counsel of record for the parties.

It is so **ORDERED.**

/s/ Mark S. Davis

Mark S. Davis

UNITED STATES DISTRICT JUDGE

Norfolk, Virginia
February 3, 2012

**<u>Citation #12</u>**
**2006 us dist lexis 13779**

LEXSEE

**MORTON GROVE PHARMACEUTICALS, INC., Plaintiff and Counter-defendant,
v. PAR PHARMACEUTICAL COMPANIES, INC. and PAR
PHARMACEUTICAL, INC., Defendants and Counter-plaintiffs.**

04 C 7007

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF
ILLINOIS, EASTERN DIVISION**

**2006 U.S. Dist. LEXIS 13779; 80 U.S.P.Q.2D (BNA) 1416; 2006-1 Trade Cas. (CCH)
P75,179**

**March 28, 2006, Decided**

**PRIOR HISTORY:** Morton Grove Pharms., Inc. v. Par Pharm. Cos., 2005 U.S. Dist. LEXIS 14947 (N.D. Ill., July 22, 2005)

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff pharmaceutical company filed an action against defendant pharmaceutical companies, seeking a declaratory judgment of noninfringement and unenforceability of certain patents and alleging violation of the Sherman Act, 15 U.S.C.S. §§ 1, 2. Defendants filed a counterclaim for patent infringement and a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) the antitrust claims.

**OVERVIEW:** Both parties developed and marketed generic versions of pharmaceuticals, and defendants were the assignee and exclusive licensee of the patents for a certain drug. Plaintiff alleged that the patents were procured by fraud, that the patents would not have been issued but for the fraud, and that defendants' litigation was a sham. The court found that plaintiff sufficiently set forth facts to support fraudulent procurement of the first patent, and because the subject matter of the claims of that application was related to subject matter of the claims other patents, the alleged omissions and inconsistent positions taken during prosecution of the first patent application were applicable to the remaining patents. Plaintiff adequately pleaded a 15 U.S.C.S. § 2 antitrust claim under Walker Process by alleging knowing and willful omissions of specific material prior art references, prior rejections of claims, and identifying a relevant

market and anticompetitive effects within the market. Plaintiff's allegations that defendants used a settlement agreement to stifle output and raise market prices supported a claim under 15 U.S.C.S. § 1.

**OUTCOME:** The court denied defendants' motion to dismiss.

**CORE TERMS:** patent, megestrol, acetate, generic, examiner, competitor's, output, Sherman Act, surfactant, pharmaceutical, unenforceable, suspension, antitrust, disclose, invalid, antitrust laws, prior art, patentability, procurement, settlement, immunity, omission, sham, patent infringement, anticompetitive, baseless, patentee, subject matter, relevant market, infringement

**LexisNexis(R) Headnotes**

*Antitrust & Trade Law > Sherman Act > Claims*
*Civil Procedure > Pleading & Practice > Defenses, Demurrers & Objections > Failures to State Claims*
[HN1]A motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) should not be granted unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claims which would entitle him to relief. The complaint must contain either direct or inferential allegations concerning every element necessary for recovery under the relevant legal theory. An antitrust plaintiff cannot allege bare legal conclusions but must provide facts that at least outline or adumbrate a violation

2006 U.S. Dist. LEXIS 13779, *; 80 U.S.P.Q.2D (BNA) 1416;
2006-1 Trade Cas. (CCH) P75,179

of the Sherman Act. In deciding the motion to dismiss, the court draws all reasonable inferences in the plaintiff's favor and views all factual allegations in the complaint as true.

***Antitrust & Trade Law > Monopolization > General Overview***
***Antitrust & Trade Law > Sherman Act > Coverage > Monopolization Offenses***
[HN2]Section 2 of the Sherman Act is violated by monopolizing, attempting to monopolize, or combining or conspiring with others to monopolize interstate or foreign commerce. 15 U.S.C.S. § 2.

***Antitrust & Trade Law > Exemptions & Immunities > Noerr-Pennington Doctrine > Sham Exception***
***Antitrust & Trade Law > Intellectual Property > Bad Faith, Fraud & Nonuse > Fraud***
***Patent Law > Inequitable Conduct > Anticompetitive Conduct***
***Patent Law > Inequitable Conduct > Effect, Materiality & Scienter > Effect of Inequitable Conduct***
[HN3]In addition to setting forth the elements of an antitrust claim, a plaintiff must also present allegations sufficient to strip the defendant of its antitrust immunity. A patentee who conforms to the patent laws in procuring and enforcing a patent enjoys immunity from the antitrust laws. Nonetheless, a patentee may be stripped of its immunity when it is alleged that its patent was obtained through knowing and willful fraud on the U.S. Patent and Trademark Office. Alternatively, immunity is also destroyed when a patentee brings a patent infringement suit that comes within the sham litigation exception of the Noerr-Pennington doctrine. Each ground is an independent basis for stripping a patent owner of immunity from the antitrust laws.

***Antitrust & Trade Law > Intellectual Property > Bad Faith, Fraud & Nonuse > Fraud***
***Patent Law > Inequitable Conduct > Anticompetitive Conduct***
***Patent Law > Inequitable Conduct > Effect, Materiality & Scienter > Fact & Law Issues***
[HN4]Antitrust liability under Walker Process arises when a patentee attempts to enforce a patent that: (1) has been procured by knowing and willful fraud and the subject matter of the patent is not otherwise patentable and (2) allows the patentee to dominate a real market.

The usual elements of an antitrust claim must also be present. Whether conduct in procuring or enforcing a patent is sufficient to strip a patentee of its immunity from the antitrust laws is to be decided as a question of the United States Court of Appeals for the Federal Circuit law. The law of the regional circuit controls as to the other elements of the antitrust claim such as the relevant market, market power, restraint on competition, and other issues not unique to patent law.

***Antitrust & Trade Law > Intellectual Property > Bad Faith, Fraud & Nonuse > Fraud***
***Patent Law > Infringement Actions > Defenses > Fraudulent Procurement***
***Torts > Business Torts > Fraud & Misrepresentation > Actual Fraud > Elements***
[HN5]Fraud under Walker Process is distinguishable from the lesser offense of inequitable conduct before the U.S. Patent and Trademark Office which may merely render a patent unenforceable. The United States Court of Appeals for the Federal Circuit equates fraud under Walker Process with the common law definition of fraud. Fraud in the context of patent prosecution consists of: (1) a false representation or deliberate omission of a fact material to patentability, (2) made with the intent to deceive the patent examiner, (3) on which the examiner justifiably relied in granting the patent, and (4) but for which the misrepresentation or deliberate omission the patent would not have been granted. Intent to deceive can be found where the state of mind is so reckless as to the consequences that it is the equivalent of intent. Merely failing to cite a reference to the examiner does not amount to procurement of a patent by fraud.

***Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements > Fraud Claims***
***Patent Law > Infringement Actions > Defenses > Fraudulent Procurement***
[HN6]An allegation of fraudulent procurement of a patent is subject to the pleading requirements of Fed. R. Civ. P. 9(b). Rule 9(b) states that in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity but malice, intent, knowledge, and other condition of mind may be averred generally. Fed. R. Civ. P. 9(b). Allegations of fraud must be concrete and particularized enough to provide the defendants with notice and allow them to prepare a defense. Nevertheless, R. 9(b) must be read in harmony with the relatively liberal pleading standards of

2006 U.S. Dist. LEXIS 13779, *; 80 U.S.P.Q.2D (BNA) 1416;
2006-1 Trade Cas. (CCH) P75,179

Fed. R. Civ. P. 8.

***Patent Law > Claims & Specifications > Claim Language > Elements & Limitations***
***Patent Law > Inequitable Conduct > Effect, Materiality & Scienter > Duties***

[HN7]An applicant has a obligation to disclose to the examiner material information that comes to an applicant's attention as a result of assertions in a lawsuit and any assertion that is made by a litigant that is contradictory to those made to the patent examiner is material information that should be brought to the attention of the examiner.

***Patent Law > Claims & Specifications > Claim Language > Elements & Limitations***
***Patent Law > Inequitable Conduct > Effect, Materiality & Scienter > Duties***
***Patent Law > Inequitable Conduct > Effect, Materiality & Scienter > Effect of Inequitable Conduct***
***Patent Law > U.S. Patent & Trademark Office Proceedings > Continuation Applications > Copendency & Disclosure***

[HN8]The duty of candor extends throughout the patent's entire prosecution history and a breach of the duty of candor early in the prosecution may render unenforceable all claims which eventually issue from the same or a related application. Nevertheless, conduct that renders the parent patent unenforceable does not necessarily infect a divisional application where the claims in the divisional are unrelated to the prior art omitted during prosecution of the parent application.

***Patent Law > Inequitable Conduct > Effect, Materiality & Scienter > Duties***
***Patent Law > U.S. Patent & Trademark Office Proceedings > Continuation Applications > Copendency & Disclosure***

[HN9]The individuals covered by 37 C.F.R. § 1.56 have a duty to bring to the attention of the examiner, or other Office official involved with the examination of a particular application, information within their knowledge as to other copending United States applications which are material to patentability of the application in question. A contrary decision of another examiner reviewing substantially similar claims is material.

***Antitrust & Trade Law > Intellectual Property > Bad Faith, Fraud & Nonuse > Fraud***
***Antitrust & Trade Law > Market Definition > Relevant Market***
***Antitrust & Trade Law > Monopolization > Actual Monopolization > Claims***
***Civil Procedure > Pleading & Practice > Pleadings > Complaints > Requirements***
***Patent Law > Inequitable Conduct > Anticompetitive Conduct***

[HN10]To establish monopolization or an attempt to monopolize under the Sherman Act, it is necessary to appraise the exclusionary power of the illegal patent claim in terms of the relevant market for the product involved. Without a definition of that market, there is no way to measure the defendant's ability to lessen or destroy competition. A market is defined as all products reasonably interchangeable by consumers for the same purposes, because the availability of a substitute lessens a firm's ability to raise prices beyond a competitive level. Although the liberal pleading standard of Fed. R. Civ. P. 8(a) applies, the United States Court of Appeals for the Seventh Circuit requires the pleader to allege more than bare legal conclusions and to present facts that at least outline a violation of the Sherman Act.

***Antitrust & Trade Law > Intellectual Property > Bad Faith, Fraud & Nonuse > Fraud***
***Antitrust & Trade Law > Market Definition > Relevant Market***
***Antitrust & Trade Law > Monopolization > Actual Monopolization > Claims***
***Patent Law > Inequitable Conduct > Anticompetitive Conduct***

[HN11]Market definition is an intensely factual determination and proper market definition can be determined only after a factual inquiry into the commercial realities faced by consumers. Submarkets, such as the generic submarket of a pharmaceutical, may constitute a relevant market for antitrust analysis.

***Antitrust & Trade Law > Monopolization > Actual Monopolization > Claims***
***Antitrust & Trade Law > Monopolization > Conspiracy to Monopolize > Claims***
***Patent Law > Inequitable Conduct > Anticompetitive Conduct***

[HN12]A complaint must contain either direct or inferential allegations concerning all the elements

Page 3

2006 U.S. Dist. LEXIS 13779, *; 80 U.S.P.Q.2D (BNA) 1416;
2006-1 Trade Cas. (CCH) P75,179

necessary for recovery. It is necessary to allege that attempted enforcement of the illegal patents provided economic domination, the power to fix prices, or exclude competitors from the relevant market.

***Antitrust & Trade Law > Market Definition > Relevant Market***
***Antitrust & Trade Law > Monopolization > Actual Monopolization > Claims***
***Antitrust & Trade Law > Monopolization > Conspiracy to Monopolize > Claims***
***Civil Procedure > Pleading & Practice > Defenses, Demurrers & Objections > Motions to Dismiss***
***Patent Law > Inequitable Conduct > Anticompetitive Conduct***

[HN13]Allegation of market share alone is insufficient to survive a motion to dismiss. It is the willful acquisition or maintenance of monopoly power as distinguished from growth or development as consequence of a superior product, business acumen, or historic accident that must be shown. Nevertheless, improperly prolonging a monopoly is as much an offense against the Sherman Act as is wrongfully acquiring market power in the first place.

***Antitrust & Trade Law > Exemptions & Immunities > Noerr-Pennington Doctrine > Coverage***
***Antitrust & Trade Law > Exemptions & Immunities > Noerr-Pennington Doctrine > Sham Exception***

[HN14]In general, the Noerr-Pennington doctrine provides immunity to those who petition the government for redress. However, immunity is withheld where the petition is a mere sham to cover an attempt to interfere directly with the business relationships of a competitor. A two-prong test exists for determining whether litigation is a sham. First, the lawsuit must be objectively baseless such that no reasonable litigant could realistically expect success on the merits. Second, the court should focus on whether the baseless suit conceals an attempt to interfere directly with a competitor's business relationships, through the use of the governmental process as opposed to the outcome of that process as an anticompetitive weapon. The suit is immunized if an objective litigant could conclude that the suit is reasonably calculated to elicit a favorable outcome. Only if the suit is found to be objectively baseless may the court proceed to the second prong of the test.

***Antitrust & Trade Law > Exemptions & Immunities >***

***Noerr-Pennington Doctrine > Sham Exception***
***Patent Law > Inequitable Conduct > Anticompetitive Conduct***
***Patent Law > Inequitable Conduct > Effect, Materiality & Scienter > Elements***

[HN15]Bringing a suit for anticompetitive purposes to enforce a patent that the patentee knows is invalid or not infringed is prohibited under antitrust law.

***Patent Law > Inequitable Conduct > Effect, Materiality & Scienter > Effect of Inequitable Conduct***

[HN16]A finding of inequitable conduct renders a patent unenforceable.

***Antitrust & Trade Law > Exemptions & Immunities > Noerr-Pennington Doctrine > Sham Exception***
***Evidence > Inferences & Presumptions > Presumptions > General Overview***
***Patent Law > Inequitable Conduct > Burdens of Proof***
***Patent Law > Infringement Actions > Defenses > Patent Invalidity > Validity Presumption***

[HN17]A patent carries a presumption of validity, a patentee has a statutory right to enforce its patents, and assertion of a duly granted patent is presumed to be made in good faith. These presumptions merely set forth the parties' evidentiary burdens. Patent invalidity is a statutory defense and the presumption of validity can be rebutted. 35 U.S.C.S. § 282. On a motion to dismiss, all that is required is that a plaintiff allege facts that, if proved, show the defendant is engaged in sham litigation.

***Antitrust & Trade Law > Exemptions & Immunities > Noerr-Pennington Doctrine > Sham Exception***
***Patent Law > Infringement Actions > General Overview***

[HN18]Success in prior litigation clearly provides the litigant with an objective basis for bringing subsequent actions on similar claims. A favorable prior settlement may afford support for a belief that subsequent litigation will be successful, but it is not dispositive. Parties may settle a litigation for a variety of reasons independent of the merits of the claims.

***Civil Procedure > Pleading & Practice > Defenses, Demurrers & Objections > Motions to Dismiss***

[HN19]A complaint merely alleging bare legal conclusions cannot survive a motion to dismiss but must at least outline the violation.

2006 U.S. Dist. LEXIS 13779, *; 80 U.S.P.Q.2D (BNA) 1416;
2006-1 Trade Cas. (CCH) P75,179

*Antitrust & Trade Law > Private Actions > General Overview*
*Civil Procedure > Pleading & Practice > Pleadings > Complaints > Requirements*

[HN20]A complainant cannot be expected to have knowledge of specific facts in regard to a litigant's motivation or intent prior to discovery. Summary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot. If a claim under the antitrust laws has been adequately set forth in the complaint, the highly factual and subjective questions of intent and purpose should be resolved after discovery and trial.

*Antitrust & Trade Law > Monopolization > Conspiracy to Monopolize > Claims*
*Antitrust & Trade Law > Monopolization > Conspiracy to Monopolize > Sherman Act*

[HN21]A contract, combination, or conspiracy in restraint of trade violates section one of the Sherman Act. 15 U.S.C.S. § 1. A plaintiff must allege: (1) the existence of some contract, combination or conspiracy, (2) an anticompetitive effect in a relevant market resulting from the defendants' actions, and (3) an injury to himself and the market.

*Antitrust & Trade Law > Monopolization > Conspiracy to Monopolize > General Overview*
*Civil Procedure > Settlements > Settlement Agreements > Effects*

[HN22]Although mere settlement of patent litigation does not violate the antitrust laws, liability arises when settlement is a device for circumventing the antitrust laws.

*Antitrust & Trade Law > Monopolization > Conspiracy to Monopolize > Sherman Act*

[HN23]If firms restrict output directly, price will rise in order to limit demand to the reduced supply. Raising price, reducing output, and dividing markets have the same anticompetitive effects. Accordingly, an agreement which has the purpose and effect of reducing output is illegal under § 1 of the Sherman Act, 15 U.S.C.S. § 1.

**COUNSEL:**  [*1]  For Morton Grove Pharmaceuticals, Inc., Plaintiff: George Carter Lombardi, Jennifer Marie

Erickson, John Edmund Mooney, Lynn Christine Ulrich, Maureen L Rurka, W. Gordon Dobie, Winston & Strawn, Chicago, IL.

For Pharmaceutical Resources, Inc., Defendant, Counter Claimant: Paul F. Stack, Elizabeth L Barbour, Robert A. Filpi, Stack & Filpi, Chtd., Chicago, IL; Cori A Mathis, Law Offices of Marc J. Lane, Chicago, IL; Kevin F. Murphy, Stephen J. Lieb, Frommer Lawrence & Haug LLP, New York, NY.

For Par Pharmaceutical, Inc., Defendant, Counter Claimant: Paul F. Stack, Elizabeth L Barbour, Robert A. Filpi, Stack & Filpi, Chtd., Chicago, IL; Cori A Mathis, Law Offices of Marc J. Lane, Chicago, IL.

For Morton Grove Pharmaceuticals, Inc., Counter Defendant: George Carter Lombardi, John Edmund Mooney, W. Gordon Dobie, Winston & Strawn, Chicago, IL.

For Par Pharmaceutical, Inc., Par Pharmaceutical Companies, Inc., Counter Claimants: Elizabeth L Barbour, Paul F. Stack, Stack & Filpi, Chtd., Chicago, IL.

**JUDGES:** HON. RONALD A. GUZMAN, United States Judge.

**OPINION BY:** RONALD A. GUZMAN

**OPINION**

**MEMORANDUM OPINION AND ORDER**

Plaintiff Morton Grove Pharmaceuticals, Inc. ("MGP") brings [*2] this action against defendants Par Pharmaceutical Companies, Inc. and Par Pharmaceutical, Inc. (collectively, "Par"). In Counts I through V of its Amended Complaint, MGP seeks a declaratory judgment of noninfringement and unenforceability of U.S. Patent Nos. 6,028,065 ("the '065 patent"), 6,268,356 ("the '356 patent"), 6,593,318 ("the '318 patent") and 6,593,320 ("the '320 patent"). In Count VI, MGP alleges violation of the Sherman Act, 15 U.S.C. § 1 *et seq.*, and seeks treble damages and injunctive relief. Par now moves to dismiss Count VI of MGP's Amended Complaint for failure to state a claim upon which relief may be granted, pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6). For the reasons below, the Court denies the motion.

2006 U.S. Dist. LEXIS 13779, *2; 80 U.S.P.Q.2D (BNA) 1416;
2006-1 Trade Cas. (CCH) P75,179

S=BFACTSS=R

The following facts, taken from MGP's complaint, are accepted as true for the purposes of this motion. This action arises under the patent and antitrust laws of the United States and this court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337, 1338 and 15 U.S.C. §§ 15 and 26. (Am. Compl. P4.) MGP and [*3] Par develop and market generic versions of pharmaceuticals. (Id. PP14-16.) In the late 1990's, several generic pharmaceutical manufacturers including Par, sought PDA approval to market a generic version of Bristol-Myers Squibb's megestrol acetate oral suspension drug. (Id. P117.) Bristol-Myers developed and marketed the branded version of megestrol acetate and was the sole supplier of the drug for a number of years. (Id.) Megestrol acetate is useful for treating anorexia, cachexia, and significant unexplained weight loss. (Id. P116.)

Par was the first to file an Abbreviated New Drug Application ("ANDA") with the U.S. Food and Drug Administration ("FDA") for approval to market a generic version of megestrol acetate. (Id. P118.) The FDA approved Par's ANDA. (Id.) In 2003, MGP filed an ANDA with the FDA to market its generic version of megestrol acetate. (Id. P12.) In expectation of FDA approval, which was received on November 1, 2004, MGP undertook preparations to manufacture and sell megestrol acetate. (Id. P13-14.) Likewise, other generic manufacturers, including Roxane Laboratories and Teva Pharmaceuticals, sought and received FDA approval to market [*4] generic versions of the drug. (Id. PP117-18.)

Par is the assignee and exclusive licensee of the '065, '356, '318 and '320 patents (collectively, "the Par Patents") which claim a composition for a megestrol acetate oral suspension product as well as uses and methods of manufacture of the composition. (Id. PP6-11.) On May 7, 2004, prior to FDA approval of MGP's ANDA, Par's counsel sent a letter to MGP concerning the Par Patents. (Id. P15.) The letter requested that MGP provide details of its product formulation and method of manufacture prior to launching its megestrol acetate product and urging MGP not to launch its product until Par had an opportunity to evaluate the formulation and manufacturing information. (Id. P16.) Par also contacted MGP to urge them to withdraw their ANDA to avoid litigation. (Id. P17.)

Par has sought to enforce the Par Patents against other generic manufacturers of megestrol acetate. (Id. PP18-21.) In 2002, Par filed a complaint against Alpharma U.S. Pharmaceuticals Division seeking a declaration of infringement of the '065 and '356 patents. (Id. P19.) In 2003, Par filed a complaint against Roxane Laboratories, Inc. alleging infringement [*5] of the '318 and '320 patents. (Id. P20.) In 2003, Teva Pharmaceuticals, U.S.A. and Copley Pharmaceutical, Inc. sought a declaratory judgment of non-infringement of the Par Patents and Par counterclaimed for infringement of the same patents. (Id. P21.)

MGP, believing it faced a patent infringement suit from Par for its manufacture and sale of megestrol acetate, filed the present suit for a declaratory judgment that MGP does not infringe the Par Patents and that the Par Patents are unenforceable. (Id. PP22, 24, 26, 28, 30, 32.) Par counterclaimed that MGP infringes the '318 patent. (Id. P22.) Following discovery on the issues of patent infringement and enforceability, MGP filed an Amended Complaint adding Count V, alleging inequitable conduct in prosecution of the Par Patents, and Count VI for violation of the Sherman Act. (Id. PP31-112, 113-34.) In turn, Par filed the present motion to dismiss Count VI for failure to state a claim.

In support of Count VI, MGP alleges that the Par Patents were procured by fraud on the U.S. Patent and Trademark Office ("PTO") and the patents would not have issued but for the fraud. (Id. P123.) MGP asserts that knowing and willfull [*6] misrepresentations were made when Par and its agents omitted and misrepresented material information to the PTO during the prosecution of the Par Patents with the intent to deceive the patent examiner. (Id.)

MGP also alleges that Par's patent infringement suits against it and other competitors are baseless in light of the alleged fraud upon the PTO. Consequently, MGP alleges that Par's litigation is a sham, being brought for the purpose and with the specific intent of monopolizing the market for megestrol acetate oral suspension products by raising the cost of doing business in the market, extorting settlements that limit output and deterring customers from purchasing competitive products. (Id. PP119, 122, 127.)

MGP further alleges that Par and others acting on their behalf monopolized or attempted to monopolize the U.S. market for megestrol acetate oral suspension products beginning in 1998 and continuing through the

Case 3:10-cv-01435-AWT   Document 46-6   Filed 06/08/12   Page 89 of 177

2006 U.S. Dist. LEXIS 13779, *6; 80 U.S.P.Q.2D (BNA) 1416;
2006-1 Trade Cas. (CCH) P75,179

present. (*Id.* PP115, 121.) Specifically, MGP asserts that Par gained a controlling share of the generic submarket in 2002 and that Par controlled in excess of seventy-five percent of the generic market for megestrol acetate in 2003 and 2004. (*Id.* P118.) [*7] MGP alleges that Par has the specific intent to monopolize the market as demonstrated by bringing baseless law suits, limiting output in the market and maintaining artificially high prices through licenses that limit the output of competitors. (*Id.* P128.)

MGP asserts that if this scheme succeeded, it would pose a dangerous probability of monopolizing the market and generic submarket for megestrol acetate. (*Id.* P131.) MGP states that Par's actions have damaged its business through lost sales and legal fees. (*Id.* P132.) Furthermore, Par has restricted output, raised competitor costs, raised the cost of entry of would-be competitors, and increased the market price for generic megestrol acetate. (*Id.* P134.)

## DISCUSSION

[HN1]A motion to dismiss pursuant to Rule 12(b)(6) should not be granted "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claims which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80(1957). The complaint must contain either direct or inferential allegations concerning every element necessary for recovery under the relevant legal theory. *Car Carriers, Inc. v. Ford Motor Co.,* 745 F.2d 1101,1106 (7th Cir. 1984). [*8] An antitrust plaintiff cannot allege bare legal conclusions but must provide facts that "at least outline or adumbrate" a violation of the Sherman Act. *Car Carriers,* 745 F.2d at 1106. In deciding the motion to dismiss, the court draws all reasonable inferences in MGP's favor and views all factual allegations in the complaint as true. *See Xechem, Inc. v. Bristol-Myers Squibb Co.,* 372 F.3d 899, 902 (7th Cir. 2004).

[HN2]Section two of the Sherman Act is violated by monopolizing, attempting to monopolize, or combining or conspiring with others to monopolize interstate or foreign commerce. 15 U.S.C. § 2. MGP alleges that Par has monopolized or attempted to monopolize the market and generic submarket for megestrol acetate oral suspension products in the United States.

[HN3]In addition to setting forth the elements of an antitrust claim, MGP must also present allegations

sufficient to strip Par of its antitrust immunity. *Nobelpharma AB v. Implant Innovations, Inc.,* 141 F.3d 1059, 1071 (Fed. Cir. 1998). A patentee who conforms to the patent laws in procuring and enforcing a patent enjoys immunity from the antitrust laws. *Simpson v. Union Oil Co.,* 377 U.S. 13, 24, 84 S. Ct. 1051, 12 L. Ed. 2d 98 (1964). [*9] Nonetheless, apatentee may be stripped of its immunity when it is alleged that its patent was obtained through knowing and willful fraud on the PTO. *Walker Process Equip., Inc. v. FoodMach. & Chem. Corp.,* 382 U.S. 172, 177, 86 S. Ct. 347, 15 L. Ed. 2d 247 (1965). Alternatively, immunity is also destroyed when a patentee brings a patent infringement suit that comes within the sham litigation exception of the *Noerr-Pennington* doctrine. *Prof. Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.,* 508 U.S. 49, 59-60, 113 S. Ct. 1920, 123 L. Ed. 2d 611 (1993) ("PRE"), *United Mine Workers v. Pennington,* 381 U.S. 657, 670, 85 S. Ct. 1585, 14 L. Ed. 2d 626 (1965) ("Pennington"); *E. R.R. Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 137-44, 81 S. Ct. 523, 5 L. Ed. 2d 464 (1961) ("Noerr"). Each ground is an independent basis for stripping a patent owner of immunity from the antitrust laws. *Nobelpharma,* 141 F.3d at 1071.

MGP asserts that the Par Patents were obtained through fraud on the PTO and that Par has engaged in sham litigation. The Court addresses each ground in turn.

### I. The *Walker Process* Claim

[HN4]Antitrust liability under *Walker Process* arises when a patentee attempts to enforce [*10] a patent that: (1) has been procured by knowing and willful fraud and the subject matter of the patent is not otherwise patentable and (2) allows the patentee to dominate a real market. *Walker Process,* 382 U.S. at 177; *Brunswick Corp. v. Riegel Textile Corp.,* 752 F.2d 261, 265 (7th Cir. 1984). The usual elements of an antitrust claim must also be present. *Walker Process,* 382 U.S. at 174. The Court of Appeals for the Federal Circuit has held that "whether conduct in procuring or enforcing a patent is sufficient to strip a patentee of its immunity from the antitrust laws is to be decided as a question of Federal Circuit law," *Nobelpharma,* 141 F.3d at 1068 (en banc). [1] The law of the regional circuit controls as to the other elements of the antitrust claim such as the relevant market, market power, restraint on competition, and other issues not unique to patent law. *Id.*

2006 U.S. Dist. LEXIS 13779, *10; 80 U.S.P.Q.2D (BNA) 1416;
2006-1 Trade Cas. (CCH) P75,179

1  The issue of "choice of circuit" law overturned Federal Circuit precedent and that portion of the opinion was therefore decided en banc.

[*11] **A. Fraudulent Procurement of the Patents**

[HN5]Fraud under *Walker Process* is distinguishable from the lesser offense of inequitable conduct before the PTO, which may merely render a patent unenforceable. *Id.* at 1069. The Federal Circuit equates fraud under *Walker Process* with the common law definition of fraud. *Id.* Fraud in the context of patent prosecution consists of:

> (1) a false representation or deliberate omission of a fact material to patentability, (2) made with the intent to deceive the patent examiner, (3) on which the examiner justifiably relied in granting the patent, and (4) but for which the misrepresentation or deliberate omission the patent would not have been granted.

*C.R. Bard, Inc. v. M3 Sys., Inc., 157 F.3d 1340, 1364 (Fed. Cir. 1998).* Intent to deceive can be found where the state of mind is so reckless as to the consequences that it is the equivalent of intent. *Nobelpharma, 141 F.3d at 1070.* Merely failing to cite a reference to the examiner does not amount to procurement of a patent by fraud. *Id. at 1071.*

[HN6]An allegation of fraudulent procurement of a patent is [*12] subject to the pleading requirements of Federal Rule of Civil Procedure ("Rule") *9(b). Medimmune, Inc. v. Genentech, Inc., 427 F.3d 958, 967 (Fed. Cir. 2005), cert. granted, 126 S. Ct. 1329, 164 L. Ed. 2d 46, No. 05-608, 2006 WL 386375 (U.S. 2006).* Rule 9(b) states that in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity but malice, intent, knowledge, and other condition of mind may be averred generally. *FED. R. CIV. P. 9(b).* Allegations of fraud must be concrete and particularized enough to provide the defendants with notice and allow them to prepare a defense. *Allen-Bradley Co, Inc. v. Autotech Corp., 1990 U.S. Dist. LEXIS 1383, No. 8608514,1990 WL 16453, at *2 (N.D. Ill. Feb. 8, 1990).* Nevertheless, *Rule 9(b)* must be read in harmony with the relatively liberal pleading standards of *Rule 8. 1990 U.S. Dist. LEXIS 1383, [WL] at *2-3.* Therefore, the Court looks to the Amended Complaint to determine if each of the elements of fraud

has been adequately set forth with respect to the Par Patents.

**1. The '065 Patent**

MGP alleges that Par failed to disclose: (1) the [*13] Bristol-Myers' parent patent application and made statements to the PTO inconsistent with those made in litigation with Bristol-Myers; (2) other material prior art references that directly refuted Par's arguments as to patentability; and (3) material experimental results. (Am. Compl. P32.) First, MGP asserts that during prosecution of the *'065 patent,* Par was aware of and did not disclose the parent application, U.S. Patent App. 07/717,155 ("the 155 application"), of Bristol-Myers' *U.S. Patent No. 5,338,732* ("the '732 patent") for megestrol acetate oral suspension product. [2]

> 2   The *'732 patent* issued from an application which was a continuation-in-part of the 07/839,016 application, which was in turn a continuation of the 07/717,155 application.

Following rejection by the examiner of all the claims in the application for the *'065 patent* in light of the *'732 patent,* Par argued that the *'732 patent* discloses that only surfactants having properties similar to polysorbate 80 could be used while their claims were [*14] distinguishable from the *'732 patent* in that surprising results using surfactants other than polysorbate were achieved. (*Id.* P44.) Shortly thereafter, the PTO issued a Notice of Allowability for Par's claims. (*Id.* P46.) During prosecution. Par did not disclose the '155 application that was the parent application of the *'732 patent,* which discloses that surfactants other than polysorbate can be substituted, including a surfactant claimed by Par in the *'065 patent.* (*Id.* P50.)

MGP also alleges that Par relied on the disclosure of other surfactants in the 155 application in an earlier suit brought by Bristol-Myers against Par for infringement of the *'732 patent.* [HN7]An applicant has an obligation to disclose to the examiner material information that comes to an applicant's attention as a result of assertions in a lawsuit and any assertion that is made by a litigant that is contradictory to those made to the patent examiner is material information that should be brought to the attention of the examiner. *Golden Valley Microwave Foods v. Weaver Popcorn Co., 837 F. Supp. 1444, 1474 (N.D. Ind. 1992).* MGP asserts that Par's argument made in the prior litigation that [*15]  various surfactants were

2006 U.S. Dist. LEXIS 13779, *15; 80 U.S.P.Q.2D (BNA) 1416;
2006-1 Trade Cas. (CCH) P75,179

dedicated to the public is inconsistent with statements made to the PTO that the claims in its application reciting various surfactants were patentable over the '732 patent which teaches that only polysorbate is an effective surfactant. (Am. Compl. P54.) In that suit, Par argued on appeal to the Federal Circuit that surfactants that were disclosed in the 155 application but not claimed in the '732 patent were dedicated to the public and precluded infringement. (*Id.* P51-53.)

MGP also alleges that Par was aware of U.S. Patent No. 4,402,695 ("the Wong reference") and other prior art that directly refuted claims of patentability but did not cite the prior art during prosecution of the '065 patent. (*Id.* P56.) Par also relied on the Wong reference in arguments made in the litigation with Bristol-Myers. (*Id.* P58.) In its Amended Complaint, MGP provides the following examples of statements made by Par during the litigation:

> "It is undisputed that the Par ingredients [glycerin and docusate sodium] are listed in the prior-art Wong reference . . . ."

> "Wong was relied on for its showing that megestrol acetate could be formulated into a liquid [*16] or semi-liquid carrier, using ingredients that included polysorbate and polyethylene glycol, as well as glycerin and a number of other ingredients."

(*Id.* P59.) MGP asserts that the omitted Wong reference established *aprima facie* case of unpatentability and that Par took a position in prosecution of the '065 patent inconsistent with arguments made in prior litigation. (*Id.* P63.)

In sum, MGP alleges that the '065 patent is anticipated by the 155 application under 35 U.S.C. § 102 and therefore unpatentable. MGP also alleges that Par was aware of the '155 reference and knowingly omitted it. Par knowingly made inconsistent statements with respect to the 155 application and the Wong reference to secure patentability and but for Par's misrepresentations and omissions, the '065 patent could not have issued. Furthermore, Par's reliance on these references during the course of litigation with Bristol-Myers suggests that Par was aware of the potential significance of the references in relation to patentability of the '065 patent. MGP asserts that the prior art established *a prima facie* case of

unpatentability and the '065 patent would not have issued [*17] but for the omissions of the references and/or the inconsistent position taken during prosecution with respect to the references. Based on these allegations, the Court holds that MGP has sufficiently set forth facts to support fraudulent procurement of the '065 patent.

Par argues that the amended claims of the '065 patent were distinguished from the '732 patent on grounds unrelated to the surfactant, and assuming that the reference had been material and was disclosed, the patent could still have issued. Par also contends that the Wong reference may be material to Par's product but it is immaterial to the Par Patents. Nevertheless, MGP alleges "the Wong reference was material in that, *according to defendants,* it discloses examples of drug products with megestrol acetate and a large number of other ingredients, including those *claimed in the '065 patent ... ."* (*Id.* P57 (emphasis added).) Par may ultimately be correct on these points, but that conclusion cannot be reached on a motion to dismiss under Rule 12(b)(6). Only when plaintiff pleads itself out of court may a complaint that otherwise states a claim be dismissed under Rule 12(b)(6). *Xechem, 372 F.3d at 901.* [*18] MGP has not done so. Therefore, MGP has adequately alleged that the '065 patent was procured by fraud.

**2. The '356, '318 and '320 Patents**

The '356 and '318 patents were issued from continuation applications of the parent application that ultimately issued as the '065 patent. Similarly, the '320 patent issued from a divisional application of the parent application. [HN8]The duty of candor extends throughout the patent's entire prosecution history and a breach of the duty of candor early in the prosecution may render unenforceable all claims which eventually issue from the same or a related application. *Fox Indus., Inc. v. Structural Pres. Sys., Inc., 922 F.2d 801, 803 (Fed. Cir. 1990).* Nevertheless, conduct that renders the parent patent unenforceable does not necessarily infect a divisional application where the claims in the divisional are unrelated to the prior art omitted during prosecution of the parent application. *Baxter Int'l, Inc. v. McGaw, Inc., 149 F.3d 1321, 1332 (Fed. Cir. 1998).*

MGP alleges that conduct during the prosecution of the parent application that issued as the '065 patent, discussed above, applies equally to the claims of [*19] the continuing applications that issued as the '356 and

2006 U.S. Dist. LEXIS 13779, *19; 80 U.S.P.Q.2D (BNA) 1416;
2006-1 Trade Cas. (CCH) P75,179

'318 patents and the divisional application that issued as the '320 patent. Par merely states that "the scope of the claims in the '318 and '320 patents differ in scope from the originally-filed '065 claims, but for different reasons" and "these claims too would be patentable even if Par were barred from enforcing them." (Def.'s Reply Mem. Supp. Mot. Dismiss at 8.) Viewing MGP's allegation as true, the subject matter of the claims of the parent application is related to subject matter contained in the claims of the '320, '356, and '318 patents, thereby making the alleged omissions and inconsistent positions taken during prosecution of the parent application applicable to the '320, '356, and '318 patents. Because fraudulent procurement has been adequately alleged with regard to the parent application and the subsequent applications are allegedly of related subject matter, MGP has adequately alleged fraud in the procurement of the '320, '356, and '318 patents in its Amended Complaint.

MGP further alleges, with respect to the '356 patent, that Par failed to disclose to the PTO documents from the Bristol-Myers litigation, including [*20] its brief in support of summary judgment of non-infringement, its appellate brief to the Federal Circuit, and the expert reports of Dr. Hem regarding the difficulty of formulating stable suspensions even though Par sought claims covering all surfactants based on a disclosure of only two surfactants. (Am. Compl. PP81-82.) It is asserted that these documents were material, established *prima facie* unpatentability, and/or refuted or were inconsistent with the position Par took during prosecution of the patents. (*Id.* P83.)

The Court agrees with Par that these allegations, as stated, fail to allege with particularity representations or omissions to the PTO that amount to fraud in the procurement of the '356 patent. In particular, MGP does not point to any specific facts or contentions in the Bristol-Myers briefs that were material to patentability. Nor does MGP satisfactorily articulate how Dr. Hem's report that proclaimed the "difficulty" of creating stable compounds establish unpatentability. Nonetheless, as described above, MGP has satisfied the burden of pleading fraud in the procurement of the '356 patent by asserting the relatedness of the '356 patent and the '065 patent, [*21] making further allegations of fraud unnecessary.

With respect to the '318 and '320 patents, MGP further alleges that Par failed to disclose to a new

examiner the rejections made by the examiner in the parent case. (*Id.* PP91, 106-07.) During prosecution of the '318 patent, Par presented a second preliminary amendment to the PTO adding additional claims which were substantially similar in scope to the claims rejected in the prosecution of the '065 patent but omitted the limitations which the examiner had required in prosecution of the '065 and '356 patents. (*Id.* P92.) MGP alleges that in the amendment, Par stated a "series of new claims covering subject matter disclosed but not previously specifically claimed in this application or in the parent application/patents is being presented." (*Id.* P93.) Neither the earlier rejections nor the references which had been the basis of rejections were disclosed. (*Id.* P94.) Furthermore, following a Notice of Allowance, Par procured a Supplemental Notice of Allowance from the examiner stating that the broader claims were fully examined and that the claims were neither disclosed nor suggested by the prior art. (*Id.* P97.)

Par counters [*22] that MGP does not allege that the examiner lacked access to the prosecution history of the parent application that indicated the rejection and that statements made by the examiner in the parent case were not cumulative of information already before the examiner of the '318 patent. Par's suggestion that the duty of disclosure to the PTO articulated in 37 C.F.R. 1.56 (information is material to patentability when it is not cumulative of information already of record or being made of record in the application) does not require it to disclose earlier rejections or references is erroneous. [HN9]"The individuals covered by 37 C.F.R. 1.56 have a duty to bring to the attention of the examiner, or other Office official involved with the examination of a particular application, information within their knowledge as to other copending United States applications which are material to patentability of the application in question." MANUAL OF PATENT EXAMINATION PROCEDURE, 8th Ed., Rev. No. 2, § 2001.06(b). A contrary decision of another examiner reviewing substantially similar claims is material. *Id.* § 2004 P9; *see Dayco Prods., Inc. v. Total Containment, Inc.,* 329 F.3d 1358, 1365-69 (Fed. Cir. 2003). [*23]

In addition to the incorporated allegations related to the '065 patent, MGP has presented further allegations of an omission of prior rejections of similar claims in a co-pending application. Without disclosure of the rejections, the examiner could have been induced to issue an allowance on those patents. Therefore, MGP has

2006 U.S. Dist. LEXIS 13779, *23; 80 U.S.P.Q.2D (BNA) 1416;
2006-1 Trade Cas. (CCH) P75,179

properly alleged an additional basis upon which the' 318 and '320 patents were procured by fraud.

**B. Dominance in a Real Market**

In addition to alleging that the Par Patents were obtained by fraud, MGP must sufficiently allege that the patents permit Par to dominate a real market. [HN10]To establish monopolization or an attempt to monopolize under the Sherman Act, it is necessary to appraise the exclusionary power of the illegal patent claim in terms of the relevant market for the product involved. *Walker Process,* 382 U.S. at 177. "Without a definition of that market, there is no way to measure [the defendant's] ability to lessen or destroy competition." *Id.* A market is defined as all products "reasonably interchangeable by consumers for the same purposes," because the availability of a substitute lessens a firm's ability to raise prices [*24] beyond a competitive level. *United States v. E.I. Du Pont de Nemours & Co.,* 351 U.S. 377, 395, 76 S. Ct. 994, 100 L. Ed. 1264 (1956); *see Geneva Pharms. Tech. Corp. v. Barr Labs., Inc.,* 386 F.3d 485, 496 (2d. Cir. 2004). Although the liberal pleading standard of Rule 8(a) applies, the Seventh Circuit requires the pleader to allege more than bare legal conclusions and to present facts that at least outline a violation of the Sherman Act. *Car Carriers,* 745 F.2d at 1106.

MGP asserts that the relevant market is the U.S. market for megestrol acetate oral suspension products and/or the generic submarket. (Am. Compl. PP118, 131.) Par was the first company to enter the generic market, gained a controlling share of the generic market in 2002, and accounted for in excess of seventy-five percent of the generic market in 2003 and 2004. (*Id.* P118.) Par obtained a majority of the market for brand-name megestrol acetate when it obtained a license from Bristol-Myers in 2002. (*Id.*) MGP alleges that Par has informed MGP and other competitors that they will license the Par Patents only on terms that limit their output. (*Id.* P128.) Par's patent enforcement actions have led [*25] to restricted output, raised costs, erected barriers to competition, and increased market price. (*Id.* P133.)

Viewing these allegations as true, MGP has adequately pleaded that Par has power in a real market as a result of the Par Patents. First, MGP has sufficiently presented a real market. Whether the market is the overall market or the generic submarket for megestrol acetate oral suspension products is a question of fact. *See*

*Eastman Kodak Co. v. Image Technical Servs.,* 504 U.S. 451, 482, 112 S. Ct. 2072, 119 L. Ed. 2d 265 (1992) ([HN11]market definition is an intensely factual determination and proper market definition can be determined only after a factual inquiry into the 'commercial realities' faced by consumers). Submarkets, such as the generic submarket of a pharmaceutical, may constitute a relevant market for antitrust analysis. *Geneva,* 386 F.3d at 496-500.

MGP has also alleged sufficient anticompetitive effects resulting from the attempted enforcement of the Par Patents. [HN12]A complaint must contain either direct or inferential allegations concerning all the elements necessary for recovery. *Car Carriers,* 745 F.2d at 1106. It is necessary to allege that attempted [*26] enforcement of the illegal patents provided economic domination, the power to fix prices, or exclude competitors from the relevant market. *Pollenex Corp. v. Sunbeam-Home Comfort,* 1992 U.S. Dist. LEXIS 11735, No. 92 C 98, 1992 WL 199080, at *2 (N.D. Ill. Aug. 7, 1992), *aff'd,* 39 F.3d 1197 (Fed. Cir. 1994). Par counters that MGP has failed to allege Par has market power as result of its patents. MGP must set forth facts sufficient to create an inference that Par has enough market power to establish a monopoly. *Knoll Pharm. Co., Inc. v. Teva Pharms. USA, Inc.,* 2001 U.S. Dist. LEXIS 12998, No. 01 C 1646, 2001 WL 1001117, at *3 (N.D. Ill. Aug. 24, 2001). MGP has done just that, alleging:

(1) [Par] advised MGP and other manufacturers of megestrol acetate oral suspension products that they will license their patents only upon terms that limit the output of competitors to a defined number of units; thereby maintaining artificially high prices. (Am. Compl. P128.)

(2) For example . . . Teva settled its litigation on terms that limit its output. (*Id.* P120.)

(3) Defendant's efforts have restricted output, raised rival costs, and increased market price for generic megestrol acetate [*27] products. Defendants have also raised the cost of entry into the market .... (*Id.* P133.)

Par argues that the complaint is deficient because

Case 3:10-cv-01435-AWT Document 46-6 Filed 06/08/12 Page 94 of 177

2006 U.S. Dist. LEXIS 13779, *27; 80 U.S.P.Q.2D (BNA) 1416;
2006-1 Trade Cas. (CCH) P75,179

MGP only alleges that the Par Patents cover certain formulations, uses and methods of manufacture, and that MGP does not allege that the patents are able to drive all or most substitutes from the market. However, whether there may be effective substitutes which do not infringe the patents is a fact to be proven. *Walker Process,* 382 U.S. at 178.

Par also argues that it achieved a seventy-five percent share in the market through entirely legal means and that MGP's allegations fail to connect its market share with attempted enforcement of the Par Patents. *See Mitsubishi Elec. Corp. v. IMS Tech., Inc.,* 1997 U.S. Dist. LEXIS 15350, No. 96 C 499, 1997 WL 630187, at *6 (N.D. Ill. Sept. 30, 1997)* ([HN13]allegation of market share alone is insufficient to survive a motion to dismiss). Par points to the six-month exclusivity period it received as the first generic to file an ANDA as well as other advantages such as superior marketing and distribution that allowed it to obtain a strong market position. It is the willful acquisition or maintenance [*28] of monopoly power as distinguished from growth or development as consequence of a superior product, business acumen, or historic accident that must be shown. *Elliott v. United Ctr.,* 126 F.3d 1003, 1004-05 (7th Cir. 1997). Nevertheless, "improperly prolonging a monopoly is as much an offense against the Sherman Act as is wrongfully acquiring market power in the first place." *Xechem,* 372 F.3d at 902. Par may initially have acquired market strength via the ANDA exclusivity period or other factors independent of the patents, but this ignores MGP'S allegations that Par's subsequent attempt to enforce the patents has had anticompetitive consequences as demonstrated by restricted supply, increased product costs, and competitive barriers.

In sum, MGP has adequately set forth facts sufficient to plead a section two antitrust claim under *Walker Process.* MGP sets forth conduct of knowing and willful omissions of specific material prior art references, as well as prior rejections of claims, which induced the PTO to issue invalid patents. It is alleged that the prior art created a statutory bar to patentability of the subject matter of the claims, and but [*29] for the omissions the Par Patents could not have issued. MGP also identifies a relevant market and sufficiently outlines anticompetitive effects within the market resulting from the attempted enforcement of the allegedly invalid patents. Finally, it is asserted that Par's course of action has a dangerous probability of success in monopolizing the market and

has caused injury to MGP, other named competitors, and consumers within the market. Therefore, MGP has properly stated a section two antitrust claim under *Walker Process.*

## II. The *PRE* Claim

As an alternative to *Walker Process,* MGP also alleges that Par is engaging in sham litigation by attempting to enforce the allegedly invalid or unenforceable Par Patents. [HN14]In general, the *Noerr-Pennington* doctrine provides immunity to those who petition the government for redress. *PRE,* 508 U.S. at 56; *Pennington,* 381 U.S. at 670; *Noerr,* 365 U.S. at 137-44. However, immunity is withheld where the petition "is a mere sham to cover . . . an attempt to interfere directly with the business relationships of a competitor." *Noerr,* 365 U.S. at 144. In *PRE,* [*30] the Supreme Court established a two-prong test for determining whether litigation is a sham. 508 U.S. at 60. First, the lawsuit must be objectively baseless such that no reasonable litigant could realistically expect success on the merits. *Id.* Second, "the court should focus on whether the baseless suit conceals 'an attempt to interfere directly with a competitor's business relationships,' through the 'use [of] the governmental *process*--as opposed to the *outcome* of that process--as an anticompetitive weapon.'" *Id.* at 60-61 (citations omitted, emphasis in original). The suit is immunized if an objective litigant could conclude that the suit is reasonably calculated to elicit a favorable outcome. *Id.* at 60. Only if the suit is found to be objectively baseless may the court proceed to the second prong of the test. *Id.*

### A. *PRE's* Objective Prong

The Court must first determine whether MGP has adequately alleged that Par's litigation is objectively baseless. MGP alleges that Par is prosecuting baseless patent infringement suits involving patents that were procured through knowing and willfull fraud, thereby [*31] making the patents unenforceable or invalid. (Am. Compl. PP119, 123.) Par is allegedly asserting the unenforceable or invalid patents in objectively baseless lawsuits against MGP, Alpharma USPD Inc., Roxane Laboratories Inc., and Teva Pharmaceuticals, U.S.A. (*Id.* PP19-22, 124-27.)

[HN15]Bringing a suit for anticompetitive purposes to enforce a patent that the patentee knows is invalid or not infringed is prohibited under antitrust law. *C.R. Bard,*

2006 U.S. Dist. LEXIS 13779, *31; 80 U.S.P.Q.2D (BNA) 1416;
2006-1 Trade Cas. (CCH) P75,179

157 F.3d at 1368. MGP alleges, in some detail, that Par knowingly obtained the patents through fraud and that the patents are unenforceable or invalid. [3]

    3   *See supra* Part I.A of this opinion addressing MGP's allegations of fraudulent procurement of the Par Patents. MGP also asserts that if the conduct does not amount to fraud, the conduct meets the less stringent definition of inequitable conduct. [HN16]A finding of inequitable conduct renders a patent unenforceable. *See, e.g., Minn. Mining & Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc., 976 F.2d 1559, 1569 (Fed. Cir. 1992)* (inequitable conduct does not invalidate a patent but renders the patent unenforceable).

[*32]  This Court and other courts have denied motions to dismiss based on similar assertions. *See, e.g., Knoll, 2001 U.S. Dist. LEXIS 12998, 2001 WL 101117, at *3* (claimant satisfied pleading requirement by alleging they sent letter to patentee prior to lawsuit asserting that patent was invalid and alleging patentee had no reasonable belief that patent would be enforced); *OpenLCR.com, Inc. v. Rates Tech., Inc., 112 F. Supp. 2d 1223, 1233 (D. Colo. 2000)* (plaintiff satisfied pleading requirement by alleging that defendant knowingly failed to disclose material prior art to PTO in procuring their patent); *In re Cardizem CD Antitrust Litig., 105 F. Supp. 2d 618, 643-44 (E.D. Mich. 2000)* (plaintiff satisfied pleading requirement by alleging patent was prosecuted for the purpose of providing a basis to instigate sham patent infringement litigation).

Par correctly points out that its [HN17]patents carry a presumption of validity, it has a statutory right to enforce its patents, and assertion of a duly granted patent is presumed to be made in good faith. *C.R. Bard, 157 F.3d at 1369* (citations omitted). These presumptions merely set forth the parties' evidentiary [*33] burdens. Patent invalidity is a statutory defense and the presumption of validity can be rebutted. 35 U.S.C. § 282. On a motion to dismiss, all that is required is that MGP allege facts that, if proved, show Par is engaged in sham litigation. *See Jarrow Formulas, Inc. v. Int'l Nutrition Co., 175 F. Supp. 2d 296, 310-11 (D. Conn. 2001)*. MGP has sufficiently alleged that the Par patents are invalid. Following Par's argument, a plaintiff asserting a sham litigation claim in the context of a patent infringement suit could never satisfy the objective prong of the *PRE*

test.

Par also argues that its prior settlement with Teva for infringement of the '318 patent provides it with a reasonable belief that it can achieve a successful outcome in the present suit. [HN18]Success in prior litigation clearly provides the litigants with an objective basis for bringing subsequent actions on similar claims. *PRE, 508 U.S. at 61 n.5.* A favorable prior settlement may afford support for a belief that subsequent litigation will be successful, but it is not dispositive. *See Foster v. Hallco Mfg. Co., 947 F.2d 469, 482 (Fed. Cir. 1991)* [*34] (holding that consent judgment as to patent validity must be construed narrowly even between the consenting parties). Parties may settle a litigation for a variety of reasons independent of the merits of the claims. *See, e.g., Fisher v. Kelly, 105 F.3d 350, 353 (7th Cir. 1997)* (parties settle for reasons wholly unrelated to the substance and issues involved in the litigation); *Wang Labs., Inc. v. Toshiba Corp., 793 F. Supp. 676, 678 (E.D. Va. 1992)* (hypothesizing that an appeal of patent invalidity may be settled because parties can jointly profit from exploiting a fraudulently procured patent, a result contrary to the patent and antitrust laws). Moreover, the Teva settlement involved only one of the four patents at issue in this case.

**B. *PRE* Subjective Prong**

Finding that MGP has raised sufficient allegations under the first prong of *PRE,* the Court must determine whether MGP has adequately alleged that Par is attempting to use the litigation process to interfere directly with the business relationships of its competitors. *PRE, 508 U.S. at 60-61.* MGP alleges that the Par patent infringement suits against it and other [*35] competitors are being brought in bad faith, to extort settlements which limit the output of competitors, raise the cost of doing business in the market, raise the cost of entry into the market, and deter customers from purchasing competitive products. (Am. Compl. PP119, 133.)

MGP'S Amended Complaint meets the second prong of *PRE* by alleging that Par's purpose in pursuing its infringement claims is to monopolize the market for megestrol acetate oral suspension products by interfering with competitors entering the market. [HN19]A complaint merely alleging bare legal conclusions cannot survive a motion to dismiss but must at least outline the violation. *Car Carriers, 745 F.2d at 1106.* MGP asserts sufficient facts to outline that Par is attempting to employ the litigation process to assert its allegedly invalid patents

2006 U.S. Dist. LEXIS 13779, *35; 80 U.S.P.Q.2D (BNA) 1416;
2006-1 Trade Cas. (CCH) P75,179

to prevent entry of competitors into the market. [HN20]A complainant cannot be expected to have knowledge of specific facts in regard to a litigant's motivation or intent prior to discovery. *See Poller v. Columbia Broad. Sys., 368 U.S. 464, 473, 82 S. Ct. 486, 7 L. Ed. 2d 458 (1962)* ("Summary procedures should be used sparingly in complex antitrust litigation where motive and [*36] intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot."); *Car Carriers, 745 F.2d at 1106* ("*Poller* . . . simply stand[s] for the proposition that, if a claim under the antitrust laws has been adequately set forth in the complaint, the highly factual and subjective questions of intent and purpose should be resolved after discovery and trial.").

MGP has adequately set forth the elements necessary to strip Par of its antitrust immunity under*PRE*. MGP has presented detailed allegations that the Par Patents are unenforceable or invalid as result of fraud or inequitable conduct in front of the PTO and that Par is attempting to enforce those patents. MGP has also satisfactorily alleged that Par is undertaking the suits for the purpose of harming competitors. Therefore, MGP has properly stated a claim under *PRE.*

### III. Claim for Violation of Section One of the Sherman Act

[HN21]A contract, combination, or conspiracy in restraint of trade violates section one of the Sherman Act. *15 U.S.C. § 1.* A plaintiff must allege: (1) the existence of some contract, combination [*37] or conspiracy, (2) an anticompetitive effect in a relevant market resulting from the defendants' actions, and (3) an injury to himself and the market. *Car Carriers, 745 F.2d at 1107.*

First, MGP alleges that Par entered into a contract, combination, or conspiracy when it states: "For example, rather than incur the cost of litigation with Par, Teva settled its litigation on terms that limit its output." (Am. Compl. P120.) [HN22]Although mere settlement of patent litigation does not violate the antitrust laws, liability arises when settlement is a device for circumventing the antitrust laws. *Asahi Glass Co., Ltd. v. Pentech Pharms., Inc., 289 F. Supp. 2d. 986, 991 (N.D. Ill. 2003).*

Second, MGP alleges Par and Teva's settlement agreement has an anticompetitive effect. [HN23](Am. Compl. P133.) If "firms restrict output directly, price will . . . rise in order to limit demand to the reduced supply."

*Gen. Leaseways, Inc. v. Nat'l Truck Leasing Ass'n, 744 F.2d 588, 594 (7th Cir. 1984).* "Raising price, reducing output, and dividing markets have the same anticompetitive effects." *Id. at 594-95.* Accordingly, "an agreement which has the [*38] purpose and effect of reducing output is illegal under *§ 1* of the Sherman Act." *A.D. Bedell Wholesale Co. v. Philip Morris Inc., 263 F.3d 239, 247 (3d Cir. 2001).*

MGP alleges that the Par-Teva settlement agreement restricted Teva's output, which in turn decreased supply of generic megestrol acetate products and increased their market price. (Am. Compl. P133.) MGP further alleges that Par has sufficient market power (seventy-five percent market share) to raise prices by reducing output (*id.* P118), and it can be inferred from that allegation that Par has the ability to raise prices above the competitive level without losing all of its business.

Third, MGP has alleged that it has been injured because it has lost sales as a result of Par's violation of section one of the Sherman Act. (Am. Compl. P132.) MGP also alleges that consumers have been injured due to increased prices of generic megestrol acetate products. (*Id.* P133.) Finally, MGP also states that competition in the generic megestrol acetate industry has been weakened due to the increased cost of entry into the market. (*Id.*)

Viewing MGP's allegations and drawing all reasonable inferences in its favor, [*39] the Court holds that the Amended Complaint states a claim for violation of section one of the Sherman Act. Whether MGP ultimately will be able to prove the elements of a section one claim is not an issue before the Court on a motion to dismiss. Therefore, the Court denies Par's motion to dismiss MGP's claim for violation of section one of the Sherman Act.

### CONCLUSION

For the foregoing reasons, the Court denies defendants' motion to dismiss Count VI of the Amended Complaint [doc. no. 45-1].

**SO ORDERED**

**ENTERED:** 3/28/06

**HON. RONALD A. GUZMAN**

**United States Judge**

**<u>Citation #13</u>**
**2009 us dist lexis 118320**

LEXSEE

**POWER INTEGRATIONS, INC., Plaintiff, v. FAIRCHILD SEMICONDUCTOR
INTERNATIONAL, INC., FAIRCHILD SEMICONDUCTOR CORPORATION,
and SYSTEM GENERAL CORPORATION, Defendants.**

**Civ. No. 08-309-JJF-LPS**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

**2009 U.S. Dist. LEXIS 118320**

**December 18, 2009, Decided
December 18, 2009, Filed**

**SUBSEQUENT      HISTORY:**      Magistrate's
recommendation at Power Integrations, Inc. v. Fairchild
Semiconductor Int'l, Inc., 2009 U.S. Dist. LEXIS 118383
(D. Del., Dec. 18, 2009)

**PRIOR HISTORY:** Power Integrations, Inc. v. Fairchild
Semiconductor Int'l, Inc., 2009 U.S. Dist. LEXIS 58455
(D. Del., July 9, 2009)

**CORE    TERMS:**    signal,    switching,    frequency,
transformer, patent's, specification, converter, voltage,
feedback signals, output, counter, primary-side, varying,
cycle,    invention's,    analog,    sampling,    digital,
reexamination, controller, oscillator, examiner's, loop,
variation, disputed, off-time, input, power supplies,
embodiment, terminal

**COUNSEL:**   [*1]   For   Power   Integrations   Inc.,   a
Delaware corporation, Plaintiff: William J. Marsden, Jr.,
LEAD  ATTORNEY,  Kyle  Wagner  Compton,  Fish  &
Richardson, P.C., Wilmington, DE; Keeley I. Vega,
Michael R. Headley, Scott A. Penner, PRO HAC VICE.

For Fairchild Semiconductor International Inc., a
Delaware corporation, System General Corporation, a
Taiwanese corporation, Defendants: John G. Day, Lauren
E. Maguire, Tiffany Geyer Lydon, Ashby & Geddes,
Wilmington, DE.

For Fairchild Semiconductor Corporation, a Delaware
corporation, Defendant: Bas de Blank, Diana M.
Rutowski, George Hopkins Guy, III., Ulysses Hui, Vickie
L. Feeman, PRO HAC VICE; John G. Day, John G. Day,
Tiffany Geyer Lydon, Ashby & Geddes, Wilmington,

DE.

For Fairchild Semiconductor International Inc., a
Delaware corporation, System General Corporation, a
Taiwanese   corporation,   Fairchild   Semiconductor
Corporation, a Delaware corporation, Counter Claimants:
John G. Day, Tiffany Geyer Lydon, Ashby & Geddes,
Wilmington, DE.

For Power Integrations Inc., a Delaware corporation,
Counter Defendant: William J. Marsden, Jr., LEAD
ATTORNEY,   Kyle   Wagner   Compton,   Fish   &
Richardson, P.C., Wilmington, DE; Michael R. Headley,
Scott A. Penner.

For   [*2]   Power   Integrations   Inc.,   a   Delaware
corporation, Counter Claimant: William J. Marsden, Jr.,
LEAD  ATTORNEY,  Kyle  Wagner  Compton,  Fish  &
Richardson, P.C., Wilmington, DE; Michael R. Headley,
Scott A. Penner.

For Fairchild Semiconductor International Inc., a
Delaware corporation, System General Corporation, a
Taiwanese    corporation,    Fairchild    Semiconductor
Corporation,   a   Delaware   corporation,   Counter
Defendants: John G. Day, Tiffany Geyer Lydon, Ashby
& Geddes, Wilmington, DE.

For Power Integrations, a Delaware corporation,
Counter Claimant: William J. Marsden, Jr., LEAD
ATTORNEY,   Kyle   Wagner   Compton,   Fish   &
Richardson, P.C., Wilmington, DE; Keeley I. Vega,
Michael R. Headley, Scott A. Penner.

For Fairchild Semiconductor International Inc., a Delaware corporation, System General Corporation, a Taiwanese corporation, Counter Defendants: John G. Day, John G. Day, Tiffany Geyer Lydon, Ashby & Geddes, Wilmington, DE.

For Fairchild Semiconductor Corporation, a Delaware corporation, Counter Defendant: Bas de Blank, Diana M. Rutowski, George Hopkins Guy, III., Ulysses Hui, Vickie L. Feeman; John G. Day, John G. Day, Tiffany Geyer Lydon, Ashby & Geddes, Wilmington, DE.

**JUDGES:** Leonard P. Stark, [*3] UNITED STATES MAGISTRATE JUDGE.

**OPINION BY:** Leonard P. Stark

**OPINION**

**REPORT AND RECOMMENDATION REGARDING CLAIM CONSTRUCTION**

Pending before the Court in this patent infringement action is the parties' request for construction of disputed claim terms. In this Report & Recommendation, I provide my recommendation as to the proper construction of the claims.

**BACKGROUND**

**A. Procedure**

Plaintiff, Power Integrations, Inc. ("Power"), filed its complaint against Defendants, Fairchild Semiconductor International, Inc., Fairchild Semiconductor Corporation, and System General Corporation (collectively, "Fairchild") on May 23, 2009. (D.I. 1) On July 15, 2009, the parties filed a Joint Claim Construction Chart and Exhibits ("JCCC"), identifying the claim terms they believe require construction and providing the intrinsic and extrinsic evidence on which their competing contentions rely. (D.I. 109) Initial briefing on claim construction was completed on September 2, 2009. (D.I. 138, 140) The parties submitted video tutorials, providing the Court with relevant technical background, on September 10, 2009) I held a *Markman* claim construction hearing on September 23, 2009. (D.I. 190) Supplemental briefing concluded on [*4] October 29, 2009. (D.I. 187)

The parties addressed ten claim terms during the claim construction hearing, per my order of July 22, 2009. (D.I. 112) While I recognize that the Court has an obligation to construe all disputed claim terms by the time the case is submitted to a jury, *see O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., 521 F.3d 1351, 1363 (Fed. Cir. 2008)*, this does not preclude the Court from placing limitations on the number of terms to be construed at an earlier point in the case, *see, e.g., Ciba Specialty Chems. Corp. v. Hercules, Inc., 436 F. Supp. 2d 670, 677 (D. Del. 2006)*.

**B. The Patents-In-Suit**

All five of the patents-in-suit are directed to switched mode power supplies, also known as "DC output" power supplies or power converters. (D.I. 118 at 2; D.I. 122 at 4, 18) These types of power supplies adjust the level of current or voltage that an electronic device receives when plugged into a power source like an A/C wall outlet. (D.I. 118 at 2; D.I. 122 at 4, 19) "Power converters usually include a transformer to isolate the input terminals on the primary side of the transformer from the output terminals on the secondary side." (D.I. 122 at 4) They generally use some [*5] form of switch to transfer the electricity coming from the power source to the output terminal of the power converter itself. (D.I. 122 at 4; D.I. 118 at 2-3) Prior art power supplies regulated the frequency of the switch (i.e., power transfer across the power converter's transformer) by using a sensor at the transformer's output terminals. (D.I. 122 at 4; D.I. 118 at 2-3) Both parties' patents-in-suit seek to make this process more streamlined and less expensive by overcoming the need to sense directly the current at the transformer's output terminals by using "primary-side control," which relies on feedback signals generated on the primary (input) side of the transformer to sense what is happening on the secondary, or output, side of the transformer. (D.I. 118 at 2-3; D.I. 122 at 4)

The switching process inside a power converter or switched mode power supply repeats itself by turning on and off at a rate that can be fixed, "typically driven by the frequency of an oscillator circuit." (D.I. 118 at 2; *see also* D.I. 122 at 5.) Because this switching usually happens very often, the power supply will generate electromagnetic waves at a high frequency, which can interfere with other nearby [*6] electronic devices. (D.I. 118 at 2) This interference, called EMI, can be lessened by varying the frequency at which the switch turns on and

off (*i.e.,* charging and discharging the transformer) by using techniques like frequency jittering (D.I. 118 at 2) and frequency hopping (D.I. 122 at 5).

When cables connect power converters to the electronic devices they supply with electricity, some of the electricity that flows from the output terminal of the power converter across the cable is lost before it reaches the device. (D.I.118 at 3; D.I. 140 at 1-2) Thus, some method of increasing the current that flows from the converter is necessary to compensate for this drop in power due to the cable's length. (D.I. at 3; D.I. 140 at 1-2)

**1. Fairchild Patents-in-Suit**

**a. '780 Patent**

U.S. Patent No. 7,061,780 ("the '780 patent"), entitled "Switching Control Circuit With Variable Switching Frequency For Primary-Side-Controlled Power Converters," was granted by the U.S. Patent and Trademark Office ("PTO") on June 13, 2006. The disputed terms to be construed in the '780 patent appear in independent claims 1 and 13. Claim 1, for example, is shown below, with the disputed language emphasized:

> 1. A switching [*7] control circuit for a primary-side-controlled power converter, comprising:
>
> a switch for switching a transformer; wherein said transformer is coupled to an input voltage of the power converter;
>
> a sense device, which is coupled to said transformer for sensing current or/and voltage of said transformer;
>
> a switching signal, coupled to said switch for regulating an output voltage and a maximum output current of the power converter; and
>
> a controller, coupled to said transformer to generate a first feedback signal and a discharge-time signal by ***multi-sampling*** a voltage signal and a discharge time of said transformer ***during an off-time of said switching signal,*** said controller further coupled to said sense device to generate a second feedback

signal in response to said discharge-time signal and a current signal of said transformer, wherein said controller generates said switching signal in response to said first feedback signal, said controller controlling a switching frequency of said switching signal in response to said second feedback signal.

'780 patent, col. 13 line 61 to col. 14 line 15; *see also* JCCC at 27-29.

**b. '972 Patent**

U.S. Patent No. 7,259,972 ("the '972 patent"), entitled "Primary-Side-Control [*8] Power Converter Having a Switching Controller Using Frequency Hopping and Voltage and Current Control Loops," was issued on August 21, 2007. The disputed terms in the '972 patents appear in claims 1, 6, and 15:

> 1. A power converter comprising:
>
> a switch, responsive to a switching signal, to control electrical power in the power converter; and
>
> ***a controller to generate the switching signal and to control the switching signal in response to a first feedback signal associated with a voltage control loop and a second feedback signal associated with a current control loop;***
>
> wherein the controller includes a pattern generator to generate a digital pattern and the controller uses the digital pattern for use in generating the switching signal as a frequency-hopping switching signal to the switch.
>
> ***
>
> 6. The power converter of claim 5, wherein the controller generates the first feedback signal by ***sampling a voltage*** from the auxiliary winding of the transformer ***and a discharge time*** of the transformer.
>
> ***

15. A method for regulating power in a power converter, comprising:

receiving electrical power from input terminals;

*controlling a switching signal to regulate the connection of the electrical power to* [*9] *output terminals in response to a first feedback signal associated with a voltage control loop and a second feedback signal associated with a current control loop;*

generating a frequency-hopping switching signal in order to reduce at least electro-magnetic interference (EMI); and

generating a digital pattern for use in generating the frequency-hopping switching signal.

'972 patent, col. 15 lines 22-29, 51-54; *see also* JCCC at 34-37, 60-64.

#### c. '595 Patent

U.S. Patent No. 7,352,595 ("the '595 patent"), entitled "Primary-Side Controlled Switching Regulator," was issued on April 1, 2008. The disputed terms in the '595 patent appear in claims 16, 17, 22, and 27. Claims 16 and 17 are representative of the terms in dispute:

16. A switching power converter, comprising:

a transformer, for transferring the energy from a primary-side to a secondary side of the transformer;

a switching device, for switching the transformer;

a control circuit, coupled to the transformer for generating a switching signal to switch the switching device and to regulate the output of the switching regulator;

wherein the control circuit including:

a first circuit, coupled to the transformer for generating a first signal by measuring [*10] a reflected signal of the transformer;

a *second circuit, producing a second signal* in response to a current signal, wherein the current signal represents a primary-side switching current of the transformer;

a first feedback circuit, generating a first feedback signal in response to the first signal;

a second feedback circuit, generating a second feedback signal in response to the second signal; and

a switching control circuit, generating the switching signal in response to the first feedback signal and the second feedback signal.

\*\*\*

17. The switching power converter as claimed in claim 16, wherein the first feedback circuit further including a first reference signal for generating the first feedback signal in response to the first signal, and the *first reference signal is varied in response to the change of the second signal.*

'595 patent, col. 14 lines 15-35, 37-41; *see also* JCCC at 79-80.

#### 2. Power Integrations' Patents-in-Suit

#### a. '851 Patent

U.S. Patent No. 6,107,851 ("the '851 patent"), entitled "Offline Converter With Integrated Softstart and Frequency Jitter," was issued on August 22, 2001. The disputed terms in the '851 patent appear in claim 11:.

11. A regulation circuit comprising:

a first [*11] terminal;

a second terminal;

a feedback terminal coupled to disable the regulation circuit;

a switch comprising a control input, said switch allowing a signal to be transmitted between said first terminal and said second terminal according to a drive signal provided at said control input;

a frequency variation circuit that provides a *frequency variation signal;*

an oscillator that provides an oscillation signal having a frequency range, said frequency of said oscillation signal varying within said frequency range according to said frequency signal, said oscillator further providing a maximum duty cycle signal comprising a first state and second state; and

a drive circuit that provides said drive signal when said maximum duty cycle signal is in said first state and said regulation circuit is not disabled.

'851 patent, col. 13 lines 23-44; *see also* JCCC at 18-21.

**b. '876 Patent**

U.S. Patent No. 6,249,876 ("the '876 patent"), entitled "Frequency Jittering Control For Varying The Switching Frequency Of A Power Supply," was issued on June 19, 2001. The disputed terms of the '876 patent appear in claims 1 and 21:

1. A digital *frequency jittering* circuit for varying the switching frequency of a power [*12] supply, comprising:

an oscillator for generating a signal having a switching frequency, the oscillator having a control input for varying the switching frequency;

a *digital to analog converter* coupled to the control input for varying the switching frequency; and

a counter coupled to the output of the oscillator and to the **digital to analog converter,** the counter causing the **digital**

*to analog converter* to adjust the control input and to vary the switching frequency.

\*\*\*

21. A frequency *jittering circuit* for varying a power supply switching frequency, comprising:

an oscillator for generating a signal having a switching frequency, the oscillator having a control input for varying the switching frequency; and

*means coupled to the control input for varying the switching frequency, including: one or more current sources coupled to the control input;* and

*a counter* coupled to the output of the oscillator and to the one or more current sources.

'876 patent, col. 8 lines 42-53; col. 9 lines 54-65; *see also* JCCC at 5-7, 9-14, 14-15.

**LEGAL STANDARDS**

"It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp., 415 F.3d 1303, 1312 (Fed. Cir. 2005)* [*13] (internal quotation marks omitted). Construing the claims of a patent is a question of law. *See Markman v. Westview Instruments, Inc., 52 F.3d 967, 977-78 (Fed. Cir. 1995),* aff'd, 517 U.S. 370, 388-90, 116 S. Ct. 1384, 134 L. Ed. 2d 577 (1996). "[T]here is no magic formula or catechism for conducting claim construction." *Phillips, 415 F.3d at 1324.* Instead, the court is free to attach the appropriate weight to appropriate sources "in light of the statutes and policies that inform patent law." *Id.*

"[T]he words of a claim are generally given their ordinary and customary meaning . . . [which is] the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Id. at 1312-13* (internal citations and quotation marks omitted). "[T]he ordinary meaning of a claim term is its meaning to the ordinary artisan after reading the entire patent." *Id. at 1321* (internal quotation

marks omitted). The patent specification "is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582 (Fed. Cir. 1996).

While [*14] "the claims themselves provide substantial guidance as to the meaning of particular claim terms," the context of the surrounding words of the claim also must be considered. *Phillips,* 415 F.3d at 1314. Furthermore, "[o]ther claims of the patent in question, both asserted and unasserted, can also be valuable sources of enlightenment . . . [b]ecause claim terms are normally used consistently throughout the patent . . . ." *Id.* (internal citation omitted).

It is likewise true that "[d]ifferences among claims can also be a useful guide . . . . For example, the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." *Id.* at 1314-15 (internal citation omitted). This "presumption is especially strong when the limitation in dispute is the only meaningful difference between an independent and dependent claim, and one party is urging that the limitation in the dependent claim should be read into the independent claim." *SunRace Roots Enter. Co. v. SRAM Corp.,* 336 F.3d 1298, 1303 (Fed. Cir. 2003).

It is also possible that "the specification may reveal a special definition given to a claim term [*15] by the patentee that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs." *Phillips,* 415 F.3d at 1316. It bears emphasis that "[e]ven when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction." *Liebel-Flarsheim Co. v. Medrad, Inc.,* 358 F.3d 898, 906 (Fed. Cir. 2004) (internal quotation marks omitted), *aff'd,* 481 F.3d 1371 (Fed. Cir. 2007).

In addition to the specification, a court "should also consider the patent's prosecution history, if it is in evidence." *Markman,* 52 F.3d at 980. The prosecution history, which is "intrinsic evidence," "consists of the complete record of the proceedings before the PTO [Patent and Trademark Office] and includes the prior art cited during the examination of the patent." *Phillips,* 415 F.3d at 1317. "[T]he prosecution history can often inform

the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, [*16] making the claim scope narrower than it would otherwise be." *Id.*

A court also may rely on "extrinsic evidence," which "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Markman,* 52 F.3d at 980. For instance, technical dictionaries can assist the court in determining the meaning of a term to those of skill in the relevant art because such dictionaries "endeavor to collect the accepted meanings of terms used in various fields of science and technology." *Phillips,* 415 F.3d at 1318. In addition, expert testimony can be useful "to ensure that the court's understanding of the technical aspects of the patent is consistent with that of a person of skill in the art, or to establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field." *Id.* Nonetheless, courts must not lose sight of the fact that "expert reports and testimony [are] generated at the time of and for the purpose of litigation and thus can suffer from bias that is not present in intrinsic evidence." *Id.* Overall, while extrinsic evidence "may be useful" to the court, it is "less [*17] reliable" than intrinsic evidence, and its consideration "is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Id.* at 1318-19.

Finally, "[t]he construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Renishaw PLC v. Marposs Societa' per Azioni,* 158 F.3d 1243, 1250 (Fed. Cir. 1998). It follows that "a claim interpretation that would exclude the inventor's device is rarely the correct interpretation." *Osram GmbH v. Int'l Trade Comm'n,* 505 F.3d 1351, 1358 (Fed. Cir. 2007) (internal quotation marks omitted). Thus, if possible, claims should be construed to uphold validity. See *In re Yamamoto,* 740 F.2d 1569, 1571 (Fed. Cir. 1984).

## CONSTRUCTION OF THE DISPUTED TERMS

### A. '780 Patent

#### 1. "Multi-sampling . . . during an off-time of said switching signal"

The parties agree that "multi-sampling" requires more than one sample to be taken of the switching signal. (D.I. 118 at 6; D.I. 140 at 10; *see also* D.I. 122 at 17-18.) They disagree, however, as to when those samples must be taken. Fairchild argues that the [*18] phrase "multi-sampling . . . during an off-time of said switching signal" does not need construction - but, if the Court does construe it, it should be construed as "sampling the voltage signal across multiple switching cycles when the switching signal is off." (D.I. 122 at 17) Power maintains that the proper construction is "sampling two or more times during one off-time of the switching signal." [1] (Transcript of *Markman* Hearing, D.I. 190 at 54 (hereinafter "Tr."))

> 1 This construction is slightly different from the one Power previously supplied in its claim construction briefs. (D.I. 118 at 6; D.I. 138 at 2)

The parties agree that the switching signal to be sampled has many cycles, and that one cycle consists of one "on" and one "off" time of the signal. (D.I. 122 at 17; D.I. 138 at 3; D.I. 140 at 11) Key to their conflict is whether the switching signal is sampled two or more times within each off-time of *each* cycle, as Power contends, or whether, as Fairchild claims, the signal need only be sampled at least once during *each off-time* of the signal's many off-times.

According to Fairchild, the plain language of the claim terms supports its construction. This is purportedly the case because, [*19] as Power noted in its opening brief, "'a' or 'an' in patent parlance generally means 'one or **more**,'" and, thus, "'multi-sampling . . . during *an* off-time of said switching signal'" "encompasses the taking of multiple samples during the off-times of *more than one* switching cycle." (D.I. 140 at 10-11 (quoting D.I. 118 at 7) (emphasis added)) However, as even Fairchild acknowledges, there are circumstances in which "an" may mean only one. "[T]he article 'a' or 'an' receives a singular interpretation only in rare circumstances when the patentee evinces a *clear intent* to so limit the article." *Philips Elecs. N. Am. Corp. v. Contec Corp.,* 312 F. Supp. 2d 592, 602 (D. Del. 2004) (internal citation omitted; emphasis added). Therefore, I turn to the written description and file history of the '780 patent to determine whether, in connection with the claim dispute I am considering, the patentee clearly intended that the indefinite article "an" be limited to a singular construction. *See KCJ Corp. v. Kinetic Concepts, Inc.,*

223 F.3d 1351, 1356-57 (Fed. Cir. 2000).

Fairchild asserts that the '780 patent's specification supports its conclusion that "multi-sampling . . . during an off-time of said [*20] switching signal" includes sampling the signal only once per each off-time of the signal's numerous cycles. In Fairchild's view, "the '780 patent describes a sampling operation that takes place in the voltage-waveform detector wherein the voltage of V[AUX] is sampled when the transformer is discharging [during the off-time of the switching signal]. The value of V[AUX] is held so that it can be used for a comparison to determine when V[AUX] begins to drop." (D.I. 122 at 18) Thus, the signal may be sampled as little as just one time per each cycle's off-time, and only one sample is held for comparison with the sample signal generated by the next switching cycle. (D.I. 140 at 11)

Power submits, in contrast, that "multi-sampling can[not] be accomplished by taking a single sample during each off-time of multiple, successive switching cycles." (D.I. 118 at 8) This is because the claimed circuit could not perform its desired function if it operated in the manner described by Fairchild. The multi-sampling operation in the '780 patent is meant to detect when the transformer has finished discharging current through the output terminal based on samples of a feedback signal that reflect the state [*21] of the output terminals. (D.I. 118 at 8-9; D.I. 122 at 18) Power claims that the transformer's discharge time could not be measured by taking a single sample from one off-time of the switching cycle because "the end of the discharge time is determined by, and the discharge time signal results from, taking multiple voltage samples until the value of the sensed voltage is different enough from the just-previous sample to indicate the end of the discharge time for that cycle." (D.I. 118 at 8-9 (citing '780 patent at Figs. 2 and 4, and col. 7 line 57 to col. 8 line 50)) Without more than one sample of the discharge time, the claimed circuit could not measure the discharge time and, hence, would not work. (D.I. 118 at 9) Further, each of the patent's references to multi-sampling "appears in the context of a single switching cycle." (D.I. 118 at 8 (citing '780 patent, col. 8 lines 51-67))

Fairchild concedes that Figure 2 of the '780 patent shows voltage signal V[AUX] being sampled multiple times in one cycle. (D.I. 122 at 18) However, Fairchild observes that the same figure also shows V[AUX] being sampled across multiple cycles. (*Id.*) Additionally, Figure

4 of the '780 patent teaches that [*22] only one sample per cycle of V[AUX] is used by comparator 155 to determine when the transformer has been discharged (D.I. 140 at 11) - although V[AUX] is sampled multiple times "in order to determine when the V[AUX] begins to drop in each cycle" (D.I. 122 at 18). Fairchild thus maintains that "the examples suggest neither that the invention is exclusively limited to requiring multi-sampling within a given cycle nor that multi-sampling across multiple switching cycles is outside the scope of the invention." (D.I. 122 at 18)

Power responds that Fairchild's construction ignores the crucial fact that, in order to determine *which* sample of V[AUX] should be held by comparator 155, V[AUX] must be sampled multiple times during a single cycle. (Tr. at 15) Because the feedback circuit "has to have some consistency over cycle to cycle," V[AUX] needs to be sampled until it starts to drop (as a result of the discharge time signal becoming disabled). (*Id.*) Once it drops, the circuit "knows that the last sample it took is no good. And it has to go back to the previous one. And that's the one it keeps [for use by comparator 155]." (*Id.* at 17-18)

Taking the '780 patent's claims and specification as a [*23] whole, I recommend that the Court adopt Power's proposed construction: "sampling two or more times during one off-time of the switching signal." (*Id.* at 54) While the claim language itself is ambiguous, the specification demonstrates that the voltage signal is sampled at least two times for each of the switching signal's off-times in order for the correct sample to be generated. *See* '780 patent, Fig 2 (showing two samples taken from each of two sample signals, V[SP1] and V[SP2] during one off-time); *id.* col. 8 lines 8-13 ("[T]he first sample signal V[SP1] and the second sample signal V[SP2] are generated in response to the sample-pulse signal. Besides, the first sample signal V[SP1] and the second sample signal V[SP2] are alternately produced during an enabled period of the discharge-time signal."); *id.* col. 8 lines 56-69 ("[T]he first sample signal V[SP1] and second sample signal V[SP2] are disabled, and the multi-sampling operation is stopped as the discharge time signal S[DS] is disabled."). There is no teaching as to how the circuit would operate if the voltage signal and discharge time were sampled only once during an off-time. For all these reasons, I find a "clear intent" to [*24] limit the article "an" to mean "one" in the context of this disputed claim term. *See Philips Elecs.*, 312 F.

Supp. 2d at 602. [2]

> [2]   Neither party has cited any evidence from the '780 patent's prosecution history that supports a different outcome.

**B. '972 Patent**

**1. Do claims 1 and 15 have "primary-side" limitations?**

The parties' first dispute concerning claims 1 and 15 of Fairchild's '972 patent is whether these claims include a "primary side" limitation. Broadly, Fairchild answers in the affirmative and Power in the negative. I agree with Power that these claims do not contain a primary-side limitation.

Fairchild proposes that the term "a controller to generate the switching signal and to control the switching signal in response to a first feedback signal associated with a voltage current control loop and a second feedback signal associated with a current control loop" in claim 1 be construed as:

> Control circuitry that generates a switching signal and controls the switching signal using feedback signals associated with voltage and current control loops to control the output voltage and the output current *at the primary-side without the need of an optical-coupler or a secondary-side regulator.*

(D.I. [*25] 122 at 5 (emphasis added))

Power's proposed construction is instead:

> A controller to generate the switching signal and to control the switching signal in response to a first feedback signal *derived by measuring a signal representative of an output voltage of the power converter,* and a second feedback signal, *distinct from the first feedback signal, derived by measuring a signal representative of a current in the switch.*

(D.I. 118 at 13 (emphasis added))

The essence of the parties' conflict is whether, as

Fairchild proposes, claims 1 and 15 should be construed to include the language "at the primary side without the need of an optical-coupler or secondary-side regulator." The parties also dispute whether Power's proposed construction, which adds "distinct from" and how certain signals are derived, is proper.

As an initial matter, it is of crucial importance that the claims in dispute do not contain any language expressly limiting their scope to primary-side control. Claims 1 and 15 do not contain primary-side limitation language, whereas other independent claims in the '972 patent do. *See* '972 patent, claims 22 and 32. [3] That four out of the patent's six independent claims do not contain [*26] primary-side limitations strongly suggests that the patentee did not believe that the very character of the invention required a primary-side limitation. *See Alloc, Inc. v. Int'l Trading Commission, 342 F.3d 1361, 1370 (Fed. Cir. 2003).* Further, the fact that some of the independent claims do have explicit primary-side limitations distinguishes this case from others in which a court has implied a claim limitation that was common to all the disclosed embodiments "but was not explicitly recited as a limitation in any of the claims." *Saunders Group, Inc. v. Comfortrac, Inc., 492 F.3d 1326, 1333 (Fed. Cir. 2007)* (emphasis added).

> 3  Similarly, the other, related Fairchild patents at issue in this case, the '780 and '595 patents, contain claims expressly limited to primary-side control. *See* '780 patent, claims 1 and 13; '595 patent, claims 1, 9, 16, and 27.

Fairchild relies on the numerous indications throughout the '972 patent's specification that the invention being disclosed is a primary-side-control power converter. For example:

> . the patent is entitled "Primary-Side-Control Power Converter Using Frequency Hopping and Voltage and Current Control Loops;"

> . the patent's "Field:" "The present [*27] invention relates generally to power converters and, more particularly, to a primary-side-control power converter having a switching controller using frequency hopping and voltage and current loops" (col. 1 lines 9-12);

> . portions of the specification: "Fig. 1 illustrates one example of a schematic diagram of a primary-side-control power converter having a switching controller," and "Thus, a primary-side-control power converter having a switching controller using frequency hopping and voltage and current control loops has been described" (col. 1 lines 65-67; col. 15 lines 9-11); and

> . Figure 1 shows the switching controller 70 located on the primary side of the transformer.

(D.I. 122 at 6-8)

The background section also distinguishes prior art requiring an "optical-coupler or other secondary-side regulation." [4] (D.I. 122 at 7) In prior art power converters, some form of secondary-side regulation (*i.e.,* regulation taking place on the output side of the transformer) was necessary to derive the feedback signal that would tell the switching signal (located on the primary side of the transformer) what was happening on the secondary side of the transformer. '972 patent, col. 1 lines 24-33. Fairchild [*28] noted at the *Markman* hearing that no embodiment or claim in the '972 patent teaches how the claimed invention would work using an optical-coupler. (Tr. at 26, 30)

> 4  *See* Tr. at 26-27 (describing an optical coupler as necessarily a form of secondary-side regulation).

Several things need to be said in response to Fairchild's contentions. First, while the '972 patent is entitled "Primary-Side-Control Power Converter," the Federal Circuit has noted "the unimportance of a patent's title to claim construction." *Pitney Bowes, Inc. v. Hewlett-Packard Co., 182 F.3d 1298, 1313 (Fed. Cir. 1999); see also Fastenetix, LLC v. Medtronic Sofamor Danek, Inc., 2007 U.S. Dist. LEXIS 53665, 2007 WL 2159613, at *29 (D.N.J. July 25, 2007).* The '972 patent's title, therefore, is not afforded much weight.

Moreover, "the 'Summary' section of the ['972 patent's] specification contains no reference to 'primary-side' control, and the other references to primary-side control in the specification occur in the context of preferred embodiments." (D.I. 138 at 10) Although the final paragraph of the '972 specification

does begin by stating that "a primary-side-control power converter . . . has been described," the last sentence of that same paragraph [*29] reads "[t]he specification and drawings are, accordingly, to be regarded in an illustrative sense rather than a restrictive sense." '972 patent, col. 15 lines 17-19. In fact, only two sentences of the '972 patent's twenty-six paragraph specification describe the invention by referring to a primary-side limitation. *See* '972 patent, col. 1 lines 65-67; col. 15 lines 9-11.

The Background of '972 patent does distinguish prior art which utilized secondary-side regulation. '972 patent, col. 1 lines 24-33. [5] But this language is not unequivocal; it does not "state that the *only way* to accomplish the goal" of reducing size, cost, and EMI is to eliminate secondary-side control or implement primary-side control. *Saunders Group, 492 F.3d at 1333* (emphasis added); *see also Liebel-Flarsheim Co. v. Medrad, Inc., 358 F.3d 898, 902 (Fed. Cir. 2004)* (refusing to read limitation from specification into patent's claims because "asserted claims do not *expressly require* [the limitation], and the common specification does not state that [the limitation] is a *required* component of the inventions") (emphasis added). [6]

[5]   *See also* '972 patent, col. 2 lines 32-35 ("The following examples and implementations overcome [*30] disadvantages of prior power converters and can reduce the size cost for power converters and [EMI]."); *id.* at col. 2 lines 42-52 ("[The disclosed] power converter can control the output voltage and the output current at the primary-side without the need of an optical-coupler or a secondary-side regulator. . . . An optical-coupler is therefore not needed to generate a feedback voltage signal.").

[6]   As noted, Fairchild also argues that claims 1 and 15 should be limited to "primary-side" control because the '972 patent does not teach an embodiment of the invention that has an optical-coupler, which is a component of a secondary-side regulating system. (Tr. at 26) But "[e]ven where a patent describes only a single embodiment, claims will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope." *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc., 381 F.3d 1111, 1117 (Fed. Cir. 2004)*; *see also Saunders Group, 492 F.3d at 1332-33* (rejecting

argument that invention should be read as limited to particular embodiment because specification did not disclose or describe other embodiments of invention). Particularly given the distinctions [*31] among the claims discussed above, I have not found evidence of such a clear intention in the specification here.

Fairchild cites the '972 patent's prosecution history as evidence that the claimed invention should be limited to a primary-side-control power converter. Fairchild argues the Examiner's initial rejection of claim 1 is significant because "[e]ven though the rejected claim 1 did not include an express 'primary-side' limitation, the Examiner nonetheless regarded it as part of the claim, demonstrating that the Examiner understood the invention was restricted to primary-side control." (D.I. 122 at 8) Power responds by noting that claim 1 was rejected on several bases aside from the primary-side control limitation. (D.I. 138 at 10) Power further asserts that the Examiner rejected claim 1 as anticipated by prior art that had secondary-side regulation, showing that the Examiner believed secondary-side regulation was relevant to the '972 patent's claims. (D.I. 138 at 11 (citing Ex. D at 5)) Furthermore, even Fairchild concedes that in response to the limited rejection of claim 1, the patentee focused on frequency hopping, not on anything to do with primary versus secondary side control. [*32] *See* Tr. at 57 (Fairchild's counsel stating that "the examiner gave his own reasons as to why these rejections were occurring and that led . . . the patentee to distinguish on the frequency hopping limitation"); *see also* D.I. 120 Ex. 21 at 2, 19. Thus, the prosecution history does not show that the patentee clearly disavowed secondary-side control or clearly distinguished the patent based on a primary-side control limitation. *See SunRace Roots Enter. Co., 336 F.3d at 1306* ("[P]rosecution history may not be used to infer the intentional narrowing of a claim absent the applicant's clear disavowal of claim coverage. . . . To be given effect, such a disclaimer must be 'clear and unmistakable.'") (internal citation omitted).

Finally, Fairchild complains that Power's proposed constructions are an attempt to invalidate claims 1 and 15 by reading them onto prior art (*i.e.,* power converters with secondary-side regulating systems). (D.I. 130 at 1; Tr. at 27) Invalidity is a matter for summary judgment, not claim construction. *See Ampex Corp. v. Eastman Kodak Co., 460 F. Supp. 2d 541, 543 n.1 (D. Del. 2006)* ("The validity of a claim is not an issue of claim

construction . . . ."). The disputed  [*33] claims are not "insolubly ambiguous" and, therefore, may and must be construed. *Exxon Research & Eng'g Co. v. United States, 265 F.3d 1371, 1375 (Fed. Cir. 2001)*. "[T]he axiom regarding the construction to preserve the validity of the claim does not apply" unless a claim remains ambiguous after application of all the available tools of claim construction. *Liebel-Flarsheim, 358 F.3d at 911* (internal citation omitted).

In sum, I am not persuaded that the '972 patent's specification and prosecution history "as a whole" show "that the very character of the invention *requires* the [primary-side] limitation be a part of *every* embodiment." *Alloc, 342 F.3d at 1370* (emphasis added). Thus, I recommend that the Court reject Fairchild's proposal to import into claims 1 and 15 the limitation "at the primary-side without the need of an optical-coupler or a secondary-side regulator."

### 2. Power's additional proposed language

The remaining disputes between the parties over claims 1 and 15 concern Power's proposals to add (1) the phrase "distinct from the first feedback signal," and (2) language describing how the two feedback signals are derived. (D.I. 118 at 13-14)

Power provides little to support the inclusion  [*34] of these phrases in claims 1 and 15, essentially asserting that its proposed construction stems from the "straightforward claim language." (D.I. 138 at 11-12) Fairchild responds that Power's construction amounts to an improper importation of extraneous limitations into the '972 patent's claims. (D.I. 140 at 5)

Having reviewed the '972 patent's claims, specification, and prosecution history, I agree with Power that the phrase "distinct from the first feedback signal" provides clarity and accords with the language in the patent's other claims. I do not agree, however, that the language describing how the two feedback signals are derived is supported. Claims 6 and 8, which both depend on independent claim 1, describe how the first and second feedback signals are generated.[7] '972 patent, col. 15 lines 51-54 ("[T]he controller generates the first feedback signal by sampling a voltage from the auxiliary winding of the transformer . . . ."); col. 15 lines 58-61 ("[T]he controller generates the second feedback signal by sampling of the sensed current from the sense circuit . . . ."). This gives rise to an "especially strong" presumption

that this limitation of dependent claims 6 and 8 is not [*35] present in claim 1. *See SunRace, 336 F.3d at 1302-03*.

> 7   The same is true of claims 18 and 20, which depend from independent claim 15 and mirror dependent claims 6 and 8. '972 patent, col. 16 lines 51-53; col. 16 lines 58-61.

### 3. "Sampling a voltage . . . and a discharge time"

The final dispute over terms in the '972 patent arises from dependent claim 6, which describes how the first feedback signal is generated. The parties do not agree as to the proper construction of "sampling a voltage from the auxiliary winding of the transformer and a discharge time of the transformer." '972 patent, col. 15 lines 50-53. Power contends that this term should be construed as "sampling both a voltage signal and a discharge time." (D.I. 118 at 11; JCCC 34-37) Fairchild, on the other hand, argues that it should be construed as "sampling a voltage from the auxiliary winding of the transformer when the transformer is discharging." (D.I. 122 at 10)

I recommend that the Court adopt Fairchild's construction of claim 6 of the '972 patent. Claim 6 is grammatically ambiguous with respect to what quantities are being joined by the word "and" in the term in dispute. Claim 6 reads, in pertinent part, "wherein the controller [*36] generates the first feedback signal by sampling a voltage from the auxiliary winding of the transformer and a discharge time of the transformer." '972 patent, col. 15 lines 50-53. Hence, "and" might conjoin "auxiliary winding of the transformer" and "a discharge time of the transformer." (D.I. 140 at 6) Or, as Power suggests, "and" might conjoin "a voltage from the auxiliary winding of the transformer" and "a discharge time of the transformer." (D.I. 118 at 11) But when read in the context of the '972 patent's specification, it becomes clear that the first quantity being sampled is the voltage from the auxiliary winding, defined as V[AUX], which is generated during a discharge time of the transformer. *See* '972 patent, col. 3 line 20 to col. 4 line 12; col. 3 lines 52-55; col. 7 lines 48-51; col. 8 line 49 to col. 9 line 30; *see also Vitronics Corp., 90 F.3d at 1582* (stating specification is "the single best guide to the meaning of a disputed term").

The patent's specification describes in several places how V[AUX] is sampled when the transformer is discharging.  For instance, the invention's voltage

waveform detector samples and measures V[AUX] "instantly before the secondary-side switching [*37] current I[S] is discharged to zero." '972 patent, col. 7 lines 48-51. Because the secondary-side switching current I[S] has the same discharge time as the transformer ('972 patent, col. 3 lines 52-55), the quoted passage shows that V[AUX] is sampled and measured before the current I[S] completely discharges, which means that it is sampled and measured during the discharge time of the transformer. (D.I. 122 at 11) Similarly, the specification shows that two sample signals, V[SP1] and V[SP2], can alternatively sample V[AUX] while the transformer is discharging. '972 patent, col. 8 line 49 to col. 9 line 30.

Moreover, claim 6 is specifically directed to sampling the auxiliary voltage V[AUX], not sampling a voltage in general. (D.I. 122 at 10) "When the switching signal V[PWM] is off or at a logic low, the electrical energy or power stored in the transformer 10 is delivered to its secondary side . . . . [and] a voltage V[AUX] is generated at the auxiliary winding N[A] of the transformer 10." '972 patent, col. 3 line 20 to col. 4 line 12. The deliverance of energy or power from the primary side to secondary side of the transformer is known as "discharging," and the time during which this [*38] occurs is called the "discharge time" of the transformer. (D.I. 122 at 10-11) V[AUX] is thus generated at the auxiliary winding while the transformer is discharging. (Id. at 11) Additionally, as Fairchild explains, a person having ordinary skill in the art would understand that "the word 'sample' only has meaning with respect to waveforms" (id. at 12), and "it is technically impossible to sample a discharge time. You can measure time" (Tr. at 36 (emphasis added))

Power also contends that Fairchild's proposed construction - of "and" as "when" - would render dependent claims 8 and 20 nonsensical. (D.I. 118 at 12) Claim 8, for example, recites sampling of a "sensed current" in addition to "a voltage . . . and a discharge time." (Id.) Substituting "when" for "and" in this claim would result in a scientific impossibility, because the particular current sensed in claim 8 only exists in the absence of a discharge time (i.e., when the transformer is charging, as opposed to discharging). (Id.) But just because the terms "sampling" and "the discharge time of the transformer" appear in claim 6 and in claim 8, to read those phrases without reference to the words between them - as Power would do [*39] - is incorrect. [8] Power's

argument fails.

> [8]   In other words, "and" does not necessarily have the same meaning in claim 8's term - "sampling of the sensed current from the sense circuit and the discharge time of the transformer" - as it does in claim 6's term - "sampling a voltage from the auxiliary winding of the transformer and a discharge time of the transformer." '972 patent, col. 15 lines 51-53, 59-61.

## C. The '595 Patent

### 1. "A second circuit, producing a second signal"

The first conflict over the '595 patent's terms concerns independent claim 16, which reads in relevant part: "a second circuit, producing a second signal in response to a current signal." '595 patent, col. 14 lines 26-27. Power proposes that this term be construed to show how this second signal is produced: "by integrating a current signal with a timing signal that represents a discharge time." (D.I. 118 at 17; JCCC at 79-80) Fairchild asserts that this term does not need construction but, if it is construed, it should mean "circuitry for producing a signal in response to a current signal." (D.I. 122 at 15)

Power bases its construction on the specification's teaching that a feedback signal can be generated from a current [*40] signal only via "second circuit 300," which operates by integrating the current over the discharge time. (D.I. 118 at 17 (citing '595 patent, col. 1 lines 51-55; col. 4 lines 24-32; col. 8 line 64 to col. 9 line 57; col. 5 lines 20-49; and Figs. 3 and 7)) Thus, Power argues its construction properly identifies the process by which the current in the primary winding of the transformer can be correlated with the power supply output current being regulated. (D.I. 118 at 17)

Power further asserts that during prosecution of the '595 patent the applicant "expressly distinguished" independent claim 16 - as well claims 22 and 27 (which also refer to a second circuit producing a second signal) - from a prior art reference, Schteynberg, by stating:

> Referring to the independent claim 1, the second circuit300) and third circuit (400), produces a second signal (V[I]) by integrating a current signal (V[W]) and the timing signal (S[DS]), which is not taught

by Schteynberg. Likewise, Schteynberg also fails to disclose the same second circuit as claimed in independent claims 9, 16, 22 and 27 because neither V[IN,AC] nor I[SENSE] [is] the claimed second circuit, which is **capable** of producing a second [*41] signal (V[I]) by integrating current signal (V[W]) and a timing signal (S[DS]).

(D.I. 120 Ex. 14 at 3 (emphasis added)) The "timing signal (SDS)" is identified in the patent as the discharge time signal. '595 patent, col. 4 lines 21-26. Thus, according to Power, the applicant "expressly limited the '595 patent by distinguishing the Schteynberg reference on the basis of 'integrating' a current signal and a timing signal." (D.I. 118 at 18) To Power, this "express" limit during prosecution of the '595 patent prevents Fairchild from claiming subject matter of any broader scope. (D.I. 138 at 12)

Fairchild, of course, denies that the above-quoted statement is an express disavowal of anything. "[A]t most," Fairchild insists, the passage "allows for the 'capability' of the second circuit being able to produce a second signal by integrating current signal V[W] and a timing signal S[DS]. It does not expressly limit the second circuit element by requiring integration to occur." (D.I. 140 at 9) Fairchild also argues that the doctrine of claim differentiation prevents the inclusion of the "integration element" in claim 16. (D.I. 122 at 14) Claim 9 of the '595 patent requires "a second circuit, producing [*42] a second signal by integrating a current signal with the timing signal," where the "timing signal represents a discharge time of the transformer." '595 patent, col. 13 lines 13-16. To add such an integration element to claim 16 would render claim 16 "identical" to claim 9, causing the redundancy that claim differentiation seeks to avoid. *See* D.I. 122 at 15; *see also SunRace,* 336 F.3d at 1303.

Hence, I agree with Fairchild that the disputed term in claim 16 does not need construction. The statement to the PTO in which Power finds a disavowal of a "second circuit" lacking the integration element is not an express disclaimer. A party seeking to show a prosecution disclaimer must demonstrate an "unambiguous" disclaimer, based on "clear and unmistakable evidence" that some of the scope that would otherwise be captured by the claim was relinquished during prosecution. *See Voda v. Cordis Corp.,* 536 F.3d 1311, 1321 (Fed. Cir.

2008). The '595 patent applicant's statement that the prior art did not read on the '595 patent's subject matter because the prior art did not include "the claimed second circuit," which is "capable" of producing a second signal through integration of the current signal [*43] and timing signal, is not unambiguous, clear, or unmistakable.

### 2. "First reference signal is varied in response to the change of the second signal"

The parties next disagree as to the proper construction of the term "first reference signal is varied in response to the change of the second signal," as it is used in claim 17. Power has offered several slightly differing constructions of this term. Power initially proposed a construction of "the analog value of the first reference signal is increased in response to the increase of the analog value of the second signal." (D.I. 118 at 18) In response to Fairchild's opening claim construction brief, Power proposed that the first reference signal must vary "continuously relative to the change of the second signal's value (*i.e.,* in an analog fashion)." (D.I. 138 at 16) Finally, at the *Markman* hearing, Power argued that claim 17 should at least be construed such that the two signals essentially move in the same direction in response to each other, so that their values "track one another . . . over a range." (Tr. at 73)

Fairchild contends that claim 17 does not require construction. If, however, it is construed, it should be construed as: "the [*44] reference signal changes in response to a change in the second signal." (D.I. 122 at 16) Fairchild rejects Power's contention that the first reference signal and the second signal must track each other proportionally or in some other correlative manner. To Fairchild, as long as the first reference signal varies in some way in response to the second signal, the claim limitation is satisfied. (D.I. 122 at 17; Tr. at 75)

The claim language does not provide guidance to resolve the parties' conflict. Turning to the specification, in one embodiment the "first reference signal" and "second signal" of claim 17 are developed and used by operational amplifiers ("op-amps"). '595 patent, Figure 3; col. 1 lines 57-61; col. 4 lines 32-42. Power argues that the presence of op-amps in Figure 3 and its accompanying description in the '595 patent would indicate to a person with ordinary skill in the art that the first reference signal and the second signal must be analog signals, because "the inputs and outputs of op-amps *must necessarily be analog.*" (D.I. 118 at 19

Page 13

(emphasis added)) Fairchild does not directly contest this conclusion (D.I. 174 at 3-4), but argues that one of ordinary skill in the art, [*45] "looking at the block diagrams of the '595 patent," "would understand that the depicted circuitry could be implemented using digital or analog circuit techniques, or some combination thereof." (D.I. 174 at 4) Further, according to Fairchild, a person of ordinary skill in the art would not necessarily read dependent claim 17 as requiring the use of op-amps or any other "specific components for generating or using the 'second signal' or 'first reference signal.'" (D.I. 174 at 2)

On these points, I am persuaded by Fairchild. I conclude that claim 17 of the '595 patent does not require construction. Power's proposed construction asks the Court to read limitations from the invention's preferred embodiment into claim 17, which on its face does not include the words "analog," "digital," "proportionally," "in an analog fashion" or "operational amplifiers."

## D. '851 Patent

### 1. "Frequency variation signal"

The dispute over the construction of claim 11 of the '851 patent centers on whether the Court should re-construe the term "frequency variation signal," given that this term has already been construed by Judge Farnan in the parties' previous litigation, *Power Integrations, Inc. v. Fairchild* [*46] *Semiconductor International, Inc.,* 04-1371-JJF (D. Del) ("*Fairchild I*"). 9 Power urges the Court to retain Judge Farnan's construction, whereby "frequency variation signal" was construed to mean "an internal signal that cyclically varies in magnitude during a fixed period of time and is used to modulate the frequency of the oscillation signal within a predetermined frequency range." (D.I. 118 at 20) If the Court does construe claim 11 of the '851 patent anew, Power insists there is no reason to reach a conclusion other than the one Judge Farnan reached. (D.I. 118 at 20-21) The "new evidence" that Fairchild believes to be relevant is Power's proposed amendments to claim 11, made in the course of an ongoing reexamination. "At the examiner's request, Power Integrations submitted proposed amendments to the PTO in the '851 [patent] and '876 [patent] reexamination matters that included language to make this Court's previous constructions more explicit in the claims (and in some cases re-wrote claims in independent form)." (D.I. 138 at 23)

9   In Power's view, the Court should find that Fairchild is "bound by the prior claim construction" due to collateral estoppel because (1) the same claim [*47] term is at issue here and in *Fairchild I,* (2) a *Markman* hearing was held in *Fairchild I,* (3) "the Court ruled on claim construction and the terms (on which the jury was instructed) framed the jury verdicts and post-trial rulings" in *Fairchild I,* and (4) Fairchild was represented by counsel at all times in *Fairchild I.* (D.I. 118 at 20-22) However, as explained below, there have been significant subsequent developments in the '851 patent's prosecution history. *See generally Hawksbill Sea Turtle v. FEMA, 126 F.3d 461, 477, 37 V.I. 526 (3d Cir. 1997)* ("When significant new facts arise out of a continuing course of conduct, the issues in a successive suit may fail to constitute the same 'issue' as to merit preclusive effect.").

Fairchild contends, by contrast, that the additional prosecution history created in the pending reexamination "must be considered," as it is "new intrinsic evidence - including tacit admissions by [Power] - [that] contradicts the earlier claim construction." (D.I. 122 at 27) Based on this new evidence, Fairchild proposes that "frequency variation signal" be construed as "a signal that causes the frequency of the oscillation signal to vary." (*Id.*)

Subsequent to Judge Farnan's claim [*48] construction in *Fairchild I,* the PTO began reexamination proceedings regarding the '851 and '876 patents. During reexamination, Power argued that the '851 patent's claimed "frequency variation signal" must be understood as an internal frequency variation signal. (*Id.*) The PTO rejected this argument, stating that the claims did not recite an internal frequency variation signal. (D.I. 122 Ex. X at 10) The PTO similarly rejected Power's assertion that the claimed "frequency variation signal" must vary the oscillation signal within a "predetermined frequency range rather than between two distinct frequencies." (D.I. 122 Ex. X at 13)

Thereafter, Power proposed to the PTO that claim 11 be amended to include the "additional limitations" from Judge Farnan's previous construction in *Fairchild I.* (D.I. 122 Ex. Y at Attachment) Power then amended claim 11 once more to add the limitation "wherein the frequency variation signal is an internally controlled signal within the regulation circuit." (D.I. 122 Ex. Z at 5) Before the

PTO could review this amendment, however, Power cancelled claim 11. (D.I. 122 Ex. T at 4) Fairchild argues that Power's initial narrowing and then broadening of claim 11 shows [*49] that one of ordinary skill in the art would conclude that the limitations in Power's various proposed amendments were not in the original claim.

Power admits that it cancelled claim 11 on reexamination, but argues that it re-wrote claim 11 as "new" claim 20, at the request of the PTO. (D.I. 120 Ex. 16 at 10 ("The patent owner respectfully submits that proposed new claims 19 and 20 only provide clarifying language that now make specific what was implicit or inherent in the scope of corresponding original claims 1 and 11, respectively, of the '851 patent as understood by the patent owner and construed by the District Court in concurrent litigation."))

I agree with Fairchild that the reexamination history needs to be considered in connection with construing the claims. I do not, however, agree with the conclusion Fairchild would have the Court draw from that history.

Statements by patentees and Examiners are part of a patent's prosecution history, which is intrinsic evidence a court should consider in construing patent claims. See SRAM Corp. v. AD-II Eng'g, Inc., 465 F.3d 1351, 1359 (Fed. Cir. 2006); Salazar v. Procter & Gamble Co., 414 F.3d 1342, 1345 (Fed. Cir. 2005). This is true of [*50] statements made during a reexamination as it is of statements made during the initial prosecution. See Laitram Corp. v. NEC Corp., 952 F.2d 1357, 1361 (Fed. Cir. 1999). This is one reason courts sometimes stay patent litigation pending the resolution of a simultaneous reexamination. See, e.g., Procter & Gamble Co. v. Kraft Foods Global, Inc., 549 F.3d 842, 848 (Fed. Cir. 2008). Also consistent with this conclusion is the Federal Circuit's guidance to district courts (at least in the context of preliminary injunction motions) to "monitor the proceedings before the PTO to ascertain whether its construction of any of the claims has been impacted by further action at the PTO or any subsequent proceedings." Kraft, 549 F.3d at 848.

There are important differences, however, between claim construction before the PTO and claim construction before an Article III Court. A PTO Examiner construing claims is required to do so applying the broadest reasonable construction consistent with the specification. See In re Morris, 127 F.3d 1048, 1054 (Fed. Cir. 1997); see also In re American Academy of Science Tech Center, 367 F.3d 1359, 1364 (Fed. Cir. 2004) ("The broadest reasonable construction rule applies [*51] to reexamination as well as initial examinations.") (internal quotation marks omitted). Courts do not apply this "broadest reasonable construction" rule. Also, before the PTO, any ambiguity or excessive breadth in a patent claim may be corrected by amending the claim. See Burlington Indus. Inc. v. Quigg, 822 F.2d 1581, 1583 (Fed. Cir. 1987). This is not a possible outcome of judicial claim construction.

Once claim construction is before a court, the court is obligated to construe claims de novo as a matter of law, without according any deference to the PTO's claim construction. See SRAM, 465 F.3d at 1359 (noting de novo standard of judicial review and rejecting construction endorsed by PTO Examiner after three reexaminations, a construction that had also been adopted by the district court); Salazar, 414 F.3d at 1343, 1347-48 ("[T]he Examiner's unilateral remarks did not alter the scope of the claim . . . . [An] Examiner's statements cannot amend a claim."); Inverness Medical Switzerland v. Princeton Biomeditech Corp., 309 F.3d 1365, 1372-73 (Fed. Cir. 2002) (rejecting contention that statement in examiner's Reasons for Allowance governed construction of disputed claim term). Of course, [*52] a district court can - and must - adopt the same construction as the PTO when the court concludes that the PTO's construction is correct. See, e.g., Biogen, 318 F.3d 1132, 1132 (Fed. Cir. 2003) (affirming district court's construction, which itself was itself consistent with PTO Examiner's view that scope of disputed term had been limited during prosecution, as advocated by alleged infringer).

Having considered the evidence before me, including the additional intrinsic evidence created during the reexamination, I reach the same conclusion as Judge Farnan as to the correct construction of "frequency variation signal," as that term is used in claim 11 of the '851 patent. The requirement that the variation be within a known and fixed frequency range is explained in several places in the specification. See, e.g., '851 patent, col. 6 lines 10-17; col. 6 lines 25-38; col. 7 lines 43-49; col. 11 lines 45-50; see also Fairchild I, D.I. 231 at 35-37. This requirement also accords with the purpose of the '851 patent, which was to avoid the disadvantages of prior art (that used externally controlled frequency variation methods to prevent EMI) by implementing a variation scheme that could be internally [*53] controlled. See '851 patent, col. 7 lines 43-49.

## E. '876 Patent

### 1. "Frequency jittering"

The parties' disagreements as to the meaning of the term "frequency jittering," as it appears in the preamble to claims 1 and 21 of the '876 patent, are: (1) whether the term can be interpreted as a limitation, and (2) whether the term should be construed anew. Power again asks the Court to preserve Judge Farnan's construction in *Fairchild I*, which construed "frequency jittering" to mean "varying the switching frequency of a switch mode power supply about a target frequency in order to reduce electromagnetic interference." (D.I. 118 at 20; *see also Fairchild I*, D.I. 232 at 2.) Fairchild, on the other hand, urges the Court not to construe this term because it is not a limitation, since it only appears in the '876 patent's preamble. (D.I. 122 at 20; D.I. 118 at 16) If the Court does construe the term, however, Fairchild proposes it be given the inventor's "express definition: varying the frequency of operation of the pulse width modulated switch by varying the oscillation frequency of the oscillator [which] is referred to as frequency jitter." (D.I. 140 at 16-17)

As occurred with the '851 patent, the [*54] PTO commenced reexamination proceedings regarding the '876 patent after the issuance of Judge Farnan's claim construction opinion in *Fairchild I*. The PTO rejected claim 1 of the '876 patent as anticipated by prior art. (D.I. 122 Ex. G at 3-6) Power responded by arguing that claim 1's preamble "was a limitation that required the reduction of electromagnetic interference or 'EMI.'" (D.I. 122 Ex. H at 18) The Examiner replied to Power as follows:

(1) The recitations "a power supply" in claim 1 and "a power conversion system" in claim 17 have not been given patentable weight because the recitations occur in the preamble. A preamble is generally not accorded any patentable weight where it merely recites the purpose of a process or the intended use of a structure, and where the body of the claim does not depend on the preamble for completeness but, instead, the process steps or structural limitations are able to stand alone.

(2) It is noted that the feature upon which the Patent Owner relies (i.e., EMI in a power supply) is not recited in the

rejected claim(s). Although the claims are interpreted in light of the specification, limitations from the specification are not read into the claims.

(D.I. [*55] 122 Ex. I at 7 (internal citations omitted)) Fairchild contends that because Power "did not dispute the Examiner's determination that the preamble was not a limitation," and instead amended the claims to incorporate the preamble into the body of the claims, Power "admitted that this amendment was necessary because the claims would not otherwise include elements that only appeared in the preamble." (D.I. 122 at 20; *see also* D.I. 122 Ex. K at 11 ("This clarifying amendment is proposed so that proper antecedent basis is provided for the switching frequency of the power supply.").)

Fairchild further contends that the '876 patent's claimed invention "does not require EMI reduction." (D.I. 122 at 20) During reexamination, the PTO stated that prior art Habetler, which "does not deal with EMI in a power supply," is "reasonably pertinent to the particular problem with which the ['876] Patentee was concerned, *i.e.*, varying the switching frequency in PWM regulator." (D.I. 122 Ex. I at 7) To Fairchild, the PTO's view aligns with "the other claims of the '876 patent, which require varying the switching frequency but make no mention of EMI reduction." (D.I. 122 at 20)

Moreover, Fairchild asserts that [*56] Power acted as its own lexicographer by defining "frequency jitter" in the '851 patent, which was incorporated by reference into the '876 patent. '876 patent, col. 6 lines 6-12. "When a document is 'incorporated by reference' into a host document, such as a patent, the referenced document becomes effectively part of the host document as if it were explicitly contained therein." *Telemac Cellular v. Topp Telecom, 247 F.3d 1316, 1329 (Fed. Cir. 2001)*. When a patent's specification demonstrates that the patentee gave a "special definition [] to a claim term . . . that differs from the meaning it would otherwise possess . . . the inventor's lexicography governs." *Phillips, 415 F.3d at 1316*. Thus, to Fairchild, what Fairchild identifies as the '851 patent's definition of "frequency jitter" as "varying the frequency of operation of the pulse width modulated switch by varying the oscillation frequency of the oscillator," should control the term's construction in the '876 patent. '851 patent, col. 3 lines 28-30.

Power responds with most of the same points it made

in relation to the construction of the term "frequency variation signal" in the '851 patent. Power argues that Fairchild is bound [*57] by collateral estoppel to the claim construction in *Fairchild I* (D.I. 118 at 21-22), and that the Court should not consider the reexamination because it is ongoing (D.I. 138 at 17-20). Even if the Court does consider the reexamination proceedings, Power maintains that the reexamination evidence does not undermine its proposed construction of "frequency jitter." Power points out that the Examiner was not referring directly to the "frequency jitter" portion of the preamble to claim 1 when he wrote that "a power supply" was not given patentable weight because it appeared in the preamble. (D.I. 138 at 21; *see also* D.I. 122 Ex. I at 7.) The PTO Examiner did not make a general statement that no preamble could be a limitation, just that two particular phrases in the preambles to claims 1 and 17 were not limitations.

Furthermore, Power points out that the amendments submitted to the PTO are not addressed to "frequency jitter," and were submitted in an effort to clarify features inherent in the claims' scope. (D.I. 122 Ex. K at 2, 11) Indeed, the passages of the reexamination history cited by Fairchild do not apply to "frequency jitter" - as the term appears only in the preamble to claim 21, [*58] and claim 21 is not in reexamination. (D.I. 138 at 22) Finally, Power insists that even if the PTO Examiner did reach a conclusion that contradicted Judge Farnan's prior construction, "the law neither requires nor suggests that [the district court and the PTO] be in lockstep." (D.I. 138 at 22)

Again, I agree with Fairchild that the ongoing reexamination proceedings are intrinsic evidence and must be considered in construing the disputed claim terms. However, after reviewing the '876 patent's claims, specification, and prosecution history, including the reexamination proceedings, I recommend that the Court adopt Power's proposed construction of "frequency jitter."

As Fairchild concedes, "the earlier '851 patent broadly claims a 'frequency variation circuit' while the later '876 patent more narrowly concerns a digital implementation." (D.I. 122 at 18-19) For this reason, the '851 patent's broader definition of "frequency jitter" appears to be a more general description of "frequency jitter," and not a definition of the "frequency jittering" disclosed in the '876 patent. *See* D.I. 118 at 23; *see also*

*Fairchild I*, D.I. 231 at 19; '851 patent, col. 3 lines 28-30. Many places in the '876 patent's [*59] specification refer to varying the switching frequency about a narrow, known, or fixed range of frequencies in order to reduce EMI. *See, e.g.,* '876 patent, col. 5 line 66 to col. 6 line 1; col. 6 lines 20-23, 29-30, 61-64. Thus, I am persuaded that Power's claim construction proposal is still correct.

## 2. "Digital to analog converter [DAC]"

The parties next dispute the proper construction of the term "digital to analog converter," or DAC, as used in claim 1 of the '876 patent. Power urges the Court not to construe this term because it is "a conventional structure, well-known to anyone of skill in the art of circuit design as a device that converts digital inputs into analog outputs." (D.I. 118 at 24) However, if the Court does construe DAC, Power argues it should be understood to mean "a device that converts a digital input into an analog output." (*Id.* at 24) In something of a reversal of roles, Fairchild asks the Court to retain what it characterizes as Power's proposed construction of the term from *Fairchild I:* "a digital to analog converter is a device that converts a digital input signal to a . . . proportional analog signal." [10] (D.I. 122 at 21)

10    Fairchild had earlier proposed "essentially [*60] proportional" (D.I. 122 at 22), but at the *Markman* hearing proposed dropping the word "essentially" (Tr. at 141-42).

Fairchild argues that its proposed construction was essentially agreed upon by the parties in *Fairchild I*, and there is no reason to allow Power to deviate from its earlier construction. (*Id.* at 21-22; D.I. 140 at 17; Tr. at 137-38) Fairchild also relies on the '876 patent's specification, which states that:

When [DAC] 150 is viewed as a plurality of current sources . . . [t]he current sources . . . are binary-weighted, that is, the current source 164 provides twice the current provided by the current source 160, the current source 160 provides twice the current supplied by the current source 156 and the current source 156 provides twice the current provided by the current source 152.

'876 patent, col. 5 lines 5-21. Finally, Fairchild points to several contemporary dictionary definitions supporting its

assertion that the digital inputs and analog outputs be "proportional." (D.I. 122 at 22)

Power denies that in *Fairchild I* it agreed that "digital to analog converter" needed construction. (D.I. 122 Ex. M at 2-3) It is true that in a communication between the parties Power [*61] at one point proposed the construction of "digital to analog converter" Fairchild now proposes here. However, this proposal was never submitted to the Court, nor did the parties ask Judge Farnan to construe this term. Power contends it cannot be bound by its statements to Fairchild on issues that were not litigated nor addressed by the Court in *Fairchild I.* (D.I. 138 at 24-25)

Power also notes that the specification does not support Fairchild's proposal to add a "proportional" limitation to the DAC. The specification recites that the current sources attached to the DAC may be arranged such that "the primary current source generates a current I and each of said one or more current sources generates a current lower than I." '876 patent, col. 2 lines 35-40. Additionally, claim 9 of the '876 patent, which depends from claim 1, explicitly teaches that "the secondary current sources [of the DAC] generate binary weighted currents." '876 patent, col. 9 lines 6-8. Therefore, Power submits that the doctrine of claim differentiation also precludes Fairchild's proposed construction because it would read the limitation from dependent claim 9 onto independent claim 1. (D.I. 118 at 24)

After considering [*62] the claim language, specification, and prosecution and litigation history of claim 1 of the '876 patent, I am persuaded that the term "digital to analog converter" does not need construction. 11 Power is not estopped from changing its view of the term's meaning by a position it temporarily advocated in correspondence with Fairchild on an issue that was not litigated nor addressed by the Court. The '876 patent's specification also demonstrates that the DAC's current sources may be configured in ways not necessarily proportional, and also that the DAC need not even be implemented through current sources. '876 patent, col. 2 lines 35-40; col. 4 lines 63-66 ("The remaining outputs . . . are connected to a digital-to-analog converter (D-to-A) 150, which *may be implemented as a series of frequency jittering voltage sources or current sources.*") (emphasis added). I also agree with Power that claim differentiation weighs against importing the proportionality limitation from dependent claim 9 onto independent claim 1.

11   Nothing in the extrinsic evidence submitted by the parties - which consists largely of dictionary definitions of DAC - alters the conclusion compelled by the intrinsic evidence.

### 3. [*63] "Means . . . for varying the switching frequency"

The last terms in dispute are found in claim 21. Power and Fairchild agree that claim 21 is written in means-plus function format, pursuant to 35 U.S.C. § 112(6). A means-plus-function claim limitation "recites a function to be performed rather than definite structure or materials for performing that function." *Lockheed Martin Corp. v. Space Sys./Loral, Inc., 324 F.3d 1308, 1318 (Fed. Cir. 2003).* When construing a means-plus-function claim, a court must first determine the function that is being performed, "staying true to the claim language and the limitations expressly recited by the claims." *Omega Eng'g v. Raytek Corp., 334 F.3d 1314, 1322 (Fed. Cir. 2003).* Next, the "court must . . . look to the specification and identify the corresponding structure for that function." *Biomedino, LLC v. Waters Techs. Corp., 490 F.3d 946, 950 (Fed. Cir. 2007).*

A claim limitation using a means-plus-function format covers "only the corresponding step or structure disclosed in the written description, as well as that step or structure's equivalents." *CCS Fitness, Inc. v. Brunswick Corp., 288 F.3d 1359, 1369 (Fed. Cir. 2000).* "A structure disclosed in [*64] the specification qualifies as 'corresponding' only if the specification or prosecution history clearly links or associates that structure to the function recited in the claim." *Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc., 424 F.3d 1293, 1308-09 (Fed. Cir. 2005).* The claim limitation thus covers only the structure, material, or acts that a person ordinarily skilled in the art would find are necessary to perform the function. *See Omega Eng'g, 334 F.3d at 1322.* Accordingly, the scope of a claim in means-plus-function format is generally more narrow than for claims that are not in this format. *See Micro Chem., Inc. v. Great Plains Chem. Co., 194 F.3d 1250, 1260 (Fed. Cir. 1999).*

In this case, Fairchild and Power concur that the function element of claim 21 is "varying the switching frequency of the oscillator," but they disagree as to what corresponding structures perform that function. (D.I. 118 at 25; D.I. 122 at 23) I agree with the parties that the claimed function is "varying the switching frequency of the oscillator." Additionally, at the *Markman* hearing,

Power conceded that the claimed counter was part of the corresponding structure. (Tr. at 113) The parties' remaining [*65] disagreements involve identifying the correct structure(s) that correspond to "one or more current sources" and "a counter."

**a. "One or more current sources"**

Fairchild and Power agree that the structure corresponding to "one or more current sources" is the digital to analog converter (DAC) 150. (D.I. 118 at 25-26; D.I. 122 at 25; D.I. 138 at 27) They disagree, however, as to whether the DAC must have exactly four binary-weighted current sources.

Power recognizes that the DAC drawn in Figure 1 of the '876 patent has exactly four binary-weighted current sources and four transistors. Power argues that Figure 1 is the invention's preferred embodiment, so the corresponding structure should not be limited to this one embodiment of a DAC. (D.I. 118 at 26-28) Power asserts: "The specification is clear that the DAC 'may include one or more current sources,' not that it necessarily has four current sources and four transistors." (D.I. 118 at 28 (quoting '876 patent, col. 2 lines 63-66)) Power also maintains that the current sources described in the specification are not necessarily binary-weighted, but that they "may" generate currents at various differing levels or "may" generate binary-weighted [*66] currents. (D.I. 118 at 28 (quoting '876 patent, col. 2 lines 20-23)) Further, the '876 patent specifies that the DAC 150 "may be implemented as a series of frequency jittering voltage sources or current sources." (D.I. 138 at 27 (quoting '876 patent, col. 4 lines 64-66)) Lastly, Power suggests that Figures 3 and 4 of the '876 patent disclose an alternative structure for varying the switching frequency of an oscillator, demonstrating again that the claim is not limited to the structure illustrated by Figure 1. (D.I. 118 at 27 (citing '876 patent, col. 6 lines 20-26))

Fairchild responds that the only disclosed structure in the '876 patent that can perform the function of "varying the switching frequency of the oscillator" using the means generally described in claim 21 (*i.e.*, with one or more current sources and a counter) is the DAC 150, "which includes four binary weighted current sources controlled by four transistors." (D.I. 122 at 26 (citing '876 patent, col. 5 lines 5-21)) Fairchild argues that no other structure disclosed in the '876 patent "would meet [claim 21's] limitation other than the DAC with binary weighted current sources." (D.I. 122 at 26) Fairchild also points out

that [*67] the structures disclosed in Figures 3 and 4 do not include the counter required by claim 21. (D.I. 140 at 20 n.6)

On this dispute, I am persuaded that Power is correct. The specification describes DACs that do not have four binary-weighted current sources, but do perform the disclosed function. *See* '876 patent, col. 2 lines 20-23, 63-66; *see also Budde v. Harley-Davidson, Inc.,* 250 F.3d 1369, 1370 (Fed. Cir. 2000) (approving use of all alternative structures described in patent's specification, not just preferred embodiment, in identifying corresponding structure in mean-plus-function claim). "When multiple embodiments in the specification correspond to the claimed function, proper application of [§ 112(6)] generally reads the claim element to embrace each of those embodiments." *Micro Chem., Inc.,* 194 F.3d at 1258. [12]

> [12] However, I agree with Fairchild that the DAC cannot be implemented through means lacking *current sources* (such as embodiments using only voltage sources or capacitors), because the claim expressly limits itself to means having one or more current sources.

**b. "A counter"**

The conflict over what structures correspond to "a counter" in claim 21 is whether, as Fairchild posits, [*68] the counter must be a 7-bit counter like the one illustrated by Figure 1 of the '876 patent. (D.I. 122 at 27) In support of its position, Fairchild notes that the only counter disclosed by the '876 patent is counter 140, which the patent describes as having exactly 7 bits. (D.I. 122 at 27 (citing '876 patent, col. 4 lines 62-66))

Power points to one sentence in the patent's specification to show that the counter that is part of the means element of claim 21 could contain something other than 7 bits: "The counter 140 *can* be a seven bit counter." '876 patent, col. 4 lines 32-34 (emphasis added). Thus, Power argues that "nothing in the claim language requires a '7-bit counter,' as opposed to a counter with any number of bits." (D.I. 138 at 29)

I have concluded that the structure corresponding to "a counter" in the means element of claim 21 is somewhere in between Power's and Fairchild's proposals. Power's contention that the counter could have any number of bits is belied by the numerous places in the

specification showing that at least 4 bits are necessary to permit the oscillator 110 to function. *See* '876 patent, col. 4 lines 33-34 ("Each output of counter 140, when clocked by primary [*69] oscillator 110, represents a particular time interval."); col. 4 lines 62-64 ("Counter 140 has a plurality of outputs Q1-Q3 [] which are not used. The remaining outputs Q4-Q7 are connected to [DAC] 150 . . . ."); col. 5 lines 29-35 (describing how Q4-Q7 change states at predetermined times during the clock cycle, after which "[t]he entire counting cycle . . . repeats itself"); col. 5 lines 49-52 ("[W]hen combinations of outputs Q4-Q7 are turned on, the outputs of the respective current sources 152, 156, 160, and 164 are added to the output of current source 122 to vary the frequency of the primary oscillator 110."). Similarly, the specification shows that only four of the counter's bits are used in the counter's operation, undermining Fairchild's proposal that it must have seven bits. *See* '876 patent col. 4 lines 62-66; col. 5 lines 29-35, 49-56. Therefore, I conclude that the structure corresponding to the counter means of claim 21 must contain at least four bits, but need not contain exactly seven.

## RECOMMENDED CONSTRUCTIONS

For the reasons set forth above, I recommend that the Court construe the disputed claim terms as follows:

1. The term "multi-sampling . . . during an off-time of [*70] the said switching signal" as used in claims 1 and 13 of the '780 patent be construed as "sampling two or more times during one off-time of the switching signal."

2. a. The term "a controller to generate the switching signal and to control the switching signal in response to a first feedback signal associated with a voltage control loop and a second feedback signal associated with a current control loop" as used in claim 1 of the '972 patent be construed as "a controller to generate the switching signal and to control the switching signal in response to a first feedback signal associated with a voltage control loop and a second feedback signal, distinct from the first feedback signal, associated with a current control loop."

2. b. The term "controlling a switching signal to regulate the connection of the electrical power to output terminals in response to a first feedback signal associated with a voltage control loop and a second feedback signal associated with a current control loop" as used in claim 15 of the '972 patent be construed as "controlling a

switching signal to regulate the connection of the electrical power to output terminals in response to a first feedback signal associated [*71] with a voltage control loop and a second feedback signal, distinct from the first feedback signal, associated with a current control loop."

3. The term "sampling a voltage . . . and a discharge time" as used in claim 6 of the '972 patent be construed as "sampling a voltage from the auxiliary winding of the transformer when the transformer is discharging."

4. The term "a second circuit, producing a second signal" as used in claim 16 of the '595 patent does not require construction.

5. The term "first reference signal is varied in response to the change of the second signal" as used in claim 17 of the '595 patent does not require construction.

6. The term "frequency variation signal" as used in claim 11 of the '851 patent be construed as "an internal signal that cyclically varies in magnitude during a fixed period of time and is used to modulate the frequency of the oscillation signal within a predetermined frequency range."

7. The term "frequency jittering" term as used in claims 1 and 21 of the '876 patent be construed as "varying the switching frequency of a switch mode power supply about a target frequency in order to reduce electromagnetic interference."

8. The term "digital [*72] to analog converter" term as used in claim 1 of the '876 patent does not require construction.

9. The term "means coupled to the control input for varying the switching frequency, including: one or more current sources . . . and a counter" as used in claim 21 of the '876 patent be construed as a means-plus function term, with a function of "varying the switching frequency of the oscillator," and a structure of a digital-to-analog converter and a counter having at least four bits.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1. The parties may serve and file specific written objections **of no longer than ten (10) pages within fourteen (14) days after being served with a copy of this Report and Recommendation.** Fed. R. Civ. P. 72(b). The failure of a party to object to legal

conclusions may result in the loss of the right to de novo review in the district court. *See Henderson v. Carlson, 812 F.2d 874, 878-79 (3d Cir. 1987); Sincavage v. Barnhart, 171 Fed. Appx. 924, 925 n.1 (3d Cir. 2006).* **A party responding to objections may do so within fourteen (14) days after being served with a copy of objections; such response** [*73] **shall not exceed ten (10) pages. No further briefing shall be permitted with respect to objections without leave of the Court.**

The parties are directed to the Court's Standing Order In *Non-Pro Se* Matters For Objections Filed Under Fed.

R. Civ. P. 72, dated November 16, 2009, a copy of which is available on the Court's website, www.ded.uscourts.gov/StandingOrdersMain. htm.

Dated: December 18, 2009

/s/ Leonard P. Stark

Leonard P. Stark

UNITED STATES MAGISTRATE JUDGE

**<u>Citation #14</u>**
**2009 us dist lexis 98278**

LEXSEE

**KONAMI DIGITAL ENTERTAINMENT CO., LTD., et al., Plaintiffs, v.
HARMONIX MUSIC SYSTEMS, INC., et al., Defendants.**

**CIVIL ACTION No. 6:08cv286**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF
TEXAS, TYLER DIVISION**

**2009 U.S. Dist. LEXIS 98278**

**October 22, 2009, Decided
October 22, 2009, Filed**

**PRIOR HISTORY:** Konami Digital Entm't Co. v. Harmonix Music Sys., 2009 U.S. Dist. LEXIS 24748 (E.D. Tex., Mar. 23, 2009)

**CORE TERMS:** lead counsel, patent, confer, discovery, Local Rules, patents-in-suit, intend, collectively, procedural requirements, confer requirement, discrepancy, designated, non-parties, briefing, serving, sheet, prior art

**COUNSEL:** [*1] For Richard Egan, Technical Advisor: Richard D Egan, O'Keefe, Egan & Peterman LLP, Austin, TX.

For Konami Digital Entertainment Co, Ltd., Plaintiff: Otis W Carroll, Jr, LEAD ATTORNEY, Deborah J Race, Ireland Carroll & Kelley, Tyler, TX; Ronald Scott Lemieux, LEAD ATTORNEY, Vid R Bhakar, Paul Hastings Janofsky & Walker LLP (Palo Alto, CA), Palo Alto, CA; Ericka Jacobs Schulz, S Christian Platt, PRO HAC VICE, Paul Hastings Janofsky & Walker - San Diego, San Diego, CA; Keren Hu, PRO HAC VICE, Paul, Hastings, Janofsky & Walker, LLP, Palo Alto, CA; Maxwell A Fox, PRO HAC VICE, Paul Hastings Janofsky & Walker - Japan, Minato-Ku Tokyo Japan; Michael N Edelman, Qin Shi, Shanee Y W Nelson, PRO HAC VICE, Paul Hastings Janofsky & Walker LLP (Palo Alto, CA), Palo Alto, CA; Robert M Masters, PRO HAC VICE, Paul Hastings Janofsky & Walker - Washington, Washington, DC.

For Konami Digital Entertainment, Inc., Plaintiff, Counter Defendant: Otis W Carroll, Jr, LEAD ATTORNEY, Deborah J Race, Ireland Carroll & Kelley, Tyler, TX; Ronald Scott Lemieux, LEAD ATTORNEY, Vid R Bhakar, Paul Hastings Janofsky & Walker LLP (Palo Alto, CA), Palo Alto, CA; Keren Hu, PRO HAC VICE, Paul, Hastings, Janofsky & Walker, [*2] LLP, Palo Alto, CA; Maxwell A Fox, PRO HAC VICE, Paul Hastings Janofsky & Walker - Japan, Minato-Ku Tokyo Japan; Michael N Edelman, Qin Shi, Shanee Y W Nelson, PRO HAC VICE, Paul Hastings Janofsky & Walker LLP (Palo Alto, CA), Palo Alto, CA; Robert M Masters, PRO HAC VICE, Paul Hastings Janofsky & Walker - Washington, Washington, DC; S Christian Platt, Paul Hastings Janofsky & Walker - San Diego, San Diego, CA.

For Harmonix Music Systems, Inc., MTV Networks, Co., Viacom, Inc., Viacom International Inc., Defendants: Mark Nolan Reiter, LEAD ATTORNEY, Gibson Dunn & Crutcher, Dallas, TX; Jason C Lo, Jennifer J Rho, Gibson Dunn Crutcher LLP-Los Angeles, Los Angeles, CA; Josh A Krevitt, Richard M Koehl, Gibson Dunn & Crutcher - NYC, New York, NY; Michael E Jones, Patrick Colbert Clutter, IV, Potter Minton PC, Tyler, TX; Robert Anthony Vincent, Gibson Dunn & Crutcher - Dallas, Dallas, TX; Susan Ashlie Beringer, Gibson Dunn & Crutcher LLP - Palo Alto, Palo Alto, CA.

For Harmonix Music Systems, Inc., MTV Networks, Co., Viacom, Inc., Viacom International Inc., Counter Claimants: Mark Nolan Reiter, LEAD ATTORNEY, Gibson Dunn & Crutcher, Dallas, TX; Jason C Lo, Jennifer J Rho, Gibson Dunn Crutcher [*3] LLP-Los Angeles, Los Angeles, CA; Josh A Krevitt, Richard M Koehl, Gibson Dunn & Crutcher - NYC, New York, NY; Michael E Jones, Potter Minton PC, Tyler, TX; Susan

Page 1

Ashlie Beringer, Gibson Dunn & Crutcher LLP - Palo Alto, Palo Alto, CA.

For Konami Digital Entertainment Co, Ltd., Counter Defendant: Otis W Carroll, Jr, LEAD ATTORNEY, Deborah J Race, Ireland Carroll & Kelley, Tyler, TX; Ronald Scott Lemieux, LEAD ATTORNEY, Vid R Bhakar, Paul Hastings Janofsky & Walker LLP (Palo Alto, CA), Palo Alto, CA; Keren Hu, PRO HAC VICE, Paul, Hastings, Janofsky & Walker, LLP, Palo Alto, CA; Maxwell A Fox, PRO HAC VICE, Paul Hastings Janofsky & Walker - Japan, Minato-Ku Tokyo Japan; Michael N Edelman, Qin Shi, Shanee Y W Nelson, PRO HAC VICE, Paul Hastings Janofsky & Walker LLP (Palo Alto, CA), Palo Alto, CA; Robert M Masters, PRO HAC VICE, Paul Hastings Janofsky & Walker - Washington, Washington, DC; S Christian Platt, Paul Hastings Janofsky & Walker - San Diego, San Diego, CA.

**JUDGES:** JOHN D. LOVE, UNITED STATES MAGISTRATE JUDGE.

**OPINION BY:** JOHN D. LOVE

**OPINION**

**MEMORANDUM OPINION AND ORDER**

Before the Court is Defendants Harmonix Music Systems, Inc., MTV Networks, Viacom International Inc., and Viacom Inc.'s (collectively, "Defendants" [*4] or "Viacom") Motion to Compel Production of Patent Prosecution Files Relating to Beat Rhythm Games (Doc. No. 113) ("Motion"). The third parties Jordan & Hamburg LLP, Frank Jordan, Herbert Ruschman (collectively, "J&H"), and Plaintiffs Konami Digital Entertainment Co., Ltd., and Konami Digital Entertainment, Inc. (collectively, "Konami") oppose the Motion to Compel with a Response (Doc. No. 134) ("Response") and a Surreply (Doc. No. 157) ("Surreply"). Defendants filed a Reply (Doc. No. 147) ("Reply") to J&H and Konami's Opposition. Having fully considered the parties' arguments and for the reasons set forth herein, Defendant's Motion to Compel is **DENIED** without prejudice due to failure to comply with the Local Rules.

**PARTIES' CONTENTIONS**

Viacom has moved to compel discovery of patent prosecution materials from Konami's patent prosecution

counsel, Jordan and Hamburg LLP ("J&H"). MOTION at 1. Specifically, they seek files relating to over two dozen Konami patents prosecuted concurrently with the three patents-in-suit. *Id.* Defendants' primary argument for compelling these files is that the files for the requested patents disclose "highly similar prior art games that Konami developed and [*5] sold before the patents-in-suit were filed." *Id.* Defendants apparently intend to use this discovery in support of inequitable conduct and invalidity defenses by attempting to demonstrate that in prosecuting these related patents, Konami and its counsel had knowledge of material prior art and intended to withhold these materials during prosecution of the three patents-in-suit. MOTION at 6.

J&H offers a substantive response that the files at issue do not relate to the patents-in-suit and goes on to detail the burden that J&H will suffer as a result of this request. RESPONSE at 2-3. In lieu of creating a detailed privilege log containing "nearly 1,000 entries," J&H offered to search for and produce any relevant documents that were (a) not privileged, and (b) were not duplicative of information that Defendants could find on the PTO website. *Id.* at 4, 9. The Defendants did not accept this compromise.

In addition to making substantive arguments, J&H also advances two procedural reasons as to why this Motion should fail. First, they argue that Defendants' filing of this Motion did not comply with the meet and confer requirement of Local Rule CV-7(h). RESPONSE at 5-6; SURREPLY at 1-2. Secondarily, [*6] since the subpoenas for the patent prosecution materials were issued by the Southern District of New York to non-parties in the litigation, J&H maintains that the serving party must move the issuing court for an order compelling production or inspection of the desired discovery. RESPONSE at 7 (relying on FED. R. CIV. P. 45(c)(2)(B)(I)). Effectively, J&H asserts that Viacom's failure to meet with either or both procedural requirements qualifies as sufficient grounds to deny this Motion.

**DISCUSSION**

At this time, the Court will not address the substantive merits of the Motion because the moving party has failed to satisfy the requirements of the Local Rules. Pursuant to Local Rule CV-7(h), prior to seeking court intervention, *lead* counsel for the movant must have a personal conference with the *lead* counsel for the

non-movant. Local Rule CV-7(h). The "meet and confer" rule further explains:

> In the personal conference, the participants must give each other the opportunity to express his or her views concerning the disputes. The participants must also compare views and have a discussion in an attempt to resolve their differing views before coming to court. Such discussion requires a sincere [*7] effort in which the participants present the merits of their respective positions and meaningfully assess the relatively strengths of each position.

Local Rule CV-7(h).

The parties apparently agree that a telephone conference occurred prior to the filing of this Motion but disagree as to whether the requirements of Local Rule CV-7(h) and (i) were met, and if not, who was responsible. Specifically, in the Certificate of Conference, Viacom claims that they conferred with Michael Edelman, Shanee Nelson, and Deborah Race, counsel and local counsel for Konami and J&H, but J&H points out that they failed to confer with either Ronald Lemieux or Otis Carroll, the designated co-lead counsel representing the non-parties. MOTION at 17. Furthermore, in the Certificate of Conference, Defendants identified S. Ashlie Beringer as "lead counsel for the Defendants," when Mark Reiter is listed on the Court's docket as Defendants' lead attorney. RESPONSE at 6 (quoting MOTION at 17). J&H accurately points out that this is in violation of the certification components set forth in Rule CV-7(i) that requires all elements of Rule 7(h) to be met, as well as the stipulation that in discovery-related motions, the Certificate [*8] of Conference must be signed by *lead counsel*. L.R. CV-7(i). The Court sees no reason that the "lead counsel" signing a Certificate of Conference should not be the same attorney that is designated as lead counsel on the Court's docket sheet. In this case, Mark Reiter is identified as lead counsel on the docket sheet.

In response to J&H's charges that Viacom did not comply with the Local Rules, Defendants offer in their Reply that the argument is "frivolous" and that the absence of Konami's lead attorney, Mr. Lemieux, violates the good faith element of the meet and confer

requirements. REPLY at 5. Viacom fails to address, however, whether Mr. Reiter had been present on the call or whether Defendants violated Local Rule CV-7(i) by listing Ms. Beringer as "lead counsel" in the Certificate of Conference. In the subsequent Surreply, J&H concedes that Mr. Lemieux did not participate in the meet and confer, but again points out the Defendants' misrepresentation in asserting that they "fulfilled [their] meet and confer obligations." SURREPLY at 1-2 (quoting REPLY at 5). Currently, the discrepancy as to Mr. Reiter's participation remains unresolved, but the Certificate of Conference and the corresponding [*9] briefing of both parties strongly suggests that Viacom did not involve their lead counsel in the meet and confer process before the filing of this discovery Motion.

As such, this Court will not allow parties to ignore its Local Rules without explanation. A Certificate of Conference indicates to the Court that the parties have complied with their meet-and-confer obligations, and in this case, Viacom has failed to address the discrepancy between the lead counsel identified on Certificate of Conference and the lead counsel identified on the Court's docket. Furthermore, both parties are reminded that "unavailability" is no excuse for lead and local counsel's failure to participate in discovery. Accordingly, the Court expects the parties to meet and confer in a timely and effective manner that minimizes inconvenience and expense.

**CONCLUSION**

In light of Viacom's noncompliance with Local Rule CV-7(h) and (i), the Court **DENIES** the Motion to Compel without reaching the merits of the request. If Defendants continue to persist in seeking the Court's assistance in producing the patent prosecution materials from J&H and Konami, the parties are **ORDERED** to meet and confer pursuant to the requirements [*10] set forth in Rule 7(h) by **November 2, 2009.** Following this meet and confer, Viacom is to notify the Court by **November 4, 2009** who is serving as lead counsel for Defendants and whether they intend to re-file this Motion in the Eastern District of Texas. [1] If Defendants intend for the Court to resolve this Motion on the merits, supplemental briefing from both sides should be filed by **November 9, 2009.**

> 1 Alternatively, as previously suggested, Viacom might re-evaluate whether the procedural requirements of Rule 45 of the Federal Rules of

Civil Procedure necessitates filing this Motion in the Southern District of New York. *See* RESPONSE at 7; SURREPLY at 4.

**So ORDERED and SIGNED this 22nd day of October, 2009.**

/s/ John D. Love

JOHN D. LOVE

UNITED STATES MAGISTRATE JUDGE

**<u>Citation #15</u>**
**2012 us dist lexis 26912**

LEXSEE

**WYETH HOLDINGS CORPORATION, WYETH-AYERST LEDERLE LLC, and
WYETH LLC, Plaintiffs and Counterclaim-Defendants, v. SANDOZ, INC.,
Defendant and Counterclaim-Plaintiff.**

**Civ. Action No. 09-955-LPS-CJB**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

**2012 U.S. Dist. LEXIS 26912**

**February 3, 2012, Decided**

**SUBSEQUENT HISTORY:** Adopted by, Motion
denied by Wyeth Holdings Corp. v. Sandoz, Inc., 2012
U.S. Dist. LEXIS 27332 (D. Del., Mar. 1, 2012)

**CASE SUMMARY:**

**OVERVIEW:** In a patent infringement suit regarding the
filing of an abbreviated new drug application, a
magistrate issued a report recommending denial of
plaintiff patent holder's motion to dismiss a counterclaim
alleging inequitable conduct because the defendant
pleaded sufficient facts, with sufficient particularity, to
give rise to a reasonable inference that the holder's
representatives deliberately acted to deceive the PTO
during the prosecution of the patent-in-suit.

**OUTCOME:** Recommended denying motion.

**CORE TERMS:** inequitable conduct, examiner,
misrepresentation, reasonable inference, tigecycline,
patent, prior art, materiality, intent to deceive, deceptive,
prong, affirmative defense, counterclaim, lactose, pled,
pleading stage, material information, declaration,
convincing, deceive, but-for, unexpected, disclose,
withheld, infer, stabilization, misrepresented,
presentation, experimental, obviousness

**LexisNexis(R) Headnotes**

*Civil Procedure > Judicial Officers > Magistrates >
Duties & Powers*

[HN1]Absent unanimous consent of the parties to the
jurisdiction of a United States Magistrate Judge, a
Magistrate Judge's authority as to the resolution of a
motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) is
limited to making a report and recommendation to the
district court. 28 U.S.C.S. § 636(b)(1)(B); D. Del. R.
72.1(a)(3).

*Civil Procedure > Pleading & Practice > Defenses,
Demurrers & Objections > Failures to State Claims*

[HN2]Where a court is resolving a motion to dismiss, not
a summary judgment motion, the court may consider not
only the allegations in the amended answer, but also any
exhibits attached to the pleading and matters of public
record.

*Patent Law > Nonobviousness > Elements & Tests >
Ordinary Skill Standard*
*Patent Law > Nonobviousness > Elements & Tests >
Prior Art*
*Patent Law > Nonobviousness > Elements & Tests >
Secondary Considerations*

[HN3]Unexpected results are a secondary consideration
of non-obviousness that can be used to overcome a
rejection by the Patent and Trademark Office. Four
factors may be used in assessing obviousness: (1) the
scope and content of the prior art, (2) the differences
between the prior art and the claims, (3) the level of
ordinary skill in the art, and (4) secondary considerations
such as commercial success, unexpected results, and
long-felt need. Secondary considerations, when present,
must be considered in determining obviousness.

***Civil Procedure > Pleading & Practice > Pleadings > Complaints > Requirements***

[HN4]A plaintiff is required to plead sufficient factual matter, taken as true, to suggest liability for the alleged misconduct. Such a complaint must include more than labels and conclusions or the formulaic recitation of the elements of a cause of action, but need only provide enough facts to state a claim to relief that is plausible on its face.

***Civil Procedure > Pleading & Practice > Pleadings > Complaints > Requirements***

[HN5]A claim is facially plausible when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant acted unlawfully.

***Civil Procedure > Pleading & Practice > Defenses, Demurrers & Objections > Failures to State Claims***
***Civil Procedure > Pleading & Practice > Pleadings > Complaints > Requirements***

[HN6]After Twombly and Iqbal, district courts faced with a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) should perform a two-part analysis. First, the district court should separate the factual and legal elements of a claim, accepting any well-pleaded facts as true, but disregarding any legal conclusions. Second, the district court must determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a plausible claim for relief. Determining whether a claim is plausible is a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.

***Civil Procedure > Pleading & Practice > Defenses, Demurrers & Objections > Failures to State Claims***
***Civil Procedure > Pleading & Practice > Pleadings > Complaints > Requirements***

[HN7]A court must construe a complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief. When ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint. As such, a well-pleaded complaint may not be dismissed simply because it strikes a savvy judge that actual proof of the

alleged facts is improbable, and that a recovery is very remote and unlikely.

***Civil Procedure > Pleading & Practice > Defenses, Demurrers & Objections > Failures to State Claims***
***Civil Procedure > Pleading & Practice > Defenses, Demurrers & Objections > Motions to Strike > General Overview***

[HN8]Fed. R. Civ. P. 12(b)(6) does not offer a mechanism for dismissing an affirmative defense, and instead refers only to claims. Fed. R. Civ. P. 12(b)(6). However, pursuant to Fed. R. Civ. P. 12(f), a court may strike from a pleading any insufficient defense. Fed. R. Civ. P. 12(f). This rule has been used in this jurisdiction to strike affirmative defenses where a party has failed to state a corresponding claim upon which relief can be granted.

***Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements > Fraud Claims***
***Patent Law > Inequitable Conduct > General Overview***

[HN9]An individual associated with the filing and prosecution of a patent application commits inequitable conduct when he or she (1) makes an affirmative misrepresentation of a material fact, fails to disclose material information, or submits false material information to the U.S. Patent and Trademark Office (PTO); (2) with the specific intent to deceive the PTO. If both of these elements--materiality and intent--are proven by clear and convincing evidence, this equitable defense bars enforcement of a patent. Although inequitable conduct is conceptually broader than fraud, any such allegations must be pleaded in accordance with Fed. R. Civ. P. Rule 9(b), which requires that the circumstances constituting fraud or mistake shall be stated with particularity. Fed. R. Civ. P. 9(b).

***Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements > Fraud Claims***
***Patent Law > Inequitable Conduct > Effect, Materiality & Scienter > Elements***

[HN10]To plead the circumstances of inequitable conduct with the requisite particularity under Fed. R. Civ. P. 9(b), the pleading must identify the specific who, what, when, where and how of the material misrepresentation or omission committed before the U.S. Patent and Trademark Office (PTO). Moreover, although knowledge and intent may be averred generally, a pleading of

inequitable conduct under Rule 9(b) must include sufficient allegations of underlying facts from which a court may reasonably infer that a specific individual (1) knew of the withheld material information or of the falsity of the material misrepresentation, and (2) withheld or misrepresented this information with a specific intent to deceive the PTO.


***Patent Law > Inequitable Conduct > Effect, Materiality & Scienter > Elements***
[HN11]In Therasense, the U.S. court of Appeals for the Federal Circuit retained the two-pronged construct for inequitable conduce requiring a showing of both materiality and intent to deceive. However, in various ways, it elected to tighten the standards for finding both intent and materiality in order to redirect a doctrine that has been overused to the detriment of the public.


***Patent Law > Inequitable Conduct > Burdens of Proof***
***Patent Law > Inequitable Conduct > Effect, Materiality & Scienter > Effect of Inequitable Conduct***
***Patent Law > Inequitable Conduct > Effect, Materiality & Scienter > Elements***
[HN12]A party making an inequitable conduct claim must show that but for an omission or misrepresentation by the patent applicant, the Patent and Trademark Office would not have allowed a patent claim to issue.


***Patent Law > Inequitable Conduct > Effect, Materiality & Scienter > Elements***
[HN13]As for the intent prong, Therasense expressly overruled a series of decisions holding that if a misrepresentation or omission at issue amounted to gross negligence or mere negligence, this would be sufficient to satisfy the intent prong; instead, a deliberate decision to make the misrepresentation or omission would be required. Lastly, the U.S. Court of Appeals for the Federal Circuit reemphasized its holding that although a district court may infer intent from indirect and circumstantial evidence, to meet the clear and convincing evidence standard, the specific intent to deceive must be the single most reasonable inference able to be drawn from the evidence.


***Civil Procedure > Pleading & Practice > Defenses, Demurrers & Objections > Failures to State Claims***
***Civil Procedure > Pleading & Practice > Pleadings >***

***Complaints > Requirements***
***Patent Law > Inequitable Conduct > Effect, Materiality & Scienter > Elements***
[HN14]In light of Therasense, a party pleading inequitable conduct in a patent case must allege facts allowing for the reasonable inference of but-for materiality.


***Civil Procedure > Pleading & Practice > Defenses, Demurrers & Objections > Failures to State Claims***
***Civil Procedure > Pleading & Practice > Pleadings > Complaints > Requirements***
***Patent Law > Inequitable Conduct > Effect, Materiality & Scienter > Elements***
[HN15]Several district courts have confronted the question of how the "single most reasonable inference" language from Therasense should be reconciled with the "reasonable inference" directives from Exergen and have reached different conclusions. On one end of the spectrum, courts deny a motion for leave to file an amended answer alleging inequitable conduct because there are multiple reasonable inferences that may be drawn from the facts alleged in the proposed inequitable conduct pleading. Other courts hold that the "single most reasonable inference" standard applies to at least some extent in the pleading context. The U.S. District Court for the District of Delaware believes that in order to adequately plead the intent prong of an inequitable conduct defense, a claimant need only allege facts from which the court could reasonably infer that the patent applicant made a deliberate decision to deceive the Patent and Trademark Office.


***Civil Procedure > Pleading & Practice > Defenses, Demurrers & Objections > Failures to State Claims***
***Civil Procedure > Pleading & Practice > Pleadings > Complaints > Requirements***
***Patent Law > Inequitable Conduct > Effect, Materiality & Scienter > Elements***
[HN16]Courts do not inquire whether a plaintiff will ultimately prevail when considering a motion to dismiss, only whether the plaintiff is entitled to offer evidence to support his or her claims. At the pleading stage, a court does not, and cannot, review all of the circumstances at play in a case, as the Therasense single most reasonable inference inquiry requires. Instead, a court assessing the sufficiency of a pleading looks only to a narrow category of materials--the pleading and any attached exhibits--provided only by one side--the party or parties

asserting the inequitable conduct claim.

### Patent Law > Inequitable Conduct > Effect, Materiality & Scienter > Duties

[HN17]Inequitable conduct allegations typically center on the failure of a patent applicant to disclose relevant prior art.

### Patent Law > Inequitable Conduct > Effect, Materiality & Scienter > Elements

[HN18]To the extent that a patent applicant's alleged misrepresentations consist solely of arguments to the examiner that are not unreasonable interpretations or demonstrably false, such statements do not amount to misrepresentations that give rise to an inequitable conduct claim.

### Patent Law > Inequitable Conduct > Effect, Materiality & Scienter > Elements

[HN19]Although an attorney may vigorously argue in favor of patentability without being subject to allegations of inequitable conduct, the law prohibits genuine misrepresentations of material fact; not all arguments by attorneys are shielded from liability for inequitable conduct.

### Patent Law > Inequitable Conduct > Effect, Materiality & Scienter > Elements

[HN20]with respect to a claim of inequitable conduct, a patent applicant is not relieved of responsibility for any alleged misstatements simply because a patent reference and certain data were before the U.S. Patent and Trademark Office (PTO). It is not possible for a patent applicant to misrepresent the teachings of the prior art unless that material is before the PTO in the first place.

### Patent Law > Inequitable Conduct > Effect, Materiality & Scienter > General Overview

[HN21]Attorney arguments can give rise to an actionable patent suit claim of inequitable conduct.

### Patent Law > Inequitable Conduct > General Overview

[HN22]In patent cases, inequitable conduct claims remain viable as a general matter, even when they are not based solely on affirmative acts of egregious misconduct.

**COUNSEL:**  [*1] For Wyeth Holdings Corporation, Wyeth-Ayerst Lederle LLC, Wyeth LLC, Plaintiffs: Jack B. Blumenfeld, LEAD ATTORNEY, Morris, Nichols, Arsht & Tunnell, Wilmington, DE; Maryellen Noreika, Morris, Nichols, Arsht & Tunnell LLP, Wilmington, DE.

For Sandoz Inc., Defendant: John W. Shaw, LEAD ATTORNEY, Karen Elizabeth Keller, Shaw Keller LLP, Wilmington, DE; David C. Doyle, PRO HAC VICE; Elizabeth C. Miller, PRO HAC VICE; James J. Cekola, PRO HAC VICE; M. Andrew Woodmansee, PRO HAC VICE; Marc D. Sharp, PRO HAC VICE.

For Sandoz Inc., Counter Claimant: John W. Shaw, LEAD ATTORNEY, Shaw Keller LLP, Wilmington, DE; David C. Doyle; Elizabeth C. Miller; M. Andrew Woodmansee.

For Wyeth Holdings Corporation, Wyeth-Ayerst Lederle LLC, Wyeth LLC, Counter Defendants: Jack B. Blumenfeld, LEAD ATTORNEY, Morris, Nichols, Arsht & Tunnell, Wilmington, DE.

For Sandoz Inc., Counter Claimant: John W. Shaw, LEAD ATTORNEY, Shaw Keller LLP, Wilmington, DE; David C. Doyle; Elizabeth C. Miller; M. Andrew Woodmansee; Marc D. Sharp.

**JUDGES:**  Christopher J. Burke, UNITED STATES MAGISTRATE JUDGE.

**OPINION BY:** Christopher J. Burke

**OPINION**

### REPORT AND RECOMMENDATION REGARDING PLAINTIFFS' MOTION TO DISMISS SANDOZ'S FOURTH COUNTERCLAIM AND TO STRIKE SANDOZ'S  [*2] FOURTH AFFIRMATIVE DEFENSE DIRECTED TO INEQUITABLE CONDUCT[1]

1   [HN1]Absent unanimous consent of the parties to the jurisdiction of a United States Magistrate Judge, a Magistrate Judge's authority as to the resolution of a motion to dismiss pursuant to Rule 12(b)(6) is limited to making a Report and Recommendation to the District Court. 28 U.S.C. § 636(b)(1)(B); D. Del. LR 72.1(a)(3).

Pending before the Court in this patent case is a motion filed pursuant to Fed. R. Civ. P. 12(b)(6) and 12(f) by Wyeth Holdings Corporation, Wyeth-Ayerst Lederle LLC, and Wyeth LLC (collectively, "Wyeth" or "Plaintiffs") seeking dismissal of the Fourth Counterclaim and Fourth Affirmative Defense of Sandoz, Inc. ("motion to dismiss"). (D.I. 64) Sandoz opposes Wyeth's motion to dismiss.

For the reasons that follow, I recommend that the Court DENY Wyeth's motion.

## I. BACKGROUND

### A. Procedural History

This is a patent case arising from Sandoz's filing of Abbreviated New Drug Application ("ANDA") No. 91-620 with the United States Food and Drug Administration ("FDA"). Sandoz's ANDA seeks to market an injectable form of tigecycline, an antibiotic that Wyeth currently markets under the brand name Tygacil®. (D.I. 1 at ¶ 10) Wyeth [*3] first filed suit against Sandoz on December 11, 2009. (D.I. 1) On September 7, 2011, Wyeth filed an Amended and Supplemental Complaint ("Amended Complaint") that reflects its current allegations against Sandoz. (D.I. 48) Wyeth's Amended Complaint alleges that Sandoz's generic tigecycline product infringes at least one valid claim of U.S. Reissue Patent No. 40,183 and U.S. Patent No. 7,879,828 ("the '828 patent") (collectively, "the patents-in-suit") and seeks a permanent injunction barring Sandoz from manufacturing, using, selling, or offering to sell in the United States, or importing into the United States, any drug product that infringes a valid claim of the patents-in-suit. (*See* D.I. 48)

Sandoz has stipulated that by submitting ANDA No. 91-620, it has committed an act of infringement under 35 U.S.C. § 271(e)(2), and has further stipulated that the commercial manufacture, use, and/or sale of its generic tigecycline antibacterial products would infringe the asserted claims of the patents-in-suit, if any of those claims are found valid and enforceable. (D.I. 62 at 5, ¶ 16; 6, ¶ 24) While conceding infringement, Sandoz challenges the validity of both of the patents-in-suit (*id.* at 7), [*4] and asserts that the '828 patent is unenforceable based upon several acts of inequitable conduct (*id.* at 11-17).

Sandoz first asserted that inequitable conduct should

bar enforcement of the '828 patent on October 21, 2011, two days after the close of fact discovery. (D.I. 62; D.I. 68 at 3) In lieu of answering Sandoz's counterclaim for inequitable conduct, Wyeth moved to dismiss (and to strike the accompanying affirmative defense of unenforceability based on inequitable conduct). (D.I. 64) Sandoz timely opposed (D.I. 68), and Wyeth's motion to dismiss was fully briefed on December 8, 2011 (D.I. 70). The Court heard oral argument on Wyeth's motion to dismiss on January 31, 2012. (D.I. 85)

### B. Sandoz's Inequitable Conduct Defense

The '828 patent was issued to Plaintiff Wyeth LLC on February 1, 2011, and is based on Application No. 11/374,330 ("the '330 application"). It is entitled "Tigecycline Compositions and Methods of Preparation," and lists three individuals (Mahdi B. Fawzi, Tianmin Zhu, and Syed M. Shah) as inventors. ('828 patent at 1) Although the title of the '828 patent refers to "Methods of Prepar[ing]" tigecycline, all of the '828 patent claims are directed to compositions that [*5] include tigecycline, lactose, and an acid. (D.I. 65 at 1, 3)

Tigecycline is a well-known antibiotic in the tetracycline family. ('828 patent at col. 1:23-25; col. 2:55-65) It is a particularly effective intravenous treatment against certain strains of drug-resistant bacteria. (*Id.* at col. 1:24-29, 45-47) Tigecycline is typically dissolved in water and then freeze-dried or "lyophilized" into a powder form before being shipped to end users, such as hospital pharmacies. (*Id.* at col. 1:55-63) Prior to being administered to patients, the powder is mixed with saline or another form of diluent and placed into intravenous bags for delivery. (*Id.* at col. 1:66-2:7)

During this process, tigecycline is subject to two countervailing degradative pathways. First, tigecycline is susceptible to rapid oxidation in solution form, which typically occurs at a slightly basic pH (about 7.8). (*Id.* at col. 2:26-35) To avoid this oxidative degradation, the pH of the solution can be lowered by adding an acid or buffer. (*Id.* at col. 2:44-48) However, lowering the pH triggers a second degradative process, known as epimerization. (*Id.* at col. 2:48-50) Under acidic conditions, the standard "*cis*" form of tigecycline [*6] is converted into the "*trans*" isomer. This epimerized product is non-toxic, but also exhibits low antibacterial efficacy. (*Id.* at col. 3:16-21) Thus, according to the '828 patent, there was a need to develop a composition that minimizes both the propensity of tigecycline to oxidize

Page 5

and its tendency to epimerize. (*Id.* at col. 3:62-65) It is through the addition of a carbohydrate (such as lactose) that a stable balance against the countervailing degradation pathways is achieved. (*Id.* at col. 4:49-59)

The addition of lactose and the accompanying acidic pH conditions claimed in the '828 patent are at the heart of Sandoz's inequitable conduct defense. [2] This defense spans more than nine pages, and refers to several exhibits, including a PowerPoint presentation given by Wyeth to the U.S. Patent & Trademark Office ("PTO"); redacted tigecycline stabilization data; patents and prior art references; prosecution history excerpts; and a declaration from Mr. Christian Ofslager, a Section Head at Wyeth. [3] (*See* D.I. 62 & exs. 1-6) The claims of the '330 application were rejected during prosecution by the PTO Examiner in light of a U.S. patent publication. (*Id.* at 8, ¶ 6) The Examiner argued that this [*7] publication (hereinafter referred to as the "Testa" reference) disclosed the combination of tigecycline and excipients, including lactose. (*Id.* at 8, ¶ 7) Moreover, in the Examiner's view, it would have been obvious to a person of ordinary skill in the relevant art to use the teachings of Testa to introduce lactose into an acidic, lyophilized solution of tigecycline to stabilize the solution against degradation. (*Id.*) The Examiner further rejected the applicants' argument that the claims were nonobvious because the claimed combination unexpectedly stabilized tigecycline; instead, he found that any improvement in stability was "minimal" at best, and "that the claimed compositions demonstrated no unexpected results." [4] (*Id.* at 8, ¶ 8)

2    Sandoz asserts inequitable conduct (and explains the basis for its allegations) in the Fourth Affirmative Defense in its Amended Answer. (D.I. 62 at 8-17) Sandoz asserts an identical counterclaim based upon the same facts and law. (*Id.* at 22) For ease of reference, Sandoz's Fourth Affirmative Defense and Fourth Counterclaim are collectively referred to as Sandoz's "inequitable conduct defense."

3    [HN2]Although the Court is resolving a motion to dismiss, not a [*8] summary judgment motion, the Court may consider not only the allegations in Sandoz's Amended Answer, but also any "'exhibits attached to the [pleading] and matters of public record.'" *Collins & Aikman Corp. v. Stockman*, Civ. No. 07-265-SLR-LPS, 2010 U.S. Dist. LEXIS 3818, 2010 WL 184074, at *3 (D. Del. Jan. 19, 2010) (quoting *Pension*

*Ben. Guar. Corp. v. White Consol. Indus., Inc.,* 998 F.2d 1192, 1196 (3d Cir. 1993)).

4    [HN3]"Unexpected results" are a secondary consideration of non-obviousness that can be used to overcome a rejection by the PTO. *See, e.g., Siemens Med. Solutions USA, Inc. v. Saint-Gobain Ceramics & Plastics, Inc.,* 637 F.3d 1269, 1291-92 (Fed. Cir. 2011) (Prost, C.J., dissenting) ("The Supreme Court has instructed us that four factors should be used in assessing obviousness: (1) the scope and content of the prior art, (2) the differences between the prior art and the claims, (3) the level of ordinary skill in the art, and (4) *secondary considerations* such as commercial success, *unexpected results*, and long-felt need.") (emphasis added). "[S]econdary considerations, when present, must be considered in determining obviousness." *Ruiz v. A.B. Chance Co.,* 234 F.3d 654, 667 (Fed. Cir. 2000).

In response, the [*9] applicants filed a request for continued examination, and thereafter made presentations to the Examiner aimed at overcoming his rejection. Sandoz contends that as part of this process, Wyeth made certain claims to the Examiner that amounted to "affirmative misrepresentations of material fact." (*Id.* at 8, ¶ 4) Sandoz cites three means through which the PTO allegedly received false and misleading information from Wyeth, as part of its response to the Examiner's final rejection: (1) during the Examiner's post-rejection interview of certain Wyeth representatives on September 16, 2010; (2) through data disclosed in the '828 patent and internal Wyeth data submitted to the PTO; and (3) in the October 5, 2010 declaration submitted to the PTO by Mr. Ofslager, who also participated in the September 16, 2010 interview. (*See* D.I. 62 at 9-17, ¶¶ 9-32)

In these presentations, Wyeth allegedly made two primary arguments: (1) the prior art, as exemplified by a European patent ("the '277 reference") "taught away" from the use of lactose to stabilize tigecycline in light of other information; and (2) the addition of lactose to an acidic solution of tigecycline led to significant and unexpectedly stable [*10] results, citing experimental data that was included in the text of the '330 application or submitted to the FDA. (*See id.*) Sandoz contends that in making these statements, Wyeth's representatives misrepresented the teachings of the prior art, overstated the stabilizing effects of lactose, and omitted key information regarding experimental error rate and

discrepancies in data. (*Id.*) According to Sandoz, these actions deceived the Examiner, who issued the '828 patent due to Wyeth's claims of "unexpected results" and other representations made by Wyeth during prosecution. (*Id.* at 16, ¶ 30)

## II. STANDARD OF REVIEW

### A. Motion to Dismiss Under Rule 12(b)(6)

Prior to 2007, district courts were permitted to dismiss a complaint for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6) only if "it appear[ed] beyond doubt that the plaintiff [could] prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957). The Supreme Court, concerned that this "no set of facts" language could be read to suggest that "a wholly conclusory statement of claim would survive a motion to dismiss whenever the pleadings left open the possibility that [*11] a plaintiff might later establish some set of [undisclosed] facts to support recovery," rejected that test in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). *Id.* at 561 (internal quotations and citations omitted). [HN4]A plaintiff is now required to plead sufficient "factual matter (taken as true) to suggest" liability for the alleged misconduct. *Id.* at 556. Such a complaint must include "more than labels and conclusions" or the "formulaic recitation of the elements of a cause of action," but need only provide "enough facts to state a claim to relief that is plausible on its face." *Id.* at 555, 570.

In *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 173 L. Ed. 2d 868 (2009), the Supreme Court extended these standards to all civil complaints. *Id.* at 1953. Notably, the *Iqbal* Court held that[HN5] a claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 1949. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant acted unlawfully." *Id.* (internal quotation marks omitted).

[HN6]After *Twombly* and *Iqbal*, district [*12] courts in the Third Circuit faced with a motion to dismiss pursuant to Rule 12(b)(6) should perform a two-part analysis. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009). First, the district court should

separate the factual and legal elements of a claim, accepting any well-pleaded facts as true, but disregarding any legal conclusions. *Id.* Second, the district court must "determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Id.* at 211 (quoting *Iqbal*, 129 S.Ct. at 1950). Determining whether a claim is plausible is "'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Id.* (quoting *Iqbal*, 129 S.Ct. at 1949).

In so doing, [HN7]the court must "construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Fowler*, 578 F.3d at 210 (citing *Phillips v. County of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (internal quotations omitted)); *see also Erickson v. Pardus*, 551 U.S. 89, 94, 127 S. Ct. 2197, 167 L. Ed. 2d 1081 (2007) ("[W]hen ruling on a defendant's motion to [*13] dismiss, a judge must accept as true all of the factual allegations contained in the complaint.") As such, a well-pleaded complaint may not be dismissed simply because "it strikes a savvy judge that actual proof of [the alleged] facts is improbable, and that a recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (internal quotations omitted).

### B. Motion to Strike Under Rule 12(f)

As noted above, Sandoz has asserted inequitable conduct in two substantively identical but procedurally distinct forms--as both a counterclaim and an affirmative defense. [HN8]Rule 12(b)(6) does not offer a mechanism for dismissing an affirmative defense, and instead refers only to "claim[s]." Fed. R. Civ. P. 12(b)(6). However, pursuant to Rule 12(f), the Court "may strike from a pleading any insufficient defense." Fed. R. Civ. P. 12(f). This rule has been used in this jurisdiction to strike affirmative defenses where a party has failed to state a corresponding claim upon which relief can be granted. *See, e.g., Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, Civ. No. 08-309-JJF-LPS, 2009 U.S. Dist. LEXIS 118383, 2009 WL 4928024, at *8-10 (Dec. 18, 2009). There is no dispute that Sandoz's inequitable conduct counterclaim [*14] and affirmative defense "rise[] or fall[]" together. (D.I. 68 at 4)

### C. Pleading Inequitable Conduct Under Rule 9(b)

[HN9]An individual associated with the filing and

prosecution of a patent application commits inequitable conduct when he or she (1) makes an affirmative misrepresentation of a material fact, fails to disclose material information, or submits false material information to the PTO; (2) with the specific intent to deceive the PTO. *Star Scientific, Inc. v. R.J. Reynolds Tobacco Co., 537 F.3d 1357, 1365 (Fed. Cir. 2008)*. If both of these elements--materiality and intent--are proven by clear and convincing evidence, this equitable defense bars enforcement of a patent. *Therasense, Inc. v. Becton, Dickinson & Co., 649 F.3d 1276, 1287 (Fed. Cir. 2011)*. Although inequitable conduct is conceptually broader than fraud, any such allegations must be pled in accordance with Rule 9(b), which requires that "'the circumstances constituting fraud or mistake shall be stated with particularity.'" *Ferguson Beauregard/Logic Controls, Div. of Dover Res., Inc. v. Mega Sys., LLC, 350 F.3d 1327, 1342, 1344 (Fed. Cir. 2003)* (quoting Fed. R. Civ. P. 9(b)).

In *Exergen Corp. v. Wal-Mart Stores, Inc., 575 F.3d 1312, 1328 (Fed. Cir. 2009)*, [*15] the Federal Circuit established the standard for evaluating the sufficiency of inequitable conduct allegations. [5] *Exergen* held that:

[HN10][T]o plead the 'circumstances' of inequitable conduct with the requisite 'particularity' under Rule 9(b), the pleading must identify the specific who, what, when, where and how of the material misrepresentation or omission committed before the PTO. Moreover, although 'knowledge' and 'intent' may be averred generally, a pleading of inequitable conduct under Rule 9(b) must include sufficient allegations of underlying facts from which a court may reasonably infer that a specific individual (1) knew of the withheld material information or of the falsity of the material misrepresentation, and (2) withheld or misrepresented this information with a specific intent to deceive the PTO.

575 F.3d at 1328-29.

5    Although *Exergen* concerned a motion for leave to amend a pleading to assert an inequitable conduct defense, its standards are also used to assess the sufficiency of a pleading that is

challenged in a motion to dismiss. *See In re BP Lubricants USA, Inc., 637 F.3d 1307, 1311 (Fed. Cir. 2011)*.

However, roughly eighteen months after the Federal Circuit's decision in [*16] *Exergen*, an *en banc* Federal Circuit altered and clarified the elements for proving inequitable conduct in *Therasense, Inc. v. Becton, Dickinson & Co., 649 F.3d 1276 (Fed. Cir. 2011)*. Unlike *Exergen*, which specifically outlined the requirements for *pleading* inequitable conduct, *Therasense* involved the review of a district court decision as to inequitable conduct made after a bench trial. *Id. at 1285*. [HN11]In *Therasense*, the Federal Circuit retained the two-pronged construct requiring a showing of both materiality and intent to deceive. However, in various ways, it elected to "tighten[] the standards for finding both intent and materiality in order to redirect a doctrine that has been overused to the detriment of the public." *Therasense, 649 F.3d at 1290*.

For example, the *Therasense* Court overruled a separate series of decisions that placed the materiality and intent prongs on a "sliding scale," in which a weak showing of intent could be found sufficient based on a strong showing of materiality, or vice versa. *Id. at 1288*. In addition, as to the first prong regarding materiality, *Therasense* held that absent evidence of "affirmative egregious misconduct," this prong requires a "but-for" showing. [*17] *Id. at 1291-92*. In other words,[HN12] the party making an inequitable conduct claim must show that but for an omission or misrepresentation by the patent applicant, the PTO would not have allowed a patent claim to issue. *Id.*

[HN13]As for the intent prong, *Therasense* expressly overruled a series of decisions holding that if a misrepresentation or omission at issue amounted to gross negligence or mere negligence, this would be sufficient to satisfy the intent prong; instead, a deliberate decision to make the misrepresentation or omission would be required. 649 F.3d at 1287-90. Lastly, the Federal Circuit re-emphasized its prior holding that although "a district court may infer intent from indirect and circumstantial evidence . . . ., to meet the clear and convincing evidence standard, the specific intent to deceive must be 'the single most reasonable inference able to be drawn from the evidence.'" *Id. at 1290* (quoting *Star Scientific, 537 F.3d at 1366*).

## III. DISCUSSION

## A. Applicable Standard Governing Inequitable Conduct Pleadings

In its opening brief, Wyeth claims that, under the tightened materiality standards announced in *Therasense*, "a pleading of inequitable conduct requires factual allegations [*18] that make it plausible that but for the alleged omission, the Examiner would not have issued the patent." (D.I. 65 at 8) Wyeth argues Sandoz has not met this burden. Moreover, as to the intent prong, Wyeth repeatedly asserted that Sandoz's inequitable conduct defense should be dismissed because "Sandoz did not plead any facts that would allow the Court to conclude that *the single most reasonable inference* from the applicants' alleged conduct is that the applicants had the specific intent to deceive the PTO." (D.I. 65 at 2 (emphasis added); *see also id.* at 8, 10) Citing *Therasense*, Wyeth argued that unless the Court finds that intent to deceive is the "single most reasonable inference" that can be drawn from the facts alleged in Sandoz's pleading, *Therasense* compels dismissal of Sandoz's inequitable conduct defense. (*Id.* at 9-11)

In response, Sandoz concedes that at the pleading stage, [HN14]in light of *Therasense*, it must allege facts allowing for the reasonable inference of "but-for" materiality. [6] (D.I. 68 at 10-12) The Court agrees that *Therasense* impacted the pleading standards for inequitable conduct claims in this way. *See Pfizer Inc. v. Teva Pharms. USA, Inc., 803 F. Supp. 2d 409, 432 (E.D. Va. 2011).*

> 6  Prior [*19] to *Therasense*, the Federal Circuit had adhered to less rigid standards for demonstrating materiality, often rooted in the PTO's Rule 56. *Therasense, 649 F.3d at 1294; see also 37 C.F.R. § 1.56 (1977)* (a reference is material "if there is a substantial likelihood that a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent"). The *Therasense* Court concluded that the current version of Rule 56 sets the bar too "low [a] bar" because "anything bearing any relation to obviousness could be found material." *Id.* at 1294-95.

However, Sandoz argues that Wyeth has "attempt[ed] to conflate the holdings of *Therasense* and *Exergen* to impose an insurmountable pleading bar for allegations of inequitable conduct" as to the intent prong. (D.I. 68 at 9) According to Sandoz, the *Therasense* Court

did not disturb the applicable pleading standard in this way. It urges the Court to reject Wyeth's formulation of the intent prong, and instead use the standard articulated in *Exergen*: whether deceptive intent could be "reasonably infer[red]" from the facts as pled. (*Id.*)

At oral argument, despite the argument made in its opening brief, Wyeth withdrew its assertion [*20] that *Therasense's* "single most reasonable inference" standard has any bearing on the Court's analysis at the pleading stage. (D.I. 85 at 9-10) However, because Wyeth has otherwise argued that Sandoz has not met the threshold showing of intent required by *Twombly, Iqbal* and *Exergen*, I am required to determine what the contours of that standard are. For this reason, and in light of the parties' previously divergent positions, the Court will briefly analyze how the *"single most* reasonable inference" language from *Therasense* should be reconciled with the "reasonable inference" directives from *Exergen.*

[HN15]Several district courts have recently confronted this question and have reached different conclusions. On one end of the spectrum, the District of South Dakota denied a motion for leave to file an amended answer alleging inequitable conduct because "there [were] multiple reasonable inferences that may be drawn" from the facts alleged in the proposed inequitable conduct pleading. *Hansen Mfg. Corp. v. Enduro Sys., Inc., No. CIV. 11-4030, 2011 U.S. Dist. LEXIS 131410, 2011 WL 5526627, at *4 (D.S.D. Nov. 14, 2011).* This conclusion derives from the *Hansen* Court's determination that *"Therasense* tightened the *standard for pleading* [*21] so that specific intent to deceive must be the single most reasonable inference able to be drawn from the evidence." *Id.* (emphasis added) (internal quotation marks and citation omitted); *see also Quest Software, Inc. v. Centrify Corp., No. 2:10-CV-859 TS, 2011 U.S. Dist. LEXIS 129629, 2011 WL 5508820, at *2-3 (D. Utah Nov. 9, 2011)* (denying defendant's motion for leave to file amended answer including inequitable conduct claim in part because "the allegations do not reveal that the intent to deceive is the most reasonable inference to be drawn from the evidence").

Other courts have held that the "single most reasonable inference" standard applies to at least some extent in the pleading context. For instance, the Eastern District of Virginia determined that *"Exergen* still states the correct elements required for pleading inequitable

conduct after *Therasense*," and that a party is not required at the pleading stage "to meet the clear and convincing evidence standard that applies on the merits." *Pfizer Inc., 803 F. Supp. 2d at 432*. However, the *Pfizer* Court concluded that in light of *Therasense*, "a party must make an initial showing from which it may be plausibly inferred that... the intent to deceive is the single [*22] most likely explanation for the non-disclosure [of but-for material information]." *Id; accord VDF FutureCeuticals, Inc. v. Sandwich Isles Trading Co.,* Civ. No. 11-00288 ACK-RLP, 2011 U.S. Dist. LEXIS 148527, 2011 WL 6820122, at *6 (D. Haw. Dec. 27, 2011) (dismissing an inequitable conduct counterclaim where the allegations pled did not "give rise to a plausible inference that the intent to deceive was the single most likely explanation" for the alleged conduct). While the *Pfizer* and *VDF* Courts did not take as rigid a view as did *Hansen*, they nonetheless held that the "single most reasonable" rubric has been engrafted onto the inequitable conduct pleading standard from *Exergen.*

I disagree with the conclusions reached by these courts. Instead, for the three reasons set forth below, I believe that in order to adequately plead the intent prong of an inequitable conduct defense, the claimant need only allege facts from which the Court could *reasonably infer* that the patent applicant made a deliberate decision to deceive the PTO.

First, the Federal Circuit explains in *Therasense* that the "single most reasonable inference" requirement is an *evidentiary* standard that must be satisfied at the proof stage, not a pleading standard. [*23] The Federal Circuit notes that "to meet the clear and convincing *evidence* standard, the specific intent to deceive must be the single most reasonable inference able to be drawn from the *evidence* . . . .Indeed, the *evidence* must be sufficient to require a finding of deceitful intent in light of all the circumstances." *Therasense, 649 F.3d at 1290* (emphasis added) (internal quotation marks omitted). This statement is couched strictly in terms of the ultimate evidentiary analysis, in which a district court determines whether under a heightened standard of proof (the clear and convincing evidence standard), deceptive intent is the single most reasonable inference to be drawn. This form of analysis clearly contrasts with the pleading stage analysis required by *Iqbal*, which asks whether, taking all of the alleged facts as true, the Court can draw the "reasonable inference" that a party is liable for the claimed misconduct, such that the claim is "plausible."

*Iqbal, 129 S.Ct. at 1949*. After all, [HN16]courts "do not inquire whether a plaintiff will ultimately prevail when considering a motion to dismiss, only whether the plaintiff is *entitled to offer evidence to support his or her claims.*" *Grier v. Klem, 591 F.3d 672, 676 (3d Cir. 2010)* [*24] (emphasis added). Moreover, at the pleading stage, a court does not (and cannot) review "all of the circumstances" at play in a case, as the *Therasense* "single most reasonable inference" inquiry requires. *649 F.3d at 1290*. Instead, a court assessing the sufficiency of a pleading looks only to a narrow category of materials (the pleading and any attached exhibits) provided only by one side (the party or parties asserting the inequitable conduct claim).

Second, in *Exergen*, the Federal Circuit appeared to specifically indicate that the "single most reasonable inference" analysis was a separate inquiry from that used to examine whether inequitable conduct is well-pled. After holding that a party must plead facts from which a court can "reasonably infer" that material information was misrepresented or withheld with the specific intent to deceive the PTO, the *Exergen* Court noted how this pleading standard differs from the applicable standard of proof first articulated in *Star Scientific, Inc. v. R.J. Reynolds Tobacco Co., 537 F.3d 1357, 1365-66 (Fed. Cir. 2008)*:

> In contrast to the pleading stage, to prevail on the merits, the accused infringer must prove both materiality and intent by clear [*25] and convincing evidence. *See Star Scientific, 537 F.3d at 1365. Whereas an inference of deceptive intent must be reasonable and drawn from a pleading's allegations of underlying fact to satisfy Rule 9(b), this inference must be the 'single most reasonable inference able to be drawn from the evidence to meet the clear and convincing standard.' Id. at 1366.*

*Exergen, 575 F.3d at 1329 n.5* (emphasis added). To read *Therasense* as disturbing this well-established dichotomy would be to collapse inequitable conduct into a mini-trial on the pleadings, and to ignore the clear holdings from both *Star Scientific* and *Exergen.* The Court finds no language in *Therasense* to support such an outcome, particularly given that "*Therasense* did not address inequitable conduct at the motion to dismiss stage and did

not discuss leave to amend." *Oracle Corp. v. DrugLogic, Inc., 807 F. Supp. 2d 885, 2011 WL 3443889, at \*13 (N.D. Cal. 2011)*.

Third, this reading is corroborated by the Federal Circuit's own post-*Therasense* case law. In *Delano Farms Co. v. Cal. Table Grape Comm'n, 655 F.3d 1337 (Fed. Cir. 2011)*, the Federal Circuit stated that "[a] charge of inequitable conduct based on a failure to disclose [*26] will survive a motion to dismiss only if the plaintiff's complaint recites facts from which the court may *reasonably infer* that a specific individual both knew of invalidating information that was withheld from the PTO and withheld that information with a specific intent to deceive the PTO." *Id. at 1350* (citing *Exergen* and *Therasense*) (emphasis added). Although this statement does not definitively resolve the issue (in part because it refers only to non-disclosure of information, as opposed to misrepresentation of material information, as alleged by Sandoz here), it strongly suggests that Sandoz need only set forth facts from which deceptive intent can be reasonably inferred. [7] *Accord Human Genome Sciences, Inc. v. Genentech, Inc.*, Case No. 2:11-cv-6519-MRP (JEMx), slip op. at 6 (C.D. Cal. Dec. 9, 2011) (considering *Therasense* and *Exergen* and concluding that "[i]n order to survive dismissal [of an inequitable conduct claim], the accused infringer must allege facts from which it is plausible that the applicant had an intent to deceive," and need not demonstrate that deceptive intent is "the most reasonable inference").

> [7]   In this District, only a single written opinion resolving a motion [*27] to dismiss an inequitable conduct claim has issued since *Therasense. See Softview LLC v. Apple Inc., Civil Action No. 10-389-LPS, 2011 U.S. Dist. LEXIS 112476, 2011 WL 4571793 (D. Del. Sept. 30, 2011)*. In *Softview*, this Court granted a motion to dismiss and strike an inequitable conduct claim and defense where the defendants' "theory [of inequitable conduct] [was] based on a mere disagreement with . . . prosecution counsel as to whether certain amendments impermissibly added 'new matter.'" *2011 U.S. Dist. LEXIS 112476, [WL] at \*1*. In granting the motion to dismiss and strike, the Court found that any such "disagreement does not give rise to a *reasonable inference* that prosecution counsel" knew that he was adding new matter and intended to deceive the PTO by so doing. *Id.* (emphasis added). This

language suggests that a "reasonable inference" of specific intent is sufficient to state a claim for inequitable conduct at the pleading stage. However, the parties in *Softview* did not raise the question as to what impact (if any) *Therasense* had on this question, as *Therasense* was not yet issued at the time that the parties submitted their briefs.

In light of these considerations, and hewing closely to the guidance of the Federal Circuit, the Court will [*28] assess whether the facts as pled give rise to a reasonable inference that material information was misrepresented with the specific intent (i.e., as the result of a deliberate decision) to deceive the PTO.

**B. Inequitable Conduct Has Been Pled With Sufficient Particularity Under the Applicable Standard**

**1. Materiality Prong--Misrepresentation of Material Fact**

[HN17]Inequitable conduct allegations typically center on the failure of a patent applicant to disclose relevant prior art. *See, e.g., Genentech, Inc. v. Trustees of the Univ. of Pa., No. 10-CV-02037-LHK, 2011 U.S. Dist. LEXIS 54784, 2011 WL 1936136, at \*7 (N.D. Cal. May 20, 2011)*. In this case, however, there is no allegation of a failure to disclose a prior art reference. Instead, Sandoz alleges that Wyeth's representatives misrepresented the teachings of the prior art in a manner that would be recognized as false by a person of ordinary skill in the art, and also submitted incomplete, misleading, and internally inconsistent empirical data relating to epimer formation in experimental solutions of tigecycline. (D.I. 62)

As an initial matter, the Court finds that Sandoz has properly and specifically identified the "who, what, where, when, and how" of the alleged material [*29] misrepresentations. *See generally Aerocrine AB v. Apieron, Inc., Civ No. 08-787-LPS, 2010 U.S. Dist. LEXIS 31176, 2010 WL 1225090, at \*9 (D. Del. Mar. 30, 2010)*. The "who" refers to three individuals who played a role in the prosecution of the '330 application: Mr. Ofslager, a Wyeth employee involved in the development of Tygacil® who submitted a declaration to the PTO and attended the interview with the Examiner; and Ian Liu and David Joran, two Wyeth attorneys who prosecuted the '330 application and also attended the Examiner interview. (D.I. 62 at 9, ¶ 9) The "what" in this case refers to the alleged misrepresentations regarding the

state of prior art (including the '277 reference, which Wyeth allegedly used as a "straw man"), (*id.* at 10, ¶ 13), and the tigecycline stabilization data that was submitted to and discussed with the PTO. The "when" implicates at least two separate dates on which misrepresentations were allegedly made: (1) at the examiner interview on September 16, 2010; and (2) the submission of the Ofslager declaration on October 5, 2010. (*Id.* at 9, ¶ 9; 12, ¶ 19) The "where"--meaning where in the prior art and other documents submitted the allegedly material information is found--is detailed in [*30] the Amended Answer, which lists each piece of information that was (or was not, but allegedly should have been) part of the asserted misrepresentations. (*See id.* at 9-16) As for the "how" element--how a reasonable examiner would have used the information allegedly concealed or falsified by Wyeth's representatives--Sandoz describes two such ways. First, by falsely asserting that a person of ordinary skill in the art would understand that the possible stabilization mechanisms discussed in the cited references "could not work for tigecycline," Wyeth was able to improperly overcome the obviousness rejection. (*Id.* at 10, ¶ 12) Second, by arguing that the Wyeth stability data established "unexpected results," Wyeth convinced the Examiner that secondary considerations of non-obviousness should overcome his rejection of the '330 application. (*Id.* at 10, ¶ 15) According to Sandoz, these data were flawed. (*Id.* at 10-15)

In its briefs, Wyeth alleges that Sandoz's allegations fall short of the requirements of the materiality prong in two primary respects. First, Wyeth asserts that Sandoz has not made the requisite showing of but-for materiality, because it "never alleged that 'the PTO would not have [*31] allowed a claim had [the Examiner] been aware' of the alleged 'critical information [that Wyeth's representatives did not share with the Examiner].'" (D.I. 65 at 12) However, Sandoz *did* explicitly allege but-for materiality. After listing the various types of alleged misrepresentations made to the Examiner by Wyeth representatives, Sandoz asserted: "Thus, the '828 patent would not have been issued *but for* [Wyeth's] deceptive and erroneous representations to the [PTO]." (D.I. 62 at 16, ¶ 30 (emphasis added)) Moreover, Sandoz alleged that because the Examiner specifically acknowledged and cited many of the statements made by Wyeth's representatives when listing the Reasons for Allowance of the '828 patent, but-for materiality is a reasonable inference. (*Id.*) Therefore, contrary to Wyeth's assertion, the allegation of but-for materiality was squarely made.

Moreover, that allegation is legally sufficient because the underlying facts allow the Court to draw the reasonable inference that the '828 patent would not have issued but for the alleged misrepresentations. Those alleged misrepresentations were made during the September 16, 2010 Examiner interview (in which Wyeth's representatives [*32] were attempting to overcome the Examiner's earlier rejection of the '330 application) and in the October 5, 2010 Ofslager declaration (a document submitted for the specific purpose of convincing the Examiner that the invention at issue was non-obvious). Moreover, the Examiner repeatedly cited the data provided in the declaration as the primary reason for his allowance of the patent. (D.I. 62, ex. 6 at 3 ("Applicant has overcome this prima facie case of obviousness by providing secondary considerations, in the form of unexpected results, as highlighted by the Ofslager Declaration below.")) The clear nexus between the alleged misrepresentations, the circumstances in which they were made, and the resulting impact they had on the Examiner's decision, leads to a reasonable inference of but-for materiality. [8]

[8] *Cf. Pollin Patent Licensing, LLC v. Capital One Auto Fin., Inc.,* No. 1:10-CV-07420, 2011 U.S. Dist. LEXIS 124805, 2011 WL 5118891, at *4 (N.D. Ill. Oct. 25, 2011) (finding allegations of materiality in inequitable conduct claim sufficient to permit leave to amend to add claim, as counterclaimant had alleged that the patent application would not have been granted if the information withheld by the applicant had been [*33] disclosed); *Nycomed U.S. Inc. v. Glenmark Generics, Ltd.,* No. 08-CV-5023 (CBA)(RLM), 2010 U.S. Dist. LEXIS 29267, 2010 WL 1257803, at *14 (E.D.N.Y. Mar. 26, 2010) (granting defendant's motion to amend regarding inequitable conduct defense and counterclaim and finding, pre-*Therasense*, that defendant's allegations of false representations to PTO were "*highly* material" because they were submitted to overcome the Examiner's rejection of application on obviousness grounds, and because in issuing a Notice of Allowance, the Examiner "expressly cited [plaintiff's] arguments" concerning the representations at issue).

Second, Wyeth asserts that regardless of the representations it made to the PTO regarding the '277 reference and observational data from tigecycline

solutions, "[t]he Examiner admittedly had all the relevant data and was free to disregard [Wyeth's] interpretation of it and draw his own conclusions." (D.I. 65 at 12) Although Wyeth describes this as indicating a failure to sufficiently allege but-for materiality, (*id.*), its claim is more accurately framed as an assertion that the alleged misrepresentations are not actually misrepresentations at all. This argument hinges on Wyeth's contention that "[t]he Federal [*34] Circuit has long held that merely presenting arguments and interpretations concerning a reference that was in front of the Examiner does not constitute an actionable misrepresentation." (D.I. 70 at 6 (citing cases)) That line of case law generally stands for the proposition that,[HN18] to the extent that an applicant's alleged misrepresentations consist solely of arguments to the Examiner that are not unreasonable interpretations or demonstrably false, such statements do not amount to "misrepresentations" that give rise to an inequitable conduct claim. *See Young v. Lumenis, Inc.,* 492 F.3d 1336, 1349 (Fed. Cir. 2007) (cited in D.I. 70 at 6); *Life Techs., Inc. v. Clontech Lab., Inc.,* 224 F.3d 1320, 1326 (Fed. Cir. 2000) (cited in D.I. 70 at 6); *Genzyme Corp. v. Transkaryotic Therapies, Inc.,* No. 00-677, 2004 U.S. Dist. LEXIS 19250, at *7 (D. Del. Sept. 27, 2004) (cited in D.I. 70 at 5).

Sandoz counters that Wyeth's argument as to the alleged misstatements about the '277 reference "misses the point... [because] [t]he conduct of the applicants' representatives was not just zealous advocacy; it was a misleading characterization of a key reference." (D.I. 68 at 13) Sandoz also highlights its allegation [*35] that "Mr. Ofslager withheld not the data itself but material information relating to the data, e.g., the error rate associated with the data, alternative explanations for the data, and inconsistencies in the data that draw into question its reliability (if one knows what to look for). . . . The Examiner did not have this information and had no way of independently learning it." (*Id.* at 12-13) In support, Sandoz cites an alternative line of case law establishing that although "an attorney is free to argue vigorously in favor of patentability without being subject to accusations of inequitable conduct, the law prohibits genuine misrepresentations of material fact." (*Id.* at 13 (citing *Ring Plus, Inc. v. Cingular Wireless Corp.,* 614 F.3d 1354, 1360-61 (Fed. Cir. 2010))) 9

     9   *See also Rothman v. Target Corp.,* 556 F.3d 1310, 1328 (Fed. Cir. 2009) (noting that [HN19]although an attorney may vigorously

argue in favor of patentability without being subject to allegations of inequitable conduct, "the law prohibits genuine misrepresentations of material fact"); *VDF FutureCeuticals, Inc.,* 2011 U.S. Dist. LEXIS 148527, 2011 WL 6820122 at *6 (noting that "not all arguments by attorneys are shielded from liability for inequitable conduct").

Wyeth's [*36] claim thus requires the Court to assess whether, accepting the well-pleaded facts of the inequitable conduct defense as true, and viewing those facts in the light most favorable to Sandoz, the Court can reasonably infer that Wyeth's statements crossed the line from permissible advocacy to impermissible misrepresentation. As an initial matter, the Court agrees with Sandoz that [HN20]Wyeth is not relieved of responsibility for any alleged misstatements simply because the '277 reference and the stabilization data were before the PTO. It is not possible for a patent applicant to misrepresent the teachings of the prior art unless that material is before the PTO in the first place. *Cf. Ring Plus,* 614 F.3d at 1360 (upholding district court's finding that a person of skill in the art would have understood two prior art references to disclose software-based algorithms, and that because applicants had identified these two references to the Examiner and claimed that these references did not propose software-based systems, these statements amounted to material misrepresentations). To countenance Wyeth's approach would create a perverse incentive, where applicants would be free to falsely characterize [*37] such documents, but then claim immunity from a later charge of inequitable conduct because the mischaracterized material was before the PTO.

Moreover, this Court recently affirmed the principle that [HN21]attorney arguments can give rise to an actionable claim of inequitable conduct. [10] In *Southco, Inc. v. Penn Eng'g & Mfg. Corp.,* 768 F. Supp. 2d 715 (D. Del. 2011), this Court denied a motion to dismiss an inequitable conduct claim that was based, at least in part, on alleged misrepresentations that the patentee's counsel made during reexamination proceedings. *Id.* at 723-24. In *Southco,* the accused infringer requested reexamination of the asserted patent in light of a prior art fastener that was found in a catalog, referred to as the "Huck reference." *Id.* at 721-22. The patentee argued to the PTO that the claims-at-issue were nonetheless patentable for two reasons: (1) the Huck reference failed to "disclose a 'rigid connection' between the head of the screw and the

knob" of the depicted fastener, as required by the patented claims; and (2) the Huck reference likewise did not show the "protrusions" required by the claimed fastener. *Id.* at 722. In seeking to dismiss and strike the counterclaim [*38] and affirmative defense of inequitable conduct in later litigation, the *Southco* plaintiff asserted (just as Wyeth has here) that the patentee's statements to the Examiner were simply "arguments of counsel and, therefore, they cannot be considered misrepresentations." *Id.* This Court rejected that proposition, and instead found that the alleged misrepresentations, even if categorized as mere "attorney argument," were "sufficient to satisfy the requirements of [Rule 9(b)]." *Id.* at 723. In doing so, it noted that defendant's allegations were, in part, "that Southco's arguments to the Examiner amounted to material misrepresentations because Southco knew its arguments were factually and patently false" given its pre-existing knowledge of the actual fastener. *Id.* [11] Thus, *Southco* demonstrates that a claim based upon allegedly false and misleading statements to the PTO regarding a prior art reference (or other information submitted to the PTO, such as experimental data) can survive the pleading stage (assuming that the other elements of the inequitable conduct defense are sufficiently pled).

> 10    All three of the cases that Wyeth cites in support of its argument that the alleged misrepresentations [*39] do not give rise to even a plausible inequitable conduct claim are of limited utility, as all of them involved a district court decision as to the sufficiency of an inequitable conduct claim at or after the summary judgment stage. (D.I. 70 at 5-6 (citing cases))
>
> 11    *See also* Elan Corp., PLC v. Teva Pharms. USA, Inc., Civ. No. 07-552-SLR, 2008 U.S. Dist. LEXIS 17807, 2008 WL 623506, at *1 (D. Del. Mar. 7, 2008) (denying plaintiff's motion to dismiss inequitable conduct claims and to strike related affirmative defenses in light of allegations that arguments made to patent examiner involved intentional falsehoods about a material reference, and did not simply constitute permissible attorney argument).

In line with the decision in *Southco*, the Court finds that at this stage, Sandoz has alleged sufficient facts to support the reasonable inference that Wyeth made actionable misrepresentations to the Examiner. The alleged misrepresentations here concern not only

knowledge of this particular industry, but also relate to Wyeth's internal testing procedures and protocols. This is precisely the sort of information that Mr. Ofslager was uniquely qualified to characterize and explain, which is what allegedly allowed him to "deceive" [*40] the Examiner by failing to do so accurately. (D.I. 62 at 16, ¶ 30) Moreover, at least with regard to Mr. Ofsalger's alleged failure to disclose to the Examiner certain significant error rates, Sandoz appears to assert that this data was never provided by Wyeth to the Examiner in any form, which would have required the Examiner to rely even more significantly on Mr. Ofsalger's representations. (D.I. 62 at 11, ¶ 16 ("Mr. Ofslager . . . never explained to the Examiner either the error rate in these figures or its significance to his conclusions.")) Taking these facts as true, as the Court must at this stage, it is at least plausible that the alleged misrepresentations traversed the line from mere argument to actionable falsehoods.

## 2. Intent Prong--Specific Intent to Deceive the PTO

In its opening brief, Wyeth asserts that Sandoz's inequitable conduct defense should also be dismissed for failure to allege a plausible claim of deceptive intent. Wyeth states that Sandoz has failed to meet its burden pursuant to the intent prong for two primary reasons.

First, Wyeth claims that "Sandoz [did] not allege facts from which the Court could conclude that the 'single most reasonable inference' to be [*41] drawn is that Wyeth intended to deceive the PTO" because "a conclusion that the named individuals acted innocently without any intent to deceive the PTO *is at least as plausible*, if not more so, than a conclusion of intent to deceive." (D.I. 65 at 10 (emphasis added)) As noted above, this argument was largely premised on the view that Sandoz could survive a motion to dismiss if and only if it offered evidence that deceptive intent was the single most reasonable inference to be drawn from the facts pled. Yet Wyeth withdrew that assertion at oral argument, (D.I. 85 at 9-10), and the Court has now concluded that the "single most reasonable inference" analysis was not meant to be grafted onto the standard for analysis of the sufficiency of pleadings. Yet it is notable that in its briefing, even Wyeth appeared to concede that a "conclusion of intent to deceive" is "at least" one "plausible" inference based on the facts as pled. (D.I. 65 at 10)

Second, Wyeth asserts that given the alleged

Page 14

"objective indicators of candor and good faith" inherent in Sandoz's pleading, and the fact that the alleged misrepresentations are "nothing more than the typical exchanges between an applicant and the PTO," [*42] Sandoz has failed to plausibly allege deceptive intent. (*Id.* at 10-11) Wyeth expands on this argument in its Reply Brief, asserting that Sandoz failed to cite any evidence concerning when Mr. Ofslager became aware of any alleged data discrepancies, whether he even considered them when presenting the data at issue to the Examiner, or whether in doing so, Mr. Ofslager "deliberately set out to deceive." (D.I. 70 at 4) Wyeth claims Sandoz's allegations thus amount to "an unsupported theory of intent." (*Id.*)

Sandoz responds to Wyeth's arguments first by cataloguing the alleged inaccuracies and inconsistencies in the tigecycline stabilization data that were submitted to and relied upon by the PTO, noting that "the accuracy of these measurements, and their comparability between experiments, was the entire premise of Mr. Ofslager's assertion of unexpected results." (D.I. 68 at 14) Sandoz alleges that this "premise" is fatally undermined by, *inter alia*, the unreported error rate and data (that was absent from Mr. Ofslager's "incomplete" presentation) showing tigecycline epimerization inexplicably decreasing over time in certain experiments. (D.I. 62 at 11-14) Given that "a person of extraordinary [*43] skill such as Mr. Ofslager would appreciate that these inconsistencies raise serious doubts about the accuracy and reliability of the methods used" by Wyeth to assess tigecycline, Sandoz argues that Mr. Ofslager's representations were meant to deliberately mislead the PTO. (D.I. 68 at 16)

The Court finds that Sandoz has pled sufficient facts, with sufficient particularity, to give rise to a reasonable inference that Wyeth's representatives deliberately acted to deceive the PTO during the prosecution of the '828 patent. Sandoz alleges that Wyeth engaged in a multi-faceted strategy to deceive the PTO by convincing the Examiner that the claimed invention, which exposes tigecycline to acidic conditions in combination with lactose, results in a much more stable solution than the prior formulations of tigecycline. (D.I. 62 at 17, ¶ 32) By way of example, Sandoz asserts that Mr. Ofslager offered numerous test results to the PTO that compared "First Generation Tigecycline" (without hydrochloric acid or lactose) to "Second Generation Tigecyline" (containing both of those elements). (*Id.* at 15, ¶ 28; ex. 1 at ¶¶ 8-9) Mr. Ofslager interpreted this data, which showed that the

purity of tigecycline [*44] was reduced by more than 2% in First Generation Tigecycline as compared to Second Generation Tigecycline, and represented that "Second Generation Tigecycline possesses a *significantly greater stability* [from prior formulations without the elements claimed in the '828 patent] in both lyophilized and reconstituted forms." (*Id.*, ex. 1 at ¶ 36 (emphasis added)) Yet Sandoz contends that Mr. Ofslager did not tell the Examiner that the error rate in these measurements was about 2%, nor that other data in the submitted materials contained results so anomalous as to render them effectively unreliable, thus creating an incomplete and misleading picture. (*Id.* at 15-16, ¶ 29)

Additionally, Sandoz repeatedly states that Mr. Ofslager made these false and misleading representation in a "deceptive" fashion--in essence, Sandoz alleges that Mr. Ofslager knew about the existence of this problematic data but made a calculated, deliberate decision to conceal it in his presentations to the Examiner. (*Id.* at 16, ¶ 30 ("As with his characterization of the data from the '330 application, Mr. Ofslager presented the data from the stability reports in a deceptive way. . . . Thus, the '828 patent would not have [*45] been issued but for Mr. Ofslager's deceptive and erroneous representations to the Patent Office.")) Assuming that Sandoz's allegations are accurate, as I must at this stage, then those allegations give rise to the plausible claim that Mr. Ofslager's presentation was designed to mislead the Examiner into issuing the '828 patent on a faulty premise (of unexpected results). *Accord Pollin Patent Licensing, LLC, 2011 U.S. Dist. LEXIS 124805, 2011 WL 5118891 at *4* (granting motion for leave to amend to assert inequitable conduct claim and finding allegation of deceptive intent was sufficient, where counterclaimant alleged that withheld information would have been material to the PTO's examination and was known to applicant).

Moreover, although Wyeth claims that "Sandoz does not present any evidence concerning when Mr. Ofslager became aware of the[] alleged 'discrepancies'" in tigecycline data or whether he even considered them when presenting data to the Examiner (D.I. 70 at 4), the Court finds that the allegations give rise to that plausible inference. Mr. Ofslager represented that all of the "facts presented in [his] Declaration" were "of [his] own knowledge" and that he had read, was familiar with, and understood Wyeth's [*46] patent application. (D.I. 62, ex. 1 at ¶¶ 9-11 & pg. 10) More significantly, Mr.

Ofslager was the individual who developed the manufacturing process for the current version of Tygacil® made by Wyeth, which "contains lactose monohydrate as a diluent/stabilizer and hydrochloric acid as pH adjustment." (*Id.*, ex. 1 at ¶ 8) He not only oversaw this process, but developed or co-developed several other drugs, and is the inventor of multiple U.S. patents and applications. (*Id.*, ex. 1 at ¶¶ 6-7) Given Mr. Ofslager's experience, his direct oversight of this process, and his statements to the Examiner, it is reasonable to infer, at this stage, that he was familiar with the testing protocols he cited in his declaration (and that were included in the '828 patent specification), as well as the contrary data referenced by Sandoz.

In its briefs, Wyeth cites only a single instance of a case in this Court where an inequitable conduct claim was disallowed in its entirety at the pleading stage due to the failure to adequately allege scienter: *Softview LLC v. Apple Inc.*, No. 10-389-LPS, 2011 U.S. Dist. LEXIS 112476, 2011 WL 4571793 (D. Del. Sept. 30, 2011). *Softview* is distinguishable from the present facts, most notably because unlike [*47] the many deliberate misrepresentations regarding stabilization data alleged in the instant case, the *Softview* counterclaim focused only on a "mere disagreement" over what constituted "new matter" in a patent application. 2011 U.S. Dist. LEXIS 112476, [WL] at *1. Similarly, Wyeth cites *Fred Hutchinson Cancer Research Ctr. v. BioPet Vet Lab, Inc.*, Civil Action No. 2:10cv616, 2011 U.S. Dist. LEXIS 68800, 2011 WL 2551002 (E.D. Va. June 27, 2011), another case in which a district court disallowed an inequitable conduct claim at the pleading stage on grounds that insufficient evidence of deliberate deception was pled. However, the claim at issue in *Fred Hutchinson* involved only "curs[o]ry allegations" that the inventors of a patent were aware of undisclosed prior art. 2011 U.S. Dist. LEXIS 68800, [WL] at *3. Those cursory allegations pale in comparison to the lengthy factual recitation in Sandoz's pleading here, which alleges misrepresentations by Mr. Ofslager and others acting on Wyeth's behalf, regarding data that they repeatedly and affirmatively brought to the PTO's attention.

At oral argument, Wyeth also cited an additional, unpublished district court decision granting a motion to dismiss inequitable conduct allegations--*Human Genome Sciences, Inc. v. Genentech, Inc.*, Case No. 2:11-cv-6519-MRP (JEMx) (C.D. Cal. Dec. 9, 2011) (slip op.) [*48] Wyeth argued that because the facts in

*Genentech* are closely analogous to those at issue here, the Court should similarly dismiss Sandoz's inequitable conduct defense. (D.I. 85 at 11)

Although the *Genentech* inequitable conduct defense included many different elements, two particular allegations are most relevant here: (1) alleged misrepresentation of a prior art reference; and (2) alleged misrepresentation of experimental data. *Genentech*, slip op. at 8-10. In *Genentech*, the defendants alleged that one of Genentech's scientists stated that the patent application-at-issue and a series of prior art references were closely related. *Id.* at 8. Genentech's prosecution counsel later represented to the PTO that one of those same prior art references "was 'irrelevant to the claims of [the patent application].'" *Id.* at 8-9. The *Genentech* court found that these allegations were insufficient to give rise to a reasonable inference of deceptive intent. *Id.* at 9. These allegations bear little resemblance to those at issue in this case. Sandoz's argument is that Wyeth's representatives asserted that the prior art, as exemplified by the [*49] '277 reference, did not disclose a stabilization mechanism that would work for tigecycline. (D.I. 62 at 9, ¶ 10; 10, ¶ 12) Sandoz's arguments are not exclusively directed to the '277 reference itself, but rather concern the real-world applications of the biochemical mechanisms disclosed in that reference. (*Id.*) If anything, this portion of *Genentech* simply stands for the proposition that conflicting statements from party-representatives will not alone be sufficient to assert a plausible claim. That proposition is inapplicable to the facts as pled by Sandoz.

The *Genentech* defendants also pointed to "one of the inventor's statements to the PTO that the experiment in the specification had resulted in reactions 'significantly higher than the background,' whereas that inventor had previously said[,] in a private letter to a colleague, that the data in the application was 'barely measurable above background.'" *Genentech*, slip op. at 10. The *Genentech* court determined that "[a]ny number of reasons could exist for that contradiction--the inventor could have made a mistake in that letter or he could have changed his mind about how to read the data." *Id.* Although there could well be an innocent [*50] explanation for the conduct described in Sandoz's inequitable conduct defense, under *Exergen*, that is by no means the *only* reasonable inference to be drawn here. Moreover, in this case, the alleged contradictions go to the heart of patentability. The Examiner made clear that the '330 application was

rejected because the stability of the claimed invention offered only "minimal" advantages over the prior art. (D.I. 62 at 8, ¶ 8) Thus, Wyeth's only recourse to obtain the '828 patent was to assert that something more than a "minimal" increase in stability was observed in the claimed combination, even if the experimental data was inconsistent with that conclusion. There is no evidence that the contradiction at issue in *Genentech* was so central to patentability, or that there was such a motive to overstate the effectiveness of the invention. Thus, the cases cited by Wyeth do not alter the Court's conclusion as to this issue.

## IV. CONCLUSION

The Federal Circuit has expressed an unequivocal desire to reign in the proliferation of inequitable conduct claims, which have "increased adjudication cost and complexity, reduced likelihood of settlement, burdened courts, strained PTO resources, increased [*51] PTO backlog, and impaired patent quality." *Therasense,* 649 F.3d at 1290. However, that effort must be balanced against the fact that "honesty at the PTO is essential," and thus [HN22]inequitable conduct claims remain viable as a general matter, even when they are not based solely on affirmative acts of egregious misconduct. *Id.* at 1290, 1292. While Sandoz faces a more difficult task of proving inequitable conduct in light of the Federal Circuit's recent precedent, it has provided a lengthy recitation of facts that give rise to a reasonable inference that Wyeth misrepresented material information with the intent to deceive the PTO. Thus, I recommend that the Court DENY Plaintiffs' motion.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1. The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b)(2). The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in the district court. *See Henderson v. Carlson,* 812 F.2d 874, 878-79 (3d Cir. 1987); *Sincavage v. Barnhart,* 171 F. App'x 924, 925 n.1 (3d Cir. 2006).

The [*52] parties are directed to the Court's Standing Order In Non-Pro Se Matters For Objections Filed Under Fed. R. Civ. P. 72, dated November 16, 2009, a copy of which is available on the Court's website, http://www.ded.uscourts.gov/StandingOrde rsMain.htm.

Because this Report & Recommendation may contain confidential information, it has been released under seal, pending review by the parties to allow them to submit a single jointly proposed redacted version of the Report & Recommendation. Such redacted version shall be submitted no later than **February 10, 2012** for review by the Court. The Court will subsequently issue a publicly-available version of its Report & Recommendation.

Dated: February 3, 2012

/s/ Christopher J. Burke

Christopher J. Burke

UNITED STATES MAGISTRATE JUDGE

**<u>Citation #16</u>**
**2004 us dist lexis 11552**

LEXSEE

**BROTECH CORPORATION and PUROLITE INTERNATIONAL, LTD. v.
WHITE EAGLE INTERNATIONAL TECHNOLOGIES GROUP, INC., ET AL.**

**CIVIL ACTION NO. 03-232**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF
PENNSYLVANIA**

**2004 U.S. Dist. LEXIS 11552; 2004-2 Trade Cas. (CCH) P74,474**

**June 21, 2004, Decided
June 21, 2004, Filed; June 21, 2004, Entered**

**SUBSEQUENT HISTORY:** Motion granted by, in part, Motion denied by, in part Brotech Corp. v. White Eagle Int'l Techs. Group, 2005 U.S. Dist. LEXIS 6091 (E.D. Pa., Mar. 16, 2005)

**PRIOR HISTORY:** Brotech Corp. v. White Eagle Int'l Techs. Group, Inc., 2003 U.S. Dist. LEXIS 21073 (E.D. Pa., Nov. 18, 2003)

**DISPOSITION:** Motion to Dismiss Defendant's Amended Counterclaim was granted.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** In plaintiffs' action to correct the name of the inventor on patents relating to inventions of certain Russian scientists and for a declaration of joint co-ownership and joint equitable title to those patents, among other claims, one of several defendants filed an amended counterclaim alleging monopolization, conspiracy to monopolize, and conspiracy to restrain trade under 15 U.S.C.S. §§ 1,2. Plaintiffs moved to dismiss the amended counterclaim.

**OVERVIEW:** The amended counterclaim attempted to correct the deficiencies in the original counterclaim. Plaintiffs argued that the counterclaim failed to cure the defects because the allegations of product market and antitrust injury remained insufficient to support the antitrust claims. Although the amended counterclaim failed to allege the cross-elasticity of demand for interchangeable substitute products, that failure was not fatal because it alleged that defendant's product was unique and did not have any substitutes. However, as the amended counterclaim did not allege facts establishing defendant's intent and preparedness to enter the market for its product, that it would be prepared to enter the market for said product in the absence of the instant lawsuit, or that Food and Drug Administration approval of said products was probable, it was insufficient to state an antitrust injury. The amended counterclaim did not include allegations that defendant's payment of defense costs had any effect on competition, price, quantity or quality of its products, or prevented it from pursuing its entry into the market. Thus, it failed to allege antitrust injury arising from the lawsuit.

**OUTCOME:** The court granted plaintiffs' motion to dismiss. The dismissal was without prejudice and with leave to file an amended counterclaim to cure the remaining deficiencies in defendant's allegation of antitrust injury.

**CORE TERMS:** counterclaim, antitrust, resin, polymeric, anticompetitive, consumer, molecular weight, toxins, incorporating, patent, citations omitted, monopolization, conspiracy, antitrust laws, cross-elasticity, defending, cure, restrain trade, relevant markets, finished product, interchangeable, preparedness, competitor, scientists, patented, generic, sham, physiological, technology, fluids

**LexisNexis(R) Headnotes**

Case 3:10-cv-01435-AWT   Document 46-6   Filed 06/08/12   Page 144 of 177

2004 U.S. Dist. LEXIS 11552, *; 2004-2 Trade Cas. (CCH) P74,474

*Civil Procedure > Pleading & Practice > Defenses, Demurrers & Objections > Failures to State Claims*
*Civil Procedure > Pleading & Practice > Pleadings > Counterclaims > General Overview*
[HN1]When deciding a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), a court must accept as true all well pleaded facts in the complaint, or counterclaim, and any reasonable inferences derived from those facts, and view them in the light most favorable to the plaintiff. However, the court need not accept bald assertions or legal conclusions. The dismissal standard is higher in antitrust cases than generally. The facts underlying the elements of an antitrust claim must be pled with specificity.

*Antitrust & Trade Law > Market Definition > Product Market*
[HN2]The United States Court of Appeals for the Third Circuit has recognized that the failure to plead the relevant product market is a sufficient basis for dismissal of an antitrust claim. The Third Circuit has explained that the outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it. The Third Circuit has defined cross-elasticity as a measure of the substitutability of products from the point of view of buyers, i.e., the measure of the responsiveness of the demand for one product to changes in the price of a different product. A complaint which fails to define the relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or which alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products, is legally insufficient.

*Antitrust & Trade Law > Monopolization > Attempts to Monopolize > General Overview*
*Antitrust & Trade Law > Monopolization > Conspiracy to Monopolize > Sherman Act*
[HN3]In order to state a claim for attempted monopolization, conspiracy to monopolize, or conspiracy to restrain trade pursuant to the Sherman Act, a claim must allege the relevant product market.

*Antitrust & Trade Law > Clayton Act > Remedies > Injunctive Relief*
*Antitrust & Trade Law > Private Actions > Standing >*

*Clayton Act*
*Civil Procedure > Pleading & Practice > Pleadings > Counterclaims > General Overview*
[HN4]Sections 4 and 16 of the Clayton Act, 15 U.S.C.S. §§ 15 and 26 respectively, provide a private right of action for violations of §§ 1 and 2 of the Sherman Act. In order to recover damages or seek injunctive relief in an antitrust suit brought pursuant to §§ 4 or 16 of the Clayton Act, a private plaintiff must prove the existence of an antitrust injury, injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The United States Court of Appeals for the Third Circuit has recognized that, because the purpose of the antitrust laws is to protect competition, a court must examine the antitrust injury question from the viewpoint of the consumer. An antitrust plaintiff must prove that challenged conduct affected the prices, quantity or quality of goods or services, not just his own welfare.

*Antitrust & Trade Law > Clayton Act > General Overview*
*Antitrust & Trade Law > Private Actions > Injuries & Remedies > General Overview*
*Antitrust & Trade Law > Sherman Act > General Overview*
[HN5]When competitors violate the antitrust laws and another competitor is forced from a market, the latter suffers an injury-in-fact. A competitor that has not yet entered the market may also suffer injury but courts require a potential competitor to demonstrate both its intention to enter the market and its preparedness to do so. The following factors are considered to be sufficient indicia of preparedness to enter the market: adequate background and experience in the new field, sufficient financial capability to enter it, and the taking of actual and substantial affirmative steps toward entry, such as the consummation of relevant contracts and procurement of necessary facilities and equipment.

*Governments > Agriculture & Food > Federal Food, Drug & Cosmetic Act*
*Healthcare Law > Treatment > Medical Devices > Classification & Regulation*
[HN6]Regulation of medical devices is governed by the Federal Food, Drug and Cosmetic Act, 52 Stat. 1040, as amended by the Medical Device Amendments of 1976, 90 Stat. 39, 21 U.S.C.S. § 301. The degree of regulation by the Food and Drug Administration (FDA) depends

Case 3:10-cv-01435-AWT   Document 46-6   Filed 06/08/12   Page 145 of 177

2004 U.S. Dist. LEXIS 11552, *; 2004-2 Trade Cas. (CCH) P74,474

upon whether the medical device in question is a Class I, II or III device. Class I devices are subject only to general manufacturing controls, Class II devices are subject to more stringent controls, and Class III devices must complete a premarket approval (PMA) process before they may be marketed. The PMA process requires the applicant to demonstrate a reasonable assurance that the device is both safe and effective. The FDA's process for review of a Class III device requires an average of 1200 hours for each submission.

*Civil Procedure > Pleading & Practice > Pleadings > Counterclaims > General Overview*
*Governments > Agriculture & Food > Federal Food, Drug & Cosmetic Act*
[HN7]Device is defined by the Food, Drug and Cosmetic Act as: an instrument, apparatus, implement, machine, contrivance, implant, in vitro reagent, or other similar or related article, including any component, part, or accessory, which is--(1) recognized in the official National Formulary, or the United States Pharmacopeia, or any supplement to them, (2) intended for use in the diagnosis of disease or other conditions, or in the cure, mitigation, treatment, or prevention of disease, in man or other animals, or (3) intended to affect the structure or any function of the body of man or other animals, and which does not achieve its primary intended purposes through chemical action within or on the body of man or other animals and which is not dependent upon being metabolized for the achievement of its primary intended purposes. 21 U.S.C.S. § 321(h).

*Antitrust & Trade Law > Clayton Act > General Overview*
*Antitrust & Trade Law > Private Actions > Injuries & Remedies > General Overview*
*Antitrust & Trade Law > Sherman Act > General Overview*
[HN8]The United States Court of Appeals for the Third Circuit requires that an allegation of antitrust injury reflect the challenged activity's anti-competitive effect on the competitive market. An antitrust plaintiff must show that the allegedly anticompetitive conduct harmed the competitive landscape.

**COUNSEL:** [*1] For BROTECH CORPORATION ta THE PUROLITE COMPANY, Plaintiff: BRUCE BELLINGHAM, SPECTOR GADON & ROSEN PC, PHILADELPHIA, PA. BRUCE L. THALL, SPECTOR

GADON & ROSEN PC, PHILA, PA. PAUL R. ROSEN, SPECTOR GADON & ROSEN, P.C., PHILADELPHIA, PA. STEVEN M. BETENSKY, WHITE & CASE LLP, NEW YORK, NY.

For PUROLITE INTERNATIONAL, LTD., Plaintiff: BRUCE BELLINGHAM, SPECTOR GADON & ROSEN PC, PHILADELPHIA, PA. BRUCE L. THALL, SPECTOR GADON & ROSEN PC, PHILA, PA. HERBERT B. KEIL, KEIL & WEINKAUF, WASHINGTON, DC. PAUL R. ROSEN, SPECTOR GADON & ROSEN, P.C., PHILADELPHIA, PA. STEVEN M. BETENSKY, WHITE & CASE LLP, NEW YORK, NY.

For WHITE EAGLE INTERNATIONAL TECHNOLOGIES GROUP, INC., WHITE EAGLE INTERNATIONAL TECHNOLOGIES, L.P., RENALTECH INTERNATIONAL, LLC ta MEDASORB, Defendants: JEFFREY A. SCHWAB, ABELMAN FRAYNE & SCHWAB, NEW YORK, NY. PETER MICHAEL RYAN, DECHERT LLP, PHILADELPHIA, PA. RICHARD L. CRISONA, ABELMAN FRAYNE & SCHWAB, NEW YORK, NY.

For RENALTECH INTERNATIONAL, LLC, WHITE EAGLE INTERNATIONAL TECHNOLOGIES GROUP, INC., WHITE EAGLE INTERNATIONAL TECHNOLOGIES, L.P., Counter Claimants: JEFFREY A. SCHWAB, ABELMAN FRAYNE & SCHWAB, NEW YORK, NY. PETER MICHAEL RYAN, DECHERT LLP, PHILADELPHIA, [*2] PA.

For BROTECH CORPORATION, Counter Defendant: DAVID M. BECKWITH, MCDERMOT, WILL & EMERY, IRVINE, CA. MAURICIO A. FLORES, MCDERMOT, WILL & EMERY, IRVINE, CA. RAPHAEL V. LUPO, MCDERMOTT, WILL & EMERY, WASHINGTON, DC.

For RENALTECH INTERNATIONAL, LLC, Counter Claimant: PETER MICHAEL RYAN, DECHERT LLP, PHILADELPHIA, PA.

**JUDGES:** John R. Padova, J.

**OPINION BY:** John R. Padova

**OPINION**

2004 U.S. Dist. LEXIS 11552, *2; 2004-2 Trade Cas. (CCH) P74,474

*MEMORANDUM*

**Padova, J.**

**June 21, 2004**

Before the Court is Plaintiffs Brotech Corporation's and Purolite International, Ltd.'s Motion to Dismiss Defendant RenalTech International, LLC's Amended Counterclaim. For the reasons that follow, the Motion is granted and the Amended Counterclaim is dismissed in its entirety, without prejudice.

## I. BACKGROUND

Plaintiffs have brought this action to correct the name of the inventor on patents relating to inventions of certain Russian scientists and for a declaration of joint co-ownership and joint equitable title to those patents. They have also brought claims for misappropriation of trade secrets, tortious interference with contract and other common law claims arising from Defendants' alleged interference with the relationship between Plaintiffs and those [*3] Russian scientists. The Second Amended Complaint alleges that, for the last ten years, Plaintiffs' employees have engaged in a cooperative research and development program with several Russian scientists led by Professor Vadim A. Davankov of the Russian Academy of Science. (2d Am. Compl. P 2.) As a result of that research, Plaintiffs' employees and the Russian scientists have developed unique macronet and micronet copolymer resins for a variety of adsorpitve uses and methods to produce these resins in a commercially viable manner, including their use in renal dialysis. (*Id.* P 4.) The Second Amended Complaint further alleges that Defendants procured eleven United States patents on these inventions, misrepresenting their ownership and failing to acknowledge Plaintiffs' property rights. (*Id.* P 73-74.) The disputed patents are: U.S. Patent 5,773,384 issued June 30, 1998; U.S. Patent 5,904,663 issued May 18, 1999; U.S. Patent 6,087,300 issued July 11, 2000; U.S. Patent 6,114,466 issued September 5, 2000; U.S. Patent 6,127,311 issued October 3, 2000; U.S. Patent 6,133,393 issued October 17, 2000; U.S. Patent 6,136,424 issued October 24, 2000; U.S. Patent 6,153,707 issued November 28, 2000; [*4] U.S. Patent 6,156,851 issued December 5, 2000; U.S. Patent 6,159,377 issued December 12, 2000; U.S. Patent 6,303,702 issued October 16, 2001. (*Id.* P 74.)

Defendant RenalTech International, LLC

("RenalTech") has asserted the instant Amended Counterclaim against both Plaintiffs asserting that Plaintiffs are using their superior economic resources and this litigation to gain control of Defendants' pioneering technology. The Amended Counterclaim alleges that RenalTech is developing new technology to assist chronic renal failure patients by removing middle molecular weight toxins, which are not efficiently removed by renal dialysis, from the blood. (Am. Countercl. PP 15-16.) RenalTech's chemists have developed this technology, a biocompatible adsorbent polymer and a device incorporating this polymer, trademarked BetaSorb, which has been designed to be used in conjunction with hemodialysis. (*Id.* P 16.) A human clinical trial of BetaSorb is currently underway in the United States. (*Id.*) RenalTech is also studying the use of its polymer technology to treat severe sepsis. (*Id.* PP 23-24.) RenalTech claims to be the only organization currently conducting human clinical trials [*5] for such products and the only organization at an advanced stage of seeking regulatory approval from the Food and Drug Administration ("FDA"). (*Id.* P 32.) RenalTech acknowledges that such products cannot be sold or used in the treatment of individuals unless they have received FDA approval. (*Id.*)

The Amended Counterclaim alleges that Plaintiffs have brought this action in order to coerce RenalTech into ceding control of its intellectual property to Plaintiffs so that Plaintiffs can unlawfully monopolize the market for its products. (*Id.* P 33.) The Amended Counterclaim alleges claims against Plaintiffs for attempted monopolization pursuant to Section 2 of the Sherman Act, 15 U.S.C. § 2; incipient conspiracy to monpolize pursuant to Section 2 of the Sherman Act; and conspiracy to restrain trade pursuant to Section 1 of the Sherman Act, 15 U.S.C. § 1.

This is not RenalTech's first attempt to assert antitrust claims against Plaintiffs in this action. RenalTech previously asserted a Counterclaim against Plaintiffs asserting causes of action for attempted monopolization pursuant to Section 2 of the Sherman Act; conspiracy to restrain [*6] trade pursuant to Section 1 of the Sherman Act; and for tortious interference with existing and prospective business relations. Plaintiffs filed a motion to dismiss. On November 18, 2003, the Court granted the motion to dismiss RenalTech's counterclaim for attempted monopolization pursuant to 15 U.S.C. § 2 because the market proposed in the

Case 3:10-cv-01435-AWT   Document 46-6   Filed 06/08/12   Page 147 of 177

2004 U.S. Dist. LEXIS 11552, *6; 2004-2 Trade Cas. (CCH) P74,474

Counterclaim did not "encompass any interchangeable substitute products and [did] not allege that there are no substitute products." (Nov. 18, 2003 Memorandum and Order at 11.) The Court granted the Motion to Dismiss RenalTech's counterclaim for conspiracy to restrain trade pursuant to 15 U.S.C. § 1 because the Counterclaim did not allege an antitrust injury and did not sufficiently allege the relevant product market. (*Id.* at 16.) The Motion to Dismiss was also granted with respect to RenalTech's claims for tortious interference with existing and prospective business relations. The Order dismissed the Counterclaim without prejudice and with leave to file an amended counterclaim. Defendants subsequently filed the instant Amended Counterclaim.

The Amended Counterclaim attempts to correct the deficiencies [*7] in the original Counterclaim by adding allegations relating to the relevant markets and antitrust injury. The Amended Counterclaim alleges that there are two markets relevant to Plaintiffs' anticompetitive conduct. (Am. Countercl. P 33.) The first is the "supplier market in the United States for the manufacture and supply of RenalTech's proprietary polymeric resin to RenalTech." (*Id.* P 33.) The Amended Counterclaim alleges that Plaintiffs' anticompetitive conduct is intended to coerce RenalTech into an exclusive manufacturing agreement, which would foreclose competition in the supplier market. (*Id.*) The second market is "the market in the United States for the finished product incorporating RenalTech's patented, proprietary hemocompatible or biocompatible polymeric resins designed to remove middle molecular weight compounds or toxins from physiological fluids, including human blood." (*Id.* P 34.) RenalTech states that it is "unaware of any existing or development stage product or service targeted toward or capable of removing the middle molecular weight toxins from physiological fluids as RenalTech's polymeric resin does" and that "there is no known substitute at any price [*8] for RenalTech's polymeric resin for the removal of middle molecular weight toxins." (*Id.*) The Amended Counterclaim further alleges that if Plaintiffs' anticompetitive conduct is successful, they will be able to control the price and output of this polymeric resin and consumers will "have no practical or available substitute for a product or service that removes middle molecular weight toxins." (*Id.*)

The Amended Counterclaim also alleges that Plaintiffs' anticompetitive litigation tactics have damaged RenalTech in two ways. RenalTech claims to have suffered recognizable antitrust injury in the form of "the costs and expenses that RenalTech has incurred and will incur in defending this predatory, anticompetitive sham litigation." (*Id.* P 39.) It further alleges that Plaintiffs' "coercion of an anticompetitive supply agreement will increase RenalTech's costs in producing finished products incorporating its patented polymeric resin, thereby increasing the price which will ultimately be charged to the consumer." (*Id.* P 40.) In addition, the increased cost will reduce demand for the product, limiting sales and injuring RenalTech. (*Id.*)

## II. LEGAL STANDARD

[HN1]When deciding [*9] a Motion to Dismiss pursuant to Rule 12(b)(6), the court must accept as true all well pleaded facts in the complaint, or counterclaim, and any reasonable inferences derived from those facts, and view them in the light most favorable to the Plaintiff. *FTC v. Commonwealth Marketing Group, Inc., 72 F. Supp. 2d 530, 535 (W.D. Pa. 1999)* (citations omitted). However, the Court need not accept "bald assertions or legal conclusions." *Morse v. Lower Merion School District, 132 F.3d 902, 906 (3d Cir. 1997)*. The dismissal standard is higher in antitrust cases than generally. *Rolite, Inc. v. Wheelabrator Envir. Systems, Inc., 958 F. Supp. 992, 995 (E.D. Pa. 1997)*. The facts underlying the elements of an antitrust claim must be pled with specificity. *Syncsort Incorporated v. Sequential Software, Inc., 50 F. Supp. 2d 318, 328 (D.N.J. 1999)* (dismissing antitrust counterclaim brought pursuant to Section 2 of the Sherman Act for failure to allege specific facts setting forth the elements of a claim for monopolization or attempted monopolization); *see also Com. of Pennsylvania ex. rel. Zimmerman v. PepsiCo., Inc., 836 F.2d 173, 182 (3d Cir. 1988)* [*10] ("When the requisite elements are lacking, the costs of modern federal antitrust litigation and the increasing caseload of the federal courts counsel against sending the parties into discovery when there is no reasonable likelihood that the plaintiffs can construct a claim from the events related in the complaint.") (quoting *Car Carriers, Inc. v. Ford Motor Co., 745 F.2d 1101, 1106 (7th Cir. 1984)*).

## III. DISCUSSION

Plaintiffs argue that the Amended Counterclaims should be dismissed because RenalTech has failed to cure the defects in its original Counterclaim. Plaintiffs maintain that the Amended Counterclaim's allegations of product market and antitrust injury remain insufficient to

2004 U.S. Dist. LEXIS 11552, *10; 2004-2 Trade Cas. (CCH) P74,474

support claims under the antitrust laws.

A. *Product Market*

Plaintiffs argue that the Amended Counterclaim should be dismissed because the allegations describing the relevant product market do not establish the reasonable interchangeability of use or the cross-elasticity of demand between the product and substitutes for it. [1] [HN2]The United States Court of Appeals for the Third Circuit ("Third Circuit") has recognized that the failure to plead the relevant product market is a sufficient [*11] basis for dismissal of an antitrust claim. *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997); *see also*, *Syncsort*, 50 F. Supp. 2d at 331. The Third Circuit has explained that "'the outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it.'" *Id.* (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 325, 8 L. Ed. 2d 510, 82 S. Ct. 1502 (1962); *Tunis Bros. Co., Inc. v. Ford Motor Co.*, 952 F.2d 715, 722 (3d Cir. 1991)). In *Queen City Pizza*, the Third Circuit defined cross-elasticity as "a measure of the substitutability of products from the point of view of buyers," i.e., the measure of "the responsiveness of the demand for one product to changes in the price of a different product." *Id.* at 438 n.6 (citation omitted). A complaint which fails to define the relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or which alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products, [*12] is legally insufficient. *Id.* at 436.

1    [HN3]In order to state a claim for attempted monopolization, conspiracy to monopolize, or conspiracy to restrain trade pursuant to the Sherman Act, the Amended Counterclaim must allege the relevant product market. *See Spectrum Sports v. McQuillan*, 506 U.S. 447, 456, 122 L. Ed. 2d 247, 113 S. Ct. 884 (1993); *Farr v. Healtheast, Inc.*, 1993 U.S. Dist. LEXIS 8268, Civ.A.No. 91-6960, 1993 WL 220680, at *11 (E.D. Pa. 1993); *Petruzzi's IGA v. Darling-Delaware*, 998 F.2d 1224, 1229 (3d Cir. 1993).

The Amended Counterclaim defines the relevant product market as follows:

the market in the United States for the finished product incorporating RenalTech's patented, proprietary hemocompatible or biocompatible polymeric resins designed to remove middle molecular weight compounds or toxins from physiological fluids, including human blood. RenalTech is unaware of any existing or development stage product or service targeted toward or capable of removing the middle molecular [*13] weight toxins from physiological fluids as RenalTech's polymeric resin does. Thus, there is no known substitute at any price for RenalTech's polymeric resin for the removal of middle molecular weight toxins. If BroTech and RenalTech succeed in their anticompetitive conduct through this sham litigation, they will be able to control the price and output of the polymeric resin, and consumers will have no practical or available substitute for a product or service that removes middle molecular weight toxins.

(Am. Countercl. P 34.) Although the Amended Counterclaim fails to allege the cross-elasticity of demand for interchangeable substitute products, that failure is not fatal in this case because the Amended Counterclaim alleges that RenalTech's polymeric resin is unique and does not have any substitutes. *See Mitel Corp. v. A&A Connections*, 1998 U.S. Dist. LEXIS 3576, No. Civ. A. 97-cv-4205, 1998 WL 136529, at *4 (E.D. Pa. Mar. 20, 1998) (recognizing that "in circumstances where the product or service is unique and therefore not interchangeable with other products or services, the single product can constitute the relevant market") (citing *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 482, 119 L. Ed. 2d 265, 112 S. Ct. 2072 (1992); [*14] *Queen City Pizza*, 124 F.3d at 439). Accordingly, the Court finds that the Amended Counterclaim's allegation that RenalTech's polymeric resin does not have any substitutes is sufficient to allege a unique product and that the Amended Counterclaim sufficiently alleges a product market made up of just that unique product.

B. *Antitrust Injury*

Plaintiffs also argue that the Amended Counterclaim

should be dismissed because RenalTech has failed to cure the deficiency in the Counterclaim's allegation of antitrust injury. [HN4]Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26 respectively, provide a private right of action for violations of Sections 1and 2 of the Sherman Act. *See* 15 U.S.C. §§ 15,26. In order to recover damages or seek injunctive relief in an antitrust suit brought pursuant to Sections 4or 16 of the Clayton Act, a private plaintiff must prove the existence of an antitrust injury, "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Atlantic Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 334, 109 L. Ed. 2d 333, 110 S. Ct. 1884 (1990)* [*15] (citing *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489, 50 L. Ed. 2d 701, 97 S. Ct. 690 (1977))*. The Third Circuit has recognized that, because the purpose of the antitrust laws is to protect competition, the court must examine "the antitrust injury question from the viewpoint of the consumer. 'An antitrust plaintiff must prove that challenged conduct affected the prices, quantity or quality of goods or services,' not just his own welfare." *Mathews v. Lancaster General Hosp., 87 F.3d 624, 641 (3d Cir. 1996)* (quoting *Tunis Bros., 952 F.2d at 728*). The Amended Counterclaim contains the following allegations of antitrust injury:

> 39. And although they have not yet succeeded, BroTech's and Purolite International's predatory litigation tactics are having their intended effect, and RenalTech has suffered antitrust injury. RenalTech has suffered and will suffer antitrust injury in at least two ways. First, the costs and expenses that RenalTech has incurred and will incur in defending this predatory, anticompetitive sham litigation are themselves a recognized form of antitrust injury, such costs and expenses reflecting the anticompetitive [*16] effect of the wrongful acts undertaken with an anticompetitive intent.

> 40. Second, BroTech's and Purolite International's ability to control the price of the polymeric resin supplied by them to RenalTech (if their anticompetitive scheme succeeds) will cause further antitrust injury directly to RenalTech and to consumers. BroTech's and Purolite

International's coercion of an anticompetitive supply agreement will increase RenalTech's costs in producing finished products incorporating its patented polymeric resin, thereby increasing the price which will ultimately be charged to the consumer. Moreover, the excessive price charged to the consumer as a result of BroTech's and Purolite International's anticompetitive conduct is likely to reduce demand for the product, thereby limiting RenalTech's sales and injuring RenalTech. BroTech and Purolite International still profit, even with reduced sales, because their anticompetitive conduct allows them to charge excessive prices to RenalTech, whereas RenalTech is faced both with excessive prices charged by BroTech and Purolite International and with reduced demand from consumers.

(Am. Countercl. PP 39-40.)

Plaintiffs have moved to [*17] dismiss the Amended Counterclaim on the grounds that these allegations are insufficient to allege an antitrust injury. Plaintiffs maintain that these paragraphs are insufficient to allege antitrust injury for two reasons: (1) the potential effect on consumers and RenalTech of Plaintiffs' future behavior, as alleged in paragraph 40 of the Amended Counterclaim, is too hypothetical to state an injury under the antitrust laws because RenalTech's polymeric resin products have not been approved by the FDA and (2) the costs of defending this litigation, as alleged in paragraph 39 of the Amended Counterclaim, do not constitute an antitrust injury.

1. *Future antitrust injury*

Plaintiffs argue that the Amended Counterclaim should be dismissed because the potential injury to competition alleged in paragraph 40 of the Amended Counterclaim is insufficient to state an antitrust injury where unsurmounted statutory or regulatory hurdles preclude the antitrust plaintiff from entering the market. (Pls.' Supp. Mem. at 3.) RenalTech has not yet entered the market for its polymeric resin. [HN5]"When competitors violate the antitrust laws and another competitor is forced from a market, the latter suffers

Case 3:10-cv-01435-AWT   Document 46-6   Filed 06/08/12   Page 150 of 177

2004 U.S. Dist. LEXIS 11552, *18; 2004-2 Trade Cas. (CCH) P74,474

[*18] an injury-in-fact." *Andrx Pharms., Inc. v. Biovail Corp. Int'l*, 347 U.S. App. D.C. 178, 256 F.3d 799, 806 (D.C. Cir. 2001). A competitor such as RenalTech "that has not yet entered the market may also suffer injury but courts require a 'potential' competitor to demonstrate both its intention to enter the market and its preparedness to do so." *Id.* (citing *Hecht v. Pro-Football, Inc.*, 187 U.S. App. D.C. 73, 570 F.2d 982, 994 (D.C. Cir. 1977)). The following factors are considered to be sufficient indicia of preparedness to enter the market: "adequate background and experience in the new field, sufficient financial capability to enter it, and the taking of actual and substantial affirmative steps toward entry, 'such as the consummation of relevant contracts and procurement of necessary facilities and equipment.'" *Hecht*, 570 F.2d at 994 (footnote and citation omitted); *see also Out Front Productions v. Magid*, 748 F.2d 166, 170 (3d Cir. 1984) ("a company . . . beginning business . . . must show not only that it had the background, experience, and financial ability to make a viable entrance, but even [*19] more important, that it took affirmative actions to pursue the new line of business.") (citations omitted). Consequently, in determining whether RenalTech has sufficiently pled an injury, or threatened injury, resulting from the filing of the instant lawsuit, the Court must examine its intent and preparedness to enter the market for its polymeric resin. *Andrx*, 256 F.3d at 807.

The Amended Counterclaim acknowledges that RenalTech must obtain FDA approval for products utilizing its polymeric resin before these products can be "sold or used in the treatment of individuals." (Am. Countercl. P 32.) [HN6]Regulation of medical devices [2] is governed by the Federal Food, Drug and Cosmetic Act, 52 Stat. 1040, as amended by the Medical Device Amendments of 1976, 90 Stat. 39, 21 U.S.C. § 301 (West 1999). *See Buckman Company v. Plaintiffs' Legal Committee*, 531 U.S. 341, 343, 148 L. Ed. 2d 854, 121 S. Ct. 1012 (2001). The degree of regulation by the FDA depends upon whether the medical device in question is a Class I, II or III device. *Id.*; *see also* 21 U.S.C. § 360c(a). Class I devices are subject only to general manufacturing [*20] controls, Class II devices are subject to more stringent controls, and Class III devices must complete a premarket approval (PMA) process before they may be marketed. *Id.* at 343-44. The PMA process requires the applicant to demonstrate a "reasonable assurance" that the device is both safe and effective. *Id.* at 344 (citing 21 U.S.C. §§ 360e(d)(2)(A),(B)). The FDA's process for review of a Class III device requires "an average of 1200

hours [for] each submission." *Id.* at 344-45 (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 477, 135 L. Ed. 2d 700, 116 S. Ct. 2240 (1996)).

2  [HN7]Device is defined by the Food, Drug and Cosmetic Act as:

an instrument, apparatus, implement, machine, contrivance, implant, in vitro reagent, or other similar or related article, including any component, part, or accessory, which is--

(1) recognized in the official National Formulary, or the United States Pharmacopeia, or any supplement to them,

(2) intended for use in the diagnosis of disease or other conditions, or in the cure, mitigation, treatment, or prevention of disease, in man or other animals, or

(3) intended to affect the structure or any function of the body of man or other animals, and which does not achieve its primary intended purposes through chemical action within or on the body of man or other animals and which is not dependent upon being metabolized for the achievement of its primary intended purposes.

21 U.S.C. § 321(h).

[*21] The Amended Counterclaim contains no allegations with respect to the classification of products incorporating RenalTech's polymeric resin, or the degree of FDA review which must be completed before those products may be marketed. The Amended Counterclaim similarly fails to include any allegations regarding how far RenalTech has gone in the process of obtaining FDA approval of products incorporating its polymeric resin, when such approval may be anticipated, or whether it will be prepared to enter the product market as soon as such approval has been received. The Amended Complaint simply alleges that such approval must be obtained and

that RenalTech is seeking such regulatory approval from the FDA. (Am. Countercl. P 32.) As the Amended Complaint does not allege facts establishing RenalTech's intent and preparedness to enter the market for its polymeric resin product, that it would be prepared to enter the market for said product in the absence of the instant lawsuit, or that FDA approval of said products is probable, the Court finds that paragraph 40 of the Amended Counterclaim is insufficient to state an antitrust injury. *See Andrx* 256 F.3d at 807-08 (determining [*22] that district court correctly dismissed generic drug manufacturer's antitrust counterclaim in patent infringement action where the generic drug manufacturer failed to allege that it was prepared to enter the market or that it anticipated FDA approval for its generic drug; also finding that district court erred in dismissing said counterclaim with prejudice where the generic drug manufacturer might be able to cure its pleading deficiency).

C. *Defense Costs*

Plaintiffs argue that the Amended Complaint should be dismissed because RenalTech's payment of costs and expenses of litigation in defense of the instant litigation does not constitute an antitrust injury. RenalTech maintains, however, that legal fees and other costs and expenses incurred in defending sham, anticompetitive litigation are recognized elements of antitrust injury. RenalTech relies on a line of cases originating with the opinion of the United States Court of Appeals for the Ninth Circuit ("Ninth Circuit") in *Handgards, Inc. v. Ethicon, Inc.*, 601 F.2d 986 (9th Cir. 1979). In *Handgards*, the Ninth Circuit found that the costs of defending a patent infringement suit which had been brought in bad [*23] faith constituted an antitrust injury: "In a suit alleging antitrust injury based upon a bad faith prosecution theory it is obvious that the costs incurred in defense of the prior patent infringement suit are an injury which 'flows' from the antitrust wrong." 601 F.2d at 997. However, the Third Circuit has not adopted the *Handgards* determination that litigation costs alone qualify as antitrust injury.

[HN8]The Third Circuit requires that an allegation of

antitrust injury reflect the challenged activity's "anti-competitive effect on the competitive market." *Eichorn v. AT&T Corp.*, 248 F.3d 131, 140 (3d Cir. 2001). An antitrust plaintiff must show that the allegedly anticompetitive conduct harmed "the competitive landscape." *Tunis Bros.*, 952 F.2d at 728 (citation omitted). While the Amended Counterclaim alleges that RenalTech's payment of defense costs in this litigation flows from Plaintiffs' allegedly anticompetitive conduct, there is no allegation that said payment had any effect on competition, on the price, quantity or quality of RenalTech's products, or prevented RenalTech from pursuing its entry into the market for its polymeric resin. [*24] *See Mathews*, 87 F.3d at 641; *Eichorn*, 248 F.3d at 140 ("we have consistently held an individual plaintiff personally aggrieved by an alleged anti-competitive agreement has not suffered injury unless the activity has a wider impact on the competitive market.") (citation omitted).

Accordingly, the Court finds that the Amended Counterclaim fails to allege antitrust injury arising from the filing of this action and Plaintiffs' Motion to Dismiss is, therefore, granted. Since RenalTech may be able to amend its counterclaim to cure the remaining deficiencies in its allegation of antitrust injury, the dismissal is without prejudice.

An appropriate order follows.

### ORDER

**AND NOW,** this 21st day of June, 2004, upon consideration of Plaintiffs' Motion to Dismiss Defendant RenalTech's Amended Counterclaim (Docket No. 45), Defendant RenalTech's response thereto, the argument held in open court on February 26, 2004, and the parties' supplemental memoranda, **IT IS HEREBY ORDERED** that the Motion is **GRANTED** without prejudice and with leave to file an amended counterclaim within twenty (20) days of the date of this Order.

BY THE COURT:

[*25] John R. Padova, J.

**Citation #17**
**2002 us dist lexis 22473**

LEXSEE

**AHMAD FARAHMAND v. DONALD H. RUMSFELD, Secretary of Defense and
LT. GENERAL HENRY T. GLISSON, Director of the Defense Logistics Agency**

**CIVIL ACTION NO. 02-1236**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF
PENNSYLVANIA**

**2002 U.S. Dist. LEXIS 22473; 90 Fair Empl. Prac. Cas. (BNA) 510**

**November 20, 2002, Decided**

**DISPOSITION:** Plaintiff's motion for consolidation
denied.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff employee filed
an action against defendants, the U.S. Secretary of
Defense and a government agency director, related to
alleged employment discrimination claims. The employee
filed a motion for consolidation of two possible actions
and defendants opposed the motion.

**OVERVIEW:** The employee alleged racial and age
discrimination in promotion opportunities denied to him
while working for the federal government. The court
found that the employee failed to show that the applicant
pools in either case had any overlap. A consolidated trial
would needlessly delay both cases and possibly confuse a
jury. Regarding the first case, the employee claimed that
he did not make it to the final tier of candidates from
which the selecting official made the decision to promote
an employee. Regarding the second case, the employee's
complaint claimed that he did not even make it to the
interview process. The court found that the two cases: (1)
were derived from different job opportunity
announcements; (2) were judged by different criteria
within two significantly different selection processes; and
(3) processed filtered applications from two separate
applicant pools. The two cases were at different stages
with different claims.

**OUTCOME:** The court denied the motion.

**CORE TERMS:** consolidation, national origin,

consolidate, promotion, pool, interview, religion,
common question of law, qualified applicants, judicial
economy, consolidated, discovery, weigh, discrimination
claim, selection process, protected class, consisting,
finalists, younger, lawsuit

**LexisNexis(R) Headnotes**

*Civil Procedure > Counsel > General Overview*
*Civil Procedure > Pretrial Matters > Consolidation of
Actions*
[HN1]A district court has inherent power to control the
disposition of cases on its docket with economy of time
and effort for itself, for counsel and for litigants. This
power is augmented by Fed. R. Civ. P. 42(a).

*Civil Procedure > Pretrial Matters > Consolidation of
Actions*
[HN2]See Fed. R. Civ. P. 42(a).

*Civil Procedure > Pretrial Matters > Consolidation of
Actions*
[HN3]In the context of Fed. R. Civ. P. 42(a), a moving
party bears the burden of proof on a motion for
consolidation.

*Civil Procedure > Pretrial Matters > Consolidation of
Actions*
[HN4]A threshold requirement for consolidation is
whether there exists a common question of law or fact.

2002 U.S. Dist. LEXIS 22473, *; 90 Fair Empl. Prac. Cas. (BNA) 510

While the existence of common issues is a prerequisite for consolidation, their mere presence does not compel consolidation. Rather, a court may consolidate cases if, in its discretion, consolidation would facilitate the administration of justice.

*Civil Procedure > Pretrial Matters > Consolidation of Actions*

[HN5]A district court has "broad discretion" when determining whether consolidation is appropriate. When exercising this discretion, a court should weigh the benefits of judicial economy against the potential for: (1) new delays; (2) expense; (3) confusion; or (4) prejudice. A motion to consolidate may be denied if: (1) the common issue is not a principle one; (2) it will cause delay in one of the cases; or (3) it will lead to confusion or prejudice in the trial of a case. Where the evidence in one case is not relevant to the issues in the other, consolidation would create a likelihood of prejudice by confusing the issues. Finally, a court may deny consolidation when one case is further into the discovery process.

*Civil Procedure > Pretrial Matters > Consolidation of Actions*

[HN6]In the context of case consolidation, acknowledging a common issue, however, does not end a district court's inquiry. The court must consider whether the interest of judicial economy are outweighed by factors such as: (1) confusion; (2) prejudice; and (3) delay during the proceedings.

*Constitutional Law > Equal Protection > Age*
*Constitutional Law > Equal Protection > Race*
*Labor & Employment Law > Discrimination > Age Discrimination > Employment Practices > General Overview*

[HN7]In the context of an employment discrimination claim, where a plaintiff alleges that he was passed over on two separate occasions for a promotion, to win on the merits the plaintiff is required to prove that he is as capable or more qualified than the relevant applicant pool.

**COUNSEL:** For Ahmad Farahmand, PLAINTIFF: Gerald Jay Pomerantz, Pomerantz & Scheffer, Philadelphia, PA USA. Mark S Scheffer, Pomerantz & Scheffer, Philadelphia, PA USA.

For Donald H Rumsfeld, Henry T Glisson, DEFENDANTS: Margaret L Hutchinson, US Attorney's Office, Philadelphia, PA USA. James G Sheehan, US Attorney's Office, Philadelphia, PA USA.

**JUDGES:** [*1]  HERBERT J. HUTTON, J.

**OPINION BY:** HERBERT J. HUTTON

**OPINION**

***MEMORANDUM AND ORDER***

HUTTON, J.

November 20, 2002

Presently before the Court are Plaintiff's Motion for Consolidation (Docket No. 4) and Defendants' Memorandum in Opposition to Plaintiff's Motion to Consolidate (Docket No. 5).

I. *BACKGROUND*

On December 23, 1997, Plaintiff filed a complaint alleging that Defendants discriminated against him when he was passed over for a promotion. He asserted that the discrimination was based on his age of 62, his Iranian national origin, and/or his religion, which is Muslim. He complained that he was not one of the four finalists chosen after an elaborate selection process, which included an important interview before a three person panel consisting of employees in the Medical Directorate in Philadelphia. Plaintiff alleged that the finalists were chosen because they were younger and did not share Plaintiff's protected class characteristics.

A jury trial on the merits resulted in a jury finding in favor of the Plaintiff concerning national origin discrimination, and for the Defendants on the claim of religious discrimination. The Court entered a Findings of Fact, Conclusions [*2] of Law, and Final Judgment in favor of the Defendants on the age discrimination claim on August 23, 1999. The Third Circuit Court of Appeals subsequently vacated the judgment in favor of the Plaintiff on the claim of national origin discrimination, and remanded it for trial, while affirming the district court's judgment for Defendants on the age discrimination claim.

On March 11, 2002, Plaintiff filed a complaint

Page 2

Case 3:10-cv-01435-AWT   Document 46-6   Filed 06/08/12   Page 155 of 177

2002 U.S. Dist. LEXIS 22473, *2; 90 Fair Empl. Prac. Cas. (BNA) 510

alleging that he had again experienced discrimination when he was passed over for a promotion, in favor of younger, allegedly less qualified applicants who were not part of his protected class of age, national origin (Iranian), race (Indo-Iranian), or religion (Muslim). Moreover, Plaintiff alleges that he was treated less favorably after the initiation of his first lawsuit. In this lawsuit, Plaintiff's central grievance is that he did not make it to the interview process.

## II. *LEGAL STANDARD*

[HN1]The Court has "inherent power to 'control the disposition of cases on its docket with economy of time and effort for itself, for counsel and for litigants.'" *Liberty Lincoln Mercury, Inc. v. Ford Marketing Corp. et. al., 149 F.R.D. 65, 80 (D.N.J. 1993)* (quoting [*3] *United States v. Kramer, 770 F. Supp. 954, 957 (D.N.J. 1991))*. This power is augmented by Rule 42(a) of the Federal Rules of Civil Procedure, which states in relevant part:

> [HN2]When actions involving a common question of law or fact are pending before the court, it may order a joint hearing or trial of any or all the matters in issue in the actions; it may order all the actions consolidated; and it may make such orders concerning proceedings therein as may tend to avoid unnecessary costs or delay.

[HN3]The moving party bears the burden of proof on a motion for consolidation. *See In re Consolidated Parlodel Litigation, 182 F.R.D. 441, 444 (D.N.J. 1998); Schneck v. International Business Machines Corp., 1996 U.S. Dist. LEXIS 17486*, CIV. NO. 92-4370 (GEB), 1996 WL 885789 *3 (D.N.J. June 25, 1996).

[HN4]A threshold requirement for consolidation is whether there exists a common question of law or fact. *See In re Consolidated Parlodel Litigation, 182 F.R.D. at 444; Easton & Co. v. Mutual Benefit Life Insurance Co., CIV.A.NOS. 91-4012, 92-2095, 1992 WL 448794 *4 (D.N.J. Nov. 4, 1992).* While the existence of common issues is a prerequisite [*4] for consolidation, their mere presence does not compel consolidation. *Liberty Lincoln Mercury, Inc., 149 F.R.D. at 81.* Rather, a court may consolidate cases if, in its discretion, "consolidation would facilitate the administration of justice." *Waste Distillation Tech., Inc. v. Pan American Resources, Inc.,*

*775 F. Supp. 759, 761 (D.Del. 1991).*

[HN5]A district court has "broad discretion" when determining whether consolidation is appropriate. *Azon v. Long Island Railroad, 2001 U.S. Dist. LEXIS 22154, 00* Civ. 6031 (HB), 2001 WL 1658219 (S.D.N.Y. Dec. 26, 2001) (quoting *Malcolm v. National Gypsum Co., 995 F.2d 346, 350 (2d Cir. 1993)).* When exercising this discretion, a court should weigh the benefits of judicial economy "against the potential for new delays, expense, confusion or prejudice." *Easton*, 1992 WL 448794 at *4.

A motion to consolidate may be denied if the common issue is not a principle one, if it will cause delay in one of the cases, or will lead to confusion or prejudice in the trial of a case. *See* 9 C. Wright & A. Miller, *Federal Practice and Procedure*, § 2382 (Civil 2d. 1995). "Where the evidence in one case is [*5] not relevant to the issues in the other, consolidation would create a likelihood of prejudice by confusing the issues." *Liberty Lincoln Mercury, Inc., 149 F.R.D. at 81.* Finally, a court may deny consolidation when one case is further into the discovery process. *See* 9 C. Wright & A. Miller, *Federal Practice and Procedure*, § 2382 (Civil 2d. 1995); *See Mills v. Beech Aircraft Corp., Inc., 886 F.2d 758, 762 (D.Miss. 1989)* (denying a motion for consolidation where the cases were at different stages of preparedness for trial).

## III. *DISCUSSION*

Plaintiff has failed to meet its burden of proving that consolidation should be granted. The only common issue between the cases before the Court is that of purported discrimination. [HN6]Acknowledging a common issue, however, does not end the Court's inquiry. The Court must consider whether the interest of judicial economy are outweighed by factors such as confusion, prejudice, and delay during the proceedings.

In the instant case, [HN7]Plaintiff alleges that he was passed over on two separate occasions for a promotion. To win on the merits the Plaintiff is required to prove that he is as capable or more [*6] qualified than the relevant applicant pool. *See Ward's Cove Package, Co. v. Antonio, 490 U.S. 642, 651, 104 L. Ed. 2d 733, 109 S. Ct. 2115 (1989)* (holding that in discrimination cases the focus must be on the available pool of qualified applicants at the relevant time). Currently, the Plaintiff has not shown that the applicant pools in either case had any overlap. A consolidated trial would, therefore,

Case 3:10-cv-01435-AWT   Document 46-6   Filed 06/08/12   Page 156 of 177

2002 U.S. Dist. LEXIS 22473, *6; 90 Fair Empl. Prac. Cas. (BNA) 510

needlessly delay both cases and likely confuse a jury.

In the first case, Plaintiff's central contention is derived from the fact that he did not make it to the final tier of candidates from which the selecting official, Paul Bellino, made the decision to promote an employee. There were four persons who made it to this final stage. In the second case, Plaintiff's complaint is grounded in the fact that he did not even make it to the interview process.

From the information before the court, it appears that the two cases are derived from different job opportunity announcements, judged by different criteria within two "significantly" different selection processes, which filtered applications from two separate applicant pools. This will similarly cause delay and confusion.

[*7] In the first case, the ultimate promotion decision was made by Paul Bellino and an interview panel consisting of three employees in the Medical Directorate in Philadelphia. The second case involves a decision made by human resources personnel in a Defense Logistics Agency office in Columbus, Ohio.

Finally, the two cases are at different stages with different claims. The first case has already gone to trial. The sole issue left to decide is the national origin claim for which the Third Circuit ordered a new trial. In the second case issues of race, religion, national origin and age will be determined. Moreover, the discovery deadline is not until January of 2003. These discrepancies weigh against consolidation. Accordingly, Plaintiff's Motion is denied.

An appropriate Order follows.

### ORDER

AND NOW, this 20th day of November, 2002, upon consideration of Plaintiff's Motion for Consolidation (Docket No. 4) and Defendants' Memorandum in Opposition to Plaintiff's Motion to Consolidate (Docket No. 5), IT IS HEREBY ORDERED that Plaintiff's Motion is **DENIED.**

BY THE COURT:

HERBERT J. HUTTON, J.

**<u>Citation #18</u>**
**1994 us dist lexis 17569**

LEXSEE

APPLIED MATERIALS, INC., Plaintiff v. ADVANCED SEMICONDUCTOR
MATERIALS AMERICA, INC., EPSILON TECHNOLOGY INC., doing business
as ASM EPITAXY, and ADVANCED SEMICONDUCTOR MATERIALS
INTERNATIONAL N.V., Defendants

No. C-92-20643 RMW

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF
CALIFORNIA

1994 U.S. Dist. LEXIS 17569; 30 U.S.P.Q.2D (BNA) 1967

April 18, 1994, Decided
April 19, 1994, FILED

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** In patent infringement case, plaintiff moved to dismiss defendant's inequitable conduct claim, and to strike defendant's inequitable conduct defense. In a separate proceeding, plaintiff moved to consolidate the instant case with a patent infringement case transferred from the United States District Court for the District of Arizona.

**OVERVIEW:** Plaintiff brought suit for patent infringement. Defendant argued that plaintiff's failure to disclose a prior art reference in an abandoned application constituted inequitable conduct. Plaintiff moved to dismiss the claim and to strike the inequitable conduct defense, contending there could not be inequitable conduct when the reference was disclosed in a continuing application from which the patent was issued. The court granted plaintiff's motions, holding that because this was not a case of nondisclosure, but a case of delayed disclosure, the materiality of the delay, not the materiality of the prior art, controlled. Because the examiner considered the prior art in the context of the continuation application, there could not be a substantial likelihood that a reasonable examiner would consider the delayed submission important in deciding whether to allow the application to issue as a patent. The court denied plaintiff's motion to consolidate; mere existence of common issues did not mandate consolidation, and the court found that consolidation would have created a likelihood of confusing the jury.

**OUTCOME:** The court granted the motions to dismiss and strike, holding that failure to disclose a prior art reference in an abandoned application was not inequitable conduct, since reference was disclosed in the continuing application from which the patent was issued. The court denied the motion to consolidate because of the likelihood of causing jury confusion.

**CORE TERMS:** patent, inequitable conduct, examiner, prior art, consolidation, consolidate, judicial notice, semiconductor, misrepresentations, materiality, reactor, disclosure, cure, matter of law, citations omitted, continuation, responding, appearing, abandoned, delayed, common question of law, argument of counsel, legal theory, substantial likelihood, failure to disclose, continuing application, case involves, above-captioned, nondisclosure

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Defenses, Demurrers & Objections > Motions to Dismiss*
*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements > Fraud Claims*
[HN1]In ruling on a motion to dismiss, district courts must accept all material allegations of fact alleged in the complaint as true, and resolve all doubts in favor of the plaintiff. However, fraud claims must be pleaded with particularity. Fed. R. Civ. P. 9(b). A complaint may be

dismissed as a matter of law for two reasons: (i) lack of a cognizable legal theory or (ii) the pleading of insufficient facts under a cognizable legal theory.

***Civil Procedure > Pleading & Practice > Defenses, Demurrers & Objections > Motions to Strike > General Overview***
[HN2]A motion to strike is governed by Fed. R. Civ. P. 12(f).

***Civil Procedure > Pleading & Practice > Defenses, Demurrers & Objections > Motions to Strike > General Overview***
[HN3]See Fed. R. Civ. P. 12(f).

***Civil Procedure > Pleading & Practice > Defenses, Demurrers & Objections > Motions to Strike > General Overview***
[HN4]When ruling on a motion to strike a court must view the pleadings in the light most favorable to the non-moving party.

***Evidence > Procedural Considerations > Burdens of Proof > Clear & Convincing Proof***
***Patent Law > Inequitable Conduct > Burdens of Proof***
***Patent Law > Inequitable Conduct > Effect, Materiality & Scienter > Elements***
[HN5]A patent applicant has a duty of candor to the United States Patent Office. The duty of candor extends through the patent's entire prosecution history. If an applicant withholds material information from the Patent Office with the intent to affect the issuance of a patent, the applicant has engaged in inequitable conduct and the patent may be rendered unenforceable. The elements of materiality and intent must be established by clear and convincing evidence. Information is material where there is a substantial likelihood that a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent. 37 C.F.R. § 1.56(a) (1991). To establish inequitable conduct, intent to deceive must be proven.

***Civil Procedure > Pleading & Practice > Defenses, Demurrers & Objections > Failures to State Claims***
***Evidence > Judicial Notice > Adjudicative Facts > Public Records***
[HN6]On a motion to dismiss, a court may take judicial

notice of facts outside the pleadings without converting a Fed. R. Civ. P. 12(b)(6) motion to one for summary judgment.

***Patent Law > Inequitable Conduct > Effect, Materiality & Scienter > General Overview***
***Patent Law > U.S. Patent & Trademark Office Proceedings > Continuation Applications > General Overview***
[HN7]When it is not a case of nondisclosure, but a case of delayed disclosure, the materiality of the delay, not the materiality of the reference, must be assessed.

***Civil Procedure > Pretrial Matters > Consolidation of Actions***
[HN8]See Fed. R. Civ. P. 42(a).

***Civil Procedure > Pretrial Matters > Consolidation of Actions***
[HN9]The district court has broad discretion under this rule to consolidate cases pending in the same district. In determining whether or not to consolidate, a court weighs the interest of judicial convenience against the potential for confusion, prejudice, or delay. This weighing process involves a review of a number of different factors including, but not limited to, whether the causes of action and facts in each action are similar, whether the complexity of the consolidated case will confuse the jury, whether trying the actions separately will involve an unneeded duplication of effort, whether consolidation will delay the trial of one or both of the actions, and whether consolidation would adversely affect the rights of any of the parties.

**JUDGES:**   [*1]   RONALD M. WHYTE, UNITED STATES DISTRICT JUDGE

**OPINION BY:** RONALD M. WHYTE

**OPINION**

ORDER GRANTING APPLIED MATERIALS, INC.'S MOTION TO DISMISS INEQUITABLE CONDUCT CLAIM AND MOTION TO STRIKE INEQUITABLE CONDUCT DEFENSE

Applied Material Inc.'s ("Applied") motion to dismiss Advanced Semiconductor Materials America, Inc. et al.'s ("ASM") inequitable conduct claim and

Case 3:10-cv-01435-AWT   Document 46-6   Filed 06/08/12   Page 160 of 177

1994 U.S. Dist. LEXIS 17569, *1; 30 U.S.P.Q.2D (BNA) 1967

motion to strike ASM's inequitable conduct defense was heard on April 15, 1994. The court has read the moving and responding papers and heard the oral argument of counsel. Good cause appearing therefor, the court grants Applied's motions.

## I. BACKGROUND

On April 18, 1989 Applied filed the parent application of U.S. Patent No. 5,194,401 for a pressure-resistant thermal reactor system for semiconductor processing. On November 15, 1989, Applied filed a divisional application. Applied filed a corresponding European patent application. On April 9, 1991 Applied received a European Search Report that made reference to U.S. Patent No. 3,744,964 ("the Hart patent"). On April 22, 1992 Applied filed a continuation application that disclosed the European Search Report and the Hart Patent in an Information Disclosure Statement. On March 16, 1993, the Examiner [*2] issued the continuation application as a patent without change.

On October 1, 1992, Applied filed suit against Advanced Semiconductor Materials et al. ("ASM") alleging that ASM infringed U.S. Patent No. 4,920,918 ("the '918 patent"). On July 15, 1993, this court, pursuant to the parties' stipulation, granted leave for Applied to amend its complaint to add U.S. Patent No. 5,194,401 ("the '401 patent") issued on March 16, 1993. On January 17, 1994, Applied stipulated to allow ASM to amend its answer and counterclaim to allege that Applied was guilty of inequitable conduct in connection with its alleged withholding of U.S. Patent No. 3,744,964 ("the Hart patent") from the United States Patent Office ("PTO") until after the original patent application was examined and allowed.

On January 21, 1993, Applied moved to dismiss the ASM defendants' inequitable conduct allegations on the grounds that the allegations are insufficient as a matter of law to support an "inequitable conduct" claim.

## II. LEGAL STANDARDS

### A. Motion to Dismiss

[HN1]In ruling on a motion to dismiss, district courts must accept all material allegations of fact alleged in the complaint as true, and resolve all doubts in [*3] favor of the plaintiff. *Blake v. Dierdorff,* 856 F.2d 1365, 1368 (9th Cir. 1988). However, fraud claims must be pleaded with

particularity. Fed. R. Civ. Pro. 9(b). A complaint may be dismissed as a matter of law for two reasons: (i) lack of a cognizable legal theory, or (ii) the pleading of insufficient facts under a cognizable legal theory. *Robertson v. Dean Witter Reynolds, Inc.,* 749 F.2d 530, 533-34 (9th Cir. 1984) (citations omitted.)

### B. Motion to Strike

[HN2]A motion to strike is governed by Rule 12(f) of the Federal Rules of Civil Procedure, which states:

> [HN3]Upon motion made by a party before responding to a pleading or, if no responsive pleading is permitted by these rules, upon motion made by a party within 20 days after the service of the pleading upon the party or upon the court's own initiative at any time, the court may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter.

As with a motion to dismiss, [HN4]when ruling on a motion to strike a court must view the pleadings in the light most favorable to the non-moving party. *California v. United States,* 512 F. Supp. 36, 39 (N.D. Cal. 1981). [*4] This court will review the allegations in the pleadings with these standards in mind.

### C. Inequitable Conduct

[HN5]A patent applicant has a duty of candor to the Patent Office. *LaBounty Mfg., Inc. v. United States Int'l Trade Com.,* 958 F.2d 1066, 1070 (Fed. Cir. 1992). The duty of candor extends through the patent's entire prosecution history. If an applicant withholds material information from the Patent Office with the intent to affect the issuance of a patent, the applicant has engaged in inequitable conduct and the patent may be rendered unenforceable. *FMC Corp. v. Manitowoc Co.,* 835 F.2d 1411, 1415 (Fed. Cir. 1987). The elements of materiality and intent must be established by clear and convincing evidence. *LaBounty Mfg., supra,* 958 F.2d at 1070. "Information is material where there is a substantial likelihood that a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent." 37 C.F.R. [at] 1.56(a) (1991). To establish inequitable conduct, intent to deceive must be proven. *Tol-O-Matic Inc. v. Proma Produkt-Und*

Page 3

Case 3:10-cv-01435-AWT   Document 46-6   Filed 06/08/12   Page 161 of 177

1994 U.S. Dist. LEXIS 17569, *4; 30 U.S.P.Q.2D (BNA) 1967

*Marketing Gesellschaft* [*5] *m.b. H., 945 F.2d 1546, 1553-54 (Fed. Cir. 1991).*

## III. ANALYSIS

### A. Judicial Notice

1

1    ASM did not oppose Applied's Request for Judicial Notice.

[HN6]On a motion to dismiss, a court may take judicial notice of facts outside the pleadings without converting a Rule 12(b)(6) motion to one for summary judgment. *Mack v. South Bay Beer Distributors, Inc., 798 F.2d 1279, 1282 (1986).* In *Mack,* the court stated that a court may take judicial notice of "records and reports of administrative bodies." *Id.* (citation omitted). Therefore, this court will take judicial notice of the United States Patent Office's public records of the proceedings in Patent Application Serial Nos. 436,838 (Request for Judicial Notice, Ex. A) and 873,483 (Request for Judicial Notice, Exh. B) which issued into U.S. Patent No. 5,194,401.

### C. Inequitable Conduct

Applied argues that, as a matter of law, the failure to disclose a prior art reference in an abandoned application cannot [*6] be inequitable conduct when the reference is disclosed in a continuing application from which a patent issued because 1) the delayed submission is not material and 2) the alleged misrepresentations relate to nondisclosure of the prior art and were "cured" with its disclosure. ASM argues that even a cursory examination of the Hart patent reveals its materiality to the '401 patent because the Hart patent discloses what Applied claims as its invention: a semiconductor reactor having a quartz reaction chamber with external strengthening ribs and the European Search Report expressly stated that the Hart patent was "relevant." Applied counters that materiality of the delay, not materiality of the prior art, must be assessed on these facts. Applied argues that, even if the Hart patent were a material reference, the fact that it was not cited in the abandoned application was not material because the Examiner was provided with the Hart reference in the context of a fresh patent application. Therefore, Applied contends, a reasonable examiner simply could not consider the earlier absence of Hart before him or her "important in deciding whether to allow

the application to issue as a patent." [*7] The court agrees. [HN7]Because this is not a case of nondisclosure, but a case of delayed disclosure, the materiality of the delay, not the materiality of the reference, must be assessed. Because the Examiner considered the prior art in the context of the continuation application, there could not be "a substantial likelihood that a reasonable examiner would consider [the delayed submission of the Hart patent] important in deciding whether to allow the application to issue as a patent." 37 C.F.R. [at] 1.56(a) (1991).

The court also rejects ASM's argument that, because of the late submission, the Examiner did not actually read the Hart patent. In *Northern Telecom, Inc. v. Datapoint Corp., 908 F.2d 931, 939 (Fed. Cir. 1990) cert. denied 498 U.S. 920, 112 L. Ed. 2d 250, 111 S. Ct. 296 (1990),* the court states that "it is presumed that public officials do their assigned jobs." *Id. at 939* (citations omitted)). Once the Hart patent was before the patent examiner, he was presumed to have considered it.

ASM also argues that while Applied withheld the Hart patent it made material [*8] misrepresentations to the PTO which were flatly inconsistent with Applied's own concealed knowledge of the Hart patent. ASM contends that because Applied did not comply with the three-part test set forth by the Federal Circuit in *Rohm & Haas Co. v. Crystal Chemical Co., 722 F.2d 1556, 1572 (Fed. Cir. 1983) cert. denied 469 U.S. 851, 83 L. Ed. 2d 107, 105 S. Ct. 172 (1984),* it did not cure the alleged misrepresentations.

In opposition, Applied claims that ASM's cure argument fails because *Rohm & Haas* involved false test results while, in the case at bar, the alleged misrepresentations relate to the prior art. Applied reasons that the *Rohm & Haas* cure requirements are relevant in the former but not in the latter case because in the case of alleged misrepresentations of prior art the Patent Examiner could independently examine the prior art after it was disclosed. Applied points to the Federal Circuit's refusal to find inequitable conduct in *Northern Telecom, Inc. v. Datapoint Corp., 908 F.2d 931, 938-40 (Fed. Cir. 1990)* where the applicant allegedly mischaracterized [*9] the prior art. The court reasoned that "the pertinent information was squarely before the examiner. . . ." *Id. at 938.* Applied attempts to distinguish *Northern Telecom* because the patentee's mischaracterization of an amendment to the patent application was made at a time

Case 3:10-cv-01435-AWT   Document 46-6   Filed 06/08/12   Page 162 of 177

1994 U.S. Dist. LEXIS 17569, *9; 30 U.S.P.Q.2D (BNA) 1967

when the document was before the Examiner rather than at an earlier time. The court disagrees. The distinction is inconsequential because in both cases the Patent Examiner could make an independent examination of the prior art. Once the prior art Hart patent was disclosed, the Patent Examiner was free to reach his own conclusion regarding the disclosure in the reference before him. The court also finds that the *Rohm & Haas* cure procedures are not applicable in the instant case. In *Rohm & Haas* a cure could only be effectuated by supplying the Patent examiner "with accurate facts" concerning the test results and "calling his attention to the untrue or misleading assertions sought to be overcome. . . ." *Rohm & Haas, supra* 722 F.2d at 1572. In the case at bar, disclosure of the prior art "cured" the alleged misrepresentations because the Patent [*10] Examiner could independently assess the veracity of the alleged misstatements by examining the prior art.

Therefore, the court finds that ASM's failure to disclose a prior art Hart reference in an abandoned application cannot be inequitable conduct when the reference was disclosed in a continuing application from which the '401 patent issued.

### IV. ORDER

Accordingly, the court grants Applied's motion to dismiss the inequitable conduct claim and motion to strike the inequitable conduct defense.

DATED: 4/18/94

RONALD M. WHYTE

UNITED STATES DISTRICT JUDGE

ORDER DENYING APPLIED'S MOTION FOR CONSOLIDATION WITHOUT PREJUDICE

The motion to consolidate of Applied Material, Inc. "Applied") was heard on April 8, 1994. In this motion, Applied seeks to consolidate for trial the two above-captioned cases pending before this court. The court has read the moving and responding papers and heard the oral argument of counsel. Good Cause Appearing therefor, the court denies plaintiff's motion to consolidate pursuant to Federal Rules of Civil Procedure, Rule 42(a).

### I. BACKGROUND

On October 1, 1992, Applied filed suit against Advanced Semiconductor Materials et al. ("ASM"). In February 1993, this [*11] court held a case management conference and set an August 15, 1994 jury trial date and a May 1, 1994 discovery cut-off. Applied alleges that ASM's Epsilon One reactor infringes two related Applied patents, U.S. Patent Nos. 4,920,918 ("the '918 Patent") and 5,194,401 ("the '401 Patent"). Both of these patents relate to the design of the quartz tube in a semiconductor reactor.

ASM filed *Advanced Semiconductor Materials, America Inc. et al. v. Applied Materials* on January 11, 1993. On September 15, 1993 Judge McNamee of the Arizona District Court granted Applied Materials' motion to transfer the case to this court. The case involves two separate patents, U.S. Patent No. 4,874,464 ("the '464 patent") relating to a process for operating an epitaxial reactor and U.S. Patent No. 4,798, 165 ("the '165 patent") relating to an apparatus for chemical vapor deposition. The parties have agreed to consolidate the cases for purposes of discovery.

### II. LEGAL STANDARDS

Federal Rule of Civil Procedure 42(a) provides:

[HN8]**Consolidation.** When actions involving a common question of law or fact are pending before the court, it may order a joint hearing or trial of any or all the matters in [*12] issue in the actions; it may order all the actions consolidated; and it may make such orders concerning proceedings therein as may tend to avoid unnecessary costs or delay.

[HN9]"The district court has broad discretion under this rule to consolidate cases pending in the same district." *Investors Research Co. v. U.S. District Court*, 877 F.2d 777 (9th Cir. 1989). In determining whether or not to consolidate, a court weighs the interest of judicial convenience against the potential for confusion, prejudice, or delay. *See Southwest Marine, Inc. v. Triple A Machine Shop, Inc.*, 720 F. Supp. 805, 807 (N.D.Cal. 1989). This weighing process involves a review of a number of different factors including, but not limited to, whether the causes of action and facts in each action are similar, whether the complexity of the consolidated case

Case 3:10-cv-01435-AWT   Document 46-6   Filed 06/08/12   Page 163 of 177

1994 U.S. Dist. LEXIS 17569, *12; 30 U.S.P.Q.2D (BNA) 1967

will confuse the jury, whether trying the actions separately will involve an unneeded duplication of effort, whether consolidation will delay the trial of one or both of the actions, and whether consolidation would adversely affect the rights of any of the parties. *Id.*

### III. ANALYSIS

Applied argues [*13] that the two cases involve common questions of law and facts such as 1) extensive testimony about the structure and development of ASM's Epsilon One reactor; 2) specific aspects of epitaxial chemical vapor deposition; 3) testimony of many of the same witnesses and expert witnesses on the technology and operation of each party's products; 4) common legal issues e.g. infringement, patent validity, and defenses of anticipation, obviousness, violation of Section 112 and inequitable conduct; 5) common prior art; 6) the commercial success of the Epsilon One; and 7) the level of "one of ordinary skill in the art". On the basis of these allegedly common questions, Applied argues that consolidation would be efficient and economical in that the parties will not have to educate two judges and two juries on the concededly highly complex and technical subject matter. In opposition, ASM argues that the factual and legal overlap between the two cases is de minimis. Although the court finds that there are some common issues, "the mere existence of common issues. . . does not mandate consolidation." *Cedar-Sinai Medical Center v. Revlon, Inc.*, 111 F.R.D. 24, 33 (D.Del. 1986). [*14]

ASM contends that granting Applied's motion to consolidate would require the jury to understand three separate technologies, increase the likelihood of juror confusion, lengthen the trial, and invite juror boredom. The court agrees. A patent case involving a single patent is difficult enough for a jury because patent cases are notoriously complex. In the instant case, consolidation would require the same jury to deal with four patents. Consolidating these two cases would require the jury to hear, digest, and keep separate testimony on twice as many patents. The court finds that the likelihood of jury confusion outweighs any efficiency that might be achieved through consolidation.

### IV. ORDER

Good Cause Appearing, the court denies without prejudice Applied's motion to consolidate the above-captioned cases for trial. Upon appropriate request, the court will revisit the issue of consolidation or partial consolidation as proposed by Applied during oral argument at the pretrial conference or by motion made closer to trial.

DATED: 4/18/94

RONALD M. WHYTE

UNITED STATES DISTRICT JUDGE

**<u>Citation #19</u>**
**1989 us dist lexis 8360**

LEXSEE

**BENJAMIN KINBERG, Individually and d/b/a BENJ. KINBERG &
ASSOCIATES, Plaintiff, v. COLORFORMS, Defendant. BENJ. KINBERG &
ASSOCIATES, Petitioner, v. COLORFORMS, Respondent**

**Nos. 89 Civ. 1156 (PKL), 89 Civ. 1292 (PKL)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK**

**1989 U.S. Dist. LEXIS 8360**

**July 21, 1989, Decided**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendant toy
manufacturer filed a motion to consolidate two actions in
plaintiff patentee's action that alleged that the
manufacturer breached the parties' licensing agreement
and infringed upon the patentee's patent. The other action
which the manufacturer sought to consolidate was filed
by the patentee against another toy manufacturer for
infringement of the patent that was the subject of the
licensing agreement.

**OVERVIEW:** The patentee opposed the motion on
grounds that the cases involved different parties and
different products, that the breach of contract case
included a claim not presented in the other action, and
that he would be prejudiced if both defendants were
permitted to combine their resources for the purposes of
litigating against him. The court held that the threshold
requirement that the cases share common issues of law
and fact was met with regard to the question of the
validity of patent. However, the court found that the
common factors were outweighed by the differences
between the cases. The court found that the patentee was
asserting infringement by two different parties on the
basis of different products. Thus, evidence concerning the
design of one of the defendants products would have
been only tenuously related to that involving the other
defendant's product. In addition, the court found that the
contract claim only pertained to one of the defendants.
Thus, the court held that the defendants would have been
required to expend more resources litigating a
consolidated case, as each would have been obligated to

attend to discovery relevant primarily to the other.

**OUTCOME:** The court denied the manufacturer's
motion to consolidate in the patentee's action that alleged
breach of contract and patent infringement.

**CORE TERMS:** patent, consolidation, slate,
luminescent, licensing agreement, consolidated,
infringement, consolidate, discovery, common question
of law, contract claim, distributor, litigating, combining,
toy, producing

**LexisNexis(R) Headnotes**

*Civil Procedure > Pretrial Matters > Consolidation of
Actions*
[HN1]Fed. R. Civ. P. 42(a) provides that when actions
involving a common question of law or fact are pending
before the court, it may order a joint hearing or trial of
any or all of the matters in issue in the actions; it may
order all the actions consolidated; and it may make such
orders concerning proceedings therein as may tend to
avoid unnecessary costs or delay.

*Civil Procedure > Pretrial Matters > Consolidation of
Actions*
[HN2]The determination whether to order consolidation
is within the discretion of the trial court. In exercising
that discretion, courts look to a variety of factors,
including identity of the parties, the existence of common

questions of law and fact, the danger of delaying cases that are approaching trial, and the potential for creating confusion by combining multiple claims. The ultimate goal is to structure the litigation in the manner that is most efficient for both the parties and the court.

**OPINION BY:** [*1]  FRANCIS, IV, Magistrate

**OPINION**

*MEMORANDUM AND ORDER*

*JAMES C. FRANCIS IV, UNITED STATES MAGISTRATE*

*The plaintiff, Benjamin Kinberg, is the owner of a patent for producing a "luminescent slate," used for drawing glowing pictures which can then be erased by lifting up the slate. The defendant, Colorforms, is a toy manufacturer and distributor that had entered into a licensing agreement with Kinberg for the production of luminescent slates. The plaintiff contends that Colorforms has breached this agreement by failing to pay royalties that are due and has infringed the patent by continuing to market luminescent slates after the licensing agreement was terminated. In reply, Colorforms argues that it was Kinberg who first violated the exclusive licensing agreement by failing to prevent Colorforms' competitors from selling the licensed products. Colorforms further contends that it is now legally producing luminescent slates pursuant to a licensing agreement with someone who was awarded a superseding patent.*

*Litigation over these claims began when Colorforms filed an action in New York State Supreme Court on February 10, 1989. Kinberg filed an action in this Court on February 16, 1989 (87 Civ.  [*2]  1156), and then filed a petition to remove the state court action (89 Civ. 1292). Those two actions have since been consolidated by agreement of the parties.*

*Colorforms now moves pursuant to Rule 42 of the Federal Rules of Civil Procedure to consolidate these actions with Kinberg v. Unimax Distribution, Ltd., 89 Civ. 0910 (WK). In Unimax, Kinberg had sued another toy distributor for infringement of the same patent. He opposes the instant motion on grounds that the cases involve different parties and different infringing products, that the instant case includes a contract claim not presented in Unimax, and that he would be prejudiced if*

the defendants were permitted to combine their resources for the purposes of litigating against him.

*Discussion*

[HN1]*Rule 42(a) of the Federal Rules of Civil Procedure states:*

*When actions involving a common question of law or fact are pending before the court, it may order a joint hearing or trial of any or all of the matters in issue in the actions; it may order all the actions consolidated; and it may make such orders concerning proceedings therein as may tend to avoid unnecessary costs or delay.*

[HN2]*The determination whether to order  [*3]  consolidation is within the discretion of the trial court. See Magnavox Co. v. APF Electronics, Inc., 496 F. Supp. 29, 32 (N.D. Ill. 1980).* In exercising that discretion, courts look to a variety of factors, including identity of the parties, the existence of common questions of law and fact, the danger of delaying cases that are approaching trial, and the potential for creating confusion by combining multiple claims. *See, e.g., Hooker Chemicals & Plastics Corp. v. Diamond Shamrock Corp., 96 F.R.D. 46, 48-49 (W.D.N.Y. 1982); Rohm & Haas Co. v. Mobil Oil Corp., 525 F. Supp. 1298, 1309-10 (D. Del. 1981); Magnavox Co. v. APF Electronics, Inc., 496 F. Supp. at 32-33.* The ultimate goal is to structure the litigation in the manner that is most efficient for both the parties and the court. *See Cedars-Sinai Medical Center v. Revlon, Inc., 111 F.R.D. 24, 32 (D. Del. 1986).*

Here, the threshold requirement that the Cases share common issues of law and fact is met: at least the question of the validity of Kinberg's patent is common to both the *Colorforms* and the *Unimax* cases. Such common factors, however, are outweighed by the differences between the cases. Kinberg [*4] is asserting infringement by two different parties on the basis of different products. Thus, evidence concerning the design of Colorforms' current luminescent slate may be only tenuously related to that involving Unimax's product. In addition, Unimax has no interest in the contract claim asserted by Kinberg against Colorforms, since no similar claim has been alleged against Unimax. Thus, although Kinberg himself might benefit slightly from consolidation since he would only have to defend his patent in a single action, the defendants would not realize any savings. On the contrary, Colorforms and Unimax

would likely be forced to expend more resources litigating a consolidated case, since each would be obligated to attend to discovery relevant primarily to the other.

It is true that in some circumstances it may be appropriate to consolidate patent infringement actions against different defendants, as was done in *Magnavox Co. v. APF Electronics, Inc., 496 F. Supp. at 32-33*. However, in that case the *plaintiff* sought consolidation of fourteen separate actions involving the same patent in order not to be subject to duplicative discovery on the same issues. Here, responding to discovery [*5] demands in two cases is a price the plaintiff is willing to pay in order to isolate his claims against each defendant.

Moreover, while judicial efficiency was enhanced by consolidation in *Magnavox*, it would be impeded here. The advantages of trying a single large case rather than fourteen small but similar cases is obvious. By contrast, combining two cases that include significant non-overlapping issues is a greater burden on the court than trying two relatively simple cases. [1]

> 1   The other factors relevant to consolidation have little bearing here. There has been no showing, for example, that consolidation would delay trial or result in confusion for the trier of fact. Nor is the plaintiff's fear of the combined resources of the defendants pertinent, since Kinberg's resources are probably far less even than those of either defendant alone.

Accordingly, Colorforms' motion to consolidate these cases with the *Unimax* case is denied.

SO ORDERED.

Dated: New York, New York

July 21, 1989

**<u>Citation #20</u>**
**1996 us dist lexis 20253**

LEXSEE

**VICTOR M. ALMONTE, Plaintiff, -vs- THE COCA-COLA BOTTLING CO. OF
NEW YORK, INC.; ROBERT MARGUIS; AND LEONARD MARLEY,
Defendants. THE COCA-COLA BOTTLING CO. OF NEW YORK, INC., Plaintiff,
-vs- LOCAL UNION 1035, INTERNATIONAL BROTHERHOOD OF
TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF
AMERICA, Defendant.**

**Civil No. 3:95cv01458 (PCD), Civil No. 3:96cv01917 (AHN)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF CONNECTICUT**

**1996 U.S. Dist. LEXIS 20253**

**December 11, 1996, Decided
December 12, 1996, FILED**

**DISPOSITION:** [*1] Union Local's Motion to
Consolidate (Doc. # 74) in Civil Action No. 3:95cv1458
DENIED. Endorsement granting Union Local's Motion to
Consolidate (Doc. # 7) in Civil Action No. 3:96cv1917
VACATED.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff employer filed
suit against defendant union and sought to vacate a labor
arbitration award. The matter was before the court on the
union's motion to consolidate the employer's suit with a
pending racial discrimination action filed by the former
employee against the employer. The employer opposed
the motion to consolidate.

**OVERVIEW:** The union filed a motion to consolidate
the employer's action seeking to vacate a labor arbitration
award with the racial discrimination suit that had been
filed against the employer by the former employee. The
court denied the motion to consolidate. In reaching its
conclusion, the court found that the only commonality
between the two actions was that both disputes arose out
of the former employee's termination by the employer.
The court further found that consolidation of the cases
would not serve judicial economy and could result in
prejudice. According to the court, the consolidation of the
two actions would delay the racial discrimination action
to the prejudice of the employer, The fact that the cases
were at such widely divergent stages defeated judicial

economy.

**OUTCOME:** The court denied the union's motion to
consolidate.

**CORE TERMS:** consolidation, consolidate, discovery,
collective bargaining agreement, legal issues, arbitration,
arbitrator, citation omitted, consolidated, termination,
vacate, common question of law, racial discrimination,
causes of action, judicial economy, consolidating,
commonality, terminated, supervisors, arbitrator
exceeded, issue of fact, contractual, fight

**LexisNexis(R) Headnotes**

*Civil Procedure > Pretrial Matters > Consolidation of
Actions*
[HN1]Fed. R. Civ. P. 42(a) provides that when actions
involving a common question of law or fact are pending
before the court, it may order a joint hearing or trial of
any or all the matters in issue in the actions. Trial courts
have broad discretion to determine whether consolidation
is appropriate. However, the discretion to consolidate is
not unfettered.

*Civil Procedure > Pretrial Matters > Consolidation of
Actions*

[HN2]In the exercise of its jurisdiction, courts must balance whether the specific risks of prejudice and possible confusion are overborne by the risk of inconsistent adjudications of common factual and legal issues, the burden on parties, witnesses, and available judicial resources posed by multiple lawsuits, the length of time required to conclude multiple suits as against a single one, and the relative expense to all concerned of the single-trial, multiple-trial alternatives.

*Civil Procedure > Pretrial Matters > Consolidation of Actions*
[HN3]Considerations of convenience and economy must yield to a paramount concern for a fair and impartial trial. Accordingly, despite possible common questions of law or fact, where confusion and prejudice will result, it is inappropriate for a court to order consolidation.

*Civil Procedure > Pretrial Matters > Consolidation of Actions*
[HN4]The moving party bears the burden of showing the commonality of factual and legal issues in different actions. In considering whether to consolidate, courts must examine the special underlying facts with close attention before ordering a consolidation.

**COUNSEL:** Attorney for Plaintiff (3:95CV1458 (PCD)): Burton S. Rosenberg, Esq., Town Attorney's Office, Hamden, CT.

Attorneys for Defendant, Coca-Cola Bottling Co. of New York, Inc., Robert Marquis, Leonard Marley, and Robert Scully (3:95CV1458 (PCD)): Jon S. Berk, Esq., Peter C. Schwartz, Esq., Gordon, Muir & Foley, Hartford, CT. Henry A. Platt, Esq., Ira Michael Shepard, Esq., Schmeltzer, Aptaker & Shepard, Washington, D.C.

Attorney for Movants, International Brotherhood of Teamsters, Local Union No. 1035 and Chauffeurs, Warehousemen & Helpers of America (3:95CV1458 (PCD)): Burton S. Rosenberg, Esq., Town Attorney's Office, Hamden, CT.

**JUDGES:** Peter C. Dorsey, Chief United States District Judge

**OPINION BY:** Peter C. Dorsey

**OPINION**

*RULING ON MOTION TO CONSOLIDATE*

Defendant Local Union 1035, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America ("Local Union") moves to consolidate the following actions currently pending in the District of Connecticut: (1) [*2] Victor Almonte v. The Coca-Cola Bottling Company of New York, Inc.; Robert Marguis; and Leonard Marley, 1996 U.S. Dist. LEXIS 20253, Civil Action No. 3:95cv01458 (PCD) ("Action 1"); and (2) The Coca-Cola Bottling Company of New York, Inc. v. Local Union 1035, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, 1996 U.S. Dist. LEXIS 20253, Civil Action No. 3:96cv1917 (AHN) ("Action 2"). [1] The Coca-Cola Bottling Company of New York, Inc. ("Coca-Cola") opposes the motion. For the following reasons, the motion to consolidate is DENIED.

> 1   Local Union filed a motion to consolidate in both actions. On December 2, 1996, the motion in Civil Action No. 3:96cv1917 was granted.

**I. BACKGROUND**

Victor Almonte is a former employee of Coca-Cola who was terminated. On July 24, 1995, Mr. Almonte commenced Action 1 for alleged racial discrimination by Coca-Cola and Mr. Almonte's supervisors, Robert Marquis and Leonard Marley. Mr. Almonte alleges eight causes of action, including various tort claims and claims for violations [*3] of 42 U.S.C. § 1981 and C.G.S. § 31-51q, relating to the alleged discrimination by Coca-Cola. Mr. Almonte seeks monetary damages as well as equitable relief.

Action 2 was commenced on September 18, 1996, by Coca-Cola. In that action, Coca-Cola seeks to vacate a labor arbitration award. Local Union and Coca-Cola are parties to a collective bargaining agreement. The agreement sets forth the circumstances under which Coca-Cola may discharge an employee. Coca-Cola alleges that Mr. Almonte was involved in a fight on company property and, thereafter, submitted a false statement to the company regarding the incident. Coca-Cola alleges that Mr. Almonte was terminated for fighting, dishonesty and falsification of company records, as provided for in the agreement.

Pursuant to the collective bargaining agreement, Local Union challenged Mr. Almonte's termination through arbitration as being without "just cause." The arbitrator found that Coca-Cola did not have "just cause" to terminate Mr. Almonte and ordered that he be reinstated. The arbitrator also found that Mr. Almonte was dishonest in reporting the events surrounding the fight. The collective bargaining agreement provides that the arbitrator [*4] has "no power to add to, modify or delete any provision of this agreement . . . ." In Action 2, Coca-Cola alleges that the arbitrator exceeded his contractual authority under the collective bargaining agreement when it ordered Coca-Cola to reinstate Mr. Almonte notwithstanding the express language of the agreement giving Coca-Cola the absolute right to discharge an employee for the facts found by the arbitrator.

### I. DISCUSSION

[HN1]Fed. R. Civ. P. 42(a) provides: "When actions involving a common question of law or fact are pending before the court, it may order a joint hearing or trial of any or all the matters in issue in the actions . . . ." Trial courts have "broad discretion to determine whether consolidation is appropriate." Johnson v. Celotex Corp., 899 F.2d 1281, 1285 (2d Cir. 1990). "However, the discretion to consolidate is not unfettered." Id. (citation omitted). [HN2]In the exercise of its jurisdiction, courts must balance:

'Whether the specific risks of prejudice and possible confusion [are] overborne by the risk of inconsistent adjudications of common factual and legal issues, the burden on parties, witnesses, and available judicial resources [*5] posed by multiple lawsuits, the length of time required to conclude multiple suits as against a single one, and the relative expense to all concerned of the single-trial, multiple-trial alternatives.'

Id. (citation omitted). "[HN3]Considerations of convenience and economy must yield to a paramount concern for a fair and impartial trial." Johnson, 899 F.2d at 1285 (citation omitted). Accordingly, despite possible common questions of law or fact, "where confusion and prejudice will result, it is inappropriate for a court to order consolidation." Tucker v. Arthur Andersen & Co.

73 F.R.D. 316, 317 (S.D.N.Y. 1976).

Local Union, as [HN4]the moving party "bears the burden of showing the commonality of factual and legal issues in different actions." In re Repetitive Stress Injury Litigation, 11 F.3d 368, 373 (2d Cir. 1993) (citation omitted). In considering whether to consolidate, courts "must examine 'the special underlying facts' with 'close attention' before ordering a consolidation." Johnson, 899 F.2d at 1285. Local Union failed to set forth sufficient facts to support consolidation.

The only commonality between the cases that Local Union seeks to have consolidated [*6] is that both disputes arise out of Mr. Almonte's termination by Coca-Cola. There is no common issue of fact. In Action 1, Mr. Almonte brought eight causes of action against Coca-Cola setting forth 60 paragraphs of factual allegations of racial discrimination. In Action 2, there is no issue of fact -- Coca-Cola is seeking to vacate the arbitration award on a legal issue. Coca-Cola is not seeking a review of the factual findings made in the arbitration. There are also no common issues of law. The legal issue in Action 1 is whether Coca-Cola's alleged discriminatory treatment and ultimate termination of Mr. Almonte violated the law. The legal issue in Action 2 is whether the arbitrator exceeded his contractual authority under a collective bargaining agreement. Indeed, Mr. Almonte and supervisors Marley and Marquis are not parties in the suit to vacate, and Union Labor is not a party in the discrimination suit.

In addition, consolidation in this case would not service judicial economy and may prejudice the parties. The cases were filed more than one year apart. Discovery in Action 1 is completed and there is a pending motion for summary judgment. After resolution of that motion, the case [*7] is ready for trial. Action 2 was just filed. "Proper judicial administration does not recommend consolidation where two actions are at such widely separate stages of preparation." Schacht v. Javits, 53 F.R.D. 321, 325 (S.D.N.Y. 1971). Accordingly, consolidation is improper when the cases sought to be consolidated are at different stages in the proceedings. Tucker, 73 F.3d at 317-18. Accord: Henderson v. National Railroad Passenger Corp., 118 F.R.D. 440, 441 (N.D. Ill. 1987) (consolidation denied when "action [sought to be consolidated] has just been filed while the case pending before this court has almost completed discovery"). "Consolidation with a recently filed case in

which discovery is just beginning will obviously entail further delay." Henderson, 118 F.R.D. at 441.

To consolidate these two actions will surely delay Action 1 to the prejudice of Coca-Cola. The fact that the cases are at such widely divergent stages also defeats judicial economy. There is no benefit to consolidating discovery because discovery in Action 1 is completed. There is also no benefit to consolidating the trial because Action 1 is to be tried to a jury and Action 2 is to be tried [*8] to the Court. Tucker, 73 F.R.D. at 318 (consolidation would not save time and would result in confusion where one case was to be tried to a jury and one case was to be tried to the court).

***III. CONCLUSION***

For the foregoing reasons, Union Local's Motion to Consolidate (Doc. # 74) in Civil Action No. 3:95cv1458 is DENIED. The endorsement granting Union Local's Motion to Consolidate (Doc. # 7) in Civil Action No. 3:96cv1917 is hereby VACATED.

SO ORDERED.

Dated at New Haven, Connecticut, December 11, 1996.

Peter C. Dorsey

Chief United States District Judge

**<u>Citation #21</u>**
**2009 us dist lexis 117468**

LEXSEE

**KONAMI DIGITAL ENTERTAINMENT CO., LTD., et al., Plaintiffs, v.
HARMONIX MUSIC SYSTEMS, INC., et al., Defendants.**

**CIVIL ACTION No. 6:08cv286-JDL**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF
TEXAS, TYLER DIVISION**

**2009 U.S. Dist. LEXIS 117468**

**December 14, 2009, Decided
December 14, 2009, Filed**

**CORE TERMS:** inequitable conduct, prior art, inventor, withheld, prosecuting attorneys, patents-in-suit, undisclosed, requisite, disclose, examiner, patent, candor, infer, pleading requirement, material misrepresentation, intent to deceive, reasonable inference, reasonable basis, identification, patentability, collectively, invalidating, additionally, prosecuting, omission, withhold, charts

**COUNSEL:** [*1] For Richard Egan, O'Keefe, Egan & Peterman LLP, Austin, Tx, Technical Advisor: Richard D Egan, O'Keefe, Egan & Peterman LLP, Austin, TX.

For Konami Digital Entertainment Co, Ltd., Plaintiff: Otis W Carroll, Jr, LEAD ATTORNEY, Deborah J Race, Ireland Carroll & Kelley, Tyler, TX; Ronald Scott Lemieux, LEAD ATTORNEY, Michael N Edelman, Qin Shi, Shanee Y W Nelson, PRO HAC VICE, Vid R Bhakar, Paul Hastings Janofsky & Walker LLP (Palo Alto, CA), Palo Alto, CA; Brock S Weber, Robert M Masters, PRO HAC VICE, Paul Hastings Janofsky & Walker - Washington, Washington, DC; Ericka Jacobs Schulz, S Christian Platt, PRO HAC VICE, Paul Hastings Janofsky & Walker - San Diego, San Diego, CA; Keren Hu, PRO HAC VICE, Paul, Hastings, Janofsky & Walker, LLP, Palo Alto, CA; Maxwell A Fox, PRO HAC VICE, Paul Hastings Janofsky & Walker - Japan, Minato-Ku Tokyo Japan.

For Konami Digital Entertainment, Inc., Plaintiff: Otis W Carroll, Jr, LEAD ATTORNEY, Deborah J Race, Ireland Carroll & Kelley, Tyler, TX; Ronald Scott Lemieux, LEAD ATTORNEY, Michael N Edelman, Qin Shi, Shanee Y W Nelson, PRO HAC VICE, Vid R Bhakar, Paul Hastings Janofsky & Walker LLP (Palo Alto, CA),

Palo Alto, CA; Brock S Weber, Robert M Masters, [*2] PRO HAC VICE, Paul Hastings Janofsky & Walker - Washington, Washington, DC; Keren Hu, PRO HAC VICE, Paul, Hastings, Janofsky & Walker, LLP, Palo Alto, CA; Maxwell A Fox, PRO HAC VICE, Paul Hastings Janofsky & Walker - Japan, Minato-Ku Tokyo Japan; S Christian Platt, Paul Hastings Janofsky & Walker - San Diego, San Diego, CA.

For Harmonix Music Systems, Inc., Viacom International Inc., Viacom, Inc., MTV Networks, Co., Defendants: Josh A Krevitt, LEAD ATTORNEY, Richard M Koehl, Gibson Dunn & Crutcher - NYC, New York, NY; Mark Nolan Reiter, LEAD ATTORNEY, Gibson Dunn & Crutcher, Dallas, TX; Jason C Lo, Jennifer J Rho, Gibson Dunn Crutcher LLP-Los Angeles, Los Angeles, CA; Michael E Jones, Patrick Colbert Clutter, IV, Potter Minton PC, Tyler, TX; Robert Anthony Vincent, Gibson Dunn & Crutcher - Dallas, Dallas, TX; Susan Ashlie Beringer, Gibson Dunn & Crutcher LLP - Palo Alto, Palo Alto, CA.

For Harmonix Music Systems, Inc., Viacom, Inc., MTV Networks, Co., Viacom International Inc., Counter Claimants: Josh A Krevitt, LEAD ATTORNEY, Richard M Koehl, Gibson Dunn & Crutcher - NYC, New York, NY; Mark Nolan Reiter, LEAD ATTORNEY, Gibson Dunn & Crutcher, Dallas, TX; Jason C Lo, Jennifer J Rho, [*3] Gibson Dunn Crutcher LLP-Los Angeles, Los Angeles, CA; Michael E Jones, Potter Minton PC, Tyler, TX; Susan Ashlie Beringer, Gibson Dunn & Crutcher LLP - Palo Alto, Palo Alto, CA.

For Konami Digital Entertainment Co, Ltd., Konami

Digital Entertainment, Inc., Counter Defendants: Otis W Carroll, Jr, LEAD ATTORNEY, Deborah J Race, Ireland Carroll & Kelley, Tyler, TX; Ronald Scott Lemieux, LEAD ATTORNEY, Michael N Edelman, Qin Shi, Shanee Y W Nelson, PRO HAC VICE, Vid R Bhakar, Paul Hastings Janofsky & Walker LLP (Palo Alto, CA), Palo Alto, CA; Brock S Weber, Robert M Masters, PRO HAC VICE, Paul Hastings Janofsky & Walker - Washington, Washington, DC; Keren Hu, PRO HAC VICE, Paul, Hastings, Janofsky & Walker, LLP, Palo Alto, CA; Maxwell A Fox, PRO HAC VICE, Paul Hastings Janofsky & Walker - Japan, Minato-Ku Tokyo Japan; S Christian Platt, Paul Hastings Janofsky & Walker - San Diego, San Diego, CA.

**JUDGES:** JOHN D. LOVE, UNITED STATES MAGISTRATE JUDGE.

**OPINION BY:** JOHN D. LOVE

**OPINION**

### MEMORANDUM OPINION AND ORDER

Before the Court is Plaintiffs' Motion to Dismiss and/or Strike Allegations of Inequitable Conduct (Doc. No. 127) ("Motion"). Defendants Harmonix Music Systems Inc., MTV Networks, Viacom International Inc., and [*4] Viacom Inc. (collectively, "Viacom") oppose the Motion to Strike and/or Dismiss with a Response (Doc. No. 146) ("Response") and a Sur-reply (Doc. No. 162). Plaintiffs Konami Digital Entertainment Co., Ltd. and Konami Digital Entertainment, Inc. (collectively, "Konami") filed a Reply (Doc. No. 154) in support of the Motion. Having considered the parties' submissions and the arguments contained therein, the Court **DENIES** Konami's Motion to Strike Allegations of Inequitable Conduct under Rules 9(b), 12(b)(6), and 12(f) of the Federal Rules of Civil Procedure.

Plaintiffs' Motion largely focuses on the Federal Circuit's recent holding in *Exergen Corp. v. Wal-Mart Store,* and argues that Viacom's inequitable conduct allegations lack the specificity required to satisfy the strict pleading standard of Rule 9(b) of the Federal Rules of Civil Procedure. MOTION at 1 (discussing *Exergen Corp. v. Wal-Mart Stores, Inc., 575 F.3d 1312 (Fed. Cir. 2009))*. Konami emphasizes that the pleading requirement of Rule 9(b) warrants the identification of the "who, what, when, where, and how of the material

misrepresentation or omission committed before the PTO." *Id.* at 2; *Exergen, 575 F.3d at 1327* (quoting *DiLeo v. Ernst & Young, 901 F.2d 624, 627 (7th Cir. 1990))*. [*5] According to Konami, the Viacom allegations are insufficient to satisfy this strict pleading requirement because (1) Viacom failed to tie its accusations to specific individuals by broadly accusing all agents and attorneys involved in prosecuting the disputed patents, and (2) the facts alleged do not establish that the accused prosecuting agents and attorneys withheld material prior art references or had the requisite intent to deceive the PTO. *See generally* MOTION at 4-8.

Viacom responds by emphasizing that the language contained in its pleadings provides sufficient detail under *Exergen* and Rule 9(b) to support a reasonable inference of inequitable conduct. *See* RESPONSE at 1-3; *Exergen, 575 F.3d at 1329* (stating that "knowledge" and "intent" may be averred generally so long as the pleadings allege sufficient facts to reasonably infer the requisite state of mind). Viacom specifically references facts in its Amended Answer that it asserts not only provided Konami with information to identify the relevant individuals accused of knowing about the contested prior art references, but also established reasonable grounds to infer that Konami's inventors and prosecuting attorneys understood [*6] that these references were material to the patents-in-suit. RESPONSE at 2 (maintaining that Viacom's inequitable conduct defenses "detailed allegations of knowledge coupled with the detailed allegations of materiality support more than a reasonable inference that the individuals identified intended to withhold this invalidating prior art from the PTO").

After reviewing the Amended Answer and accompanying exhibits that disclose Viacom's inequitable defense pleadings, the Court finds that Viacom has sufficiently provided the factual details required by *Exergen* to plead inequitable conduct in a patent case. *Exergen* clearly articulated that Rule 9(b) warrants the identification of the "who, what, when, where, and how of the material misrepresentation or omission committed before the PTO. The Federal Circuit teaches that these allegations need not be a "smoking gun," but rather sufficient grounds to infer the requisite knowledge and intent. Applying this standard to Viacom's pleadings, it is apparent that Viacom provides facts that establish a reasonable basis to allege that individuals employed by or retained by Konami had knowledge of the prior art references at issue, and that there was [*7] potentially

intent to withhold these references from the PTO. (Doc. No. 97 at 8-36) ("Amended Answer").

Reading the pleadings to identify the "who" in Viacom's allegations, the Court finds that Viacom identifies specific individuals that it accuses of withholding material prior art and violating a duty of candor to the PTO. AMENDED ANSWER at 8, 19, 24. As required by Rule 9(b), Viacom names the patent prosecution attorneys and inventors against whom it intends to bring charges of inequitable conduct. [1] The Court is similarly persuaded that Viacom has met the "what" and "where" requirements with pleadings that identify charts of potentially invalidating Konami prior art games--on a claim-by-claim and limitation-by-limitation basis. AMENDED ANSWER, EXH. B--J. Additionally, Viacom pleads the "how" required under *Exergen* by compiling analysis that incorporates Examiner statements to support its theories. These statements suggest that the disclosed Konami prior art may not be cumulative of all of the information on record, and therefore, gives Viacom a reasonable basis on which to allege undisclosed prior art references. *See, e.g.,* AMENDED ANSWER at 10 (P 39), 22 (P 82); *see generally* AMENDED [*8] ANSWER, EXH. B--J.

> 1   Viacom names at least seven individuals that participated in prosecution of the patents-in-suit. Among those named are: Mr. Frank Jordan (prosecuting attorney), Mr. C. Bruce Hamburg (prosecuting attorney), Takahiro Omori ('923 inventor), Tadasu Kitae ('067 inventor), Naonobu Kaneiso ('067 inventor), Toru Takeda ('067 inventor), and Yasushi Kawasaki ('822 inventor). *See* RESPONSE at 2, SURREPLY at 1; AMENDED ANSWER at 8, 19, 24.

The Court additionally finds the facts presented here are distinguishable from the facts considered in *Exergen.* For example, in *Exergen,* the defendant did not identify a single specific individual accused of inequitable conduct, nor any facts to show that there was knowledge and intent to deceive during the prosecution process. *Exergen, 575 F.3d at 1329.* In the Defendants' Amended Answer, however, Viacom provides a consistent set of allegations

that disclose both its theory of inequitable conduct and the individuals it alleges have violated their duty of candor to the PTO. Similarly, in *Exergen,* the pleading failed to establish that the relevant claim limitations were present in the withheld prior art references. *See id. at 1329.* Viacom's pleadings, [*9] by contrast, provide analysis of specific claim limitations in the patents-in-suit as they relate to the undisclosed references. *See* SURREPLY at 1 (citing AMENDED ANSWER, EXH. B (P 38), EXH. C (P 54), EXH. D (P 55), EXH. E (P 66), EXH. F (P 80), EXH. G (P 97), EXH. H (P 118), EXH. I (P 127), and EXH. J (P 136)). Furthermore, while the *Exergen* pleading generally avowed that the withheld references were "material," Viacom's Amended Answer more particularly points out why a reasonable examiner would have considered the withheld reference important to the patentability of a claim. SURREPLY at 1-2 (citing to relevant portions of the claim charts provided in the Amended Answer that detail the claim limitations present in the undisclosed references); *see also Exergen, 575 F.3d at 1329* (quoting *Regents of Univ. Of Cal. v. Eli Lilly & Co., 119 F.3d 1559, 1570 (Fed. Cir. 1997)* ("Information is material if a reasonable examiner would have considered it important to the patentability of a claim.")). In sum, based on a comparison between the "particularity" requirements in the *Exergen* allegations, and those in the instant case, the Court cannot conclude that Defendants' allegations warrant exclusion [*10] under the Federal Rules.

The Court finds that Viacom provides a consistent set of allegations that disclose both its theory of inequitable conduct and the individuals it alleges have violated their duty of candor to the PTO. Accordingly, Konami's Motion is **DENIED.**

**So ORDERED and SIGNED this 14th day of December, 2009.**

/s/ John D. Love

JOHN D. LOVE

UNITED STATES MAGISTRATE JUDGE

# End Of LexisNexis® Get & Print Report

**Session Name:**      **GP030608**
**Date:**              **June 08, 2012**
**Client:**            **4286600-116**